Natasha Prinzing Jones
(MT Bar No. 5226)
Matthew B. Hayhurst
(MT Bar No. 4979)
BOONE KARLBERG P.C.
201 West Main St., Suite 300
P.O. Box 9199
Missoula, MT 59807
Telephone: (406) 543-6646
Facsimile:  (406) 549-6804
npjones@boonekarlberg.com
mhayhurst@boonekarlberg.com

Ambika Kumar *(PHV pending)*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 330
Seattle, WA 98104-1610
Telephone: (206) 622-3150
Facsimile:  (206) 757-7700
ambikakumar@dwt.com

Tim Cunningham *(PHV pending)*
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 241-2300
Facsimile:  (503) 778-5299
timcunningham@dwt.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| SAMANTHA ALARIO, HEATHER DIROCCO, CARLY ANN GODDARD, ALICE HELD, and DALE STOUT,<br><br>Plaintiffs,<br><br>v.<br><br>AUSTIN KNUDSEN, in his official capacity as Attorney General of the State of Montana,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## I.    PRELIMINARY STATEMENT

1.     Plaintiffs, creators and viewers of content on TikTok, bring this lawsuit to challenge An Act Banning TikTok in Montana (SB 419).  The Act attempts to exercise powers over national security that Montana does not have and to ban speech Montana may not suppress.  By shuttering an entire forum for communication that Defendant Montana Attorney General Austin Knudsen himself admitted is one of "the best way[s] ... to get your free speech out there,"[1] the law creates a prior restraint on expression that violates the First Amendment, depriving Montanans of access to a forum that for many is a "principal source[] for knowing current events" and "otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 99 (2017).

2.     Montana's claimed interests in SB 419 are not legitimate and do not support a blanket ban on TikTok.  Montana has no authority to enact laws advancing what it believes should be the United States' foreign policy or its national security interests, nor may Montana ban an entire forum for communication based on its perceptions that some speech shared through that forum, though protected by the First Amendment, is dangerous.  Montana can no more ban its residents from viewing or posting to TikTok than it could ban the *Wall Street Journal* because of

---

[1] Ex. A (Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419) at 17.

who owns it or the ideas it publishes.  Even if Montana could regulate *any* of the speech that users share through TikTok, SB 419 wields a sledgehammer when the First Amendment requires a scalpel.

3.     SB 419 is unconstitutional and preempted by federal law.  The Act violates the First Amendment and the Due Process Clause of the Fourteenth Amendment, as well as the Foreign Affairs and Commerce Clauses of the United States Constitution.  The Act is also preempted by the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701 *et seq.*, and by Section 721 of the Defense Production Act (Section 721), 50 U.S.C. § 4565, which authorize the President and the Committee on Foreign Investment in the United States (CFIUS)— not individual states—to investigate and if necessary mitigate national security risks arising from foreign economic actors.

4.     Plaintiffs create, publish, view, interact with, and share videos on TikTok.  By virtue of TikTok's editorial processes and distribution mechanisms that enable even little-known creators to develop massive followings, Plaintiffs have amassed significant audiences who tune in by the thousands to stream and engage with their content.  Plaintiffs bring this action to preserve their rights to publish, view, and share content through TikTok, to protect access to their TikTok followers, and to avert the irreparable harm they will suffer if SB 419 takes effect.

## II.   PARTIES

5.     Plaintiff Samantha Alario owns a small business that designs and sells sustainable swimwear.  She lives in Missoula with her two young children.  Ms. Alario uses TikTok to promote her company and engage with customers and has gained a substantial following that has taken her business to new heights.  Ms. Alario also enjoys using TikTok for personal entertainment and education.

6.     Plaintiff Heather DiRocco is a former sergeant in the U.S. Marine Corps.  She lives with her husband and three children in Bozeman, Montana.  Ms. DiRocco creates and shares content on TikTok, and her account has more than 200,000 followers.  She uses TikTok to connect with other veterans and to create content on topics including comedy, makeup, and mental health.  Ms. DiRocco's TikTok account has become so popular that it generates a substantial portion of her income.

7.     Plaintiff Carly Ann Goddard lives in Custer, Montana, with her young child and her husband, who is a rancher.  Ms. Goddard creates and shares content on TikTok regarding life on a ranch, parenting, recipes, home décor, and style.  She also uses TikTok to connect with other mothers and make friends.  Her account, which has more than 95,000 followers, has allowed her to roughly triple her family's household income.

8.     Plaintiff Alice Held is a student in Missoula, Montana, studying applied

human physiology with a specialty in exercise metabolism.  She uses TikTok to share content about her outdoor adventures such as mountain climbing, biking, and camping.  Ms. Held has more than 215,000 followers on TikTok.

9.     Plaintiff Dale Stout lives in Missoula, Montana.  Mr. Stout creates and shares humorous videos on TikTok.  Mr. Stout also uses TikTok to make friends, connect with a community, and learn. Mr. Stout, whose account has more than 44,000 followers, also earns revenue from the content he posts to TikTok.

10.     Defendant Austin Knudsen is the Montana Attorney General and is charged with enforcement of SB 419.  Attorney General Knudsen testified in support of SB 419.  *See* **Exhibit A** (transcript of hearing).

### III.   JURISDICTION

11.     This action arises under the United States Constitution, particularly the Commerce Clause, art. I, § 8, cl. 3, and Supremacy Clause, art. VI, and the First and Fourteenth Amendments.  It also arises under the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988, IEEPA, 50 U.S.C. §§ 1701 *et seq*., and Section 721, 50 U.S.C. § 4564.

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331, 1343(a), and 1367(a) because Plaintiffs' claims either arise under federal law or share a common nucleus of operative facts with federal claims.

13.     This Court has authority under the Declaratory Judgment Act, 28

U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.

## IV.   VENUE

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District.

15.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) and Mont. Code Ann. § 25-2-125 because Plaintiffs create, publish, share, and view content through TikTok in this District, and thus the injuries giving rise to this action have been and will continue to be suffered by Plaintiffs in this District.

## V.   DIVISIONAL VENUE

16.     Divisional venue in the Missoula Division is proper under Local Civil Rules 1.2(c) and 3.2(b), and Mont. Code. Ann. §§ 25-2-125, 25-2-126(a), and 25-2-118, because three of five Plaintiffs reside in and have suffered and will continue to suffer constitutional injuries in counties within the Missoula Division.

## VI.   FACTUAL ALLEGATIONS

**A.    The TikTok Forum**

17.     TikTok is a short-form video-sharing platform that allows users to create, share, watch, and interact with videos through their smartphones and other

devices. TikTok's mission is to inspire creativity and bring joy.[2]

18.     More than one billion people use TikTok around the world each month.[3]  More than 150 million Americans use the TikTok app on a monthly basis.[4] TikTok was the top downloaded app in the United States in 2021 and 2022 and has become "central to American culture and to livelihoods of influencers and business owners."[5]  Many have found that the app "has fundamentally changed the nature of modern communication with its aesthetics, practices, storytelling, and information-sharing."[6]

19.     TikTok allows users to create and upload videos ranging from 15 seconds to 10 minutes in length.  Users who create and share videos are called "creators," and the term "users" embraces both content creators and consumers. TikTok offers creators a palette of tools to amplify their expression, such as sounds, filters, and special effects. Creators control the content of their videos, including which features to pair with the content of their self-directed videos, such as the sound.  TikTok users can also comment on, like, and share creators' videos.  The

---

[2] TikTok, *Our Mission*, https://www.tiktok.com/about?lang=en.

[3] TikTok, *Thanks a Billion* (Sept. 27, 2021), https://newsroom.tiktok.com/en-us/1-billion-people-on-tiktok.

[4] TikTok, *Celebrating our thriving community of 150 million Americans* (Mar. 21, 2023, https://newsroom.tiktok.com/en-us/150-m-us-users.

[5] Catherine Thorbecke, *TikTok might be too big to ban, no matter what lawmakers say*, CNN Business (Dec. 23, 2022), https://www.cnn.com/2022/12/16/tech/tiktok-ban-users/index.html.

[6] Jessica Maddox, *Banning TikTok Hurts Higher Education*, Wired (Jan. 5, 2023), https://www.wired.com/story/state-tiktok-ban-higher-education/.

comment feature allows users to leave their impressions of or reactions to a TikTok video and facilitates dialogue between users.  Not all of TikTok's features are available to younger users.

20.    TikTok attracts creators seeking a global audience.  Creators use TikTok because of its powerful "organic reach," which allows them to get their content to large numbers of viewers beyond their current followers without paid promotion.[7]  Creators attribute this reach to the fact that TikTok is designed to inspire users to explore new content and creators with minimal effort.  TikTok offers a "For You" page, which opens to a stream of videos that is curated by TikTok's recommendation system based on users' specific interests.  Because of this system, "learning users' interests and preferences in real time as they interact with content, it's not unusual for videos created by everyday people to suddenly get millions of views ....  This has created a new equation for fame, ... where a single viral video can rocket someone into the spotlight overnight."[8]

21.    Although TikTok is sometimes compared to other platforms that permit users to create and share content, TikTok differs in important ways.  TikTok hosts videos and does not have a forum for photos.  TikTok also does not host written

---

[7] Alexandra Garfinkle, *TikTok: Are influencers panicking about bans? We asked three to weigh in*, Yahoo! Finance (Jan. 19, 2023), https://finance.yahoo.com/news/tiktok-are-influencers-panicking-about-bans-we-asked-three-to-weigh-in-205625085.html.

[8] AJ Willingham, *The biggest ways TikTok has changed American culture*, CNN (Apr. 2, 2023), https://edition.cnn.com/2023/04/02/us/tiktok-american-culture-effects-cec/index.html.

posts.  Nor does the TikTok experience center upon the creation of detailed personal profiles with personal information about the users' backgrounds, likes, interests, birthdate, education, relationship status and employment information, or a comment wall.   TikTok instead focuses on its "For You" page, powered by its recommendation system, which provides curated videos for each user.

22.    TikTok is also known for fostering new communities.  Unlike other platforms, TikTok was created for users to explore new content and is not focused exclusively on "following" friends, family, celebrities, or influencers.  On TikTok, no "interest is too small or obscure to coalesce into a community ....  This cycle can have extremely positive results for awareness and education....   Groups that specialize in, for instance, little-known cultural art forms or environmental conservation can reach new audiences, creating a mutually beneficial exchange where awareness is spread, and users get the pleasure of discovering something new."[9]

23.    For example, a college student in Missoula found that TikTok helped her "connect with other students at [her] university and people across the country.... find[ing] not just one community, but many."[10]  She further noted that the app was

---

[9] Willingham, *supra* note 8.

[10] Shelly Russel, *Gianforte must veto TikTok ban to support Montana students*, Missoulian (May 2, 2023), https://missoulian.com/opinion/columnists/shelly-russel-gianforte-must-veto-tiktok-ban-to-support-montana-students/article_e463c8aa-e835-11ed-a4c6-834bda6b1e6b.html.

"crucial to expanding worldviews and acts as a tool for diversity and inclusion." Plaintiffs have strengthened their own communities through TikTok.  Ms. DiRocco, for example, uses the app to connect with other veterans and share information about mental health and suicide prevention.  And when Ms. Goddard moved across the country from Florida to Montana, she used TikTok to meet other young mothers and form friendships with those her own age.  Likewise, Mr. Stout has created a strong community on TikTok who sometimes support each other financially—for example, paying one of the members' electricity bills when she was out of work.

24.    For some of the Plaintiffs and other Montanan creators, being able to express themselves on TikTok has given them a great sense of purpose and positively impacted their mental health.  For example, Ms. Goddard looks forward to creating new videos every morning—a purpose which helped her recover from postpartum depression.  Ms. Held believes TikTok provides a sense of hope to those who do not have access to traditional therapy.

25.    In addition to Plaintiffs, other TikTok "users who have built their livelihoods and found a sense of community on the app say they can't imagine an America without it."[11]  As one creator put it:  "TikTok is way more than just dancing videos or lip-syncing videos. It really has so many different niches, and you can find

---

[11] Thorbecke, *supra* note 5.

community in any of them[.]... So if it were to go away, it would be a great loss."[12]

**B.     TikTok Provides an Outlet for Creative and Political Expression.**

26.    TikTok is a forum for communications protected by the First Amendment and a center for people from different walks of life and parts of the world to exchange ideas. The content on TikTok is, like other internet content, as "diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (cleaned up). TikTok creators post videos on topics ranging from the light-hearted to serious, including art, science, comedy, pets, cooking, music, photography, travel and tourism, psychology, agriculture, politics, current events, and other social issues. TikTok users view and can engage with these videos by commenting on or sharing them with friends and acquaintances, by messaging the creator, or by responding with their own content.

27.    Plaintiffs use TikTok to showcase the natural beauty of the state, advertise their local businesses, and share educational information. For example, Ms. Goddard shares beautiful scenes of life on a Montana ranch. Ms. Held posts inspirational videos from her mountain-climbing adventures, and she "went viral" on TikTok when she shared her experience camping for a month during the pandemic. Ms. Alario promotes her local business.

28.    Plaintiffs also use TikTok to learn new skills and find inspiration. For

---

[12] *See id.*

example, Ms. Alario uses the app to learn about everything from investing and financial skills to physical workouts and holiday crafts.  Ms. DiRocco likes to use TikTok to learn how to accomplish various do-it-yourself projects, such as how to fix her car.  Ms. Goddard often uses the app to learn new recipes.  And Mr. Stout has learned about subjects ranging from physical health to current events.

29.    TikTok has also emerged as an essential forum for political advocacy. Nearly thirty percent of all major-party candidates in U.S. Senate races have TikTok accounts, as do twenty percent of all major-party House candidates.[13]

30.    Politicians across the spectrum use the service, especially to reach young voters, activate new voters, and break out as candidates.  For example, Republican Montana State Senator Ken Bogner maintains a public TikTok account (@kenbogner) dedicated to "[s]howing off the great state of Montana."  Likewise, Democratic Montana Representative Zooey Zephyr uses her TikTok account (@zoandbehold) to provide the public daily updates on legislative sessions.

31.    Similarly, on the national level, U.S. Senator Ed Markey (D-Mass.) uses TikTok to "listen and learn from young people," who he says "are leading, they know what's going on and they know where we are headed, especially online."[14]

_____

[13] Cat Zkrezewski *et al.*, *As midterms loom, TikTok faces its next political test*, Wash. Post (Oct. 31, 2022), https://www.washingtonpost.com/technology/2022/10/31/tiktok-faces-2022-midterm-elections/.

[14] Anna P. Kambhampaty, *Securing the TikTok Vote*, N.Y. Times (Mar. 19, 2022), https://www.nytimes.com/2022/03/19/style/tiktok-political-campaigns-midterm-elections.html.

U.S. Rep. Jeff Jackson (D-N.C.) posted a video about how government works that was viewed by at least 2.7 million people.[15]  And when Pastor Brian Hawkins (R-Cal.) was a candidate for Congress, he found that "when I go live [on TikTok] I'm seeing a different level of support."[16]

32.    During the 2020 presidential election, many TikTok creators launched political "hype houses," which livestreamed debates, challenged candidates' statements, and discussed policy issues.[17]  There were conservative, liberal, bipartisan, and undecided houses—providing a wide range of viewpoints easily accessible to voters.  These "houses" sometimes engaged with each other on major issues—through "duetting," a TikTok feature that allows users to respond to videos with their own videos and post them side-by-side.  Additionally, a "significant percentage of US politicians campaigned on the app ahead of the midterm elections" in 2022.[18]

33.    Young people have observed that candidates and officeholders using TikTok "makes it easier for my generation to see their media rather than through

---

[15] Shamarria Morrison, '*Transparency is key to trust': NC Congressman goes viral for explaining how government works*, WCNC Charlotte (Jan 12, 2023), https://www.wcnc.com/article/news/politics/north-carolina-politics/north-carolina-congressman-viral-explaining-government/275-1053060e-5128-4049-9b7a-b61c887a6291.

[16] Josh Robin & Rachel Tillman, *Views to votes: Candidates employ TikTok to spread political message ahead of midterms*, Spectrum News (Sept. 22, 2022), https://www.ny1.com/nyc/all-boroughs/news/2022/09/22/tiktok-midterm-elections-campaign-season-democrats-fetterman-oz.

[17] Taylor Lorenz, *The Political Pundits of TikTok*, N.Y. Times (Feb. 27, 2020), https://www.nytimes.com/2020/02/27/style/tiktok-politics-bernie-trump.html.

[18] Thorbecke, *supra* note 5.

news or articles."[19]  Aside from just politics, a recent study found that ten percent of all U.S. adults regularly obtain news from TikTok.[20]  And news organizations like the 176-year-old Associated Press have recently joined TikTok to reach new audiences.[21]

34.     Ms. DiRocco uses TikTok for this purpose, especially as a means to obtain time-sensitive news.  For example, when tornados hit the Midwest in April 2023, Ms. DiRocco found out first from TikTok and was able to quickly check in with family and friends in the area.  Creators in that region teamed up to help victims by distributing water, cleaning debris, and rescuing pets.  For Ms. DiRocco, this was not an isolated event, as TikTok often is the first to notify her of real-time news.

### C.      TikTok Provides an Important Marketing Platform.

35.     Because of TikTok's broad organic reach, some creators—including in Montana—have garnered a significant user following and earn income by creating and posting videos on TikTok.  TikTok creators with a large fan base can earn revenue by promoting third-party products and services.  TikTok creators can also use their accounts to promote their own products, services, and local businesses.

---

[19] Kambhampaty, *supra* note 14.
[20] Katerina Eva Matsa, *More Americans are getting news on TikTok, bucking the trend on other social media sites*, Pew Research Center (Oct. 21, 2022), https://www.pewresearch.org/fact-tank/2022/10/21/more-americans-are-getting-news-on-tiktok-bucking-the-trend-on-other-social-media-sites/.
[21] Thorbecke, *supra* note 5.

36.    In 2020, TikTok launched a Creator Fund, which allows creators with a large following who consistently post content to realize additional earnings by monetizing their videos.   The Creator Fund was made to "further support … creators" and "encourage those who dream of using their voices and creativity to spark inspirational careers."[22]

37.    Additionally, in the fall of 2022, TikTok partnered with American Express on its #ShopSmall Accelerator program to help small businesses during the holiday shopping season.[23]   TikTok also recently launched an initiative highlighting small-business entrepreneurs who have found significant success on the platform, allowing many to achieve financial freedom.[24]

38.    For many creators, "TikTok is more than an app—it's their life and livelihood."[25]   As one creator stated: "A part of what people have done on [TikTok] is created their own slice of the American dream that is preached so much about,...

---

[22] Vanessa Pappas, *Introducing the $200M TikTok Creator Fund*, TikTok (July 22, 2020), https://newsroom.tiktok.com/en-us/introducing-the-200-million-tiktok-creator-fund.

[23] *American Express and TikTok Launch the #ShopSmall Accelerator to Help Small Businesses Reach New Audiences on Small Business Saturday*, Business Wire (Nov. 14, 2022), https://www.businesswire.com/news/home/20221114005124/en/American-Express-and-TikTok-Launch-the-ShopSmall-Accelerator-to-Help-Small-Businesses-Reach-New-Audiences-on-Small-Business-Saturday%C2%AE.

[24] Daysia Tolentino, *TikTok launches docuseries on small businesses that found success on the platform*, NBC News (Mar. 15, 2023), https://www.nbcnews.com/tech/tiktok-for-good-docuseries-small-businesses-rcna74925.

[25] Jordan Greene, *TikTok changed their lives. Now, these creators are considering how a ban would impact them*, TODAY (Mar. 30, 2023), https://www.today.com/news/news/tiktok-ban-creators-react-rcna77012.

whether it's opening a small business or people who are no longer facing homelessness, people who are able to retire, creators who are now allowed to pursue their creative pursuits."[26]

39.     For example, Ms. Goddard was able to roughly triple her family's income through TikTok.  Because her husband works as a rancher and Ms. Goddard is a stay-at-home mother, her family uses this additional income for their survival. Given the uncertainty posed by SB 419, Ms. Goddard and her husband are waiting to have more children and make other major life decisions until they know whether they will be able to keep the income flow that Ms. Goddard has worked so hard to build through TikTok.

40.     Likewise, Ms. DiRocco generates ten to thirty percent of her income from producing content on TikTok, which she uses to help support her three children. Ms. Alario has seen her local business grow by using TikTok as a marketing tool.

41.     Montana creators credit the TikTok platform as a driving factor in their success.  For example, Ms. DiRocco has about ten times the number of followers on TikTok as she does on Instagram (more than 200,000 on TikTok versus 23,500 on Instagram).  Likewise, Ms. Goddard has gained over 95,000 followers on TikTok—

---

[26] Jaimie Ding, *For some, TikTok is a path to riches and the American dream. With a ban, it could all disappear*, L.A. Times (Mar. 26, 2023), https://www.latimes.com/business/story/2023-03-26/biden-tiktok-ban-small-business-owners-fear-sales-hit.

and just 157 followers on YouTube. Mr. Stout has stopped posting content to Instagram, having found more success and acceptance on TikTok. Plaintiffs believe TikTok's recommendation system and organic reach are particularly valuable and offer more opportunities to reach other users. As one analyst explained: "TikTok offers the broadest organic reach of any of the channels right now," which is a sentiment shared by local businesses and independent creators.[27]

42.    Plaintiffs are not alone in their economic reliance on TikTok. As one Montana business owner stated: "There are a lot of small businesses that ... operate via TikTok,... don't have a storefront, [and] work out of their homes," and a potential statewide ban would damage such businesses.[28]

### D.    Courts Have Blocked Previous Attempts to Ban TikTok.

43.    Federal judges have three times enjoined attempts to ban TikTok. *See TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83 (D.D.C. 2020) (holding that former President Trump lacked authority to issue an executive order to "regulate or prohibit, directly or indirectly" any exchange of "informational materials" or "personal communication[s]" transmitted to the United States through TikTok) (citation & internal quotation marks omitted); *Marland v. Trump*, 498 F. Supp. 3d 624, 642

---

[27] Ding, *supra* note 26.

[28] Dominic Vitiello, *Some local businesses disheartened by potential statewide TikTok ban*, NBC Montana, (Apr. 10, 2023), https://nbcmontana.com/news/local/some-local-businesses-disheartened-by-potential-statewide-tiktok-ban.

17

(E.D. Pa. 2020) (enjoining same executive order; rejecting government's "descriptions of the national security threat posed by the TikTok app" as "hypothetical"); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 112 (D.D.C. 2020) (enjoining the same executive order).

44.     Since these decisions, the federal government has not banned TikTok. Instead, efforts to address the federal government's claimed national security concerns have included less sweeping measures, such as rules prohibiting TikTok from government devices and proposals to require TikTok to store data for United States operations within the United States.  *See infra* Section VII.E.

45.     TikTok has also reported taking a number of measures to provide additional security and protections for its American users' data.  TikTok reports that to date, it has spent about $1.5 billion implementing "Project T," under which protected U.S. user data will be monitored and tightly controlled by a subsidiary that reports to an independent board.[29]  TikTok has also reported its plan to implement third-party monitoring of content to ensure that it is free from any potential foreign or outside influence.[30]  These layers of review and oversight are unprecedented in the technology industry.[31]

---

[29] TikTok, *About Project Texas:  TikTok's Commitment to U.S. National Security*, https://usds.tiktok.com/usds-about/ (last visited May 4, 2023).
[30] *See id.*
[31] *See id.*

### E.    Montana Enacts SB 419 to Ban TikTok.

46.    Enacted despite testimony from individuals recounting the harm to ordinary Montanans like Plaintiffs, the law bans TikTok from operating in Montana and prohibits mobile application stores in the state from offering TikTok to Montana users.   *See* SB 419 § 1(1).   Violation of this prohibition—from which users themselves are exempt—is punishable by a $10,000 fine for each violation and an additional $10,000 each day thereafter if the violation continues.   *Id.* §§ 1(2), 7(a)-(b).

47.    The Legislature identified two interests that supposedly justify SB 419. First, banning TikTok is purportedly necessary to protect Montanans from "the People's Republic of China" and "the Chinese Communist Party."   *Id.* Findings & Declarations at 1–2.   Claiming that TikTok Inc.'s parent is a Chinese company, the Act speculates that TikTok enables the Chinese government and Chinese Communist Party to access information about Montanans, "including real-time physical locations of users."   *Id.* at 1.   It asserts that a ban is justified because "TikTok's continued operation in Montana" permits "the People's Republic of China to conduct corporate and international espionage in Montana."   *Id.* at 2.

48.    SB 419's focus on the regulation of foreign affairs is underscored by Section 4, which voids SB 419 if TikTok "is acquired by or sold to a company that is not incorporated in any other country designated as a foreign adversary in 15

C.F.R. § 7.4 at the time [TikTok] is sold or acquired."  *Id.*  Section 7.4 is a part of

the U.S. Code of Federal Regulations that lists the "foreign governments" the United

States Secretary of Commerce has "determined" are "foreign adversaries," including

China, Cuba, Iran, North Korea, Russia, and Venezuela.

49.    Attorney General Knudsen confirmed SB 419's foreign policy goals in

testimony before the Montana State House Committee on the Judiciary.  Claiming

without evidence that China uses TikTok to "spy on Americans" and engage in

"asymmetric warfare" against its "existential enemy" the United States, Attorney

General Knudsen argued that SB 419 is needed because "there's no guarantee that

the feds are actually going to act here."  *See* Exhibit A.  State Senator Shelley Vance,

who authored SB 419, similarly claimed the Act is necessary "to send a message to

other states and to Congress" since she has "no faith in our national administration"

to handle these issues with China.  *Id.*  And Attorney General Knudsen later told

reporters that "pushing back against the Chinese government" is "what this is

about."[32]

50.    As a second basis for the law, the Legislature claims that banning

communication through TikTok is justified because TikTok "allow[s]" the

publication of "dangerous content" that supposedly encourages "minors to engage

---

[32] Fran Beyer, *Mont. AG Knudsen to Newsmax:  State TikTok Ban First of Its Kind*, Newsmax (Apr. 17, 2023), https://www.newsmax.com/newsmax-tv/tiktok-montana-ban/2023/04/17/id/1116448/.

in dangerous activities." SB 419 Findings & Declarations at 1. SB 419's proponents make no secret that the law regulates speech based on its content. Asked to address what "our kids" are "exposed to on TikTok," Attorney General Knudsen listed his objections to types of content he deemed harmful. Steve Cape, director of the Montana Coalition for Safety and Justice, in turn claimed that TikTok publishes "depressive videos" "[i]f you're depressed." *See* Exhibit A. And Keith Krach, who testified in support of SB 419 from the Institute of Tech Diplomacy at Purdue University, called TikTok a "propaganda tool" that he claimed amplifies user-generated content aligned with the Chinese Communist Party's views. *See id.* Enacting SB 419, he explained, would prevent the dissemination of that "propaganda." *Id.*[33]

51.    The State plans to enforce the TikTok ban as soon as it takes effect. In an interview with *Newsmax TV*, Attorney General Knudsen warned the public he "absolutely" will "go after the company itself" and "anybody that allows it to be downloaded" with a "$10,000 per day civil penalty." "That[,]" he said, "is our enforcement mechanism right there."[34] Attorney General Knudsen confirmed that SB 419 intends to shutter Plaintiffs' and every other Montanan's ability to

---

[33] Notably, Ms. DiRocco, the mother of three teenagers, strongly disagrees with these characterizations of the content on TikTok. In her experience, TikTok is the safest and least harmful social media platform for her children.

[34] Beyer, *supra* note 32.

communicate through TikTok, stating that "the app w[ill] no longer be able to function" under the law.[35]

52.    SB 419 will irreparably harm Plaintiffs and all Montanans.  By shuttering an entire forum for expression, the law will immediately and permanently deprive Plaintiffs of their ability to express themselves and communicate with others.  "[T]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Sanders Cnty. Repub. Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (citation & internal quotation marks omitted).

53.    SB 419's proponents have confessed doubts about the law's constitutionality.  Attorney General Knudsen, for one, admitted that "from a legal standpoint, and from a First Amendment standpoint," SB 419 is "unprecedented" and breaks "new ground." *See* Exhibit A.  He stated that the "full legal implications" of SB 419 will require "the U.S. Supreme Court to weigh in." *See id.*

54.    Montana Governor Greg Gianforte had such grave doubts about SB 419's legality, he circulated an amendment that effectively re-wrote the law—even

---

[35] *Montana could enforce TikTok ban by '$10,000 per day in civil penalty' on tech giants: Attorney General*, Yahoo!Finance (Apr. 17, 2023), https://finance.yahoo.com/video/montana-could-enforce-tiktok-ban-204434662.html?guccounter=1.

though that law, too, would have been impermissible.[36] The governor's press secretary conceded that this proposed amendment sought to "address[] the bill's technical and legal concerns."[37]

55.     Despite these reservations, the Legislature enacted SB 419 without the governor's proposed amended language on April 18, 2023, and Governor Gianforte signed it into law on May 17, 2023. The law is slated to take effect January 1, 2024. A copy of the enacted version of SB 419 is attached to this Complaint as **Exhibit B**.

## VII.   LEGAL PRINCIPLES

### A.     The First Amendment

56.     Prior restraints on speech and publication "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Any law that imposes a prior restraint on expression thus carries "a heavy presumption against its constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), even where the federal government claims the restraint is necessary for national security, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971).

57.     Content-based, viewpoint-based, and speaker-based laws that restrict

---

[36] Kalhan Rosenblatt, *Montana governor wants to expand state TikTok ban to potentially include other social media platforms*, NBC News (Apr. 26, 2023), https://www.nbcnews.com/tech/montana-tiktok-state-ban-governor-amendment-rcna81564.
[37] *Id.*

or burden speech are also presumptively unconstitutional under the First Amendment. The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790–91 (2011) (quotation omitted). Only certain narrowly defined categories of speech fall outside the First Amendment's protection—defamation, incitement, obscenity, and speech integral to criminal conduct—and the Supreme Court has rejected attempts to expand these categories as "startling and dangerous." *United States v. Stevens*, 559 U.S. 460, 470 (2010).

58. The First Amendment prohibits the government from engaging in content- or speaker-based regulation of protected speech unless the government can establish that the measure is (i) necessary to advance a "compelling" government interest, (ii) narrowly tailored to serve that interest, and (iii) the least restrictive means available to do so. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Within this sphere, the government cannot ordinarily regulate individuals' rights to distribute and receive information. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Nor can the government unduly burden or chill protected speech, or discriminate among speakers, particularly where such restrictions "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994).

24

59.     The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 244 (2002).  A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Stevens*, 559 U.S. at 473 (quotation omitted).

**B.     Due Process**

60.     The Fourteenth Amendment to the U.S. Constitution provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV.

61.     Due process principles apply to property interests "defined by existing rules or understandings" under state law, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972), including intangible property interests, *see In re Marriage of Hull*, 219 Mont. 480, 484–85 (1986), such as social media accounts on TikTok, *e.g.*, *Salonclick LLC v. SuperEgo Mgmt. LLC*, 2017 WL 239379, at *2–4 (S.D.N.Y. Jan 18, 2017).

62.     Due process principles also protect one's liberty to work in a chosen occupation.  *See, e.g.*, *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 65 n.4 (9th Cir. 1994).

63.     Due process principles also protect one's liberty to receive information. *See Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015).

64.     Due process requires that persons deprived of constitutionally protected property or liberty interests by the government receive adequate notice and opportunity to be heard before any such deprivation occurs.  It also "forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 302 (1993).

## C.      The Dormant Commerce Clause

65.     Article I, Section 8 of the U.S. Constitution vests Congress with the power "to regulate Commerce ...  among the several States." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause bars state laws that unduly restrict interstate commerce—a restriction referred to as the "Dormant Commerce Clause."

66.     Under the Dormant Commerce Clause, even laws that regulate evenhandedly and do not purport to discriminate against other states are unconstitutional if they impede the flow of commerce through interstate channels in a manner that clearly exceeds their putative local benefits.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *GM Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997). The Dormant Commerce Clause likewise prohibits states from "directly" regulating activities, including speech, when the "practical effect of [the] regulation is to control conduct" that occurs "wholly outside" the regulating state's jurisdiction. *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (citation & internal quotation

26

marks omitted).

**D.      The Foreign Affairs Doctrine**

67.      The Constitution vests the federal government with "the exclusive authority to administer foreign affairs." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc). "Under the foreign affairs doctrine, state laws that intrude on this exclusively federal power are preempted." *Id.* Indeed, "even when the federal government has taken no action on a particular foreign policy issue, the state generally is not free to make its own foreign policy on that subject." *Id.* at 1072.

68.      A state law is preempted where (i) its "real purpose" does not concern an area of traditional state responsibility and (ii) it intrudes on the federal government's foreign affairs powers. *Id.* at 1074–75. A state law intrudes on these powers when it has "'more than some incidental or indirect effect' on foreign affairs." *Id.* at 1076 (quoting *Zschernig v. Miller*, 389 U.S. 429, 434 (1968)).

**E.      The International Emergency Economic Powers Act**

69.      Enacted in 1977, IEEPA grants the President authority to "investigate, regulate, or prohibit" certain economic transactions based on an identified foreign threat. 50 U.S.C. §§ 1701, 1702(a)(1)(A).

70.      A corollary statute, the National Emergencies Act (NEA), permits the President to declare an emergency under IEEPA, *see* 50 U.S.C. §§ 1621, 1631, and

to terminate any declared emergency.  50 U.S.C. § 1622(a)(2).

71.     As two scholars have observed, "the President's IEEPA orders reign supreme throughout the land[.]" Harold H. Koh & John C. Yoo, *Dollar Diplomacy/dollar Defense: The Fabric of Economics and National Security Law*, 26 Int'l Law. 715, 744 (1992).

72.     Given concerns that regulations under IEEPA infringed First Amendment rights, Congress amended the Act in 1988 to expressly carve out from its delegation "the authority to regulate or prohibit, directly or indirectly" the importation or exportation of informational materials.  In a 1994 amendment titled "Free Trade in Ideas," Congress clarified that the informational materials exception applies to importation and exportation "of any information or informational materials," "regardless of format or medium." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003); 50 U.S.C. § 1702(b)(3).

73.     IEEPA now precludes the President from "regulat[ing] or prohibit[ing], directly or indirectly," "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," and "the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonographic records, photographs, microfilms, microfiche, tapes,

compact disks, CD ROMs, artworks, and news wire feeds," except for specifically enumerated export controls not applicable here.  50 U.S.C. § 1702(b)(1) & (3).

74.    IEEPA preempts any state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (citation omitted).  To make this determination, courts "examin[e] the federal statute as a whole and identify[] its purpose and intended effects."  *Id.* at 373.  The ordinary presumption against preemption does not apply to IEEPA because IEEPA governs "inherently federal" foreign relationships.  *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (citations omitted).

75.    President Biden and former President Trump have exercised their IEEPA powers to address concerns that China is using Chinese-owned software applications and companies to gather data on Americans.

76.    On May 15, 2019, invoking IEEPA, former President Trump issued Executive Order 13873.  Securing the Information and Communications Technology and Services Supply Chain, 84 Fed. Reg. 22,689 (May 17, 2019).  Executive Order 13873 declared a national emergency with respect to the threat of foreign adversaries "creating and exploiting vulnerabilities in information and communications technology and services [ICTS] ... to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its

people." *Id.* Executive Order 13873 provided that unrestricted use of such technology and services "designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries" helps foreign adversaries create and exploit vulnerabilities. 84 Fed. Reg. at 22,690.

77.     The President instructed the Department of Commerce to develop regulations to address this threat, including identifying and prohibiting certain ICTS transactions that pose an undue risk to national security. The President also gave the Secretary of Commerce "discretion [to] design or negotiate measures to mitigate" the concerns the Executive Order identified. 84 Fed. Reg. at 22,690.

78.     Pursuant to Executive Order 13873, the Department of Commerce issued a rule, codified at 15 C.F.R. § 7.4, identifying "foreign adversaries" for purposes of the executive order and its implementation. The People's Republic of China, including the Hong Kong Special Administrative Region, is among the foreign governments identified. 15 C.F.R. § 7.4(a)(1).

79.     On June 9, 2021, President Biden issued Executive Order 14034, which supplemented Executive Order 13873. Protecting Americans' Sensitive Data from Foreign Adversaries, 86 Fed. Reg. 31,423 (June 11, 2021). Executive Order 14034 *expressly revokes* former President Trump's 2020 Executive Order 13942 banning TikTok, and directs heads of executive departments and agencies to "promptly take

steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, implementing or enforcing" them.  86 Fed. Reg. at 31,424.  The President and Congress are reportedly considering alternative methods to address the concerns raised in Executive Order 13942.

80.    Executive Order 14034 states that "[t]he Federal Government should evaluate" threats posed by software applications owned or controlled by a foreign adversary, including China, using "rigorous, evidence-based analysis and should address any unacceptable or undue risks consistent with overall national security, foreign policy, and economic objectives, including the preservation and demonstration of America's core values and fundamental freedoms."  86 Fed. Reg. 31,423

81.    Executive Order 14034 directs the Department of Commerce to provide a report "recommending additional executive and legislative actions to address the risk associated with connected software applications that are designed, developed, manufactured, or supplied by persons owned or controlled by, or subject to the jurisdiction or direction of, a foreign adversary"; to "evaluate on a continuing basis transactions involving connected software applications that may pose … an unacceptable risk to the national security of the United States or the security and safety of United States persons"; and based on that evaluation, to "take appropriate action in accordance with Executive Order 13873 and its implementing regulations."

86 Fed. Reg. at 31,424–25.

**F.      Section 721 of the Defense Production Act**

82.     Section 721 codifies the federal government's exclusive authority to review foreign acquisitions of U.S. businesses and to investigate and address national security risks associated with foreign investment and trade.

83.     Section 721 creates CFIUS, an interagency committee of the federal executive branch tasked with reviewing foreign acquisitions of U.S. businesses to determine their impact on national security.  50 U.S.C. §§ 4565(b)(1)(A)–(B) & 4565(a)(4)(B)(i).  CFIUS is directed to investigate, identify, and respond to national security risks associated with foreign economic activity in the United States by conditioning, or if necessary blocking, proposed transactions or offerings. *Id.*  The specific measures imposed by CFIUS "shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction, which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id.* § 4565(*l*)(4)(A).  If the risks to a particular transaction cannot be mitigated, the President may prohibit the transaction.  *Id.* § 4565(d).

84.     Because Section 721 authorizes the President and CFIUS to establish federal policies in the area of national security as it relates to foreign economic activity in the United States, state laws that erect "an obstacle to the accomplishment

32

and execution" of its "full purposes and objectives" are preempted under the Supremacy Clause of the United States Constitution. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation omitted).

85.   Public records and reports demonstrate that the federal government has exercised its authority under Section 721 to address TikTok's operations in the United States.  A recent status report filed in the United States Court of Appeals for the District of Columbia Circuit indicates that the parties are engaged in "ongoing negotiations" toward a "mutual agreement" on TikTok's data management practices that would resolve any purported federal concerns about TikTok's U.S. operations. *See* Status Report, *TikTok Inc. v. CFIUS*, No. 20-1444 (D.C. Cir. Apr. 24, 2023). The Biden Administration has reportedly proposed directing ByteDance Ltd. (TikTok's ultimate parent company) to divest its stake in the TikTok platform, without banning Americans from using TikTok to communicate or share expression.[38]

86.   Together with the actions taken under IEEPA, these federal executive actions reflect the U.S. government's chosen policy to counteract suspected Chinese espionage in the United States through private Chinese companies, including through the private communications services and other technologies they offer.

---

[38] *See* John D. McKinnon, *U.S. Threatens Ban if TikTok's Chinese Owners Don't Sell Stakes*, Wall St. J. (Mar. 15, 2023), https://www.wsj.com/articles/u-s-threatens-to-ban-tiktok-if-chinese-founder-doesnt-sell-ownership-stake-36d7295c.

## VIII.  CLAIMS FOR RELIEF

### CLAIM ONE:
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
### TO THE U.S. CONSTITUTION

87.    Plaintiffs incorporate all prior paragraphs of this Complaint.

88.    SB 419 violates Plaintiffs' rights guaranteed by the First Amendment.

89.    SB 419's blanket ban on TikTok in Montana is a prior restraint that preemptively forecloses an entire forum for communication relied upon by Plaintiffs and other Montanans.  The law attempts to force TikTok and mobile application providers to ensure that no one in Montana uses or downloads TikTok, by threatening them with massive sanctions.  The law prevents Plaintiffs and all Montanans from engaging in protected speech.  And it categorically prohibits Plaintiffs and all Montanans from receiving information to which they are entitled. "[N]o conceivable governmental interest would justify such an absolute prohibition of speech." *Bd. of Airport Commr's of City of L.A. v. Jews for Jesus*, 482 U.S. 569, 575 (1987).  SB 419 bears a heavy presumption of unconstitutionality, even more onerous than strict scrutiny, that it cannot overcome.

90.    SB 419 is also substantially overbroad.  The law takes the broadest possible approach to its objectives, restricting and banning the protected speech of all TikTok users in Montana to prevent the speculative and unsubstantiated possibility that the Chinese government might direct TikTok Inc., or its parent, to

34

spy on some Montana users. And to address the concern that some content on TikTok may be too "dangerous" for minors, the law bans *all* speech by *all* Montana users, regardless of its First Amendment protection, or who views it. SB 419 sweeps in and suppresses far more speech than it may permissibly regulate.

91.    SB 419 also constitutes a content-based and speaker-based restriction subject to strict scrutiny, which it cannot survive. SB 419 applies to specific categories of speech (videos and communications on TikTok), selects among speakers (TikTok users), and exempts publishers approved by state censors (those owned by citizens of countries not deemed foreign adversaries). SB 419 is also explicitly content-, medium-, and speaker-based, as stated in SB 419's preamble and confirmed by its author and principal sponsors. These restrictions "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)" and require strict scrutiny. *Turner*, 512 U.S. at 658.

92.    SB 419 fails strict or any lesser form of scrutiny. No legitimate state interest justifies SB 419's blanket speech ban. Nor is SB 419 even the least restrictive means to accomplish its stated objectives. In fact, SB 419 enacts *the most restrictive means* imaginable. TikTok content cannot reasonably be construed to pose a categorical threat to national security or Montanans' health and safety. And Executive Order 14034 demonstrates that less restrictive means to address the

government's interests exist.  That Order identifies the same national security concern that SB 419 purports to address, *rescinds* former President Trump's TikTok ban, and directs the Department of Commerce to develop recommendations and take appropriate action to address that concern in a way that preserves "America's core values and fundamental freedoms."  86 Fed. Reg. at 31,423.

93.   Plaintiffs' First Amendment rights have been and will continue to be burdened because of the impending ban.

94.   Unless declared invalid and enjoined, SB 419 will unlawfully deprive Plaintiffs of their rights under the First Amendment, inflicting immediate and irreparable harm.

## CLAIM TWO:
## VIOLATION OF THE DUE PROCESS CLAUSE OF
## THE FOURTEENTH AMENDMENT

95.   Plaintiffs incorporate all prior paragraphs of this Complaint.

96.   The U.S. Constitution mandates that no person can be deprived of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV.

97.   SB 419 deprives Plaintiffs of their property rights in their TikTok accounts, including their followers and the revenues they derive therefrom.

98.   SB 419 deprives Plaintiffs of their liberty to pursue their chosen occupation as TikTok content creators.

99.   SB 419 deprives Plaintiffs of their liberty to obtain information through

TikTok's communications service.

100.   Plaintiffs did not receive adequate notice or opportunity to respond to the deprivations mandated by SB 419.   They therefore have been denied constitutionally protected property rights and liberties without due process of law.

101.   Plaintiffs' liberty to pursue their chosen occupation, and to obtain information, are fundamental rights deeply rooted in our nation's history.   The deprivation of these rights is thus subject to strict scrutiny, no matter the process provided.

102.   No legitimate, let alone compelling, state interest that Montana can lawfully pursue justifies SB 419's deprivations.  Nor is SB 419 rationally related, let alone narrowly tailored, to achieve its purported objectives.

103.   Unless declared invalid and enjoined, SB 419 will unlawfully deprive Plaintiffs of their due process rights.

**CLAIM THREE:**
**VIOLATION OF THE FOREIGN AFFAIRS DOCTRINE**

104.   Plaintiffs incorporate all prior paragraphs of the Complaint.

105.   SB 419 is preempted under the Foreign Affairs Doctrine because it impermissibly invades the federal government's exclusive authority to administer foreign affairs under Articles I, II, and VI of the United States Constitution.

106.   SB 419 does not concern an area of traditional state responsibility.  By its own terms, SB 419 seeks to sanction purported "international espionage" by a

"foreign adversary."  SB 419 Findings & Declarations at 1; *id.* § 4.  It bans the use of a communications service based on the company's foreign ownership to thwart a foreign government's supposed intelligence gathering.  These aims do not concern state responsibilities and are traditionally and exclusively within the federal government's power.

107.   SB 419 impermissibly intrudes on the federal government's exclusive powers to determine and direct the nation's foreign policy.  Its effect on foreign affairs is not merely incidental.  It expressly aims to address a specific national security concern by regulating commerce with a foreign country, and SB 419's ban has a direct impact on the United States' relationship with China.

108.   Unless declared invalid and enjoined, SB 419 will unconstitutionally interfere with the federal government's uniform foreign policy for the United States in violation of the United States Constitution.

## CLAIM FOUR:
## VIOLATION OF THE COMMERCE CLAUSE

109.   Plaintiffs incorporate all prior paragraphs of this Complaint.

110.   The Dormant Commerce Clause "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Env'tl Quality*, 511 U.S. 93, 98 (1994).

111.   SB 419 violates the Commerce Clause because it regulates

extraterritorially in violation of the rule in *Edgar*, 457 U.S. at 541-43. SB 419 necessarily has the practical and unconstitutional effect of regulating commercial and speech-related activities that occur wholly outside Montana, such as by causing TikTok Inc., the California-registered business that provides the TikTok platform in the United States, to block speech that originates in New York from reaching Montana. This is because the internet is accessible globally, such that a state cannot block internet content from its own citizens without affecting citizens of other states.

112.  SB 419 also violates the Commerce Clause under *Pike*, 397 U.S. at 142, because the law would impose an unreasonable and undue burden on a channel of interstate commerce that would impede the flow of online service across state lines in clear excess of any legitimate local benefit conferred on the State of Montana. The law targets subjects—internet communications, internet communications platforms, and mobile software application stores—whose operations are national by nature and require uniform regulation. SB 419 not only burdens but outright bans out-of-state communications, including commercial offers and ad-generating content, from reaching Montana's market.

113.  The Montana Legislature has not identified any legitimate local interest (as opposed to abstract national interests in national security) sufficient to justify these onerous impositions on interstate commerce.

114.  Unless declared invalid and enjoined, SB 419 will unconstitutionally

burden interstate commerce in violation of the Commerce Clause.

## CLAIM FIVE:
## IEEPA PREEMPTION, 50 U.S.C. §§ 1701 *et seq.*

115.   Plaintiffs incorporate all prior paragraphs of this Complaint.

116.   SB 419 is preempted by IEEPA because it conflicts with the federal policy established by IEEPA and the President's exercise of authority thereunder, and thus "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372–73 (citation omitted).

117.   IEEPA vests the President with power to act on the United States' behalf with respect to foreign threats.  Under IEEPA, two Presidents have identified the same national security concern that SB 419 purports to address and directed federal agencies to address this concern in multiple Executive Orders, including Executive Orders 13873 and 14034.

118.   SB 419 conflicts with the federal policy in IEEPA and the Presidents' Executive Orders because it attempts to address the same concern through different means.  SB 419 undermines federal policy because its restrictions extend beyond the specific range of regulations Congress and the President have deemed appropriate.  For example, while Executive Order 14034 expressly rescinds former President Trump's TikTok ban, SB 419 seeks to reinstate that ban in Montana.

119.   SB 419 also presents a conflict because it imposes restrictions Congress

40

expressly carved out from even the President's authority to address foreign threats. To protect First Amendment rights, IEEPA exempts from the President's authority any power to regulate personal communications and the importation or exportation of information and informational materials, yet SB 419's ban on TikTok does just that.

120.  SB 419's indefinite ban on TikTok in Montana also interferes with the President's discretion to continue investigating concerns regarding the Chinese government's intelligence-gathering and to determine when to lift any restrictions relating to those concerns.

121.  Given Congress's explicit delegation of power to the President to respond to foreign threats and the President's exercise of that authority with respect to China's intelligence gathering, and given SB 419's effort to address the same concern, SB 419 presents a clear obstacle that interferes with the federal government's prerogative to select and accomplish regulatory objectives under IEEPA.

### CLAIM SIX:
### SECTION 721 OF THE DEFENSE PRODUCTION ACT PREEMPTION, 50 U.S.C. § 4565

122.  Plaintiffs incorporate all prior paragraphs of this Complaint.

123.  SB 419 is preempted by Section 721 of the Defense Production Act because it conflicts with the federal policy established by that law and the President's

and CFIUS's exercise of authority thereunder, creating "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citation omitted).

124.   Section 721 grants the President and CFIUS exclusive authority to investigate, identify, and respond to national security risks associated with foreign economic activity in the United States by conditioning, or if necessary blocking, proposed transactions or offerings. 50 U.S.C. §§ 4565(b)(1)(A)–(B) & 4565(a)(4)(B)(i).

125.   The President and CFIUS have exercised their authority under Section 721 to address TikTok's operation in the United States, including to address alleged national security issues arising from its data management practices.  The federal government's negotiations with TikTok are ongoing, and the federal government has not elected to ban TikTok from operating in the United States outright.

126.   SB 419 has substituted the State of Montana's view of how best to regulate the alleged national security issues arising from TikTok's United States operations for that of the United States, requiring a total ban on TikTok regardless of federal policy.  Even if the President were to exercise his authority to permit but condition TikTok's operations in the United States, that mandate would be at odds with SB 419's requirement that the app be banned entirely in Montana.  SB 419 enacts an end-run around the federal government's Section 721 review and thus

represents a clear obstacle to federal objectives.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

1.    Declare under 28 U.S.C. § 2201 that SB 419 is invalid under the United States Constitution because it violates Plaintiffs' First Amendment and due process rights, as well as the Commerce Clause, and the Foreign Affairs Clauses of Articles I, II, and VI;

2.    Declare under 28 U.S.C. § 2201 that SB 419 is entirely preempted by IEEPA and Executive Orders 13873 and 14034, and Section 721 of the Defense Production Act;

3.    Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under his office's direction or control from taking any action to enforce SB 419, under 42 U.S.C. § 1983 and this Court's inherent equitable powers;

4.    Enter judgment in favor of Plaintiffs;

5.    Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

6.    Award Plaintiffs all other such relief as the Court deems just and proper.

DATED: May 17, 2023                     BOONE KARLBERG P.C.

                                        By: _____
                                            Natasha Prinzing Jones
                                            Matthew Hayhurst
                                            *Attorneys for Plaintiffs*


                                        DAVIS WRIGHT TREMAINE LLP

                                        By: _____
                                            Ambika Kumar (PHV pending)
                                            Tim Cunningham (PHV pending)
                                            *Attorneys for Plaintiffs*

44