# EXHIBIT F

Natasha Prinzing Jones
(MT Bar No. 5226)
Matthew B. Hayhurst
(MT Bar No. 4979)
BOONE KARLBERG P.C.
201 West Main St., Suite 300
P.O. Box 9199
Missoula, MT 59807
Telephone: (406) 543-6646
Facsimile: (406) 549-6804
npjones@boonekarlberg.com
mhayhurst@boonekarlberg.com

Ambika Kumar *(pro hac vice)*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 330
Seattle, WA 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700
ambikakumar@dwt.com

Tim Cunningham *(pro hac vice)*
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 241-2300
Facsimile: (503) 778-5299
timcunningham@dwt.com

*Attorneys for Plaintiffs Samantha Alario,*
*Heather DiRocco, Carly Ann Goddard, Alice*
*Held, and Dale Stout*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| SAMANTHA ALARIO, HEATHER DIROCCO, CARLY ANN GODDARD, ALICE HELD, and DALE STOUT, <br><br> Plaintiffs, <br><br> v. <br><br> AUSTIN KNUDSEN, in his official capacity as Attorney General of the State of Montana, <br><br> Defendant. | Lead Case No. 9:23-cv-00056-DWM CV 23–56–M–DWM <br><br> Member Case No. CV 23–61–M–DWM <br><br> **DECLARATION OF AMBIKA KUMAR IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Ambika Kumar, declare as follows:

1.      I am a partner in the law firm Davis Wright Tremaine LLP, have been admitted *pro hac vice* to practice before this Court, and am counsel for Plaintiffs in this matter.  I make this declaration from personal knowledge and a review of the files and records in this matter.

2.      Attached as Exhibit 1 is a true and correct copy of a transcript of the March 28, 2023 Montana House Judiciary Committee Hearing on SB 419, which my office had transcribed.

3.      Attached as Exhibit 2 is a true and correct copy of the following article attributed to Aaron Drapkin and published in tech.co on November 15, 2022: *TikTok Extends Video Length Limit to 10 Minutes*, available at https://tech.co/news/tiktok-extends-video-10-minutes.  My office obtained a copy of this article as well as the remaining exhibits to my declaration by visiting the websites listed in each paragraph.  In addition, my office has omitted extraneous pages following the articles attached to this Declaration as Exhibits 7, 13, 14, 16, 18, and 19.

4.      Attached as Exhibit 3 is a true and correct copy of a portion of TikTok's website titled *Effects*, available at https://support.tiktok.com/en/using-tiktok/creating-videos/effects.

5.     Attached as Exhibit 4 is a true and correct copy of TikTok's Support website describing *Messaging and Notifications*, available at https://support.tiktok.com/en/using-tiktok/messaging-and-notifications.

6.     Attached as Exhibit 5 is a true and correct copy of TikTok's September 27, 2021 press release titled *Thanks a Billion!*, available at https://newsroom.tiktok.com/en-us/1-billion-people-on-tiktok.

7.     Attached as Exhibit 6 is a true and correct copy of TikTok's March 21, 2023, press release titled *Celebrating our thriving community of 150 million Americans*, available at https://newsroom.tiktok.com/en-us/150-m-us-users.

8.     Attached as Exhibit 7 is a true and correct copy of the following article attributed to Cat Zakrzewski et al. and published by The Washington Post on October 31, 2022: *As Midterms Loom, TikTok Faces Its Next Political Test*, available at https://www.washingtonpost.com/technology/2022/10/31/tiktok-faces-2022-midterm-elections/.

9.     Attached as Exhibit 8 is a true and correct copy of the following article attributed to Anna P. Kambhampaty and published by The New York Times on March 19, 2022: *Securing the TikTok Vote*, available at https://www.nytimes.com/2022/03/19/style/tiktok-political-campaigns-midterm-elections.html.

10.     Attached as Exhibit 9 is a true and correct copy of the following article attributed to Josh Robin and Rachel Tillman and published by Spectrum News on September 22, 2022: *Views to votes: Candidates employ TikTok to spread political message ahead of midterms*, available at https://www.ny1.com/nyc/all-boroughs/news/2022/09/22/tiktok-midterm-elections-campaign-season-democrats-fetterman-oz.

11.     Attached as Exhibit 10 is a true and correct copy of the main page of Montana State Senator Ken Bogner's TikTok account, available at https://www.tiktok.com/@kenbogner.

12.     Attached as Exhibit 11 is a true and correct copy of the main page of Montana State Representative Zooey Zephyr's TikTok account, available at https://www.tiktok.com/@zoandbehold.

13.     Attached as Exhibit 12 is a true and correct copy of TikTok's June 18, 2020, press release titled *How TikTok Recommends Videos #ForYou*, available at https://newsroom.tiktok.com/en-us/how-tiktok-recommends-videos-for-you.

14.     Attached as Exhibit 13 is a true and correct copy of the following article attributed to Alexandra Garfinkle and published by Yahoo! Finance on January 19, 2023: *TikTok: Are influencers panicking about bans? We asked three to weigh in*, available at https://finance.yahoo.com/news/tiktok-are-influencers-panicking-about-bans-we-asked-three-to-weigh-in-205625085.html.

15.     Attached as Exhibit 14 is a true and correct copy of the following article attributed to Jaimie Ding for Tribune News Service and published by The Dallas Morning News on March 28, 2023: *TikTok has created small business success stories and fast-tracked American dreams*, available at https://www.dallasnews.com/business/retail/2023/03/28/tikttok-has-created-small-business-success-stories-and-fast-tracked-american-dreams/.

16.     Attached as Exhibit 15 is a true and correct copy of SB 419, as enacted by the Montana Legislature on April 18, 2023 and signed into law by Governor Greg Gianforte on May 17, 2023, available at https://leg.mt.gov/bills/2023/BillPdf/SB0419.pdf.

17.     Attached as Exhibit 16 is a true and correct copy of the following article attributed to Fran Beyer and published by Newsmax on April 17, 2023: *Mont. AG Knudsen to Newsmax: State TikTok Ban First of Its Kind*, available at https://www.newsmax.com/newsmax-tv/tiktok-montana-ban/2023/04/17/id/1116448/.

18.     Attached as Exhibit 17 is a true and correct copy of an email I received on June 26, 2023.

19.     Attached as Exhibit 18 is a true and correct copy of the following article attributed to Will Oremus and published by The Washington Post on April 17, 2023: *Discord Leak Suggests China Doesn't Need TikTok to Find U.S. Secrets*, available

at https://www.washingtonpost.com/technology/2023/04/17/discord-document-leak-tiktok-ban/.

20.     Attached as Exhibit 19 is a true and correct copy of the following article attributed to Darrell M. West and Mishaela Robison and published by the Brookings Institute on February 16, 2023: *TikTok Bans Won't Guarantee Consumer Safety*, available at https://www.brookings.edu/articles/tiktok-bans-wont-guarantee-consumer-safety/.

21.     Attached as Exhibit 20 is a true and correct copy of Montana Governor Greg Gianforte's December 16, 2022, memorandum *Prohibiting the Use of TikTok on State IT Infrastructure*, available at https://governor.mt.gov/_docs/MEMO_221216_Banning_TikTok_on_State_Devices.pdf.

22.     Attached as Exhibit 21 is a true and correct copy of Montana SB 384, as signed into law by Governor Greg Gianforte on May 19, 2023, available at https://leg.mt.gov/bills/2023/billpdf/SB0384.pdf.

23.     Attached as Exhibit 22 is a true and correct copy of TikTok CEO Shou Zi Chew's June 30, 2022, letter to Senator Marsha Blackburn, et al., available at https://www.blackburn.senate.gov/services/files/A5027CD8-73DE-4571-95B0-AA7064F707C1.

24.     Attached as Exhibit 23 is a true and correct copy of TikTok's website titled *User Safety*, available at https://support.tiktok.com/en/safety-hc/account-and-user-safety/user-safety.

25.     Attached as Exhibit 24 is a true and correct copy of the Petition for Review filed in *TikTok, Inc. v. CFIUS*, No. 20-1444 (D.C. Cir.) on November 10, 2020.

26.     Attached as Exhibit 25 is a true and correct copy of the Status Report filed in *TikTok, Inc. v. CFIUS*, No. 20-1444 (D.C. Cir.) on Feb. 21, 2023.

I declare under penalty of perjury that the foregoing is true and correct. Signed in Seattle, Washington this 5th day of July, 2023.

_____

Ambika Kumar

# EXHIBIT 1

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**[00:00:00]**

**CHAIR AMY REGIER:** The House Judiciary will come to order. Will the Secretary please take roll?

**SECRETARY:** Thank you, Madam Chair, Vice-Chair Ler.

**VICE CHAIR LER:** Here.

**SECRETARY:** Vice-Chair, Bishop.

**VICE CHAIR BISHOP:** Here.

**SECRETARY:** Representative Mitchell.

**REPRESENTATIVE BRAXTON MITCHELL:** Here.

**SECRETARY:** Representative Sheldon Galloway.

**REPRESENTATIVE SHELDON GALLOWAY:** Here.

**SECRETARY:** Representative Smith.

**REPRESENTATIVE LAURA SMITH:** Here.

**SECRETARY:** Representative Deming.

**REPRESENTATIVE LEE DEMING:** Here.

**SECRETARY:** Representative Knudsen.

**REPRESENTATIVE CASEY KNUDSEN:** Here.

**SECRETARY:** Representative France.

**REPRESENTATIVE TOM FRANCE:** Here.

**SECRETARY:** Representative Carlson.

**REPRESENTATIVE JENNIFER CARLSON:** Here.

**SECRETARY:** Representative Howell.

**REPRESENTATIVE SJ HOWELL:** Here.

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**SECRETARY:** Representative C. Hinkle.

**REPRESENTATIVE CALEB HINKLE:** Here.

**SECRETARY:** Representative Duram.

**REPRESENTATIVE NEIL DURAM:** Here.

**SECRETARY:** Representative Hawk.

**CHAIR AMY REGIER:** Excused.

**SECRETARY:** Representative Zephyr.

**REPRESENTATIVE ZOOEY ZEPHYR:** Here.

**SECRETARY:** Representative Kmetz.

**REPRESENTATIVE GREG KMETZ:** Here.

**SECRETARY:** Representative Etchart.

**REPRESENTATIVE JODEE ETCHART:** Here.

**SECRETARY:** Representative J. Hinkle.

**REPRESENTATIVE JED HINKLE:** Here.

**SECRETARY:** Representative Rusk.

**REPRESENTATIVE WAYNE RUSK:** Here.

**SECRETARY:** Minority Leader Abbott.

**REPRESENTATIVE KIM ABBOTT:** Here.

**SECRETARY:** Chair Regier.

**CHAIR AMY REGIER:** Here. Good morning, everyone. We are going to begin with Senate Bill 419. We'll open Senate Bill 419. Senator, please open on your bill.

**SENATOR SHELLEY VANCE:** Madam Chair, member of the House Judiciary, my name is Shelley Vance, Senate District 34. I hail from Gallatin County, and I represent Belgrade and the surrounding area. It's an honor for me to bring you Senate Bill 419, a ban to – excuse me, a bill to ban TikTok in Montana. Weeks ago, China shocked our nation and our state when it flew a

2

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

surveillance balloon over Montana and other parts of our nation. This brazen intrusion of our national sovereignty gathered untold information in service of the Chinese Communist Party. Whatever information the balloon gathered, it surely fell short of China's other surveillance tool, TikTok. After years of investigative reporting, we now know this to be true. TikTok endangers the safety of Montanans and Americans at large. We know beyond a doubt that TikTok's parent company, ByteDance, is operating as a surveillance arm of the Chinese Communist Party and gathers information about Americans against their will or unknown to them. TikTok, which markets itself as a harmless mobile app, entices people to download the app like any other social media network to join viral dance trends, post funny entertaining content and all sorts of shiny distracting things. Once downloaded, TikTok has access to the most sensitive information on your device—your name, your home address, your personal network, your friends, your online viewing habits and whole host of other pieces of information. You're not the user, you're being used. Senate Bill 419 puts an end to China's surveillance operation in Montana. It's operative clause is simple: "TikTok may not operate within the territorial jurisdiction of Montana." Whenever TikTok operates where the criminal law of Montana applies, it's on the hook for $10,000 dollars. Penalties attached for each discreet violation and continue in the amount of an additional $10,000 dollars each day the violation occurs. This bill also provides for contingent voidness by allowing TikTok to operate in Montana if it severs its ties with ByteDance. Madam Chair, the Attorney General of Montana and others on his team are here with me today to speak on the bill. Thank you.

**CHAIR AMY REGIER:** Thank you. We'll begin with proponents in the room. I am limiting testimony to two minutes, both online and in the room. Thanks for being here.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Excuse me. Madam Chair and members of the committee, for the record, Attorney General Austin Knudsen here representing the Montana Department of Justice. I want to thank Senator Vance for bringing this very important bill. We've seen some amazing things in the last few weeks. As the Senators noticed – or as she noted, the surveillance spy drone that floated over our state, took pictures of our sensitive nuclear installations here in Montana, but let's just talk about TikTok, that we're talking about here today. We've seen some amazing things on Capitol Hill. We've seen bipartisan support for a federal ban on TikTok. I think that's pretty amazing in and of itself. We saw the CEO of TikTok

**[00:05:00]**

get in front of a bipartisan Congressional Committee and duck and dive and do everything he could to not say that TikTok is spying on Americans. We know that's exactly what TikTok is doing. TikTok is spying on Americans, period. TikTok is a tool of the Chinese Communist Party. It is owned by a Chinese company, and under China law, if you are based in China, you will cooperate with the Chinese Communist Party, period. If they request that data, they will – they required to turn it over, and that's what's happening here. We know this just from all the investigations that have gone on from our own internal investigations. There's a lot of people here behind me that are employees of the Department of Justice who are much more knowledgeable than I am and can provide some detailed information for you. I'm not one to ban private business, but I think this is an extraordinary situation. This is a business that is controlled

by an existential threat an enemy of the United States, and that's China's own words. China considers America it's largest enemy by their own military doctrines and publications. They see a war with the United States as inevitable, and they're using TikTok as an initial salvo in that war. So, I would strongly urge a due pass here. This is something we think we can defend and something we think we can enforce. So, thank you, Madam Chair.

**CHAIR AMY REGIER:** Thank you. Next proponent in the room.

**ANNE DORMADY:** Madam Chair and members of the Committee, my name is Anne Dormady—D-o-r-m-a-d-y. I'm the current Information Bureau Chief at the Division of Criminal Investigation with the Montana Department of Justice. I've been in the organization for 19 years. Part of my responsibility is coordinating threat response strategies for our state, both foreign and domestic. My team works closely with state government and federal law enforcement agencies all committed to protecting Montana and national interests from foreign interference. At the same time, I also oversee our Cyber Crime Unit and Internet Crimes Against Children Program, aggressively pursuing online sexual predators. I'm here today on behalf of Montana Department of Justice to discuss some observations and analysis regarding the impact of TikTok and the potential threat it poses to Montana. TikTok is owned by the company ByteDance, which is headquartered in Beijing. There are grave concerns with this popular app related to national security and China's influence through TikTok. TikTok has claimed that the company protects all American users' data and that the Chinese government officials have no access to it. However, ByteDance recent confirmed the company employees use TikTok to track U.S. journalists' IP addresses to find their location information to determine if employees were meeting with the media. FBI Director, Wray, and a Commissioner of the Federal Communications Commission, or FCC, have made public statements about concerns related to the economic and national security threat that the Chinese government poses to the United States, including statements specifically about TikTok. Last year, the Montana Department of Justice identified this threat posed by the app and banned the use on agency devices due to the potential foreign government security threat. Imagine if the app was used for nefarious reasons by the Chinese government to target staff by determining location data on where they lived, their routes of travel, who they communicated with, or any other sensitive information housed on state-owned devices. Finally, there are concerns on the threat the application poses to children by online predators. Nationally, predators have been found guilty of using TikTok to commit child exploitation by targeting minors viewing and even distributing child pornography. The Montana Internet Crimes Against Children Program, which is one of the units I oversee, has received multiple cyber tip reports on concerns that child exploitation is occurring through TikTok. Chair and Members of Committee, as our federal partners continue to assess the impact to national security given what we know, then it is reasonable to ask if the Chinese government should be able to track and control the data collection on Montana's citizens. We have a responsibility to protect our citizens from harm, and as innocent -

**MALE VOICE:** Madam Chair, time is up.

**ANNE DORMADY:** - and entertaining as this software system appears to be, it can be used for malicious intent with global implications of harm. Thank you for your time.

4

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**ERIC TARR:** Good morning. Madam Chair, my name is Eric Tarr—T-a-r-r-. I'm the Information Security Officer for the Department of Justice. My role here today is to talk about the data extrapolation and understand how TikTok is taking our personal data and using it for their benefit.

**[00:10:00]**

If you look at the privacy policy of TikTok and read it, it actually tells you it will scan things more than what's just on the app. As soon as you open it, it will scan everything on your device, including your computer files, and any other data. So, the point that we're trying to make is there's a lot more on the back end that TikTok is grabbing from the citizens of Montana, and we see the traffic going to China. So, 30 percent of the traffic is always going to China from the IP addresses that TikTok and ByteDance are using. The main issue I have is the data protection. So, we have to protect the integrity of the data and the citizens, and that's why I'm here today. So, I will answer any technical questions if you had them. So, thank you.

**CHAIR AMY REGIER:** Thank you. Next proponent. No further proponents in the room? Moving online, Steve Cape.

**STEVE CAPE:** Mr. Chairman, Members of the Committee, thank you for having this bill and a hearing and the witnesses. I come here on behalf of a Montana Coalition for Safety and Justice. Privacy has become a major issue with us because privacy and data security is key to a free society and the safety of our citizens. With that, I testify with a background in data security. I am a member of the International Association of Privacy Professionals. I also sit on the American Bar Association in Cyber Security, Privacy and Digital Rights Committee. I also sit on the Human Rights Committee. TikTok is one of the greatest dangers when it comes to privacy security, and is a great danger to our citizens, it's a great danger to our children. Within 40 minutes of using TikTok, your information off your computer has been sent to China an a profile has been made based on what you're watching.

**ANNOUNCER:** Madam Chair, one minute left.

**STEVE CAPE:** If you're depressed, you will successfully be sent more depressive videos finally to how-to-kill-yourself videos. If you're a child molester, they pick that up and immediately within 55 minutes, you're in the middle of child exploitation videos. If you have any other personal issue, it will take you right to [PH] viddies and feed on them. While you're watching it, it's taking all your data. It's taking all the data of anything that's connected to your device. So, your phone, your connections, your contacts, your children's information, the children's information and who they play with and talk to is all being sent to China. It's all being exploited. It's all being used. Using TikTok is the digital equivalent of inviting Bundy, Adolf Hitler, [PH] Mangala right into your own house.

**CHAIR AMY REGIER:** Joel Thayer.

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

**JOEL THAYER:** Thank you, Madam Chair and esteemed Members of this Committee for allowing me to testify in support of SB419. My name is Joel Thayer and I am a practicing attorney in the technology space in Washington, DC, and am President of the Digital Progress Institute, which is a nonprofit organization that advocates for incremental changes in the tech sector through bipartisan consensus. It is my view that SB419 presents a measured bill that seeks to address an important public policy concern, which in this case is the Chinese government's use of China's own technology to surveil American citizens. Candidly, given the lack of federal leadership regarding a commercial ban of TikTok, Montana is well suited to act as a leader here. It's undeniable that TikTok is more than just an innocuous dancing app. It is a sophisticated tool designed to monitor your every move and collect your physical characteristics, much like other social media companies do. However, TikTok has one troubling distinction from its competitors, the Chinese government may be the one watching. Such potential access from a foreign government to Americans' data drove the Biden administration to call for a full ban of the app.

[OVERLAY]

**MODERATOR:** Madam Chair, one minute.

[OVERLAY]

**JOEL THAYER:** [INDISCERNIBLE] President Biden's call for a ban hearkens back to what the Trump administration attempted in its 2020 order. Strangely, some take issue with ban the app commercially on the grounds that TikTok has a First Amendment right to be in our markets. However, the First Amendment does not prevent the government from imposing a ban on TikTok. The courts have been very clear on this issue.

**[00:15:00]**

The government would be acting here based on TikTok's conduct, namely its action that present an unacceptable national security threat, not based on the content of TikTok's speech or that of its users. Courts have consistently distinguished between conduct and speech to determine whether the First Amendment is applicable or prohibitive towards the enactment or enforcement of a particular policy. I appreciate the opportunity to testify, and I look forward to addressing your questions regarding this important bill.

**CHAIR AMY REGIER:** Bryan Burack.

**BRYAN BURACK:** Madam Chair, Members of the Committee, my name is Bryan Burack—that's B-u-r-a-c-k, and I'm the Senior Policy Advisor of the Heritage Foundation's Asian Study Center here in Washington, DC. Madam Chair, TikTok presents a unique national security threat that can only be resolved through a ban. Like many social media apps, TikTok turns a cellphone into a powerful surveillance device, but TikTok is different than other social media giants. Its parent company, ByteDance, is ultimately controlled by the Chinese government and the Communist Party of China. ByteDance is obligated under Chinese law to share data with the government and to assist them with intelligence operations. The government owns a golden chair

6

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

in ByteDance, which gives them a seat on its corporate board and the power to select ByteDance's so-called editor in chief, who is really its chief sensor and happens to be the secretary of ByteDance's Communist Party [PH] cell. TikTok's government connection is on full display during the CEO's Congressional testimony here in Washington last week. Although ByteDance has structured itself so that technically TikTok and its Chinese business are separate subsidiaries of a Cayman Island's parent, the members of Congress easily recognized that this is a shell company and that decisions are made in Beijing.

[OVERLAY]

**MODERATOR:** Madam Chair, one minute.

[OVERLAY]

**BRYAN BURACK:** [INDISCERNIBLE] is led by the same person in charge of ByteDance's larger business in China. Important TikTok staff report to ByteDance, not TikTok's CEO, and although the CEO promised not to comply with Chinse government demands, members on both sides of the aisle just didn't believe him. His bosses are legally required to help the Chinese government collect intelligence or interfere in the United States. ByteDance has tried to hide TikTok's government control behind this elaborate corporate structure. They've made grandiose promises about new security measures, but the truth is, they simply can't guarantee the privacy of American users. Under the control of the CCP, TikTok is the perfect tool for mass surveillance, political interference and influence operations. The app should be banned. I thank the Chair and the Members.

**CHAIR AMY REGIER:** Keith Krach. Mr. Krach, you're on mute.

**KEITH KRACH:** Can you hear me now?

**CHAIR AMY REGIER:** We can hear you.

**KEITH KRACH:** Okay. Good morning, and I appreciate your leadership on this issue because the reality we face as a nation is one of every increasing cyber warfare and seemingly ceaseless intense variations of weaponized technological competition. I served as Undersecretary of State. My mission was to develop a global economic security strategy to maximize national security, drive economic growth, and combat authoritarian aggression. Both sides of the aisle watched, and understand that our rivals are playing the long game, and they're playing a game of keeps, a game of four dimensional military, economic, diplomatic and cultural chess with technology at its core. And TikTok is one of China's most potent weapons. For the purpose of this critical legislation, let me just emphasize three key points. First, TikTok is controlled by the Chinese government from a legal, structural, governance and leadership perspective. It's one percent golden share stake even guarantees TikTok's algorithm can be manipulated by the Communist Party.

**MODERATOR:** Madam Chair, one minute.

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**KEITH KRACH:** Second, TikTok is programmed to be weaponized. It tracks keystrokes as well as password and location, and it also preys on children. It's disguised as candy, but it's really cocaine. I won't let my 11-year-old twins near it. And to make matters worse, it's not just about you or your children, it's about everybody you digitally interact with—your friends, your family, your business associates and everyone in your life. It's like a weaponized digital virus. And then third, it's also a powerful propaganda tool, and that's why posts on something like Tiananmen Square or democracy in Taiwan seem to magically disappear. Finally, the Chinese government and TikTok are spending millions of dollars on the best lobbyists and lawyers.

**CHAIR AMY REGIER:** Mr. Johnson, I need to have Mr. Krach state an spell his name for the record.

**MR. JOHNSON:** Madam Chair, I will bring him back.

**[00:20:00]**

**CHAIR AMY REGIER:** Mr. Krach, I need to have you state and spell your name for the record.

**KEITH KRACH:** Keith Krach—K-r-a-c-h.

**CHAIR AMY REGIER:** Thank you. And are you representing anyone in particular?

**KEITH KRACH:** Excuse me?

**CHAIR AMY REGIER:** Are you representing anyone in particular?

**KEITH KRACH:** Yes, the Krach Institute for Tech Diplomacy at Perdu.

**CHAIR AMY REGIER:** Perfect. Thank you. Seeing no further proponents online, we'll move to opponents in the room. First opponent.

Here for the next bill really, but I'm kind of worked up about this bill too. You know, I think we're picking –

**CHAIR AMY REGIER:** Senator, please state and spell your name?

**SENATOR JEREMY TREBAS:** Thank you. Yeah, appreciate that. Jumped ahead of things here. Thought you all knew me already. Senator Jeremy Trebas—T-r-e-b-a-s—just speaking on my own behalf here. Why are we picking on one app? Just because it's owned by China? If you Google anything, you look up news stories, who else is spying on us domestically? Facebook, how long have they been doing that? Facebook and Google participated in the Prism Program back when Obama was president in 2013, and they passed that information off to the NSA frankly. And most recently, Facebook was spying on American citizens who were taking about

8

the election results of 2020, passing it off to the FBI. So, if we're going to ban these things, let's ban them all. Let's ban Google, let's ban – Twitter might be okay now, I'm not sure. Let's ban Facebook especially. So, if we're going to do this, let's ban them all and protect all of our citizens, right? The other question I ask you is, if I choose to put this app on my phone, is Google spying on me in the shower or TikTok?

**MODERATOR:** Madam Chair, one minute.

**SENATOR JEREMY TREBAS:** Maybe so, but I made that choice, and I know all these apps are spying on me, so I make the choice to put these apps on. I make the choice to have a cellphone frankly, which hacks my location and could be hacked by the Chinese government at any point, and they could know where I am. So, we're going to be spied on no matter what. So, let's not pick on one app. Otherwise, let's broaden the topic and talk about them all. Thanks.

**CHAIR AMY REGIER:** Next opponent.

**SHAUNA WHITE BEAR:** Hi, I'm Shauna White Bear, spelled –

**CHAIR AMY REGIER:** Get in front of the microphone, please.

**SHAUNA WHITE BEAR:** Hi, Shawna Whitebear, spelled S-h-a-u-n-a, White Bear is two words. Senator Shelley's Vance bill banning TikTok in Montana is anti-business, and it will potentially shut down thousands of small businesses like mine. My business, White Bear Moccasins, is thriving because of TikTok. When the pandemic hit, the platform not only kept me connected with my customers, but also, I was able to grow my business. Small businesses across the country make their livelihoods from TikTok in a way that energizes communities and puts money in local economics. Senate Bill 419 will create unsettle – excuse me – will also show Montana does not support entrepreneurs in our own state. It will deprive thousands of growing businesses currently active on TikTok, and Montana of a free tool that helps companies succeed and ultimately delivers meaningful economic impact to the state. White Bear Moccasins, for example, sees a significant percentage of its business generated on TikTok. Not only has it been great –

**MODERATOR:** [INDISCERNIBLE], one minute.

**SHAUNA WHITE BEAR:** - for my company, but it's an amazing tool to help communities grow. Indigenous makers like me thrive on it. This platform has opened wonderful opportunities for other makers and me. People who may not have gotten the same traction on Instagram flourish on TikTok. It has a much larger reach. Someone with 5000 followers on Instagram may have 100,000 on TikTok. Vance's argument that safety public is at risk because people will attempt the viral challenges presented on the platform is flawed. The bill points to challenges such as attempting to climb stacks of milk crates and cooking chicken in Nyquil. These challenges are promoted across platforms such as Facebook and Instagram as well. Why should the financial wellbeing of small businesses be tied to whether someone decides to do something

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

unsafe? These are individual personal decisions. Shutting down TikTok and putting it's makers livelihoods at risk is not going to stop people from making bad decision.

**MODERATOR:** Madam Chair, two minutes.

**SHAUNA WHITE BEAR:** Look, too, at what TikTok has done to connect people to the rest of the world.

**[00:25:00]**

**CHAIR AMY REGIER:** Time is up. Next opponent in the room.

**VICTORIA CHEYENNE:** Good morning. My name is Victoria Cheyenne—C-h-e-y-e-n-n-e. Today I ask you think about when you were 18 years old. Maybe you were on your way to college or imaging what dreams, careers, futures you wanted to explore, but difficulties of figuring out who you could be and the paths to get there. When I was 18 years old, I threw myself headfirst into the film and television industry, struggling to find mentors, educators, voices of guidance. My name is Victoria Cheyenne. Today I work at producing, editing and directing at Paramount, one of the world's largest producers of entertainment. I'm proud to work for a company occupying space for innovative storytelling and being behind hit Montana shows like Yellowstone and 1883 that have contributed massively to the $191 million dollars in direct spending in Montana, and over 840 fulltime jobs for locals, just between 2020 and 2022 alone. I'm also an indigenous filmmaker who has spent the last year working on a documentary with Native students at Montana State University in Boseman. So, how do I hire entertainment workers? How do I spread education, awareness, how I document and spread enthusiasm for a growing film industry in Montana?

**MODERATOR:** Madam Chair, one minute.

**VICTORIA CHEYENNE:** The answer is TikTok, a platform where I've been able to uniquely reach millions of people contributing to young people across Montana having direct access to freedom of speech, access to education, access to learn how to enter the industry, an industry that is not predominantly in Montana, but Montanans have benefited from. Something that makes the United States so special is this access to freedom of speech, access to education, access to learning how we can reach all of this. Why would we want to make choices like China to limit our access to public education, public information? Why would we want to hurt Montana small businesses, students, workers and artists by banning a tool that directly contributes to the community and economy? Thank you.

**CHAIR AMY REGIER:** Next opponent.

**KEEGAN MEDRANO:** Chair Regier, Members of the Committee, my name is Keegan Medrano—that's M-e-d-r-a-n-o—and I'm here representing the American Civil Liberties Union of Montana. We oppose SB419 which prohibits TikTok from operating in Montana, targeting app stores and fining this private business and any entity helping TikTok through fines of

$10,000 dollars per day. So, firstly, I want to flag, we're unsure of how this bill would be implemented without an expansive exercise of government overreach. So, SB419, again, prohibits its operation and targets app stores, but I'm curious as to what is stopping me from accessing TikTok through a VPN? How will the state will know if I'm accessing it through a VPN? I mean, what's the enforcement model for this? So, there are many alternative ways to seek out this information, and that's ways that people can access information. We also believe that, again, this is a blatant exercise of censorship and is an egregious violation of Montanans' free speech rights. So, the bill deprives Montana, or people in Montana from their ability to engage with diverse viewpoints and ideas. People have engaged on TikTok on things like alternative viewpoints on vaccinations –

**MODERATOR:** Madam Chair, one minute.

**KEEGAN MEDRANO:** - and other ideas. Targeting one app from another country does not solve whatever problem proponents think they are solving. Banning TikTok, we also believe, would lay the groundwork for excessive government control over the internet and violate our constitutional right to free expression. The First Amendment protects our ability to speak, to receive information, and to associate freely, and this legislation is an egregious violation of that. And we believe that neither the state or the federal government has the authority to ban speech in this way. And as previous opponents have mentioned, what differentiates this app from other apps, which also takes in our data, tracks us, collects biometric information? So, please oppose SB419. Thank you.

**CHAIR AMY REGIER:** Further opponents in the room. Seeing none. Moving online, Daniel Carlino.

**DANIEL CARLINO:** Hey, my name's Daniel Carlino. I'm here to fight against the big government overreach that's going on in this room, and to help protect Montanans' rights. Social media companies do need to be reeled in, and I'd like to see regulation to protect our privacy, but banning TikTok at Montanans' expenses is not [INDISCERNIBLE] Facebook/Meta will profit off of this bill and is going to gain more power and control off of bills like this. This bill does not solve the problem of social media companies taking away our privacy, but this bill does just empower companies like Meta and Facebook to have more and more power to take away our privacy.

**[00:30:00]**

I ask that you do not take away Montanans' rights, and I ask that you stand up against this big government overreach and vote "no".

**CHAIR AMY REGIER:** Christopher Marchese.

**CHRISTOPHER MARCHESE:** Good morning, Chair, and Members of the Committee. My name is Chris Marchese spelled M-a-r-c-h-e-s-e, and I serve as Director of Litigation for NetChoice. I respectively ask that you vote against SB419 for two reasons. First, it violates the

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

First Amendment and risks unintended consequences. As we heard from earlier speakers here today, TikTok is a platform for Americans to share their free speech. And even if everybody in the room is convinced that TikTok poses a security risk, the bill is not narrowly tailored enough to survive a First Amendment challenge. For example, the bill encompasses innocent third parties that are not the subject of the bill, including apps and app stores. That alone is enough to give the court some skepticism about the bill's constitutionality. So, at the very least, the committee should rework the bill to do what it actually is alleging to do, but also recognizing that the First Amendment prohibits the government from banning Americans from using a platform or from accessing content on that platform. Now there is a CFIUS review that is ongoing at the federal level, and that choice respectively asks that the Committee wait until that review is over.

**MODERATOR:** Madam Chair, one minute.

**CHRISTOPHER MARCHESE:** Otherwise, legislation like this might interfere with efforts to ensure that Americans can still use TikTok while addressing any privacy concerns the U.S. government has. Thank you.

**CHAIR AMY REGIER:** Frederick Baker.

**FREDERICK BAKER:** Hello. My name is Frederick Baker—B-a-k-e-r. I'm in opposition of Senator Shelley Vance's bill proposing to ban TikTok in Montana as I believe it's an unwarranted attempt to control and regulate information. Many perceive TikTok as merely a platform for teenagers to share dance videos, but its offerings go far beyond that. TikTok serves as a valuable resource for small businesses in Montana seeking advice and support, a hub for building and [PH 00:32:26] finding community, and a vital network for those in recovery from addiction. As a 39-yaer-old combat veteran and small business owner based in Montana, I can attest to the positive impact of TikTok. After overcoming opioid dependency, legal troubles and rehabilitation, I started a metal fabrication business called Metal Tech. Promoting my business on TikTok led to significant growth and revenue, far surpassing the results from Facebook and Instagram.

**MODERATOR:** [INDISCERNIBLE 00:33:00]

**FREDERICK BAKER:** I've been able to grow my business from a plasma table and a shipping container in my backyard to my spacious shop. Not only has TikTok been instrumental in the success of my Montana-based business, but it has also contributed to my personal development and recovery journey. Addiction recovery needs community, and TikTok offers an accessible and supportive network for Montanans and similar situations. Unfortunately, this bill jeopardizes the powerful tool for personal and professional growth in Montana. By attempting to ban TikTok, the government infringes upon our First Amendments rights of freedom of speech, setting a dangerous precedent for further erosion of our constitutional rights that I and my fellow soldiers fought to protect. This legislation not only endangers businesses in Montana, but also puts nonprofits like My Hoodies for Heroes at risk, and we're –

**CHAIR AMY REGIER:** David Edmonson.

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**DAVID EDMONSON:** Good morning, Chair Regier and Members of the Committee. My name is David Edmonson. That's E-d-m-o-n-s-o-n, and I'm here on behalf of Tech Net respectfully testifying in opposition to SB419. Listening to today's testimony and the bill layout, I understand that the bill seeks to prohibit the use of TikTok in Montana. However, as currently written, SP419 would affect separate technology companies that we do not believe are the intended targets of the legislation, specifically companies that operate app stores. As drafted, a company would violate the provisions of the bill simply by having the app listed as an option to be downloaded within Montana. App stores, however, do not have the ability to geo-fence on a state-by-state basis, and it would thus be impossible

**[00:35:00]**

for our members to prevent the app from being downloaded specifically in the state of Montana. We therefore urge this Committee and the House to narrow the bill by removing the references to mobile application stores. Appreciate your consideration and thank you for your time.

**CHAIR AMY REGIER:** Seeing no further opponents online. Do we have any informational witnesses in the room?

**ANNA SCHNEIDER:** Madam Chair, Members of the Committee, my name is Anna Schneider—S-c-h-n-e-i-d-e-r. I am the Bureau Chief for the Office of Consumer Protection with the Department of Justice, and I am here to answer any questions that you may have regarding the investigation and litigation.

**CHAIR AMY REGIER:** Thank you. Further informational witnesses. Seeing none. Questions from the Committee? Representative Kmetz.

**REPRESENTATIVE GREG KMETZ:** Madam Chair, I have a question for the Attorney General.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative.

**REPRESENTATIVE GREG KMETZ:** Madam Chair, Attorney General, what are out kids being exposed to on TikTok?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative Kmetz, a lot of harmful stuff frankly. The more we dig into an investigate the content—and I want to stress, this bill is not about content—I don't care what the content on TikTok is, I'm concerned with the spying applications for the Chinese Communist Party. But with that said, as a parent of teenage kids, it's certainly something I've looked into. There's a lot of dangerous content that TikTok pushes. There was an investigation earlier in the year, some really good investigative journalism where a handful of news outlets put together basically false profiles. Built a profile for themselves on TikTok and rolled in TikTok and put themselves out there as 13-year-old and 14-year-old children. And within a matter of less than an hour, these "children" were being fed

13

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

content from TikTok, pornographic content, drug abuse content, suicide content. Frankly stuff that no 13 or 14-year-old child should be exposed to. And again, I want to stress, this bill is not about content. This is about TikTok being abused and used a foreign entity to spy on Montanans and spy on Americans. However, I do have some content – definite content concerns being pushed on children by TikTok. Madam Chair.

**CHAIR AMY REGIER:** Representative Ler.

**REPRESENTATIVE BRANDON LER:** Also, for the Attorney General.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Mr. Vice-Chair.

**REPRESENTATIVE BRANDON LER:** Madam Chair, eg, what types of information can TikTok harvest from its users.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** This is pretty amazing. Madam Chair, Representative Ler, this is pretty amazing stuff. First of all, I will say that Mr. Tarr might be able to provide some better information on this, but I have done some of my own research on this. If you look at the actual privacy settings that TikTok has available on its app--most people just scroll through that stuff and click "accept" and just go--but if you actually look into what they can collect, it's quite concerning. First of all, TikTok basically gave itself permission to collect all of your biometric data. Your keystrokes, but let's talk about facial recognition. I mean, that's one that's very concerning to this legislature. We've already seen some legislation moving. They're collecting your facial recognition data, and it says right in their privacy settings that they're doing that. They're scanning the backgrounds of all your other apps on your phone. That was stated earlier, but I really want to stress that. I mean, you are allowing ByteDance and therefore the Chinese Communist Party access to everything on your phone. They're scanning all of your files. They're scanning all of your other apps. They're tracking your background information. They're tracking your location. They're going so far as to when you post that funny video on TikTok, they're scanning the background information in that video and in that photographic evidence for any kind of sensitive useful intelligence. Is there anything in that picture we can use? So, this is pretty astounding stuff. I'm not going to stand here and defend any of the other social media companies either. I think they do certainly some egregious things, but none of them to that level. None of the other applications are collecting data on that level.

**REPRESENTATIVE BRANDON LER:** Follow up.

**CHAIR AMY REGIER:** Go ahead.

**REPRESENTATIVE BRANDON LER:** Last question, why should Montana ban this if the federal government is already looking at doing so.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Mr. Chairman – Madam Chairman, Mr. Vice-Chair, that's a great question. First of

**[00:40:00]**

all, I think Montana's got an opportunity here to be a leader. No other state has done this. Secondly, I think we found an actual enforceable mechanism for us to do that. Third, there's no guarantee that the feds are actually going to act here. I mean, there's a lot of saber rattling going on, and it's bipartisan, which I'm really, really excited about. I'm glad that both sides of the aisle are equally concerned about national security, equally concerned about providing intelligence to a stated enemy. And again, I really want to stress that. In Chinese People's Liberation Army published materials—and you have to understand that the PLA, the People's Liberation Army in China is not a stand-alone entity. It is an arm of the CCP. It is an arm of the Chinese Communist Party. So, nothing comes out of the military doctrines without signoff by the CCP. In China's military published manuals and a lot of their training materials, they don't refer to the United States as "the United States". They refer to us as a term that is best translated as "strong enemy". That is their term for the United States in all of their military doctrine and all of their training manuals. So, at the outset, we are dealing with a foreign actor who views the United States as an existential enemy. To me, that's the real concern here. So, I think Montana's got a great opportunity here to be on the cutting edge and be the first, be out in front of this. But really, I'm concerned about whether the feds are actually going to do anything here. Madam Chair.

**REPRESENTATIVE BRANDON LER:** Thank you.

**CHAIR AMY REGIER:** Representative Mitchell. Chair, I have one for the AG, also.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative.

**MITCHELL:** Madam Chair, Attorney General, so from my understanding, TikTok is banned in China. So, why do you think that China, they isolate their app from their kids and their own culture but why do you think they're not isolating it from the kids in our country.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative Mitchell, that is an excellent point and thank you for bringing that up. That's a great point for folks that maybe don't know that. The version of TikTok that we get here in the United States, the Chinese government doesn't even allow its own citizens to have access to. They don't let their children see the content that they push on our children, and I think there's a real question there. Why is that? Again, I'm kind of a nerd on this stuff, and I was doing some reading into Chinese military doctrine, like what are they training their soldiers and their military brass? Well, they have a think asymmetric warfare, and one of their stated goals, stated tools within a lot of their military doctrine is aimed at creating social unrest, creating – undermining our country through media, through social media. They view this as a weapon of war, as a tool to undermine our country, and I think we have to ask ourselves if a lot of the dangerous content that is being pushed into American and onto American children is not allowed in China for their own children, we have to ask ourselves just exactly how fair is this? Representative, Madam Chair.

**CHAIR AMY REGIER:** Follow up?

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

**REPRESENTATIVE BRAXTON MITCHELL:** For Mr./Miss Tarr, can't remember who.

**ERIC TARR:** Madam Chair, Mr. Revenue.

**REPRESENTATIVE BRAXTON MITCHELL:** Now I'm sure, Mr. Tarr, can you explain to the degree of control that the CCP has over ByteDance and TikTok, and then how specifically does China access data from American users? Because I mean I know if I go on my phone here, if I have the app downloaded, you grant access to microphone, you grant access to photos, you grant access to this, that and this. Unless that application is closed, and they don't necessarily have to be on it, at anytime, anywhere you go, they have access to what you're doing, what you're streaming, what you're saying through your microphone. Do you know how they access all that and if they do when you're not –

**ERIC TARR:** Madam Chair and Mr. Representative, I don't have all the technical details on that right now. I do know if you leave the app running in the background, it's still scraping information on your phone. So, if you don't close app out on the phone, it's still going out there and extrapolating all the information. So, any files you open during the day, if that app is still running on the back end, it's going to grab that information, text messages and anything like that. And as far as the first part of your question, I don't have that information for you.

**REPRESENTATIVE BRAXTON MITCHELL:** Just one more.

**CHAIR AMY REGIER:** Go ahead.

**REPRESENTATIVE BRAXTON MITCHELL:** Are there any less restrictive ways for kind of protecting Montana's interests, other ways of maybe going about this potentially? And do you think this is a constitutional effort?

**ERIC TARR:** I'm probably not at the level to answer that one, so I might have to defer.

**[00:45:00]**

Sorry.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** I got pointe at, Madam Chair. May I answer?

**CHAIR AMY REGIER:** You may. Thank you.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative Mitchell, I think this is the least restrictive way for us to do this. I want to stress, I mean, we made it appoint, we're not coming after individual users. I have no interest in doing that, and the bill before you specifically prohibits that. The easiest way for us to do this is through the Google Play Store and the app store in Apple. Despite some testimony that you heard earlier from opponents, they do have the ability to block certain apps. They do have the ability to geo-fence certain apps out of Montana. That technology exists and it's in use. I'll point to certain gambling

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

apps. Gambling is legal is some states, it's illegal in other states. Lottery is legal in some states, it's illegal in other states. Why is it when you drive between states, suddenly your gambling app in one legal state shuts off and is not able to be used in the state you're visiting? It's because they geo-fenced that app out. That technology exists. Likewise both Google and Apple block certain apps every day for all kinds of different reasons, but we know there are certain apps that for whatever reasons—political, financial, whatever they may be—that those entities block from their application stores. So, the idea that this can't be done is just simply not true. It can be done quite easily and there's a lot of data out there that that's doable. The constitutional question, I do think this will withstand First Amendment scrutiny, Madam Chair and Representative. Again, we've done this in the least restrictive way we can, number one. Number two, this is not content-based. This has got nothing to do with the content put out by TikTok. This has to do with their use as a spying tool on Americans by a foreign enemy. And I think that really is the key legal argument here, and we are kind of in uncharted waters here a bit. I mean, this has never really been litigated before, and frankly, we might need the U.S. Supreme Court to weigh in on this one. What is now the public square? When we're talking about the First Amendment, what is the best way to get your message, to get your free speech out there? It's not longer to stand on an apple cart in the public square and give a speech. It's to get on social media. We know that. The best way to spread your message is via social media. Well, what do you do with an entity, a social media entity that is controlled by a foreign enemy and is being used by that foreign enemy to spy on Americans? This is really unprecedented, we don't really know the full legal implications here, and I this might be something that the courts need to weigh in on. So, from that standpoint alone, I think this legislation is valuable, but I do think it's going to withstand scrutiny. We've dug into this quite deeply. I'm very comfortable, Representative.

**REPRESENTATIVE BRAXTON MITCHELL:** Thank you. AG, one more follow up just for Mr. Edmonson online.

**CHAIR AMY REGIER:** Go ahead. Sorry, who did you say?

**REPRESENTATIVE BRAXTON MITCHELL:** Mr. Edmonson online.

**CHAIR AMY REGIER:** Mr. Edmonson.

**REPRESENTATIVE BRAXTON MITCHELL:** Madam Chair, Mr. Edmonson, to kind of elaborate on what the Attorney General was saying, so obviously right now, we have app – Montana, I'm not sure, you said you were from Texas, so Montana, sports betting is illegal, so apps like DraftKings, FanDuel, Sportsbook, all that stuff is all prohibited in Montana. So, you're saying that it's unenforceable to geo-fence a location, specifically Montana. I don't understand where you're getting that from. I think it's pretty easy to geo-fence or shut down an app. Obviously, you can download an app still, but it might just buffer, but I think it's pretty easy from my understanding to prevent an app from being used in the state. Are you just saying that because it's out of your convenience to do so or –

**DAVID EDMONSON:** Madam Chair, Representative, no, sir. So, while that conversation was just going on, while the Attorney General was talking, so I am in Texas and I can't do sports

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

betting via an app. I downloaded the app to be able to do so, but the compliance is on the app to verify my location--I mean, I literally just did this—to ensure that I am in a location in which gambling is allowed. So, the app is the actual one that ensures that they are able to operate in an area in which it's not restricted. During my testimony, I mentioned that app stores aren't able to geo-fence on a state-by-state basis. They do so on a national level, but don't have that capability at a sub-national

**[00:50:00]**

level. And the issue comes about over the fact that state borders are going to be hard borders in the same sense as national ones. You know, consider someone that is near the border in Montana in another state but their wireless service might be using a tower in another state. So, that person is going to be located in Montana physically, but their cell service is being provided by another state. And so, removing the app store provisions wouldn't make the ban meaningless. Instead, it would just place the responsibility on TikTok much like it is with gambling apps.

**CHAIR AMY REGIER:** Representative Jed Hinkle.

**REPRESENTATIVE JED HINKLE:** Thank you, Madam Chair. I guess I'll start out with the sponsor.

**SENATOR SHELLEY VANCE:** Madam Chair, Representative.

**REPRESENTATIVE JED HINKLE:** Thank you, Madam Chair and Senator, couldn't let you off in the hearing here. I don't know if you will be able to answer this question, so you can re-refer if need to be, but I notice that the internet service provider was struck out of the bill. Guessing that must have happened over in the Senate. I heard just some rumblings about the internet service provider and how that's really the teeth if the State of Montana were to ban TikTok. However, it was taken out of the bill. Could you help us to understand why it was taken out of the bill and/or if it needs to be put in the bill to make what we're trying to do here, or what you're trying to do here successful?

**SENATOR SHELLEY VANCE:** Madam Chair, Representative. Hinkle, I will try to answer your question, but I am going to defer if I – if we need further explanation on that. My understanding is, okay, I'm going to go old school. I recognize the fact that we have got a minimum of three generations in this room, maybe a little older than that, I don't know, or more than that. I don't know. So, my explanation would be going old school, a telephone line is like an ISP to a landline. So, take it down to one of these, the ISP, the internet service provider is like the line of connection between the apps that we put on our phone and the actual phone. So, any further? Okay. That's me – so, we took it out because it was a situation where the ISPs were not the ones that are doing the spying. They're not the ones that this bill is all about. Thank you.

**REPRESENTATIVE JED HINKLE:** Thank you, and if I could also, Madam Chair, ask a question of the Attorney General?

18

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

**CHAIR AMY REGIER:** Attorney General?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative Hinkle.

**REPRESENTATIVE JED HINKLE:** Thank you, Madam Chair, Attorney General. So, what I'm looking at it, and I think you touched on a little bit with Representative Mitchell's question, but I'm looking at just to try to get a picture of how this is really going to be enforced in Montana should this bill go forward, and if you have any comments on the internet service provider, whether that's actually a key part of the legislation or – just give me a picture of how this is going to work, should this be signed into law in the state of Montana. We have individuals who already have this on their phones. We have individuals from out of state that may be coming into Montana with this on their phones. And then also there's a question of simply switching off your location on your phone and then being able to download the app that way, and to get around – if you could just cover kind of those topics. Thank you.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Sure. Madam Chair, Representative Hinkle, I'm going to state at the outset, I'm not IT guru, so some of that might be a little out of my wheelhouse, but let's talk about enforcement, how this could – well, let's talk about ISPs first. We felt that was an appropriate amendment to make in the Senate after some discussions with a lot of the ISPs, a lot of the cellphone carries, because that's usually how people are downloading content. We didn't think it was necessarily appropriate to hold them accountable for what the end user of the phone, number one, but number two, I think more importantly, the application store is offering. So, from an enforcement standpoint, no, I don't think that ISP component is necessary to the bill. We're comfortable with this. In fact, I think this is a

**[00:55:00]**

better product. I mean, really what we're talking about is the application markets. That's how we're going to enforce this. I want to stress again—and it says right in the bill—we cannot enforce this on the end user. If you've got TikTok on your phone, you want to download TikTok on your phone, you're not going to get a knock on the door from the Department of Justice. We're specifically precluded from doing that. What we can do for enforcement is civilly go after Google and Apple for offering this product on their application stores, and that's how we're going to enforce this. It'll be done through our Office of Consumer Protection. That's where we've got the teeth under the Montana Unfair Trade Practices Act, and we've got investigative authority, and we've got civil enforcement authority through that office. So, from that standpoint, I think we're good. I forget the last part of your question, Representative. I apologize.

**REPRESENTATIVE JED HINKLE:** Madam Chair, Attorney General, the last part of the question was, I guess, just switching off the location data – the location on your phone and then being able to still download the app because there is no location. And then with that, and I'm still asking a question, are there any other entities beyond Google and Apple who offer that app? As you know, I'm a flip hone user, and I don't even download apps. So, if everyone wants to be safe from TikTok, I think you should go back to flip phones. But anyway, if you could just kind of touch on those subjects. Thanks.

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair and Representative Hinkle, the further down this rabbit hole I go, the more I agree with you, and I'm considering going back to my trusty old flip phone. And for the record, that's what I got my children when they wanted a cell phone for the house. I got them a flip phone. Representative, some of that stuff is probably a little out of my wheelhouse just from a technical standpoint. I don't know how that works if you shut your location services off, if that somehow bypasses and allows you to download from a geo-fence. I don't believe that is the case, but technically I'm not in a position I can answer that. Maybe Mr. Tarr can? I'm getting nods here. Can we get Mr. Tarr up here to re-refer that, Madam Chair?

**CHAIR AMY REGIER:** Yes, Mr. Tarr?

**ERIC TARR:** Madam Chair, Representative, so I believe the question is how, if you turn off the geolocations on your phone, is TikTok still able to track that? As the AG pointed out earlier, even if you take a video with the geolocations off, they're still tracking that information by extrapolating the geolocation in the video.

**REPRESENTATIVE JED HINKLE:** Madam Chair, Mr. Tarr, I think my question is can you switch your location off on your phone to get around the prohibition of downloading the app? That's what I'm looking for?

**ERIC TARR:** Oh, okay. Sorry. Probably not through a DNS umbrella, which is domain system umbrella, you're blocking the IP address. So, even if you were going through – you turned that off, geolocation on your phone, the app store or any store you go to is still going to have that location based on number.

**REPRESENTATIVE JED HINKLE:** Okay, and then Madam Chair, the second part of my question if I may ask?

**CHAIR AMY REGIER:** Go ahead.

**REPRESENTATIVE JED HINKLE:** Madam Chair, Mr. Tarr, also are there any other app providers other than Google and Apple whereby you may download this app that would not be affected with this bill, or are we capturing who needs to be enforced upon?

**ERIC TARR:** Madam Chair, Mr. Representative, my understanding is that it would be any provider who has an app store, so Samsung, Android. Those are all common names. So, anybody who provides those type of app stores would be included.

**REPRESENTATIVE JED HINKLE:** Thank you.

**CHAIR AMY REGIER:** Representative Etchart.

20

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**REPRESENTATIVE JODEE ETCHART:** Thank you, Madam Chair. I have a question for online, Mr. Krach.

**KEITH KRACH:** Yes, I'm here.

**REPRESENTATIVE JODEE ETCHART:** Madam Chair, Mr. Krach, can you please explain to me if there would be any difficulty or if it would be easy for these app stores that we've talked about and mentioned, for instance Google or Apple, to ban these apps from their platforms?

**KEITH KRACH:** Certainly. You know, this is a very appropriate method to do it. As Undersecretary of State, we came up with a program called The Clean Network, and that's how we defeated China's master

**[01:00:00]**

plan to control 5G. We also had Clean Carrier, Clean Cloud, Clean Cable, Clean Apps and Clean Store. So, what you're talking about is Clean Store. Certainly, the owners of those stores have the capability to do that. I also was the CEO of DocuSign and we have one billion users around the world. So, the capabilities to do this is really an issue for these companies and they can solve it. They have the technical capabilities to be able to solve it. If you look at it in China, TikTok serves up education STEM resources for children. So, it certainly is, the ability to do that. And a big reason why this legislation is so important is because TikTok backed by the Chinese government is spending millions and millions of dollars on lobbyists and lawyers—the best money can buy—and this is going to be a precedent setting case, and one that's really needed. Just think, if the CCP can weaponize a balloon, imagine what they can do with 150 million U.S. TikTok users at its mercy? I think this is totally appropriate and these companies will obey the law. So, I think your approach is 100 percent correct.

**CHAIR AMY REGIER:** Follow up?

**REPRESENTATIVE JODEE ETCHART:** Follow up, Madam Chair, for Mr. Krach. Sir, would you be able to discuss any of the geofencing issues? From I understand with geofencing, if I'm out and I have different things on my phone of where I might want to go to dinner or advertising, that they'll pop up on my phone whether I'm in San Diego or Houston or Billings, Montana. So, if that geofencing advertising can pop up on my phone to do that, why is it going to be so hard for these tech companies to geofence different applications that are able to be downloaded on phones?

**KEITH KRACH:** It's not going to be difficult for them, and I think that's the point. So, they have the capabilities to do that, and I think you bring up a very profound point on this.

**CHAIR AMY REGIER:** Okay. Representative Duram.

**REPRESENTATIVE NEIL DURAM:** Thank you, Madam Chair. Question for our representative from the American Civil Liberties Union.

21

**CHAIR AMY REGIER:** Mr. Medrano?

**REPRESENTATIVE NEIL DURAM:** Of Montana specifically. Thank you for being here, Mr. Medrano.

**KEEGAN MEDRANO:** Certainly. Chair Regier, Representative Durham.

**REPRESENTATIVE NEIL DURAM:** Madam Chair, Mr. Medrano, from the hundreds of emails and the handful of phone calls I've received from young people—reference this bill—this TikTok is a big deal to them. Would you agree with me that TikTok is the music played by the Pied Piper to steal this generation's heart and mind?

**KEEGAN MEDRANO:** Chair Regier, Representative Duram, I'm unsure a little bit of what you're getting at. There are –

**REPRESENTATIVE NEIL DURAM:** Madam Chair, if I may clarify?

**CHAIR AMY REGIER:** You may.

**REPRESENTATIVE NEIL DURAM:** I'm confident not everybody knows the story of the Pied Piper.

**KEEGAN MEDRANO:** I do. Yes, sir.

**REPRESENTATIVE NEIL DURAM:** The Pied Piper played a team and stole a whole bunch of children for a nefarious reason. Mr. Medrano, could you agree with me that TikTok is that music that's stealing a generation of children from the United States of America?

**KEEGAN MEDRANO:** Chair Regier, Representative Duram, I don't understate that there are issues with social media apps and its impact on children. If you take a look at how Instagram impacts people's perceptions of their bodies, if you take a look at how TikTok interprets and how people approach consuming information, I would counter by saying that I think that social media broadly has issues and impacts that we need to address, and that we also need to address those issues outside of our communities, right? So, we've heard about sex trafficking and child pornography, and those are horrible, awful things, and I believe that we, as a society, should address those, and that social media does not create those issues. They may exacerbate those issues, but they are reflective of the issues of our own society.

**REPRESENTATIVE NEIL DURAM:** Thank you, Mr. Medrano. Madam Chair, follow up?

**CHAIR AMY REGIER:** Follow up.

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

**REPRESENTATIVE NEIL DURAM:** A similar concept, different language, if our daily efforts are an act of worship, would you agree that this generation is choosing CCP through TikTok as their new god?

**[01:05:00]**

**KEEGAN MEDRANO:** Chair Regier, Representative Duram, apologies, I'm not trying to be obtuse. Could you rephrase your question?

**REPRESENTATIVE NEIL DURAM:** Thank you, Madam Chair. More generally paraphrased, if our daily efforts and activities are a reflection of that which we value most, aka or God, and the need for TikTok for this current generation, is it fair to say that that's their act of worship, that's what they choose to worship with their daily effort?

**KEEGAN MEDRANO:** Chair Regier, Representative Duram, I believe that with appropriate guardrails, that individuals should be able to engage with social media apps. I wouldn't amount it to worship. I wouldn't say that TikTok is our new church, but I do believe that of course it is an important app for expression, for exploring ideas, for sharing information, and I think that that's vitally important for our younger generation. And when it comes to China, I hope that we as a body can reflect on the fact that a state may be counter to us, may be seeking to subvert, may be a challenge to us on a state-to-state or sovereign-to-sovereign level, but I also hope that we can avoid xenophobic approaches to this question of TikTok and to free speech and to our rights under the constitution. You know, I want to posit another app, Representative Duram. There's an app called FaceApp. It's owned by a Cypriot, or it's owned in Cypriot, so Cyprus, by a Russian owner. That app allows anyone to take a picture—I could take a picture of you, Representative Duram—that's available online, put it into the app, and then that company now owns your biometric data, and that's from a Russian owner. Russia is also enemy state.

**REPRESENTATIVE NEIL DURAM:** Thank you, Madam Chair, a follow up question for the bill sponsor, please?

**CHAIR AMY REGIER:** Go ahead.

**REPRESENTATIVE NEIL DURAM:** Chair, Senator Vance, thank you for bringing this bill. One of my concerns about the bill is if TikTok correctly spells its name as T-i-c-k, as the parasite that I believe it is.

**SENATOR SHELLEY VANCE:** T-i-k.

**REPRESENT DURAM:** If they change – the bill says T-i-k. If tomorrow we pass this bill and gets signed into law and then the day after, the corporation changes their name to T-i-c-k-t-o-k, the bill would not apply to them. Is that your position as well?

**SENATOR SHELLEY VANCE:** Madam Chair, Representative, I'd like to defer to the AG, please.

23

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

**CHAIR AMY REGIER:** Yes.

**REPRESENTATIVE NEIL DURAM:** Madam Chair, if I could maybe clarify that question. Attorney General Knudsen, thank you for being here. TikTok in this bill is spelled T-i-k-T-o-k. If that corporation changed the spelling of their name but the content remained the same, would this bill still prohibit that corporation?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative Duram, that's an interesting point. I think from a logistics standpoint, from a branding standpoint, from a trademark standpoint, I don't imagine that TikTok is in a big hurry to change their name and rebrand themselves, but you do make an interesting point that, as I stand here right now, I don't have a good answer for you. Possibly—that's probably the best I can do right now. I think we would hope it would still apply, and then there's broad language in this bill that we would still be able to take care of the parent company at least. Obviously, that's a big concern, we're taking about divestment. That's probably the best I can do right now, Representative.

**REPRESENTATIVE NEIL DURAM:** Thank you.

**CHAIR AMY REGIER:** Representative Smith.

**REPRESENTATIVE LAURA SMITH:** Thank you, Madam Chair. I have a question. I believe it would be for the representative from it's either Tech Net or Net Choice, or technology language. It was an opponent. Do you remember? There's one of each. Oh, are they online?

**CHAIR AMY REGIER:** They both are online, correct.

**REPRESENTATIVE LAURA SMITH:** Oh, my apologies. Is that David Edmunson?

**DAVID EDMUNSON:** Yes, ma'am.

**REPRESENTATIVE LAURA SMITH:** Yes, this is Representative Smith. So, I guess I want to take us back to the privacy concerns that I think we all share on this bill. So, we heard testimony—quite a bit of testimony—that businesses rely on TikTok, and probably other platforms for advertising. So, we also heard testimony that there are a variety of apps that are already sort of culling some of our private data. I think about my own phone and the number of toddler games that I have on it. So, I guess what I think about is, would it make more sense to really look at a more

**[01:10:00]**

comprehensive privacy bill that would allow folks to access TikTok and the other platforms while protecting user privacy? Do you have thoughts on that?

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

**DAVID EDMUNSON:** Madam Chair, Representative, thank you for the question. First, I want to be clear, TikTok is not a member of TechNet, of our organization, so I can't speak to any specifics as it relates to TikTok itself. Big picture though, I do agree that a comprehensive omnibus privacy approach is sound. That's why we, as an organization, support a federal national privacy bill to offer both clear obligations to businesses as well as new rights to consumers across the country. We have been leading a national cross coalition or cross industry coalition effort in Washington, DC through our federal program to help push that conversation to the forefront. So, I think in general, without speaking to the issues of TikTok that I know are much of the source of the discussion of today's hearing, we do agree that comprehensive privacy bills make sense. Yes, ma'am.

**REPRESENTATIVE LAURA SMITH:** Thank you.

**CHAIR AMY REGIER:** Representative Zephyr.

**REPRESENTATIVE ZOOEY ZEPHYR:** Madam Chair, let's start with Mr. Tarr.

**ERIC TARR:** Madam Chair, Representative.

**REPRESENTATIVE ZOOEY ZEPHYR:** Madam Chair, Mr. Tarr, I want to circle way back just to clarify on a comment Representative Jed Hinkle made. In terms of downloading the app, obviously if you turn off your location data that preclude that your IP address is still received, it knows where you are. But there's nothing stopping someone from utilizing a VPN network to download TikTok from outside of the state.

**ERIC TARR:** So, Madam Chair, Representative, when it comes to the VPNs, it's more of a technical issue where they'd need to start geo-blocking those VPNs from certain geolocations. The State of Montana is currently doing that for state phones with several malicious state actors out there across the world. So, the possibility is there. It's just going to take a lot more work.

**REPRESENTATIVE ZOOEY ZEPHYR:** Just a quick follow up on that?

**CHAIR AMY REGIER:** Go ahead.

**REPRESENTATIVE ZOOEY ZEPHYR:** Thank you, Madam Chair. So, just to clarify, the intent of this bill would be if a VPN allowed you to set your location to Texas or Florida or something, and you then downloaded TikTok from there, would the intent of the Department of Justice be to pursue litigation against those VPN networks for allowing you to do so?

**ERIC TARR:** Okay, Madam Chair, Representative, I'm going to defer to legal counsel on that.

**CHAIR AMY REGIER:** Would you like to rerefer?

**REPRESENTATIVE ZOOEY ZEPHYR:** Yes, please, Madam Chair.

Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419
Davis Wright Tremaine
April 5, 2023
Transcript by TransPerfect

**CHAIR AMY REGIER:** Attorney General?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative, I think the intent would be "no", that would not be our intent. Yeah, I think that's the best answer.

**REPRESENTATIVE ZOOEY ZEPHYR:** Thank you. Follow again for the Attorney General.

**CHAIR AMY REGIER:** Follow up.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative.

**REPRESENTATIVE ZOOEY ZEPHYR:** Madam Chair, Attorney General, again, going back to the striking out of the provision around ISPs, my reading of this bill would then be that I could access TikTok from my computer via one of my internet service like Chrome or something like that. Is that a correct understanding of this bill?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative, I mean, again, I don't want to get too far out over my skis and try to be a technical expert in those areas. I certainly am not. My age gap is probably showing, but I might need to rerefer that one, honestly, representative, because I'm not sure I have the answer to that. Could we get Mr. Tarr back up here?

**REPRESENTATIVE ZOOEY ZEPHYR:** [PH] We'll walk back and forth, and -

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Maybe we'll both just stand here.

**REPRESENTATIVE ZOOEY ZEPHYR:** Madam Chair, Mr. Tarr, the question was, my understanding of the striking out of the ISP line in this bill, you can download TikTok onto your phone. They also have a website that you can scroll the same content on. My understanding is that this bill would allow for someone to go onto Chrome or whatever internet browser they choose and access TikTok in that way. Is that correct?

**ERIC TARR:** Madam Chair, Representative, yeah, you could still go online. That's where I was mentioning the DNS umbrella. So, we would have a domain name blocked for IP addresses. So, coming into the State of Montana, if you were online and you're trying to go use TikTok, we could have Google block those type of things too. Is that answer kind of –

**REPRESENTATIVE ZOOEY ZEPHYR:** That does, thank you. So, one follow up quickly for you. Is the data –

**CHAIR AMY REGIER:** Follow up.

**REPRESENTATIVE ZOOEY ZEPHYR:** Thanks. Sorry, Madam Chair.

**[01:15:00]**

26

**Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419**
**Davis Wright Tremaine**
**April 5, 2023**
**Transcript by TransPerfect**

So, is the concern around the data that's being collected, we heard the sponsor mention name, home, viewing habits, friends, network—network being your IP address—data that's collected by other social media network as well?

**ERIC TARR:** Madam Chair, Representative, you know, looking at other social platforms, they do collect certain things, but there's privacy settings that you actually have to go in and click. The issue we're seeing with TikTok is, they're blatantly stating in their privacy, they're even collecting your keystrokes and everything as soon as you agree. There's no settings where you can turn that off.

**REPRESENTATIVE ZOOEY ZEPHYR:** Follow up for the Attorney General.

**CHAIR AMY REGIER:** Follow up.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative.

**REPRESENTATIVE ZOOEY ZEPHYR:** Thank you, Madam Chair, Attorney General. I am a little bit astounded by, I think, we talked about the technical understanding here. I feel like there's a lack of understanding around how algorithm works, around how other social media companies collect data around what [PH] worship is. My question is, we see, we talked – one of the proponents or opponents mentioned Facebook selling data around election security. We talked about Cambridge Analytica. My question for you is, if privacy is the concern—and you said content's not the concern, privacy is the concern. This feels so much like it's not about that concern. Moreso that it's about saber waving for China. Can you talk about why you're not doing that broad type of privacy bill that was discussed by the TechNet representative?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Sure. Madam Chair, Representative, again, I come back to my previous testimony. I think this is a unique legal question, and I think this is a unique legal situation. Certainly, I have concerns about other social media companies collecting data. I have concerns about privacy, I have concerns about personal data of Montanans being collected by other companies. I think the discreet difference here is that those are U.S. companies, and from a legal standpoint, I think that puts us in a lot different situation. This is –

**REPRESENTATIVE ZOOEY ZEPHYR:** Follow up, real quick. Sorry to cut you off. Can I follow up?

**CHAIR AMY REGIER:** Follow up.

**REPRESENTATIVE ZOOEY ZEPHYR:** Madam Chair, Attorney General, so just to clarify, U.S. companies selling our data to a foreign company who uses that to spy on us versus TikTok giving it to China, you see those as – you see the former as okay and the latter as not okay?

**ATTORNEY GENERAL AUSTIN KNUDSEN:** Madam Chair, Representative, no, I certainly did not say that and I certainly would not say that, and I would not advocate for that. I will also

27

posit that this bill is now in your hands. I mean, Representative, if you feel like that should be amended into this bill, we would certainly take that into account. This is fully in the House's hands at this point, if you feel that necessary.

**REPRESENTATIVE ZOOEY ZEPHYR:** Thank you, Madam Chair.

**ATTORNEY GENERAL AUSTIN KNUDSEN:** But Representative, no, I certainly don't think one is better than the other. I think from a legal standpoint and from a First Amendment standpoint, we are on new ground here because this is an entity basically controlled by an enemy foreign actor. Madam Chair.

**CHAIR AMY REGIER:** Thank you. Any further questions? See none. Senator, would you like to close on your bill?

**SENATOR SHELLEY VANCE:** Thank you, Madam Chair, Members of the Committee. We are in new grounds. We're in very new ground. I offer these things for you to think about. TikTok is about power and control. I believe it's a national security issue. The CCP is using TikTok to study our people while invading on Americans' privacy. A common phrase to help government or business in Montana's legislative committee hearings is, "Here's another tool in the toolbox". TikTok is one of CCP's tool in their toolbox. Cui bono? Who benefits? I have no faith in our national administration. I'd like for us to send a message to other states and to Congress by passing Senate Bill 419 to ban TikTok in Montana. Thank you, Madam Chairman and Members of the House Judiciary.

**CHAIR AMY REGIER:** This closes the hearing on Senate Bill 419.

**[01:20:00]**



I, Anders Nelson, hereby certify that "Transcript of March 28, 2023 Montana House Judiciary Committee Hearing on SB 419" is, to the best of my knowledge and belief, a true and accurate transcription in English.

Anders Nelson
Project Manager

April 6, 2023

# EXHIBIT 2




tech.co

Stay Informed ⌄     Work Smarter ⌄     Stay Secure ⌄     Grow Your Business ⌄

Home › News ›

# TikTok Extends Video Length Limit to 10 Minutes

The ever-expanding social media platform is hoping to achieve a healthy balance between short and long-form content.



Written by
Aaron Drapkin

Published on
March 2, 2022



## Most Recent

**Does Character AI Save Chats, and Is Character AI Safe?**
Aaron Drapkin · 22 mins ago

**Zoom Introduces New Intelligent Director AI Tool**
Jeremy Rodgers · 2 hours ago

**WhatsApp Business Adds Features as It Hits 200M Monthly Users**
Jeremy Rodgers · 4 hours ago

**Congress Limits Staff Use of ChatGPT**
Jeremy Rodgers · 5 hours ago

**Unicorn IRL Admits 95% of Users Fake and Shuts Down**
Jeremy Rodgers · 6 hours ago

Video-focused social media site TikTok has extended its video length maximum to 10 minutes, more than tripling the previous limit of just three.

TikTok is fast becoming one of the most profitable places for social media managers to implement digital marketing strategies, with one billion active users now using the platform.

Getting the video length right is crucial for apps like TikTok, who have to balance retaining their current userbase who like short-form content with the need to expand to other demographics.

## TikTok Expands its Video Length…Again

The recent move to 10 minute-long videos isn't the first time that TikTok has upped its video length. Before this recent change, the current maximum was three minutes, which itself was an advance on 60 seconds. The original limit on a TikTok video was 15 seconds.

This seems to fit into line with how short-form video apps generally mature. Apps like Vine initially started with 6-second video limits before extending them to 140 seconds before Twitter (which opened Vine) killed the App off to focus on its own video content.

> "We're excited to start rolling out the ability to upload videos that are up to 10 minutes, which we hope would unleash even more creative possibilities for our creators around the world" – TikTok Spokesperson.

Explaining the decision, TikTok said it was "always thinking about new ways to bring value to our community and enrich the TikTok experience" and wanted to again give users "more time to create and be entertained on TikTok."

## Why is TikTok Upping its Video Length Limit?

Like any other social media platform, TikTok is constantly trying to attract new users.

Longer videos have the potential to attract an older audience to the platform and could increase the amount of time people spend actually watching videos on the app rather than searching for 'Part 2s' of videos that are longer than three minutes.

This move may also help TikTok attract creators that excel in making long-form content on sites like YouTube, and in turn, bring more users to the platform.

Many YouTube commentators, lifestyle vloggers, and other content creators that have garnered large fanbases through their long-form video content already publish TikToks, but their main focus is still channels on platforms known for hosting lengthier videos.

known for their long-form (or at least not short form) content, such as Instagram Reels and YouTube Shorts.

### Is TikTok a Good Place to Market my Business?

The stratospheric rise of TikTok, which was first launched in 2016 – as well as the fact advertising on the platform is a lot cheaper than the likes of Facebook – make it a fantastic place to raise brand awareness and advertise products or services.

The **social media management** strategies usually involve a cross-platform approach with the content being made for and posted on a variety of different social media channels.

The ease at which you can achieve high engagement on TikTok, however, is currently unrivaled in the current social media landscape, which explains why so many **social media management tools** now offer support for the platform. Overall, TikTok is much more trend-driven than Facebook or Twitter, for instance. It's got built-in editing tools that other sites don't have and a particularly good algorithm for promoting truly engaging content.

Now, with videos allowed to be up to 10 minutes long, there's even more scope for inventive and original ways to advertise products and services on the platform.

Share this post   

Did you find this article helpful?   Click on one of the following buttons    

Tags    SOCIAL MEDIA

Written by:

   **Aaron Drapkin**
Writer

Aaron Drapkin is a Lead Writer at Tech.co. He has been researching and writing about technology, politics, and society in print and online publications since graduating with a Philosophy degree from the University of Bristol five years ago. As a writer, Aaron takes a special interest in VPNs, cybersecurity, and project management software. He has been quoted in the Daily Mirror, Daily Express, The Daily Mail, Computer Weekly, Cybernews, and the Silicon Republic speaking on various privacy and cybersecurity issues, and has articles published in Wired, Vice, Metro, ProPrivacy, The Week, and Politics.co.uk covering a wide range of topics.

## Explore More

See all news



**WhatsApp Business Adds Features as it Hits 200M Monthly Users**

Meta may have had a challenging time of late, but WhatsApp...

Jeremy Rodgers · 4 hours ago



**Unicorn IRL Admits 95% of Users Fake and Shuts Down**

The messaging app that raised $200M announces shutdown...

Jeremy Rodgers · 7 hours ago

**LinkedIn Launches New Approach To Detect Fake Profiles**

In a bid to help its fake profile problem, the platform has...

Eric Di Cataldo · 4 days ago



**Facebook and Instagram to Restrict News Sharing in Canada**

A new Canadian law looks set to force online platforms to...

Eric Di Cataldo · 4 days ago

Load more articles

About us   Contact us   Become a Partner   Privacy Policy   Your Privacy Choices   Terms of Use

© 2023 Marketing VF Ltd. All Rights Reserved.

Registered Office: 1st & 2nd Floors, Wenlock Works, 1A Shepherdess Walk, London, N1 7DE, United Kingdom. Registered in England & Wales (no. 08953544)


∧ Back to top

# EXHIBIT 3

How TikTok is supporting our community through COVID-19 ›

♪ TikTok                                                                          Home        Search

**Getting started** ⌄

**Using TikTok** ⌃

Creating videos
Credit a video
Creator tools on TikTok
TikTok Stories
Duets
Stitch
Effects
Camera tools
Sounds
Books
Create playlists of your videos
Editing, posting, and deleting
Accessibility

Exploring videos
For You
STEM feed
Friends Tab
Liking
Sharing
Your favorite books
Watch videos in a Series
Watch videos in a playlist
Video Downloads
Discover and search

Messaging and notifications
Comments
Direct messages
Notifications
TikTok stickers

Followers and Following
Following and unfollowing
Finding friends from your contacts
Removing followers
Blocking users
Finding your blocked list

Growing your audience
How to grow your audience
Verified accounts on TikTok
Personal and Business Accounts on TikTok
Government, Politician, and Political Party Accounts
My videos aren't getting views
How can creators earn on TikTok?
Use Promote to grow your TikTok audience
Report a problem

**Account and privacy settings** ⌄

**Safety** ⌄

**Log in and troubleshooting** ⌄

**TikTok LIVE, Gifts, and wallet** ⌄

**Monetize on TikTok** ⌄

# Effects

### Jump to a section

Effects • Filters • Adding effects after recording

### Effects

Effects are used to customize and add details to TikTok videos. Effects can be added before and after you record a video, but some effects are only available before recording and others are only available after.

To shoot with an effect:

1. Tap **Effects**, located left of the red recording button in the camera screen.
2. View the various categories and tap on an effect.
3. Preview the effects and make a selection.
4. Tap on the recording screen and begin creating your video!

Adding effects to your Favorites allows you to find them later.

To add an effect to your Favorites:

1. Select the effect you would like to favorite.
2. Once it appears on your screen you can press **Sticker**.
3. The effect will now appear in your Favorites.

To remove an effect from Favorites, go to the effect and press **Sticker**.

### Filters

To add a filter to your video:

1. Tap **Filters** located on the right side of the screen.
2. Select a filter you would like to use.

Select **Management** to pick which filters you'd like to see appear in the app.

### Adding effects after recording

To add text after recording:

1. Tap **Text**, located on the bottom of the editing screen.
2. Select the desired font and customize the color of your text and background.
3. Tap **Done**.
4. Tap and drag to move the text to a desired spot on your video.

To change text size:

1. Pinch or zoom in on the text.
2. Adjust to your desired text size.

To add a sticker or emoji:

1. Tap **Stickers** located on the bottom of the editing screen.
2. Select **Stickers** or **Emojis** tab or search for animated **GIFs**.
3. Tap to make your selection then drag to move your animation to a desired spot on your video.

Note: Multiple text and stickers can be added to one video.

To delete text or stickers:

1. Long press the text or sticker you would like to delete and move it to the top of the video.
2. The **Delete** will appear.
3. Move the text or sticker to the icon until it turns red. The item will be deleted.

Was this helpful?                    👍 Yes       No

# Helpful links



Creating an account
...ting ...
Creating a TikTok video

© 2023 TikTok

# EXHIBIT 4

TikTok

Home

Search

How TikTok is supporting our community through COVID-19 ⓘ ✕

Getting started ⌄

Using TikTok ⌃

Creating videos

Credit a video

Creator tools on TikTok

TikTok Stories

Duets

Stitch

Effects

Camera tools

Sounds

Books

Create playlists of your videos

Editing, posting, and deleting

Accessibility

Exploring videos

For You

STEM feed

Friends Tab

Liking

Sharing

Your favorite books

Watch videos in a Series

Watch videos in a playlist

Video Downloads

Discover and search

Messaging and notifications

Comments

Direct messages

Notifications

TikTok stickers

Followers and Following

Following and unfollowing

Finding friends from your contacts

Removing followers

Blocking users

Finding your blocked list

Growing your audience

How to grow your audience

Verified accounts on TikTok

Personal and Business Accounts on TikTok

Government, Politician, and Political Party Accounts

My videos aren't getting views

How can creators earn on TikTok?

Use Promote to grow your TikTok audience

Report a problem

Account and privacy settings ⌄

Safety ⌄

Log in and troubleshooting ⌄

TikTok LIVE, Gifts, and wallet ⌄

Monetize on TikTok ⌄

# Messaging and notifications

Comments

Direct messages

Notifications

TikTok stickers

## Helpful links

Creating an account

Setting up your profile

Creating a TikTok video

**TikTok**

**Company**
About TikTok
Newsroom
Contact
Careers
ByteDance

**Programs**
TikTok for Good
TikTok for Developers
Effect House
Advertise on TikTok
TikTok Rewards
TikTok Browse
TikTok Embeds

**Resources**
Help Center
Safety Center
Creator Portal
Community Guidelines
Transparency
Accessibility

**Legal**
Terms of Service

English ▼

© 2023 TikTok



# EXHIBIT 5



☰  ♪ TikTok

How TikTok is supporting our community through COVID-19  ⊙                        ✕

All
News
Product
Community
Safety
Company

[United States ▾]

Community   Sep 27, 2021

# Thanks a billion!

Share this post
🐦 f



At TikTok, our mission is to inspire creativity and bring joy. Today, we're celebrating that mission and our global TikTok community. More than 1 billion people around the world now come to TikTok every month to be entertained as they learn, laugh, or discover something new. We're honored to be a home for our immensely diverse community of families, small businesses, and creators who transform into our favorite stars.

TikTok has become a beloved part of life for people around the world because of the creativity and authenticity of our creators. Our global community is remarkable in its ability to reach millions of people, across generations. From music, food, beauty and fashion to art, causes, and everything in between, culture truly starts on TikTok.

Whether you're in Singapore, São Paolo, Stockholm, or Seattle, we celebrate YOU – the creators who inspire us, the artists who launch chart-breaking albums, the brands who help us discover and connect with products we love, the communities who lift us up, and all the people who keep us laughing and dancing.

Thank you for making this journey so special.

– The TikTok Team







Product   Jun 27, 2023

## More Ways for Creators to Collaborate with Brands: TikTok Creative Challenge

Creators are at the heart of TikTok, driving creativity, culture and entertainment. Representing a new generation of storytellers, the TikTo...

Product   Jun 27, 2023

## Updating Family Pairing and establishing TikTok's Youth Council



By Julie de Bailliencourt, Global Head of Product Policy



Community    Jun 22, 2023

### TikTok @ VidCon 2023: Step into the Creator Galaxy

As an entertainment platform powered by a diverse community, TikTok is excited to be at VidCon Anaheim 2023 to celebrate the creativity of ou...



## Download now

**QR CODE**   **App Store**   **Google Play**   **amazon appstore**   **Microsoft**

**TikTok**

**Company**
About TikTok
Newsroom
Contact
Careers
ByteDance

**Programs**
TikTok for Good
TikTok for Developers
Effect House
Advertise on TikTok
TikTok Rewards
TikTok Browse
TikTok Embeds

**Resources**
Help Center
Safety Center
Creator Portal
Community Guidelines
Transparency
Accessibility

**Legal**
Terms of Service

© 2023 TikTok

# EXHIBIT 6

☰   ♪ TikTok

How TikTok is supporting our community through COVID-19  ⊙                                                    ✕

All
News
Product
Community
Safety
Company

[ United States      ▾ ]

Company     Mar 21, 2023

# Celebrating our thriving community of 150 million Americans

Share this post
🐦 📘

TikTok is a special place where Americans come together to learn, be entertained, grow their business, as they continue to create, discover and connect with a broader global community. Today, we're celebrating our mission as we continue to inspire creativity and bring joy across the United States for more than **150 million people**.



We're honored to be a home for our immensely diverse community in the United States, made up of **nearly half the country's population**, including book lovers, foodies, families, emerging artists and so much more. This milestone would not have been possible without the hard work and unwavering commitment of **almost 7,000 TikTok employees in the US**, as well as our incredible community in the country and around the world.

**Creating real-world opportunity**
TikTok has evolved into the preferred platform for **nearly 5 million businesses** seeking expansion and success, including countless small businesses.

For example, Spencer Russell, CEO and founder, quit his 9-to-5 to start a platform of online courses that helps parents and caregivers teach their little ones to read. His TikTok presence has given Toddlers CAN Read (@toddlerscanread) a reach that Russell hasn't been able to achieve anywhere else. Another example is Jessie Whittington, who founded Country Lather Soap Works and turned to TikTok's #SoapTok community, which has been invaluable for her life and small business.

These are just a few of the small business owners among countless others in the US who are building communities and creating economic opportunities on TikTok. Discover the inspiring journeys of small businesses on TikTok across various regions of the United States through TikTok Sparks Good, our new docuseries featuring 60-second stories that celebrate creator successes that start on TikTok, and are a catalyst for real world impact off the platform.

**Enhancing our safeguards**
This milestone coincides with a critical period for TikTok. Certain politicians have raised concerns about the potential banning of our platform, which would directly affect all 150 million Americans who have embraced TikTok. To proactively address US national security concerns, we've taken unprecedented steps by enhancing safeguards for our US users. Over the last two years, we've invested $1.5 billion in setting up TikTok US Data Security and have been building a comprehensive framework to isolate protected US user data. Today, we are also proud to launch the U.S. Data Security (USDS) site aimed at providing transparency into our commitments and answering common questions around our efforts to safeguard data.



@tiktok ✔
Our CEO, Shou Chew, shares a special message on behalf of the entire ...See more
♪ original sound - TikTok

This week, our CEO, Shou Chew, will appear before Congress to outline these steps we are

taking to protect our users and uphold our mission of inspiring creativity and spreading

representatives and express your thoughts on the platform.

Thank you to all of our loyal users! We extend our deepest gratitude to each and every one of you.

– The TikTok Team



Product   Jun 27, 2023

## More Ways for Creators to Collaborate with Brands: TikTok Creative Challenge

Creators are at the heart of TikTok, driving creativity, culture and entertainment. Representing a new generation of storytellers, the Tikto...

Product   Jun 27, 2023

## Updating Family Pairing and establishing TikTok's Youth Council

By Julie de Bailliencourt, Global Head of Product Policy Today we're announcing a new way caregivers can support their teen's viewing...

Community   Jun 22, 2023

## TikTok @ VidCon 2023: Step into the Creator Galaxy

As an entertainment platform powered by a diverse community, TikTok is excited to be at VidCon Anaheim 2023 to celebrate the creativity of ou...



## Download now

QR CODE | Download on the App Store | GET IT ON Google Play | available at amazon appstore | Get it from Microsoft

TikTok

**Company**
About TikTok
Newsroom
Contact
Careers
ByteDance

**Programs**
TikTok for Good
TikTok for Developers
Effect House
Advertise on TikTok
TikTok Rewards
TikTok Browse
TikTok Embeds

**Resources**
Help Center
Safety Center
Creator Portal
Community Guidelines
Transparency
Accessibility

**Legal**
Terms of Service

© 2023 TikTok

# EXHIBIT 7

The Washington Post
*Democracy Dies in Darkness*

Subscribe     Sign in



humanN    Plant-based Formula for Heart Health Support    10% off coupon
HumanN SuperBeets Black Cherry - Beet Root...

Tech    Help Desk    Artificial Intelligence    Internet Culture    Space    Tech Policy

**TECHNOLOGY**

# As midterms loom, TikTok faces its next political test

TikTok has long sought to avoid politics. The 2022 midterms are making that impossible.

By Cat Zakrzewski, Naomi Nix and Taylor Lorenz

October 31, 2022 at 1:00 p.m. EDT



Nearly 30 percent of all major-party candidates in Senate races have TikTok accounts, and one-fifth of all major-party House candidates have an account on the platform, according to new analysis. (Ivan Abreu/Bloomberg News)

 Listen   7 min     Share    💬 Comment    6

Three years ago, TikTok imposed strict rules prohibiting campaign advertising as the video-sharing app tried to avoid the scandals over political content that have long dogged its social media rivals.

But with Election Day fast approaching, TikTok can't manage to stay on the sidelines.

Tech is not your friend. We are. Sign up for The Tech Friend newsletter.    →

[ *As Washington wavers on TikTok, Beijing exerts control* ]

Nearly 30 percent of all major-party candidates in Senate races have TikTok accounts, and one-fifth of all major-party House candidates have an account on the platform, according to a new analysis from the Alliance for Securing Democracy, a U.S.-based nonprofit group that examines efforts by foreign nations to interfere in democratic institutions.

Democrats have been more likely to embrace the app, with 34 percent of candidates in Senate, House, governor and secretary of state races having TikTok accounts, according to the report. But 12 percent of Republican candidates in the same races also have TikTok accounts, the report says.

ADVERTISING

SHOP NOW

State Farm
Home & auto. Bundle & save.

Vern M Pierce Ins Agcy Inc
Farmingville

Contact me today

Availability and amount of discounts and savings vary by state.

**MOST READ TECHNOLOGY** ›



1   I moved my Gmail to a less creepy email. It was surprisingly easy.

2   What's your type? Try these tests to pick the perfect font for you.    

3   Meta's new AI lets people make chatbots. They're using it for sex.    

4   17 fatalities, 736 crashes: The shocking toll of Tesla's Autopilot    

The majority of candidates mentioned in the ASD report have created their accounts since 2020, when very few politicians were on TikTok.

A Washington Post review of what appears on TikTok from these accounts shows that politicians are still learning how best to use the app. Some clips attack their opponents or feature cameos from celebrity supporters. Others encourage young people to vote.

In one video that has been viewed more than a million times, the campaign of Democratic Pennsylvania Senate candidate John Fetterman pokes fun at his opponent, Republican Mehmet Oz, for shopping for asparagus and salsa, using a popular audio clip of a British broadcaster saying, "What on earth is happening in the House of Commons?"

In another video that garnered slightly over 10,000 views, North Carolina state Sen. Jeff Jackson (D) appears using a video filter that turned his face into a head of broccoli, saying, "Politics is very serious business."



But other candidates' posts are more similar to videos they might share on more traditional social media like Facebook and Twitter. A recent video on Oz's TikTok showed him at a gas station, criticizing President Biden's economic agenda.

[ *Democrats outreach to TikTok: A trip to D.C., a private chat with Obama and an hour with Biden* ]

Even though politicians are still figuring out how to harness the app's power, their increased presence signals that TikTok could play a bigger role in future U.S. elections. That's worrying to some national security and social media experts alike, who say the app isn't as prepared as other social networks to spot misinformation.

"It's very clear that TikTok is not ready for the onslaught of political content," said Lindsay Gorman, a senior fellow at ASD and a former senior adviser in the Biden White House. "And there's a question whether TikTok — being owned by a Chinese company — can ever really be ready for handling U.S. political content responsibly."



She recalled the Russian use of Facebook in the 2016 election, when Russian agents bought ads in rubles and organized a dirty-tricks campaign on the social network that wasn't really understood until after Donald Trump was sworn in as president.

"If Russia had owned Facebook during 2016, the amount of influence that Russia could have exerted on American voters might have made that effort much, much more successful," Gorman said. "That's the vulnerability that we're talking about with TikTok. ... And that vulnerability is too big to tolerate."

But it's becoming difficult for politicians to ignore TikTok as it increasingly shapes culture and media. It is the fastest-growing social media app, with more than 100 million users in the United States. Ten percent of all U.S. adults now regularly get news from the app, according to a study from the Pew Research Center.

[ *How TikTok ate the internet* ]





civil society and nonpartisan news outlets, in part to prepare for the midterm elections, which include adding labels on political content that connects people to an Election Center, which is intended to counter misinformation. TikTok spokesman Ben Rathe said that the company takes "our responsibility to protect the integrity of our platform and elections with utmost seriousness."



Keep remote workers secure across locations and devices

Unify network and security

GET STARTED

LUMEN

"We continue to invest in our policy, safety and security teams to counter election misinformation and verify accounts of politicians in the U.S.," he said.

The surge of candidates has tested TikTok's ability to carry out its own policies requiring, for example, that political accounts be verified, to prevent impersonation. ASD researchers found that the app had verified only 40 of the 227 accounts associated with politicians that ASD catalogued in its report.

It also has a mixed record as it decides which potentially rule-breaking posts to leave up or take down during a heated campaign season.

Fetterman began using TikTok in August, successfully building an audience of about 140,000. In early October, however, TikTok suddenly began banning Fetterman's content. Five videos were removed for violating the platform's policies, but the videos were benign and didn't contain any violative content. Within 24 hours, TikTok reversed the decision and reinstated the videos, but the dust-up showed the volatile nature of building an audience on the app.



Keep remote workers secure

LUMEN

And in another recent experiment, TikTok failed to detect 90 percent of ads featuring false and misleading messages about the election, according to researchers at the watchdog group Global Witness and the Cybersecurity for Democracy team at the New York University Tandon School of Engineering.

The findings follow a Mozilla report released in 2021 that found more than a dozen examples of influencers posting on behalf of political organizations without disclosing they'd been paid to do so. TikTok prohibits advertisements that promote a particular political candidate, government leader, or a stance for or against an "issue of public importance" and also bars creators from being paid by outside groups to produce such videos.

[ *The Technology 202: Influencers are evading TikTok's political ad ban, researchers say* ]

Last week, Reps. Adam B. Schiff (D-Calif.) and Lori Trahan (D-Mass.) sent a letter to TikTok chief executive Shou Zi Chew, demanding a briefing about its ability to curb misinformation and potential incitement of violence ahead of the 2022 and 2024 elections.



Keep remote workers secure

LUMEN


Unify network and security

GET STARTED

LUMEN

MOST READ



1 Supreme Court rejects theory that would have meant radical changes to election rules

2 Opinion | He has flown 23 million miles. Here are his travel secrets. 

3 Wildfire smoke puts Chicago among cities with worst air quality in the world 

4 Advice | The plant protein that could push meat off your plate 

5 Melted, pounded, extruded: Why many ultra-processed foods are unhealthy 


Keep remote workers secure across locations and devices

Unify network and security

GET STARTED

LUMEN

We believe that TikTok needs to be more transparent about how the platform's automated and human systems flag and remove content, and the effectiveness of their systems, especially regarding content related to the Midterm Elections," the lawmakers wrote.

Misinformation is also evident on the site. Large TikTok influencers, such as the Republican Hype House, a right-wing content collective, and other right-wing influencers have had their accounts suspended and, in some cases, permanently deactivated for promoting election fraud conspiracies and anti-vaccine messaging, but only after those videos racked up thousands of views.

[ *The White House is briefing TikTok stars about the war in Ukraine* ]

"TikTok is absolutely grappling with the same issues" as other social media sites, said Samuel Woolley, program director of the propaganda research team at the Center for Media Engagement at the University of Texas at Austin. "They tried to take more of a hard-line policy against disinformation but they have nothing like the staff and capacity and experience that you see at companies like [Facebook parent company] Meta and [Google parent company] Alphabet for dealing with these kinds of things."



CORE BTS
3 Ways Governance Helps You Achieve Cost Optimization
Read More

For Democrats, though, the TikTok demographic might prove crucial in the party's battle to maintain its majority in Congress. That's one reason NextGen America, a progressive political action committee founded by billionaire hedge fund manager Tom Steyer, who briefly ran for the Democratic presidential nomination in 2020, has worked with influencers to target young people.

"There's no way that we can be a youth organization trying to reach young people and not be on TikTok," said NextGen America president Cristina Tzintzún Ramirez.

The Democratic National Committee also has embraced TikTok, recently organizing a trip to Washington for influencers to meet with their campaign arms and take videos with former president Barack Obama. The group also met with Biden in the Oval Office.

Meanwhile, the Republican Party has resisted such efforts. "We do not have any plans to give the Chinese Communist Party our data, nor do we plan to use their spyware," Republican National Committee spokesman Nathan Brand said.

TikTok officials consistently deny that the Chinese government has pressured them for data on its users and say that if asked to do, so they would refuse.

💬 6 Comments     ↗ Share



By Cat Zakrzewski
Cat Zakrzewski is a technology policy reporter, tracking Washington's efforts to regulate Silicon Valley companies. Her reporting covers antitrust, privacy and the debate over regulating social media companies. 🐦 Twitter

By Naomi Nix
Naomi Nix is a staff writer for The Washington Post, covering Meta and other social media companies. Before joining The Post in 2022, she was a reporter for Bloomberg News and the Chicago Tribune. 🐦 Twitter

By Taylor Lorenz
Taylor Lorenz is a columnist at The Washington Post covering technology and online culture. Before joining The Post, she was a technology reporter for the New York Times' business section. She was also previously a technology reporter at the Atlantic and the Daily Beast. 🐦 Twitter

**MORE FROM THE POST**

### Wildfire smoke puts Chicago among cities with worst air quality in the world

Today at 11:59 a.m. EDT



# EXHIBIT 8

# Securing the TikTok Vote

Is the app the next frontier of political campaigning or just another place to burnish one's image?

 **By Anna P. Kambhampaty**

Published March 19, 2022    Updated June 22, 2023

If all politics is theater, Representative Tim Ryan is one of its subtler actors. A moderate Democrat from Ohio's 13th district who has represented the state for nearly two decades, his speeches and debate performances are often described as coming out of central casting. His style choices are D.C. standard. He's not usually the subject of late-night skits or memes.

That's not to say he isn't trying. Back in the spring of 2020, as Covid-19 was overtaking the country and a divided Congress was duking it out over a sweeping stimulus bill, Mr. Ryan, 48, was so frustrated at the stalled legislation that he decided to channel his emotion into a TikTok video.

The 15-second clip features Mr. Ryan lounging around his office in a white button-down and dress pants, his tie slightly loose, as he mimes a clean version of "Bored in the House," by Curtis Roach. It's a rap song that resonated with cooped-up Americans early on in the pandemic, featuring a refrain ("I'm bored in the house, and I'm in the house bored") that appears in millions of videos across TikTok. Most of them depict people losing their minds in lockdown. Mr. Ryan's interpretation was a little more literal: Bored … in the House … get it?



Mr. Ryan is not a politician one readily associates with the Zoomers of TikTok. His talking points tend to revolve around issues like reviving American manufacturing rather than, say, defunding the police. But the chino-clad congressman wasn't naïve to the nontraditional places from which political influence might flow. Years ago he was all in on meditation. Why not try the social platform of the moment?

His teenage daughter, Bella, got him up to speed and taught him some of the dances that had gone viral on the app. "I just thought it was hysterical, and that it was something really cool that her and I could do together," Mr. Ryan said in a phone interview.



Representative Tim Ryan of Ohio joined TikTok in 2020. "I started to see it as an opportunity to really speak to an audience that wasn't watching political talk shows or watching the news," he said.  Elizabeth Frantz for The New York Times

Soon enough, he was posting on his own account, sharing video montages of his floor speeches and his views on infrastructure legislation, backed by the sound of Taylor Swift's "All Too Well." (As any TikTok newbie would quickly learn, popular songs help videos get discovered on the platform.)

"I started to see it as an opportunity to really speak to an audience that wasn't watching political talk shows or watching the news," Mr. Ryan said. This year, he's running for Ohio's open Senate seat; he thinks TikTok could be a crucial part of the race.

But as primaries begin for the midterm elections, the real question is: What do voters think?

## Privacy, Protest and Punditry

Social media has played a role in political campaigning since at least 2007, when Barack Obama, then an Illinois senator, registered his first official Twitter handle. Since then, enormous numbers of political bids have harnessed the power of social platforms, through dramatic announcement videos on YouTube, Twitter debates, Reddit A.M.A.s, fireside chats on Instagram Live and more. TikTok, with its young-skewing active global user base of one billion, would seem a natural next frontier.

So far, though, compared with other platforms, it has been embraced by relatively few politicians. Their videos run the gamut of cringey — say, normie dads bopping along to viral audio clips — to genuinely connecting with people.

"TikTok is still in the novelty phase in terms of social media networks for political candidates," said Eric Wilson, a Republican political technologist.

Republicans in particular have expressed concerns about the app's parent company, ByteDance, whose headquarters are in China. In the final year of his presidency, Donald J. Trump signed an executive order to ban the app in the United States, citing concerns that user data could be retrieved by the Chinese government. (President Biden revoked the order last summer.)

After a brief stint on the app, Senator Marco Rubio of Florida, a Republican, deleted his account. He has since called on President Biden to block the platform entirely. In an email statement, Mr. Rubio, 50, wrote that TikTok "poses a serious threat to U.S. national security and Americans' — especially children's — personal privacy."



Senator Marco Rubio of Florida believes that TikTok "poses a serious threat to U.S. national security and Americans' — especially children's — personal privacy." Scott McIntyre for The New York Times

That point has been disputed by national security experts, who think the app would be a relatively inefficient way for Chinese agencies to obtain U.S. intelligence.

"They have better ways of getting it," said Adam Segal, the director of the Digital and Cyberspace Policy program at the Council on Foreign Relations, among them "phishing emails, directed targeted attacks on the staff or the politicians themselves or buying data on the open market."

Regardless, TikTok seems to have empowered a new generation to become more engaged with global issues, try on ideological identities and participate in the political process — even those not old enough to vote.

There have been rare but notable examples of TikTok inspiring political action. In 2020, young users encouraged people to register for a Tulsa, Okla., rally in support of former President Donald Trump as a prank to limit turnout. Ahead of the rally, Brad Parscale, Mr. Trump's 2020 campaign manager, tweeted that there had been more than a million ticket requests, but only 6,200 tickets were scanned at the arena.

Such activity is not limited to young liberals on the platform. Ioana Literat, an associate professor of communication at Teachers College, Columbia University, who has studied young people and political expression on social media with Neta Kligler-Vilenchik of the Hebrew University of Jerusalem, pointed to the political "hype houses" that became popular on TikTok during the 2020 election. The owners of those accounts have livestreamed debates, debunked misinformation spreading on the app and discussed policy issues.

"Young political pundits on both sides of the ideological divide have been very successful in using TikTok to reach their respective audiences," Ms. Literat said.

## You've Got My Vote, Bestie

Many of the politicians active on TikTok are Democrats or left-leaning independents, including Senator Jon Ossoff of Georgia, Senator Bernie Sanders of Vermont, Senator Ed Markey of Massachusetts, Representative Ilhan Omar of Minnesota and the mayors of two of America's largest cities, Lori Lightfoot and Eric Adams (who announced he had joined this week with a video that featured his morning smoothie regimen).

This could be because the platform has a large proportion of young users, according to internal company data and documents that were reviewed by The New York Times in 2020, and young people tend to lean liberal. (TikTok would not share current demographic data with The Times.)



Senator Ed Markey of Massachusetts has cultivated a following on TikTok, where young users often refer to him as their "bestie."  Alyssa Schukar for The New York Times

"If you are a Democrat running for office, you're trying to get young voters to go out and support you," said Mr. Wilson, the Republican strategist. "That calculation is different for Republicans, where you're trying to mobilize a different type of voter" — someone who is likely older and spends time on other platforms.

For his part, Mr. Markey has cultivated a following on TikTok with videos that are a mix of silly (such as him boiling pasta in acknowledgment of "Rigatoni Day"), serious (for example, him reintroducing the Green New Deal with Alexandria Ocasio-Cortez and Cori Bush) and seriously stylish (him stepping out in a bomber jacket and Nike high tops). The comments on his videos are filled with fans calling him "bestie" ("go bestie!!", "i love you bestie," "YES BESTIE!!!!").

The feeling is mutual. "When I post on TikTok, it's because I'm having fun online and talking with my friends about the things we all care about," Mr. Markey, 75, wrote in an email. "I listen and learn from young people on TikTok. They are leading, they know what's going on and they know where we are headed, especially online. I'm with them."



View profile

Senator Ed Markey

Related videos

Watch now

**@ed_markey** ✔

you have to stop

A Moment Apart - ODESZA - hannah_harpist

Dafne Valenciano, 19, a college student from California, said that she's a fan of Mr. Ossoff's TikTok account. During his campaign season, "he had very funny content and urged young voters to go to the ballots," Ms. Valenciano said. "Politicians accessing this social media makes it easier for my generation to see their media rather than through news or articles."

Several of the videos posted by Mr. Ossoff, 35, who has moppy brown hair and boyish good looks, have been interpreted by his fans as thirst traps. "YAS DADDY JON," one user commented on a video of him solemnly discussing climate change. Another wrote, on a post celebrating his first 100 days in office, that Mr. Ossoff was "hot and he knows it," calling him a "confident king." The senator has more than half a million followers on TikTok.

Some politicians end up on the platform unwittingly. Take, for instance, the viral audio of Kamala Harris declaring, "we did it, Joe" after winning the 2020 election. Though the vice president doesn't have an account herself, her sound bite has millions of plays.

Catering to such viral impulses may seem gimmicky, but it's a necessary part of any candidate's TikTok strategy. Political advertising is prohibited on the platform, so politicians can't promote much of their content to target specific users. And the app pushes videos from all over the world into users' feeds, making it hard for candidates to reach the ones who might actually vote for them.

Daniel Dong, 20, a college student from New Hampshire, said that he often sees posts from politicians in other states in his TikTok feed, but "those races don't matter to me because I'm never going to be able to vote for a random person from another state."

## The Art of the Viral Video

Christina Haswood, a Democratic member of the Kansas House of Representatives, first started her TikTok account in the summer of 2020, when she was running for her seat.

"I went to my campaign manager and was like, 'Wouldn't it be funny if I made a campaign TikTok?'" Ms. Haswood, 27, said.



"A lot of folks don't see an Indigenous politician, a young politician of color," said Christina Haswood, a member of the Kansas House of Representatives. She hopes to inspire young people to run for office.  Arin Yoon for The New York Times

She won the race, making her one of a handful of Native Americans in the Kansas state legislature. "A lot of folks don't see an Indigenous politician, a young politician of color. You don't see that every day across the state, let alone across the country," Ms. Haswood said. "I want to encourage young people to run for office."

At first, Ms. Haswood created TikToks that were purely informational — videos of her talking directly to the camera, which weren't getting much traction. When one of the candidates running against her in the primary also started a TikTok, she felt she needed to amp things up.

Conner Thrash, at the time a high school student and now a college student at the University of Kansas, started to notice Ms. Haswood's videos. "I really loved what she stood for," Mr. Thrash, 19, said. "I realized that I had the ability to bridge the gap between a politician trying to expand their outreach and people like my young, teenage self."

So he reached out to Ms. Haswood, and the two started making content together and perfecting the art of the viral TikTok. A video should strike a careful balance of entertaining but not embarrassing; low-fi without seeming careless; and trendy but innovative, bringing something new to the never-ending scroll.

One of their most-watched videos lays out key points of Ms. Haswood's platform, including the protection of reproductive rights and legalizing recreational marijuana. The video is set to a viral remix of Taylor Swift's "Love Story" and follows a trend in which TikTok users push the camera away from themselves midsong. (Ms. Haswood used a Penny skateboard to achieve the effect.)



Christina Haswood

View profile

Related videos

Watch now

@haswoodforks

Meet Christina Haswood, the future for democratic politics in Kansas. ❤️ ...See more

Love Story - Disco Lines

TikTok may have helped Ms. Haswood win her race, but few candidates have had her success. Several politicians with large TikTok followings, including Matt Little (a former liberal member of the Minnesota Senate) and Joshua Collins (a socialist who ran for U.S. representative for Washington), lost, "pretty badly — in their respective elections," Ms. Literat said, "so technically they did not succeed from a political perspective."

The behavior of young voters in particular can be hard to predict. In the 2020 presidential election, about half of Americans between the ages 18 and 29 voted, according to the Center for Information & Research on Civic Learning and Engagement at Tufts University — a record turnout for an age group not known for showing up to the polls.

Still, "young people help drive the culture," said Jennifer Stromer-Galley, the author of "Presidential Campaigning in the Internet Age" and a professor of information studies at Syracuse University.

"Even though they may or may not ever vote for Jon Ossoff, being on TikTok does help shape Ossoff's image," she added. "More people are going to know Ossoff's name today because of his TikTok stunt than they did before."

Audio produced by Adrienne Hurst.

A version of this article appears in print on , Section ST, Page 10 of the New York edition with the headline: Trying to Trend, Politicians Take On The TikTok Challenge

# EXHIBIT 9

SPECTRUM
**NEWS** NY1

ALL BOROUGHS  >  |  JUNE 27, 2023  |  12:02PM PT          76° EDIT

WATCH LIVE · LOG IN

LATEST NEWS   WEATHER   TRANSIT   POLITICS   ARTS+CULTURE   COMMUNITY+NEIGHBORHOODS   PODCASTS   OUR JOURNALISTS          Search

**GET OUR APP** Our Spectrum News app is the most convenient way to get the stories that matter to you. Download it here.



*The TikTok app logo appears in Tokyo on Sept. 28, 2020. (AP Photo/Kiichiro Sato, File)*

DECISION 2022

## Views to votes: Candidates employ TikTok to spread political message ahead of midterms

BY JOSH ROBIN · CHIEF NATIONAL POLITICAL REPORTER AND RACHEL TILLMAN | NATIONWIDE
PUBLISHED 6:12 PM ET SEP. 22, 2022

Election Day is in less than seven weeks, evidenced by the flurry of political ads and mailers sent out and put up across the country as candidates feverishly try to get their messages out.

This year, one social media platform is getting special attention in the political sphere, even at the risk of drumming up snark – and worse – from those scrolling by.

---

**What You Need To Know**

 • With the midterm elections less than seven weeks away, individuals running for political office have increasingly used TikTok to spread their message to a younger audience

 • According to recent data, around 60% of TikTok's 80 million monthly active users in the United States are between the ages of 16 - 24, and 80% are between the ages of 16 - 34

 • The race for U.S. Senate in Pennsylvania between Democrat John Fetterman and Republican Mehmet Oz is just one example of a battle in which the candidates are hoping clicks translate to votes

 • TikTok is Chinese-owned, and former President Donald Trump moved to shut it down – which is one reason why you might not see GOP candidates on TikTok as frequently as Democrats

---

Enter TikTok, the video-sharing app best known for trends, music and dancing. But increasingly, individuals running for political office have used TikTok to spread their message to a younger audience.

"Most TikTok users are younger, particularly compared to Twitter or Facebook," Maggie Macdonald, a postdoctoral fellow at the NYU Center for Social Media and Politics, told Spectrum News. "And so it is a way for politicians to try and reach those people in a way that they may otherwise not be able to."

According to recent data, around 60% of TikTok's 80 million monthly active users in the United States are between the ages of 16 - 24, and 80% are between the ages of 16-34. That means a far greater share of TikTok users belong to Gen Z than on, say, Facebook, where just 23% of active users are between the ages of 13 - 24.

While a few political videos have gone viral, TikTok doesn't draw nearly as many messages from candidates as older social media platforms.

Why? For one, putting something compelling on TikTok requires time and practice – shooting a video, a bit of editing and adding memes and images. Using trending audios or sounds can also increase views.

"It's easier to write a 280 character tweet than it is to make a really engaging, dynamic video," Macdonald posited.

And of course, it's things people want to see. That – and a cute kid with corn – have millions of people entranced, wasting time, or both.

But that hasn't stopped some politicians from getting in on the fun. The race for Pennsylvania's Senate seat being vacated by Republican Sen. Pat Toomey is just one example of a battle in which the candidates are hoping clicks translate to votes.

In the Keystone State, Republican Dr. Mehmet Oz – a retired cardiothoracic surgeon best known for his decade-long television program "The Dr. Oz Show" – is running against John Fetterman, Pennsylvania's current lieutenant governor and a longtime public servant at various levels of government.

Their online back-and-forth has gained notoriety across a variety of platforms, but perhaps the most viral instance concerned a resurfaced video Oz posted to his TikTok account in mid-April. At the time, Oz railed against the high prices of vegetables he intended to use for "crudité," a French word for a vegetable appetizer plate. He also called the store "Wegner's," an apparent mashup of grocery chains Wegmans and Redner's, in the video that now has 4.4 million views – among the top-most-viewed videos shared to the account since Oz announced his candidacy last November.

In response, Fetterman shared a video poking fun at Oz's statements, showcasing individuals dressed up as broccoli and holding signs emblazoned with the phrases "I'm afraid Dr. Oz is going to dip me in salsa" and "Veggies for Fetterman."

That response video has a fraction of the views on Oz's original TikTok – 153,000 compared to 4.4 million – though the same format has proven successful for others (when it comes to garnering attention on the app). Fetterman's latest comment garnered 11 million views.

There are an increasing number of high-profile political figures on TikTok, some of whom are gunning for highly-competitive Senate seats.

Take, for instance, Rep. Tim Ryan, a Democrat running for Senate in Ohio against J.D. Vance, who has gained the endorsement of former President Donald Trump.

Ryan's TikTok, while not yet nearing the amount of likes garnered by either Fetterman or Oz, is filled with trending audios poking fun at Vance's past criticism of Trump, celebrating Ryan's time fighting for Ohioans in Congress and lauding workers across the Buckeye State (to the tune of a remixed version of the Corn Kid's words, of course).

Vance does not appear to be on TikTok.

Then there's Rep. Val Demings, a Democrat running for Florida's Senate seat against Marco Rubio. Her TikTok presence – in terms of likes and followers – rivals that of John Fetterman, and she frequently posts videos of campaign events and jabs at Rubio to her account.

Rubio does not have a TikTok account, and has targeted Demings for her use of the social media app.

"While Marco Rubio fights back against Communist China, Val Demings is dancing on TikTok," a recent campaign ad from his team said in part.

TikTok is Chinese-owned, and former President Trump moved to shut it down – which is one reason why you might not see GOP candidates on TikTok as frequently as Democrats.

Still, at least one Republican running for Congress in California said his party should embrace the platform more..

"I've noticed when I go live I'm seeing a different level of support. There's a lot of Republicans that are on there," Brian Hawkins, a Republican candidate for the House of Representatives, told Spectrum News. "You have to think about it for a million views and to get shared. These are like minded people. So there are a lot of Republicans. I think it's a missed opportunity."

It does not appear his Democratic rival, Rep. Raul Ruiz, is on TikTok. His campaign office did not return a request for comment.

It's not only candidates for office using the newer social media platform to spread their message. TikTok has become a home for serious issues too, including those fighting both for and against abortion rights.

"Roe's on the ballot this year," Sam Shlafstein of Gen-Z For Change told Spectrum News. "And I think that's really an important talking point because I think as we've seen what's sort of like a lot of midterm production predictions, Republicans are really hurting from the fall of Roe."

Earlier this year, the Democratic National Committee launched its own TikTok account, which it has used to elevate candidates in various state races, raise awareness about voter registration, push forward President Joe Biden's agenda and more.

But it remains to be seen if TikTok views will translate to votes. Anecdotally, such was not the case for one popular candidate on the platform: Ken Russell, who was running for the Democratic nomination for a House seat in Florida, was an early and often TikTok user, and demonstrated an impressive understanding of trends on the app.

His account has 11.9 million likes, more than the pages of Fetterman, Oz, Demings and Ryan combined. Still, Russell lost the primary for House District 27 in Florida to Maria Elvira.

As of yet, there is no clear link between a candidate's TikTok presence and their overall performance in their race. In the two aforementioned races where the Democrat has a TikTok presence and the Republican does not (i.e. Ohio and Florida), the candidates are in close competition; data shows Rubio likely has an edge over Demings, while Ryan and Vance grapple to take the lead in polls.

---

**YOU MAY ALSO BE INTERESTED IN**



DECISION 2024

**Trump is returning to Michigan with hopes of repeating the battleground success he found in 2016**

NATIONWIDE | 2 DAYS AGO



PRIDE MONTH 2023

**Party and protest mix as LGBTQ+ pride parades kick off from New York to San Francisco**

NATIONWIDE | 2 DAYS AGO



POLITICS

**One year later, the Supreme Court's abortion decision is both scorned and praised**

NATIONWIDE | 3 DAYS AGO



POLITICS

**Biden signs executive order expanding access to contraception**

WASHINGTON, D.C. | 3 DAYS AGO



▶ 2:07

GEORGE SANTOS

**Rep. George Santos' $500K bond guarantors revealed to be father, aunt**

NATIONWIDE | 4 DAYS AGO



SUPREME COURT

**Supreme Court rules against a man who was given 27 years in prison for having a gun**

WASHINGTON, D.C. | 5 DAYS AGO



SPECTRUM NEWS | CONTACT | ABOUT | RSS | FAQ | SITEMAP | CAREERS | ADVERTISE WITH US | CERTIFICATIONS | TERMS |
YOUR PRIVACY RIGHTS | CALIFORNIA CONSUMER PRIVACY RIGHTS |
CALIFORNIA CONSUMER LIMIT THE USE OF MY SENSITIVE PERSONAL INFORMATION |
DO NOT SELL OR SHARE MY PERSONAL INFORMATION/OPT-OUT OF TARGETED ADVERTISING




© 2023, Charter Communications, all rights reserved.

# EXHIBIT 10

♪ TikTok    Search    + Upload    Log in

For You
Following
Explore *New*
LIVE

Log in to follow creators, like videos, and view comments.

Log in



**kenbogner**
kenbogner

Follow

68 Following    431 Followers    18K Likes

Montana State Senator
Showing off the great state of Montana

Videos    Liked

       

Memorial Day ▷ 56
We're going to be ok us

Wild Horse Race ▷ 2179
Thought I was going to ...

Romantic ▷ 140

Better than the California coast? ▷ 5124
Can't wait to be back on...

Might be the biggest sports disaster ▷ 312
Montana once hosted t...

The coldest spot in the nation ▷ 244
Coldest place in the enti...

Everyone should hear an elk bugle ▷ 547
Everyone should hear a...

▷ 422
Definitely should've kep...

      

The toughest place to play in the country ▷ 364
Up With Montana! The t...

How to become a politician ▷ ...
Replying to ...

Does it deserve to be the "Crown of the Continent"? ▷ 378
"Crown of the Continent"

Is this a big issue in your state? ▷ 801
If not, what is?

Really, this isn't in Asia ▷ ...
Can you believe this isn'...

Would you marry ScarJ? ▷ 306
Would you marry ScarJ...

What's the longest river in the US? ▷ 180.3K
What's the second long...

Roadtrip Recap ▷ 304
Follow along for next w...

       

Do you know where peas come from? ▷ 364
Farmers feed the world!

Reagan's cool hat ▷ 316
the Gipp had some drip

My proudest bill ▷ 745
Very proud I had a small...

What it's like to drive through my district ▷ 270
Love being a Senator in...

What it's like to drive through my Senate district ▷ 228
I love being a Senator f...

Would've you been a vigilante for your town? ▷ ...
"Vigilante shit" -T. Swift

Could you sleep in a sheepwagon? ▷ 318
Sheepwagon! Montana i...

What you had to do before gps ▷ 432
Do you remember life b...

      

Have you seen Lewis and Clark's compass in MT? ▷ 273
Do you remember life b...

How to finish a long day ▷ ...
$3 dive bar beers

Engine Trouble ▷ 388
"Perfect time to die"

Not very fun ▷ 381
Winding road. Loose cat...

Pioneer Mountains ▷ ...
So what's yours?

Anaconda ▷ 306
30 feet taller than the W...

17th Amendment ▷ ...
Should we go back to st...

Butte ▷ 429
Butte, America - the rich...

       

Work truck ▷ 459
Take your baby to work ...

MT Military Museum ▷ 547
War dogs and the first s...

Senator Mansfield ▷ 396
Mike Mansfield first join...

▷ 1277
The office #senator ...

▷ ...
Not a bad place to work...

Roadtrip Week 1 Recap ▷ ...
Follow along for week 2!

MT Military Museum ▷ ...
"In remembrance of th...

▷ 245.2K
Roadtrips are good for t...

       

Medicine Rocks ▷ 692
Teddy Roosevelt really ...

I found Jurrasic Park! ▷ 662
I touched the bones. Oo...

Dunk Tank! ▷ 1766
It's way colder than it lo...

Let's roadtrip! ▷ 569
How real is ...

Outtakes ▷ 772
I thought this would be ...

▷ ...
But seriously, no A/C is ...

How to turn on this ... ▷ ...
Could you get it the first...

1966 FORD beauty ▷ 384
What's your best find?



▷ 373

About  Newsroom  Contact  Careers
ByteDance
TikTok for Good  Advertise  Developers
Transparency  TikTok Rewards
TikTok Embeds
Help  Safety  Terms  Privacy
Creator Portal  Community Guidelines

Get app

# EXHIBIT 11



## TikTok

For You

Following

Explore *New*

LIVE

Log in to follow creators, like videos, and view comments.

Log in



**zoandbehold** ✓
Rep. Zooey Zephyr

Follow

76 Following   61.2K Followers   434.3K Likes

Representative for Montana's 100th House District

**Videos**   🔒 Liked


A day in Glacier Nationa...


I spent Monday in Glaci...


Montana Youth are suin...


Thank you to ...


We will not be intimidat...


This Friday, at queer pr...


Today the Montana GO...   "If you vote yes on this ...


SB 458 creates a faulty ...


#transdayofvisibility in ...


Today I spoke out again...


We've made it through t...


Yesterday, my first bill p...


Yesterday, my first bill p...   Yesterday I testified aga...


Today I spoke on the ho...


I spent my Saturday at t...


This Thursday I oppose...


HB 303 passed 2nd rea...


Weekends during the le...


Today I opposed an "ob...


On Friday I testified aga...


On Day 19, I got my first ...   Over the last couple we...


basic overview of floor s...


Being elected means liv...


Today MT republicans b...


Went to a bipartisan sau...


And that's week 1! Reca...


Day 4 - brought my first ...


Day 3 - lobbyist events...


Day 2 of the 2023 MT le...


Day 1 of 90 is in the boo...


First time in DC. Ice skat...


day 1 of legislative orien...

About Newsroom Contact Careers
ByteDance
TikTok for Good Advertise Developers
Transparency TikTok Rewards
TikTok Embeds
Help Safety Terms Privacy
Creator Portal Community Guidelines
© 2023 TikTok

Get app

# EXHIBIT 12

☰ ♪ TikTok

How TikTok is supporting our community through COVID-19 ⊙                              ✕

All
News
Product
Community
Safety
Company

United States ▾

Product    Jun 18, 2020

# How TikTok recommends videos #ForYou

Share this post

 

TikTok's mission is to inspire creativity and bring joy. We're building a global community where you can create and share authentically, discover the world, and connect with others. The For You feed is part of what enables that connection and discovery. It's central to the TikTok experience and where most of our users spend their time.

When you open TikTok and land in your For You feed, you're presented with a stream of videos curated to your interests, making it easy to find content and creators you love. This feed is powered by a recommendation system that delivers content to each user that is likely to be of interest to that particular user. Part of the magic of TikTok is that there's no one For You feed – while different people may come upon some of the same standout videos, each person's feed is unique and tailored to that specific individual.

The For You feed is one of the defining features of the TikTok platform, but we know there are questions about how recommendations are delivered to your feed. In this post we'll explain the recommendation system behind the For You feed, discuss how we work to counter some of the issues that all recommendation services can grapple with, and share tips for how you can personalize your discovery experience on TikTok.

### The basics about recommendation systems

Recommendation systems are all around us. They power many of the services we use and love every day. From shopping to streaming to search engines, recommendation systems are designed to help people have a more personalized experience.

In general, these systems suggest content after taking into account user preferences as expressed through interactions with the app, like posting a comment or following an account. These signals help the recommendation system gauge the content you like as well as the content you'd prefer to skip.

### What factors contribute to For You?

On TikTok, the For You feed reflects preferences unique to each user. The system recommends content by ranking videos based on a combination of factors – starting from interests you express as a new user and adjusting for things you indicate you're *not* interested in, too – to form your personalized For You feed.

Recommendations are based on a number of factors, including things like:

- **User interactions** such as the videos you like or share, accounts you follow, comments you post, and content you create.

- **Video information**, which might include details like captions, sounds, and hashtags.

- **Device and account settings** like your language preference, country setting, and device type. These factors are included to make sure the system is optimized for performance, but they receive lower weight in the recommendation system relative to other data points we measure since users don't actively express these as preferences.

All these factors are processed by our recommendation system and weighted based on their value to a user. A strong indicator of interest, such as whether a user finishes watching a longer video from beginning to end, would receive greater weight than a weak indicator, such as whether the video's viewer and creator are both in the same country. Videos are then ranked to determine the likelihood of a user's interest in a piece of content, and delivered to each unique For You feed.

While a video is likely to receive more views if posted by an account that has more followers, by virtue of that account having built up a larger follower base, neither follower count nor whether the account has had previous high-performing videos are direct factors in the recommendation system.

### Curating your personalized For You feed

*Getting started*

How can you possibly know what you like on TikTok when you've only just started on the app? To help kick things off we invite new users to select categories of interest, like pets or travel, to help tailor recommendations to their preferences. This allows the app to develop an initial feed, and it will start to polish recommendations based on your interactions with an early set of videos.

For users who don't select categories, we start by offering you a generalized feed of popular videos to get the ball rolling. Your first set of likes, comments, and replays will initiate an early round of recommendations as the system begins to learn more about your content tastes.

*Finding more of what you're interested in*

Every new interaction helps the system learn about your interests and suggest content – so the best way to curate your For You feed is to simply use and enjoy the app. Over time, your For You feed should increasingly be able to surface recommendations that are relevant to your interests.

Your For You feed isn't only shaped by your engagement through the feed itself. When you decide to follow new accounts, for example, that action will help refine your recommendations too, as will exploring hashtags, sounds, effects, and trending topics on the Discover tab. All of these are ways to tailor your experience and invite new categories of content into your feed.

*Seeing less of what you're not interested in*

TikTok is home to creators with many different interests and perspectives, and sometimes you may come across a video that isn't quite to your taste. Just like you can long-press to add a video to your favorites, you can simply long-press on a video and tap "Not Interested" to indicate that you aren't interested in a particular video. You can also choose to hide videos from a given creator or made with a certain sound, or report a video that

seems out of line with our guidelines. All these options contribute to future recommendations in your For You feed.

### Addressing the challenges of recommendation engines

One of the inherent challenges with recommendation engines is that they can inadvertently limit your experience – what is sometimes referred to as a "filter bubble." By optimizing for personalization and relevance, there is a risk of presenting an increasingly homogenous stream of videos. This is a concern we take seriously as we maintain our recommendation system.

*Interrupting repetitive patterns*

To keep your For You feed interesting and varied, our recommendation system works to intersperse diverse types of content along with those you already know you love. For example, your For You feed generally won't show two videos in a row made with the same sound or by the same creator. We also don't recommend duplicated content, content you've already seen before, or any content that's considered spam. However, you might be recommended a video that's been well received by other users who share similar interests.

*Diversifying recommendations*

Diversity is essential to maintaining a thriving global community, and it brings the many corners of TikTok closer together. To that end, sometimes you may come across a video in your feed that doesn't appear to be relevant to your expressed interests or have amassed a huge number of likes. This is an important and intentional component of our approach to recommendation: bringing a diversity of videos into your For You feed gives you additional opportunities to stumble upon new content categories, discover new creators, and experience new perspectives and ideas as you scroll through your feed.

By offering different videos from time to time, the system is also able to get a better sense of what's popular among a wider range of audiences to help provide other TikTok users a great experience, too. Our goal is to find balance between suggesting content that's relevant to you while also helping you find content and creators that encourage you to explore experiences you might not otherwise see.

*Safeguarding the viewing experience*

Our recommendation system is also designed with safety as a consideration. Reviewed content found to depict things like graphic medical procedures or legal consumption of regulated goods, for example – which may be shocking if surfaced as a recommended video to a general audience that hasn't opted in to such content – may not be eligible for recommendation. Similarly, videos that have just been uploaded or are under review, and spam content such as videos seeking to artificially increase traffic, also may be ineligible for recommendation into anyone's For You feed.

### Improving For You

Developing and maintaining TikTok's recommendation system is a continuous process as we work to refine accuracy, adjust models, and reassess the factors and weights that contribute to recommendations based on feedback from users, research, and data. We are committed to further research and investment as we work to build in even more protections against the engagement bias that can affect any recommendation system.

This work spans many teams – including product, safety, and security – whose work helps improve the relevance of the recommendation system and its accuracy in suggesting content and categories you're more likely to enjoy.

Ultimately, your For You feed is powered by your feedback: the system is designed to continuously improve, correct, and learn from your own engagement with the platform to produce personalized recommendations that we hope inspire creativity and bring joy with every refresh of your For You feed.

*Note: At the TikTok Transparency Center in Los Angeles, invited experts will have the opportunity to learn how our algorithm operates along with reviewing TikTok source code, which will be made available at the center for testing and evaluation.*



Product   Jun 27, 2023

### More Ways for Creators to Collaborate with Brands: TikTok Creative Challenge

Creators are at the heart of TikTok, driving creativity, culture and entertainment. Representing a new generation of storytellers, the Tikto...



Product   Jun 27, 2023

### Updating Family Pairing and establishing TikTok's Youth Council

By Julie de Bailliencourt, Global Head of Product Policy Today we're announcing a new way caregivers can support their teen's viewing...



Community   Jun 22, 2023

### TikTok @ VidCon 2023: Step into the Creator Galaxy

As an entertainment platform powered by a diverse community, TikTok is excited to be at VidCon Anaheim 2023 to celebrate the creativity of ou...



Company

About TikTok
Newsroom
Contact
Careers
ByteDance

Programs

TikTok for Good
TikTok for Developers
Effect House
Advertise on TikTok
TikTok Rewards
TikTok Browse
TikTok Embeds

Resources

Help Center
Safety Center
Creator Portal
Community Guidelines
Transparency
Accessibility

Legal

Terms of Service

© 2023 TikTok

# EXHIBIT 13

https://finance.yahoo.com/news/tiktok-are-influencers-panicking-about-bans-we-asked-three-to-weigh-in-205625085.html

June 27, 2023

yahoo!finance

| HOME | MAIL | NEWS | FINANCE | SPORTS | ENTERTAINMENT | LIFE | SEARCH | SHOPPING | YAHOO PLUS | MORE... |

Search for news, symbols or companies    🔍 Search    Sign in   🔔   ✉ Mail

**Finance**   Watchlists   My Portfolio   Markets   News   Videos   Yahoo Finance Plus   Screeners   Personal Finance   Crypto   Industries   ...

NOW BETTER BANKING IS
RIGHT AROUND THE CORNER
498 E Stacy Rd
Allen, TX 75002
MEMBER FDIC
Frost

| S&P 500 | Dow 30 | Nasdaq | Russell 2000 | Crude Oil |
|---|---|---|---|---|
| 4,378.41 | 33,926.74 | 13,555.67 | 1,849.93 | 67.95 |
| +69.59 (+1.65%) | +212.03 (+0.63%) | +219.89 (+1.65%) | +26.67 (+1.46%) | -1.42 (-2.05%) |

⚑ U.S. markets closed

yahoo!finance

# TikTok: Are influencers panicking about bans? We asked three to weigh in.

💬 1

f

🐦

✉



NEW
99% EXPERIENCE SKIN RELIEF
OF ONE OR MORE SENSITIVE SKIN SYMPTOMS
OLAY
ECZEMA THERAPY
AVAILABLE AT
Walgreens
SHOP NOW
scan with your phone camera
*NO PRESCRIPTION REQUIRED

👤 **Alexandra Garfinkle** · Senior Reporter

January 19, 2023 · 5 min read

In this article:

| GOOG | GOOGL | META |
|---|---|---|
| -0.07% | -0.01% | +3.08% |

As talk of banning TikTok grows, the so-called influencers whose livelihoods are linked to the platform aren't panicking – at least, not yet.

Yahoo Finance spoke to three of those influencers, with nearly 5.5 million followers between them. The topic of conversation: How they're thinking about the escalating series of bans on state and university devices, as well as the fiery rhetoric coming out of Washington. For the most part, though they're concerned, they haven't yet seen their businesses affected so far.

"The current bans do not have a direct impact on our business," influencer and digital marketer Chase Chappell told Yahoo Finance. "If they were to ban TikTok for everyone in the U.S., that'd be a cause for concern, as 50% of all our clients come from TikTok specifically. This is also my biggest platform in terms of followers and views, and our business does rely on this platform as a source of growth."

Chappell's business focuses on helping others grow their social media reach and TikTok is a major part of his life. He spends two to four hours a day on the platform, and his business isn't the only one on TikTok that he's apprehensive about. He's worried about the fate of the businesses he deals with as well.

"If TikTok were to be banned, thousands of our clients would be impacted financially as this platform has become a major source of their customer base and revenue," he said. "Not only that, this would have a major economic impact across the U.S., as millions of users are buying items from U.S. companies that they discovered specifically on TikTok."



Chase Chappell's TikTok page, taken on Jan. 19, 2023.



THE BEST IN PESTS.™
Learn More
ORKIN

Quote Lookup 🔍

**Related Quotes**

| Symbol | Last Price | Change | % Change |
|---|---|---|---|
| GOOG | 119.01 | -0.08 | -0.07% |
| Alphabet Inc. | | | |
| GOOGL | 118.33 | -0.01 | -0.01% |
| Alphabet Inc. | | | |
| META | 287.05 | +8.58 | +3.08% |
| Meta Platforms, Inc. | | | |

**TRENDING**

1. 2 in 5 Americans find credit card debt embarrassing: Report
2. Big banks face Fed stress test after this year's bank failures
3. US STOCKS-Wall Street closes higher as upbeat economic data allays slowdown fears
4. Costco cracking down on shoppers sharing membership cards
5. Why consumers are less pessimistic on stocks according to economic data

There's only so much data on the growing role of small businesses on TikTok and, critically, is now influencing what influencers do on it. But what we do have shows a picture of a platform where the influencer economy is thriving.

Data from digital marketer Higher Visibility suggests that as much as 65% of the most prominent, full-time online creators are using TikTok as their primary platform going into this year. The 'why' is pretty simple – creators and small businesses, which are often one and the same, are frequently drawn to TikTok's now-storied organic reach. Additionally, TikTok itself has been studying small businesses on its platform, gathering data based on 7,000 responses. Bottom line: As many as 78% of small businesses currently on the platform are planning to increase investment in it.

So, as influencers wait for the Washington-TikTok standoff to play out, what are they doing to protect themselves? For one, many have been diversifying away from TikTok. Mik Zenon, whose TikTok presence focuses on products and "life hacks" like finding the most useful home gadgets on Amazon (AMZN), has been building out on other platforms for years now.

"If the bans were to ever extend to personal devices, then the impact would be significant," he said. "There was talk of something like this happening in summer 2020 under Trump's presidency. Back then, 100% of my business was on TikTok. I learned quickly the need to have a presence on as many platforms as possible… I have a substantial following now on Instagram, Facebook, and YouTube and I have collected tens of thousands of emails over the years. I no longer feel like I am over-leveraged on one platform."

Still, about 25% of Zenon's livelihood is entwined with TikTok.



Mik Zenon's TikTok page, taken on Jan. 19, 2023.

## Security concerns?

As far as data security is concerned, our Yahoo Finance influencers were mixed on the problem. For Zenon, he's no more worried about TikTok, which is owned by Beijing-based ByteDance, than any other platform.

"I've come to accept that all social media platforms collect our personal data to some degree when we use their apps," he said.

Chappell, meanwhile, said the government's concern makes him question the long-term ramifications.

"It certainly makes me question how this could be used against the U.S. in a future scenario, [but] as of right now, I have no specific personal reasons to be worried about," he said. "My only concerns are around potential 'what ifs,' but I can't worry about 'what ifs' all the time, otherwise I'd always be in a worry and that's not good for anyone."

For TikTok's part, the company is in the midst of a negotiation with the Committee on Foreign Investment in the United States (CFIUS) to address the government's security concerns. "We believe that the proposal under review by CFIUS—made up of our country's top national security agencies—will address all national security concerns about TikTok so that our community can feel confident in their safety, privacy, and security," a company spokesperson said.

## 'My followers are everything'

The prospects of the ban aside, TikTok is clearly important to the small businesses on the platform.

For Fafa Araujo, who runs Fafa Fitness and frequently goes by her first name, the platform has done nothing short of changing her life, she said. She joined TikTok in 2021, and has gained 2.1 million followers in the short time since.



Videos          🔒 Liked



calfs can dance too 😏 ... | pure brazilian style 🇧🇷🌴🌴... | that friday feeling 😂 #viral | Brazilian in miami 🌴🇧🇷 ...

Fafa's TikTok page, taken on Jan. 19, 2023.

"I would be really hard for me to move forward right now or even to where I am without TikTok," she told Yahoo Finance.

"TikTok brings me what I'm looking for—people that I can help," she added. "I know it's only been two years for me on TikTok, but it's helped me find my happiness helping others. TikTok is the love of my life."

For Araujo, who is based in Miami, the fear of a ban comes down to her connection with those followers – she doesn't want to lose them, professionally and especially on a personal level.

"My followers are everything," she said. "Without them, what am I?"

*Allie Garfinkle is a Senior Tech Reporter at Yahoo Finance. Follow her on Twitter at [@agarfinks](#).*

[Click here for the latest trending stock tickers of the Yahoo Finance platform.](#)

[Read the latest financial and business news from Yahoo Finance.](#)

*Download the Yahoo Finance app for [Apple](#) or [Android](#).*

*Follow Yahoo Finance on [Twitter](#), [Facebook](#), [Instagram](#), [LinkedIn](#), and [YouTube](#).*

---

**READ MORE**

**Amazon may be the largest US retailer in 2024, according to JPMorgan analysts**
Yahoo Finance · 3 min read


**NBA: Why top draft pick Victor Wembanyama is an unprecedented branding opportunity**
Yahoo Finance · 9 min read


**How the White House is moving into the action phase of its effort to regulate AI**
Yahoo Finance · 5 min read


Advertisement

Welcome to Yahoo comments! Please keep conversations courteous and on-topic. To foster productive and respectful conversations, you may see comments from our Community Managers, who will be designated by a "Yahoo Staff" or "Staff" label. To promote the best user experience, we close commenting after an article has been posted for three days. Yahoo Finance's Conversations message boards accept comments indefinitely. See our [community guidelines](#) for more information.

Advertisement

Advertisement

---

🟨 **RECOMMENDED STORIES**



Investor's Business Daily
**Regeneron Stock Crumbles After FDA Rejects Its Next Blockbuster Contender**
The Food and Drug Administration rejected a high-dose version of Regeneron's eye drug Eylea on Tuesday, leading REGN stock to crumble.
46m ago



LA Times
**'Deceiving and disgusting': Readers react to the rise of restaurant service fees**
A class-action lawsuit filed against the restaurant group that owns Jon & Vinny's has started a larger conversation on the ethics of service fees and tipping. L.A. Times readers share their thoughts.
1d ago



Ad · Street Insider
**Steve Jobs Left His Daugher Eve Jobs Billions**
This Makes Her The Richest Heiress

# EXHIBIT 14

**Sections**    Search                     *The Dallas Morning News*                    Sign In    SUBSCRIBE NOW $1 for 3 months

Featured:  ERCOT   Vote for Best in DFW   Ken Paxton   Podcasts   Public Notices   ePaper   Obituaries   Content Removal Review                    FWD>DFW

MORE FROM HOMEPAGE

Dallas friends celebrate life of Norma Valles, 'Mayor of the Mexican-American community'    |    As Bojangles fried chicken opens in Texas, CEO says 20 stores are in D-FW's future    |    Prosper's landmark silos to become anchor of Jerry Jones firm's newest project    |    Does Dallas College have the answer to the teacher shortage?

ADVERTISEMENT

BUSINESS › RETAIL

# TikTok has created small business success stories and fast-tracked American dreams

For some, TikTok is a path to riches and the American dream. With a ban, it could all disappear.



ADVERTISEMENT

A proposed ban of TikTok would be a devastating blow to many of the small businesses that have turned to the app to reach potential customers instead of shelling out for more traditional and pricey forms of marketing. (Dreamstime/TNS) (Dreamstime / TNS)

By Tribune News Service
5:02 AM on Mar 28, 2023 CDT



 Listen to this article now
▶    Powered by Trinity Audio                         1.0x

When Lauren Wyman felt crushed under the weight of her corporate finance job in 2019, she found solace in launching a small goth and alternative clothing business.

She initially made Facebook and Instagram accounts for her shop, Dark Mother Clothing, but generated only $5,000 to $6,000 in sales the first year. Wyman, 32, joined TikTok at the start of the pandemic, launched new products and posted a couple of videos that went viral.

ADVERTISEMENT


GIVE. ADVOCATE. VOLUNTEER. LIVE UNITED.

In 2022, she grossed $217,000."

A part of what people have done on this app is created their own slice of the American dream that is preached so much about," said Wyman, who's based in Arizona, "whether it's opening a small business or people who are no longer facing homelessness, people who are able to retire, creators who are now allowed to pursue their creative pursuits."



## D-FW Retail News

The latest on retail openings, closings and trends in D-FW.

EMAIL ADDRESS

Enter your email address              SUBMIT

By signing up you agree to our Terms of Service and Privacy Policy.

TOP BUSINESS STORIES

 Prosper's landmark silos to become anchor of Jerry Jones firm's newest project
MEMBER EXCLUSIVE

 Downtown Dallas and Fort Worth apartment vacancies are rising as new units are built
MEMBER EXCLUSIVE

 American, Southwest pilot applicants' data hacked at Austin recruiting firm

 California logistics firm headed by former Amazon exec plans Dallas office

 Frisco's $1 billion Gate project is getting more apartments
MEMBER EXCLUSIVE

ADVERTISEMENT


GIVE. ADVOCATE. VOLUNTEER. LIVE UNITED.

MORE STORIES

 Dallas friends celebrate

testified in front of lawmakers Thursday, trying to convince them that TikTok is not a national security threat. But he was largely unsuccessful in making the case that TikTok was out of the reach of Chinese influence, observers say.

The Biden administration has recently increased efforts to force a sale of TikTok by its owner ByteDance, which is a Chinese company subject to Chinese law — the same thing Trump sought to do in 2020 with a TikTok ban that was blocked by federal courts.

ADVERTISEMENT

On March 15, the Committee on Foreign Investment in the United States reportedly gave ByteDance an ultimatum: Sell TikTok or face a ban in the United States.

A recent bill introduced in the Senate that would enable the Biden administration to ban TikTok has bipartisan support. An outright ban of the app would be a devastating blow to many of the small businesses that have turned to TikTok to reach potential customers instead of shelling out for more traditional and pricey forms of marketing.

**Related:** Dallas-based TikTok creator DeAndre Brown amplifies LGBTQ voices in the corporate space

Kellis Landrum, co-founder of Los Angeles marketing agency True North Social, said Facebook and Instagram are "pay-to-play" platforms that don't give as much of a return on investment."

ADVERTISEMENT



GIVE. ADVOCATE. VOLUNTEER. LIVE UNITED.

TikTok offers the broadest organic reach of any of the channels right now," Landrum said. "If you're very successful on TikTok, that's probably most of what you're focusing on because [as] a small business, you can't afford to attack marketing on a bunch of different fronts at the same time."

Elyse Burns, who runs a stationery and home goods design company she launched in college in 2015, said she's seen a direct correlation between her TikTok videos and sales. After posting a video featuring a shipment of day planners that got 2.9 million views in June 2022, she sold more than 2,000 day planners in two days.

"I can look at my sales and see like that month, I had a viral TikTok," Burns said.

Last year, she did $1 million in sales through her website, which receives traffic from TikTok and Instagram. She devotes four hours a day to those two platforms but has since expanded to doing wholesale and opening a storefront in Durham, N.C., to diversify her revenue. Through her business, which she now runs full time, she's been able to pay off most of her student loans and purchase a house.

Christina Ha experienced a similar phenomenon with her New York cat cafe and rescue organization, Meow Parlour. In late 2020, she started posting videos of her retired parents interacting with some of her foster kittens. When she posted a video about her parents sewing cat beds to support her rescue work, her audience clamored to buy them. She raised $20,000 in one week.

"It was insane and kind of unexpected," Ha said. "When I look back at the video, it probably wasn't my finest work."

A video she posted this month captioned, "A day in the life of my 76-year-old dad," got 10.2 million views — and another $30,000 in cat bed sales. She's also received a flurry of visitors to Meow Parlour who have signed up to foster and adopt cats and become monthly donors to the nonprofit.

ADVERTISEMENT

"TikTok is so, so, so amazing. The community is extremely supportive in a way I've not found on other social media platforms," Ha said.

Even businesses such as garbage can cleaning and carpet repair have found audiences on TikTok.

Josh Nolan, who runs Carpet Repair Guys in the San Francisco Bay Area, said he joined TikTok after nearly two decades of doing carpet repair after a technician told him he needed to get on social media. The results were astounding.

life of Norma Valles ...
... of the ... ...
American community

**Wild Salsa will reopen in downtown Dallas after 3-year closure**
MEMBER EXCLUSIVE

**As Bojangles fried chicken opens in Texas, CEO says 20 stores are in D-FW's future**
MEMBER EXCLUSIVE

**Bojangles is now open in Texas**

**Azucar Ice Cream will close July 31 in Oak Cliff amidst lease dispute**

ADVERTISEMENT

When he started moving content that he posted on Instagram and Facebook to TikTok, they were "just going through the roof," he told Dallas-based WFAA.

ADVERTISEMENT

Nolan still uses Yelp and Google AdWords to bring in business, but he hears from customers all the time that they've watched TikTok or YouTube videos of him doing carpet repairs, he said. He now has more than 850,000 followers on the app and makes some additional income through brand sponsorships.

"I'm not off the truck yet. I'm still on the job on my knees fixing carpets, but it's been good side money," Nolan said. "It's paid for some vacations for my family, and it's just really an exciting thing for someone who never looked at himself as like a social media content creator. I'm just a blue-collar contractor. But yet you've got this resource here at your disposal."

> **Related:** **TikTok to impose 60-minute time limit for users younger than 18**

Last fall, TikTok partnered with American Express on its #ShopSmall Accelerator program to help small businesses during the holiday shopping season.

ADVERTISEMENT

A week after the Senate bill to give the federal government the power to ban the app was introduced, TikTok launched an initiative highlighting small-business entrepreneurs who have found explosive success on the platform, allowing many to quit their day jobs. That is what Wyman hopes to do, but the uncertainty of TikTok now gives her pause.

"Wanting to take the leap but also being scared, that you go from … having over 125,000 followers (TikTok and Instagram combined) down to having only 17,000 (on Instagram), that's a large risk to take," she said.

As part of the company's campaign to change lawmakers' minds, TikTok paid for a group of TikTokers to travel to Washington ahead of Chew's testimony to protest the potential ban of their beloved app. Chew himself posted a TikTok appealing to the masses a few days before his testimony.

> **Related:** **UT schools, UNT block students from using TikTok on campus Wi-Fi**

ADVERTISEMENT

"I can tell you without question that the next generation of Black business owners are going to come from the TikTok platform," said Baedri Nichole, a bakery owner from Columbus, Ohio, who was part of the TikTok-organized news conference. "If you ban TikTok, then you put at risk putting a cap on the ambitions of a whole generation of wealth creators."

Without access to TikTok, small-business owners say they would probably focus their efforts on Instagram, where they already cross-post content from TikTok. But many are lukewarm about the Meta-owned platform.

"Instagram hasn't really done much for me as a creator or a small business," Wyman said. "I've used their tools, I've tried their ads. … The platforms are nowhere near the same in terms of their audience, their engagement."

**Jaimie Ding, Los Angeles Times, Tribune News Service.**

ADVERTISEMENT


freshworks
Outdated ITSM
got your IT
agents outraged?
Simplify your IT
with one powerful
ITSM solution.
Learn more

# EXHIBIT 15



AN ACT BANNING TIKTOK IN MONTANA; PROHIBITING A MOBILE APPLICATION STORE FROM
OFFERING THE TIKTOK APPLICATION TO MONTANA USERS; PROVIDING FOR PENALTIES;
PROVIDING FOR ENFORCEMENT AUTHORITY; PROVIDING DEFINITIONS; PROVIDING FOR
CONTINGENT VOIDNESS; AND PROVIDING A DELAYED EFFECTIVE DATE.


WHEREAS, the People's Republic of China is an adversary of the United States and Montana and has
an interest in gathering information about Montanans, Montana companies, and the intellectual property of
users to engage in corporate and international espionage; and

WHEREAS, TikTok is a wholly owned subsidiary of ByteDance, a Chinese corporation; and

WHEREAS, the People's Republic of China exercises control and oversight over ByteDance, like other
Chinese corporations, and can direct the company to share user information, including real-time physical
locations of users; and

WHEREAS, TikTok gathers significant information from its users, accessing data against their will to
share with the People's Republic of China; and

WHEREAS, TikTok fails to remove, and may even promote, dangerous content that directs minors to
engage in dangerous activities, including but not limited to throwing objects at moving automobiles, taking
excessive amounts of medication, lighting a mirror on fire and then attempting to extinguish it using only one's
body parts, inducing unconsciousness through oxygen deprivation, cooking chicken in NyQuil, pouring hot wax
on a user's face, attempting to break an unsuspecting passerby's skull by tripping him or her into landing face
first into a hard surface, placing metal objects in electrical outlets, swerving cars at high rates of speed,
smearing human feces on toddlers, licking doorknobs and toilet seats to place oneself at risk of contracting
coronavirus, attempting to climb stacks of milkcrates, shooting passersby with air rifles, loosening lug nuts on
vehicles, and stealing utilities from public places; and

WHEREAS, TikTok's stealing of information and data from users and its ability to share that data with



the Chinese Communist Party unacceptably infringes on Montana's right to privacy; and

WHEREAS, TikTok's continued operation in Montana serves as a valuable tool to the People's

Republic of China to conduct corporate and international espionage in Montana and may allow the People's

Republic of China to track the real-time locations of public officials, journalists, and other individuals adverse to

the Chinese Communist Party's interests; and

WHEREAS, TikTok's allowance and promotion of dangerous challenges threatens the health and

safety of Montanans.


BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:


**Section 1. Prohibition -- penalty -- enforcement -- definitions.** (1) Tiktok may not operate within

the territorial jurisdiction of Montana. An entity violates this prohibition when any of the following occurs within

the territorial jurisdiction of Montana:

(a)     the operation of tiktok by the company or users; or

(b)     the option to download the tiktok mobile application by a mobile application store.

(2)     An entity that violates a provision of this section is liable in the amount of $10,000 for each

discrete violation and is liable for an additional $10,000 each day thereafter that the violation continues.

(3)     It is an affirmative defense to this section if the violating entity could not have reasonably

known that the violation occurred within the territorial jurisdiction of Montana.

(4)     Penalties under this section do not apply to law enforcement activities, national security

interests and activities, security research activities, or essential government uses permitted by the governor on

the information technology system of the state.

(5)     Penalties in this section do not apply to users of tiktok.

(6)     The department of justice shall enforce the provisions of this section.

(7)     As used in this section, the following definitions apply:

(a)     "Discrete violation" means each time that a user accesses tiktok, is offered the ability to access

tiktok, or is offered the ability to download tiktok.

(b)     "Entity" means a mobile application store or tiktok.



*Authorized Print Version* – SB 419

**ENROLLED BILL**

(c)    "Mobile application" means a type of software program designed to run on a mobile device.

(d)    "Territorial jurisdiction" means all places subject to the criminal jurisdiction of Montana.

(e)    "Tiktok" means the social networking service owned by the Chinese company bytedance limited or any successors.

**Section 2.**   **Codification instruction.** [Section 1] is intended to be codified as an integral part of Title 30, chapter 14, and the provisions of Title 30, chapter 14, applies to [section 1].

**Section 3.**   **Severability.** Each part of [this act] is severable. If any part of [this act] is invalid, illegal, or unenforceable, all valid parts remain in effect. If a part of [this act] is invalid in one or more of its applications, only those applications may be void and the remaining valid applications remain in effect as severable from the invalid applications and parts.

**Section 4.**   **Contingent voidness.** [This act] is void if tiktok is acquired by or sold to a company that is not incorporated in any other country designated as a foreign adversary in 15 C.F.R. 7.4 at the time tiktok is sold or acquired.

**Section 5.**   **Effective date.** [This act] is effective January 1, 2024.

- END -



*Authorized Print Version* – SB 419

**ENROLLED BILL**

I hereby certify that the within bill,

SB 419, originated in the Senate.


_____

Secretary of the Senate



_____

President of the Senate



Signed this _____day

of_____, 2023.



_____

Speaker of the House



Signed this _____day

of_____, 2023.

SENATE BILL NO. 419

INTRODUCED BY S. VANCE

AN ACT BANNING TIKTOK IN MONTANA; PROHIBITING A MOBILE APPLICATION STORE FROM OFFERING THE TIKTOK APPLICATION TO MONTANA USERS; PROVIDING FOR PENALTIES; PROVIDING FOR ENFORCEMENT AUTHORITY; PROVIDING DEFINITIONS; PROVIDING FOR CONTINGENT VOIDNESS; AND PROVIDING A DELAYED EFFECTIVE DATE.

# EXHIBIT 16

Tuesday, June 27, 2023

NEWSMAX
TV · HEALTH · FINANCE · WORLD

# NEWSMAX

Home | Platinum | Newsfront | Politics | Opinion | Podcast | The Wire | Books | Best Lists | Specials | Sci & Tech

Home | Newsmax TV

Tags: tiktok | montana | ban | attorney general | austin knudsen

## Mont. AG Knudsen to Newsmax: State TikTok Ban First of Its Kind



By Fran Beyer  |  Monday, 17 April 2023 01:28 PM EDT

Comment | Print | A A A

Listen to this Newsmax article
0:00 / 2:42

Montana GOP Attorney General Austin Knudsen on Monday said legislation awaiting gubernatorial approval is a chance for the state to be a leader in "pushing back" on China spying.

Knudsen told Newsmax's "National Report" that GOP Gov. Greg Gianforte, by signing the measure into law, has a powerful chance to put Montana on "the cutting edge."

"Montana's got the opportunity here," Knudsen said, "pushing back against the Chinese communist government, because that's what this is about. This is about China spying on Montanans.



"This is about an app that they perniciously used to collect intel and collect data to scan everything else you have on your phone — because that's what they're doing with TikTok. So, I'm hopeful that the governor will do the right thing."

Montana became the first state to approve a bill banning the popular video-streaming app, sending the bill Friday to Gianforte.

The bill makes it illegal to download TikTok in the state, with penalties of up to $10,000 a day for any entity, like Apple and Google's app stores or TikTok itself, that makes the app available. If enacted, the state ban would begin in January 2024.

Knudsen told Newsmax the state "absolutely can" enforce the measure and it will "go after the company itself" and "anybody that allows it to be downloaded," including Google or Apple.

"My office largely drafted this bill, and [enforcement] is something that we considered — almost at the outset," Knudsen said. "If you've got TikTok downloaded on your phone or on your device in Montana as a citizen, we're not coming after you. That's specifically in the law.

"This is to go after the company itself, TikTok, and anybody that allows it to be downloaded. So we'd be looking at Apple and Google, specifically. And there's a $10,000 per day civil penalty. That's our enforcement mechanism right there."

He said the process would go through the Department of Justice in Montana and its Office of Consumer Protection.



Free Newsmax E-Alerts
Email:
Country: United States
Zip Code:                SIGN UP
Privacy  We never share your email.



Hot Topics
· Hunter Biden          · FBI
· Joe Biden             · Immigration
· Supreme Court         · Transgender
· Donald Trump          · 2024 Elections
· Russia Ukraine War    · Newsmax TV

More Hot Topics



Around The Web
Powered by Newsmax

Newsmax TV Live

Danica Patrick
Listen · Channels · Schedule
On Now    2:00p ET · American Agenda
Coming Up:  4:00p ET · The Chris Salcedo Show

Around the Web

Vanguard Vs. Fidelity Vs. Schwab


Brain Scan Uncovers Root Cause of Tinnitus (It's Genius)

Ringing Ears? When Tinnitus Won't Stop, Do This (Watch)


Airlines Hate when You Do This, but Can't Stop You

You May Also Like

Whitaker to Newsmax: 'Too Much Evidence' of DOJ Interference
Tuesday, 27 Jun 2023 H 40 AM
There is now 'too much evidence' that Attorney General Merrick Garland and the Department of Justice interfered with the ...

Trump to Newsmax: RFK Jr. Has Important Points to Make in '24 Race
Tuesday, 27 Jun 2023 00 47 AM
Former President Donald Trump told Newsmax on Monday that he knows and respects Democrat 2024 presidential candidate Rob ...

NEWSMAX
Be the first to know.



**Get Newsmax**
**Text Alerts.**

Text: **Newsmax**
to: **39747** and get
Breaking News Alerts.



Message & Data rates may apply. Up to 1 message per day.
Reply STOP to 39747 to cancel anytime.

"We'd be looking at enforcing civil penalties on both TikTok and/or Google and Apple for allowing them to be downloaded in the state of Montana," he said.

A federal court challenge from TikTok is reportedly expected and the issue could wind up in front of the U.S. Supreme Court.

Last month, TikTok Chief Executive Shou Zi Chew faced sharp-edged questions from lawmakers in Washington, as he tried to calm bipartisan fears about the social media app.

**About NEWSMAX TV:**

NEWSMAX is the fastest-growing cable news channel in America!

- Find NEWSMAX in **over 100 million U.S. homes** via cable/streaming – **More Info Here**
- Watch NEWSMAX TV online – **See It Here**
- Download the **FREE** NEWSMAX App on Your Smartphone to Watch Now!

**Related Stories:**

- **Blaine Holt to Newsmax: Restrict Act Unconstitutional**
- **WH TikTok Crackdown Will Hurt Dems: 'Shooting Yourself in the Foot'**

© 2023 Newsmax. All rights reserved.



**Sign up for Newsmax's Daily Newsletter**
Receive breaking news and original analysis - sent right to your inbox.

Your Email Address

Zip Code          (Optional for Local News)          Sign Me Up

Privacy: We never share your email address.

**Special Links:**

- Here's The Average Price of Gutter Protection in The U.S.
- If You Eat Oatmeal Every Day This is What Happens
- Metformin May Harm Your Legs (Do This to Stop It)
- Men Do Not Know About This 15-Second Ritual
- Medical Student Discovery Melts Up To 52Lbs of Belly Fat

 **Click Here** to comment on this article

▶Around the Web


Method Discovered by Accident
'Stops' Ringing Ears (Watch)


Here's the Average Price of Gutter
Protection in the U.s


Washington: Say Bye to Your Car
Insurance if You Drive Less Than
50 Miles/day


Washington Residents Swear By
This Ultimate Pain Relief Discovery


Amazon's New Return Fees: What You Should Know





# EXHIBIT 17

**From:** Corrigan, Christian <Christian.Corrigan@mt.gov>
**Sent:** Monday, June 26, 2023 10:07 AM
**To:** Berengaut, Alexander <aberengaut@cov.com>; Rob Cameron <rcameron@jmgattorneys.com>
**Cc:** Tasha Jones <npjones@boonekarlberg.com>; Torstensen, Peter <Peter.Torstensen@mt.gov>; Kumar, Ambika <AmbikaKumar@dwt.com>; Anna R. Snedeker <ASnedeker@jmgattorneys.com>
**Subject:** RE: TikTok cases - proposed Joint Motion re PI schedule

Alex:

Thank you for your patience.  As discussed, please see Defendant's proposed limited expedited discovery requests.  We're certainly open to limiting any of the requests in scope in order to facilitate an agreement on the issue of limited discovery.  To that same end, we're open to removing some of the requests as well.   As for length of discovery, we're amenable to any time period that works for Plaintiffs.

We look forward to hearing from you.

Sincerely,

**Christian B. Corrigan**
Solicitor General
Office of Montana Attorney General Austin Knudsen
Christian.Corrigan@mt.gov
406.444.2707



**CONFIDENTIAL—PRIVILEGED—DELIBERATIVE**
**Notice:** This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential, privileged, or deliberative and pre-decisional material, including attorney-client communications and attorney work product.  Any unauthorized review, use, disclosure, or distribution is prohibited.  This electronic transmission does not constitute a waiver of privilege.  If you are not the intended recipient, and have received this message in error, please contact the sender immediately by email reply and destroy all copies of the original message, including any attachments.

#     #     #

## INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant, by its undersigned counsel, hereby serves the following Interrogatories. Defendant serves these Interrogatories after discussion with Plaintiff's counsel about conducting limited discovery before Plaintiff files a motion for preliminary injunction. Defendant does not waive any arguments or defenses in response to Plaintiff's complaint and forthcoming preliminary injunction motion.

These Interrogatories are to be answered by Plaintiff, who shall answer each Interrogatory separately and fully in writing and other oath. Plaintiff shall serve a copy of the answers and objections, if any, by electronic mail to Defendant's counsel within 30 days. Grounds for objecting to an interrogatory, if any, must be stated with specificity. Any ground not stated in a timely objection is waived unless the Court, for good cause, excuses the failure.

## DEFINITIONS

For purposes of these interrogatories only, Defendant uses the definitions set forth below. Any terms not defined shall be given their ordinary meaning.

1.      "Describe" means to state all facts, information, and opinions known and held regarding, relating to, concerning, and pertinent to the Interrogatory.

2.      "Identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment and title. Once a person has been identified in accordance with this subparagraph, the name of that person need only

be listed in response to subsequent discovery requesting the identification of that person.

3.      "You" and "your" mean Plaintiff TikTok, as well as any of its employees, agents, representatives, or members, including any person or entity acting or purporting to act on its behalf, at its direction, or under its supervision.

4.      "ByteDance" means ByteDance, Ltd., as well as any of its subsidiaries, employees, agents, representatives, or members, including any person or entity acting or purporting to act on its behalf, at its direction, or under its supervision.

5.      All references in these Interrogatories to an individual person include any and all past or present employees, staff, interns, representatives, designees, attorneys, advisors, consultants, contractors, agents, predecessors in office or position, and all other persons or entities acting or purporting to act on the individual person's behalf or subject to the control of such a person. All references in these Interrogatories to an entity, governmental entity, or any other type of organization include its past or present officers, executives, directors, employees, staff, interns, representatives, designees, attorneys, advisors, consultants, contractors, agents, and all other persons or entities acting or purporting to act on behalf of such an organization or subject to its control.

6.      In construing these Interrogatories, apply the broadest construction, so as to produce the most comprehensive response. Construe the terms "and" and "or" either disjunctively or conjunctively, as necessary, to bring within the scope of the Interrogatory all responses that might otherwise be construed to be outside that

scope. Words used in the singular shall include the plural. Words or terms used herein have the same intent and meaning regardless of whether the words or terms are depicted in lowercase or uppercase letters.

## INSTRUCTIONS

1.     Responses to these Interrogatories should be made in the manner prescribed by Federal Rule of Civil Procedure 33.

2.     You shall restate each interrogatory before responding to it.

3.     If you object to any part of an Interrogatory, respond to all parts of the Interrogatory to which you do not object, and separately state with specificity the part of each Interrogatory to which you are objecting and the ground for each objection.

4.     An interrogatory is not objectionable merely because an answer involves an opinion or argument that relates to fact or the application of law to fact.

5.     If the answer to any of these Interrogatories in whole or in part is refused because of a claim of privilege or protection, please state in a written response all of the circumstances and facts upon which your assertion of privilege is based, including all information as is necessary to understand and challenge (if appropriate) the withholding of the information.

6.     That an Interrogatory calls in part for information which you claim to be privileged is not a basis for you to fail to identify and produce fully all information called for by the Interrogatory as to which no privilege is claimed.

7.     Any Interrogatory propounded in the disjunctive should also be read as if propounded in the conjunctive and vice versa.

8. Any Interrogatory propounded in the singular should also be read as if propounded in the plural and vice versa.

9. Any Interrogatory propounded in the present tense should also be read as if propounded in the past tense and vice versa.

10. These Interrogatories are continuing in nature, so as to require you to reasonably notify Defendant and to supplement responses hereto in the event that any additional responsive information is discovered during the pendency of these proceedings. Supplemental responses shall be served promptly upon discovery of such information and undertaken in accordance with Federal Rule of Civil Procedure 26(e).

11. No Interrogatory is to be left unanswered. If the answer to an Interrogatory or any part thereof is "none" or "unknown," you should specify as much in writing in your response. If the question is not applicable, please specify "not applicable" in writing in your response, as well as the reasons for the alleged inapplicability.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all beneficial owners of ByteDance Ltd., including but not limited to all global institutional investors, governments, governmental entities or parties, public officials, subsidiary employees, and private individuals, and include in your response the name and address of the owner as well as their percentage of ownership.

### ANSWER:

### INTERROGATORY NO. 2:

Identify all subsidiaries of TikTok, including but not limited to all "special-purpose" subsidiaries as noted in Paragraph 38 of Plaintiff's complaint, and include in your response the name and address of each subsidiary.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify every foreign location where TikTok has ever stored U.S. user data, and include in your response the name of the location or facility, the address, and the approximate dates that information was stored at each location.

**ANSWER:**

**INTERROGATORY NO. 4:**

Identify all information that TikTok currently collects from its U.S. users as alleged in Paragraph 36 of Plaintiff's complaint.

**ANSWER:**

**INTERROGATORY NO. 5:**

Identify all information that TikTok previously collected from its U.S. users, excluding any information disclosed in response to Interrogatory No. 4.

**ANSWER:**

**INTERROGATORY NO. 6:**

Describe with specificity the "unprecedented initiative dedicated to safeguarding U.S. user data," as alleged in Paragraph 37 of Plaintiff's complaint, and include in your response the dates on which you started to implement each aspect of the "initiative" and the dates on which you expect you will have fully implemented each aspect of the initiative.

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify all "USDS-controlled infrastructure" as alleged in Paragraph 38 of Plaintiff's complaint, and include in your response the name and address of any entity identified in your response.

**ANSWER:**

**INTERROGATORY NO. 8:**

Identify every request to TikTok or its subsidiaries for U.S. user data, and include in your response the name of the requester, the entity—foreign or domestic—on behalf of which the request was made, the date of the request.

**ANSWER:**

**INTERROGATORY NO. 9:**

Identify every measure proposed "to mitigate any purported national security concerns," as alleged in Paragraph 66 of Plaintiff's complaint, and include in your response a description of the measure and whether each measure proposed was ultimately implemented.

**ANSWER:**

**INTERROGATORY NO. 10:**

Identify all data breaches to TikTok's systems, networks, databases, or data storage facilities, and include in your response a description of the breach, the date of the breach, the duration of the breach, the source of the breach, and the data that was accessed during the breach.

**ANSWER:**

**INTERROGATORY NO. 11:**

Identify any communications between TikTok and the Chinese Communist Party or any Chinese government entity, agency, party, or authority regarding TikTok's U.S. user data, and include in your response names, dates, and a description of what was discussed.

**ANSWER:**

**INTERROGATORY NO. 12:**

Identify any ByteDance officer or employee who has or ever had access to U.S. user data collected by TikTok, and include in your response the names and addresses of any person identified.

**ANSWER:**

**INTERROGATORY NO. 13:**

Identify all prior versions of the TikTok app that have ever collected precise or approximate GPS information from U.S. users, and include in your response the name or number of the app version, the dates the version was used, and whether the GPS information was approximate or precise.

**ANSWER:**

**INTERROGATORY NO. 14:**

Identify all government investigations into TikTok, and include in your response the name of the governmental entity, the government agency involved, the dates of the investigation, the target of the investigation, and a brief description of the government's findings.

**ANSWER:**

## <u>REQUESTS FOR PRODUCTION</u>

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant, by its undersigned counsel, hereby serves the following Interrogatories. Defendant serves these Interrogatories after discussion with Plaintiff's counsel about conducting limited discovery before Plaintiff files a motion for preliminary injunction. Defendant does not waive any arguments or defenses in response to Plaintiff's complaint and forthcoming preliminary injunction motion.

These Requests for Production are to be answered by Plaintiff and served upon counsel for Defendant on or before 30 days at the Office of the Montana Attorney General, 215 North Sanders Street, Helena, MT 59601, or at such a place or in such a manner mutually agreed upon by counsel for Plaintiff and Defendant. The grounds for objecting to these Requests for Production must be stated with specificity. Any ground not stated in a timely objection is waived unless the Court, for good cause, excuses the failure.

## <u>DEFINITIONS</u>

For purposes of these requests only, Defendant uses the definitions set forth below. Any terms not defined shall be given their ordinary meaning.

1.     "Document," whether singular or plural, is used here in the broadest sense to mean anything which may be considered to be a document or tangible thing within the meaning of Federal Rule of Civil Procedure 34. This definition includes, but is not limited to, each and every writing of whatever nature, and shall mean the original and any draft or copy that differs in any way from the original in any written or graphic matter, however produced or reproduced, and shall mean, without

limitation, each and every tangible thing from which information can be processed or transcribed from disk, diskette, compact disc, tape, or any other electronic media or data computations. The term includes, but is not limited to, communications, letters, emails, and any attachments, messages, facsimile transmissions, telegrams, telex messages, reports, books, agreements, correspondence, contracts, financial statements, instruments, ledgers, journals, accountings, minutes of meetings, payrolls, studies, calendar and diary entries, notes charts, schedules, tabulations, maps, work papers, brochures, evaluations, memoranda of telephone conversations, audio and video tape recordings, internal communications, bills, tapes, computer printouts, drawings, designs, diagrams, exhibits, photographs, reproductions, data, spreadsheets, maps, shapefiles, geojson files, block assignment files, and any marginal comments appearing on any document and copies of documents which are not identical duplicates of the originals (e.g., because handwritten or "blind copy" notes or notations appear thereon or are attached thereto). The term "document(s)" includes the defined term "Electronically Stored Information," which is defined below. The term "document" specifically seeks the production of Electronically Stored Information in native format.

2.     "Electronically Stored Information" or "ESI" includes, but is not limited to, any and all electronic data or information stored on a computing device and/or electronic platform. Information and data is considered "electronic" if it exists in a medium that can only be read through the use of computing device. This term includes but is not limited to databases; all text file and word processing documents

(including metadata); presentation documents, shapefiles, geojson files, block assignment files, data, code, spreadsheets; graphics, animations, and images (including but not limited to "JPG, GIF, BMP, PDF, PPT, and TIFF files); email, email strings, and instant messages (including attachments, logs of email history and usage, header information and "deleted" files) and any real-time text, audio, picture, or video transmissions through the internet as well as any text, audio, picture, or video transmissions between mobile phones and/or fixed or portable devices, including server, network, desktop, laptop, or tablet computers whether private or public; email attachments; calendar and scheduling information; cache memory; Internet history files and preferences; audio; video, audiovisual recordings; voicemail stored on databases; networks; computers and computer systems; computer system activity logs; servers; archives; back-up or disaster recovery systems; hard drives; discs; CD's; diskettes; removable drives; tapes; cartridges and other storage media; printers; scanners; personal digital assistants; computer calendars; handheld wireless devices; cellular telephones; pagers; fax machines; and voicemail systems. This term includes but is not limited to onscreen information, system data, archival data, legacy data, residual data, and metadata that may not be readily viewable or accessible, and all file fragments and backup files.

3.    "You" and "your" mean Plaintiff TikTok, as well as any of their employees, agents, representatives, or members, including any person or entity acting or purporting to act on their behalf, at your direction, or under their supervision.

4.     "ByteDance" means ByteDance, Ltd., as well as any of its subsidiaries, employees, agents, representatives, or members, including any person or entity acting or purporting to act on its behalf, at its direction, or under its supervision.

5.     All references in these requests to an individual person include any and all past or present employees, staff, interns, representatives, designees, attorneys, advisors, consultants, contractors, agents, predecessors in office or position, and all other persons or entities acting or purporting to act on the individual person's behalf or subject to the control of such a person. All references in these requests to an entity, governmental entity, or any other type of organization include its past or present officers, executives, directors, employees, staff, interns, representatives, designees, attorneys, advisors, consultants, contractors, agents, and all other persons or entities acting or purporting to act on behalf of such an organization or subject to its control.

6.     In construing these Requests for Production, apply the broadest construction, so as to produce the most comprehensive response. Construe the terms "and" and "or" either disjunctively or conjunctively, as necessary, to bring within the scope of the request all responses that might otherwise be construed to be outside that scope. Words used in the singular shall include the plural. Words or terms used herein have the same intent and meaning regardless of whether the words or terms are depicted in lowercase or uppercase letters.

## INSTRUCTIONS

1.     You are required when answering these Requests, to furnish all requested information, not subject to valid objection, that is known by, possessed

by, available to, or subject to reasonable access or control by you or any of your attorneys, consultants, representatives, investigators, agents, and all others acting on your behalf or under your supervision. Without limiting the term "control," a document is deemed to be within your control if you have the right to secure the document or copy thereof from any persons or public or private entity having physical control thereof.

2.      If you object to responding to any of these Requests, in whole or in part, you must  state your objection(s) with specificity and all factual and legal bases for the objection(s). If you object to a portion of a Request, you must specify the part to which you object and respond to the remainder.

3.      If, in responding to or failing to respond to any of these discovery requests, you invoke or rely upon privilege of any kind, state specifically the nature of the privilege(s), the bases on which you invoke, rely upon, or claim the privilege(s), including statutory or decisional reference, and identify all documents or other information, including contacts and communications, which you believe to be embraced by the privilege(s) invoked. If you withhold any information based on the attorney-client privilege, the attorney work-product immunity, or any other privilege or immunity, you must identify the document or information withheld and provide the following information: (i) a description of the document or information, including the nature of the document or information (e.g., email, letter, database, etc.); (ii) the author(s) and/or creator(s) of the document or information; (iii) the recipient(s) or addressee(s) of the document or information; (iv) the date of the

document or information; (v) the subject matter of the document or information; (vi) the nature of all privileges or immunities claimed; and (vii) all such additional information as is necessary to understand and challenge (if appropriate) the withholding of the document or information.

4.      If you contend that it would be unduly burdensome to obtain and provide all of the information or documents called for in response to any Request or part thereof, then in response to the appropriate request: (a) produce all such information or documents as are available without undertaking what you contend to be an unduly burdensome request; (b) describe with particularity the efforts made by you or on your behalf to produce such information or documents; and (c) state with particularity the grounds upon which you contend that additional efforts to produce such information or documents would be unduly burdensome.

5.      These requests are continuing in nature. Pursuant to the duty of supplementation under Federal Rule of Civil Procedure 26(e), your response must be supplemented, and any additional responsive material disclosed if responsive material becomes available after you serve your response. You must also amend your responses to these requests if you learn that a production is in some material respect incomplete or incorrect.

6.      If any requested document or other potentially relevant document is subject to destruction under any document retention or destruction program, the documents should be exempted from any scheduled destruction and should not be

destroyed until the conclusion of this lawsuit or unless otherwise permitted by court order.

7.    If a responsive document has been destroyed or has passed out of your possession, custody, or control, please provide the following information with respect to each such document: its title, date, author(s), sender(s), recipient(s), subject matter, the circumstances under which it has become unavailable, and, if known, its current location and custodian.

8.    Documents are to be kept in their original format as they are kept by you, provided that documents or records shall be produced as described hereinafter, and hard-copy documents may be produced in electronic format. Documents should be produced in their entirety, without abbreviation, redaction, or expurgation; file folders with tabs or labels identifying documents responsive to these requests should be produced intact with said documents; and documents attached to each other should not be separated. Please produce any electronically stored information ("ESI") in native format files and bates numbered individual PDF files, with a corresponding load file preserving all native metadata. Each document produced should be categorized by the number of the request for which it is produced.

9.    For documents produced in PDF format that originated in electronic form, metadata shall be included with the data load files described above, and shall include (at a minimum) the following information: file name (including extension); original file path; page count; creation date and time; last saved date and time; last modified date and time; author; custodian of the document (that is, the custodian

from whom the document was collected or, if collected from a shared drive or server, the name of the shared drive or server); and MD5 hash value. In addition, for email documents, the data load files shall also include the following metadata: sent date; sent time; received date; received time; "to" name(s) and address(es); "from" name(s) and address(es); "cc" name(s) and address(es); "bcc" name(s) and address(es); subject; names of attachment(s); and attachment(s) count. All images and load files must be named or put in folders in such a manner that all records can be imported without modification of any path or file name information.

10.   All Requests for Production concern the period of time as specified in the response to present, until the date on which the trial in this cases commences, or if unspecified from January 1, 2020, to the present, until the date on which trial in this case commences.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1:**

Produce any and all communications to or from the Chinese Communist Party or any Chinese government agency, authority, party, or official regarding TikTok's U.S. user data.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**

Produce any and all communications to or from ByteDance regarding TikTok's U.S. user data.

**RESPONSE:**

## REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant, by its undersigned counsel, hereby serves the following Interrogatories. Defendant serves these Interrogatories after discussion with Plaintiff's counsel about conducting limited discovery before Plaintiff files a motion for preliminary injunction. Defendant does not waive any arguments or defenses in response to Plaintiff's complaint and forthcoming preliminary injunction motion.

These Requests for Admissions are to be answered by Plaintiff, who shall answer each Request for Admission separately and fully in writing and under oath. Plaintiff shall serve a copy of the answers and objections, if any, by electronic mail to Defendant's counsel within 30 days. The matter is admitted unless, within 30 days after service of these requests, Plaintiff serves upon Defendant a written response. Any grounds for objection must be stated with specificity. It is not grounds for objection that the truth of a matter is a genuine issue for trial. Any ground not stated in a timely objection is waived unless the Court, for good cause, excuses the failure.

## DEFINITIONS

For purposes of these requests only, Defendant uses the definitions set forth below. Any terms not defined shall be given their ordinary meaning.

1.     "You" and "your" mean Plaintiff TikTok, as well as any of their employees, agents, representatives, or members, including any person or entity acting or purporting to act on their behalf, at your direction, or under their supervision.

2.      "ByteDance" means ByteDance, Ltd., as well as any of its subsidiaries, employees, agents, representatives, or members, including any person or entity acting or purporting to act on its behalf, at its direction, or under its supervision.

3.      In construing these Requests, apply the broadest construction, so as to produce the most comprehensive response. Construe the terms "and" and "or" either disjunctively or conjunctively, as necessary, to bring within the scope of the Request all responses that might otherwise be construed to be outside that scope. Words used in the singular shall include the plural. Words or terms used herein have the same intent and meaning regardless of whether the words or terms are depicted in lowercase or uppercase letters.

## **INSTRUCTIONS**

1.      Responses to these Requests for Admission should be made in the manner prescribed by Federal Rule of Civil Procedure 36.

2.      The matter is admitted unless, within 30 days after service of these requests, you serve a written response.

3.      You must restate each request before responding to it.

4.      Unless you object to a matter, you must admit or deny the matter or state in detail the reasons why you cannot truthfully admit or deny.

5.      You may identify the part of a matter that is true and deny the rest. Any denial must fairly meet the substance of the request.

6.     Lack of information is not a reason for failure to admit or deny unless, after reasonable inquiry, the information known or reasonably available is insufficient to enable an admission or denial.

7.     You may not object to a request on the ground that you consider the subject of the requests to be a genuine issue for trial.

8.     You must respond to any portion of a Request to which you do not object, and separately state with specificity the part of each Request to which you are objecting and the ground for each objection.

9.     If your admission or denial to any of these Requests in whole or in part is refused because of a claim of privilege or protection, state in a written response all of the circumstances and facts upon which your assertion of privilege is based.

10.     Any Request propounded in the disjunctive should also be read as if propounded in the conjunctive and vice versa.

11.     Any Request propounded in the singular should also be read as if propounded in the plural and vice versa.

12.     Any Request propounded in the present tense should also be read as if propounded in the past tense and vice versa.

13.     These Requests are continuing in nature, so as to require you to reasonably notify Defendant and to supplement responses hereto in the event that any additional responsive information is discovered during the pendency of these proceedings. Supplemental responses shall be served promptly upon discovery of such information and undertaken in accordance with Federal Rule of Civil Procedure 26(e).

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that at any time Plaintiff could modify the TikTok app to start collecting GPS information from U.S. users.

### ANSWER:

### REQUEST FOR ADMISSION NO. 2:

Admit that the TikTok app has been hacked.

### ANSWER:

### REQUEST FOR ADMISSION NO. 3:

Admit that a hacker could access U.S. user data.

### ANSWER:

### REQUEST FOR ADMISSION NO. 4:

Admit that ByteDance has access to U.S. user data collected by TikTok.

### ANSWER:

### REQUEST FOR ADMISSION NO. 5:

Admit that there are members of the Chinese Communist Party employed by TikTok.

### ANSWER:

### REQUEST FOR ADMISSION NO. 6:

Admit that individuals employed by the Chinese Communist Party share office space with ByteDance.

### ANSWER:

# EXHIBIT 18

# The Washington Post
*Democracy Dies in Darkness*

Subscribe    Sign in



Eight signs you need to overhaul your approach to workforce transformation

ProEdge: A new approach to workforce transformation. This guide can help you understand if your approach to workforce transformation needs help.

Advertisement by PwC

LEARN MORE

Tech    Help Desk    Artificial Intelligence    Internet Culture    Space    Tech Policy

THE DISCORD LEAKS

# Discord leak suggests China doesn't need TikTok to find U.S. secrets

Classified document dump is a reminder that the internet is hard to control

 Analysis by Will Oremus
Staff writer | + Follow
Updated April 17, 2023 at 7:18 p.m. EDT | Published April 17, 2023 at 6:00 a.m. EDT



The Pentagon's Special Operations Command has published a guide to safe use of social media. This is part of its recommendations to troops about how to use TikTok safely. (Washington Post illustration; United States Special Operations Command/The Washington Post; iStock)



pwc

Technology multiplies growth.

See what happens when the right tech enters the mix.

It's all part of The New Equation.

Go now

Share    Comment 576

 Human read    ▶ Listen 7 min

On March 23, lawmakers crowded into a packed Capitol hearing room to harangue the CEO of the social app TikTok about the company's Chinese ownership and the risks it posed to U.S. national security. Months earlier, President Biden had signed a bill banning TikTok from federal employees' devices, to prevent sensitive information from falling into the wrong hands.

Tech is not your friend. We are. Sign up for The Tech Friend newsletter. →

What the members of Congress didn't know was that state secrets had been trickling out for months on social media and were beginning to circulate in ever-wider online forums — not on TikTok, but on U.S.-owned Discord. In the two weeks after the TikTok hearing, those classified documents would make their way into public view on U.S.-owned Twitter — and remain there for days, as owner Elon Musk mocked the idea that he ought to remove them.

The leaks, which included assessments of the Ukraine war and revelations of U.S. spying, didn't stem from any foreign adversary's sinister plot. Rather, they appear to have stemmed from a 21-year-old U.S. National Guard member's desire to impress his online pals.

MOST READ TECHNOLOGY >



1   I moved my Gmail to a less creepy email. It was surprisingly easy.

2   What's your type? Try these tests to pick the perfect font for you.

3   Meta's new AI lets people make chatbots. They're using it for sex.

4   17 fatalities, 736 crashes: The shocking toll of Tesla's Autopilot



Advertisement

**The Discord Leaks**

Dozens of highly classified documents have been leaked online, revealing sensitive information intended for senior military and intelligence leaders. In an exclusive investigation, The Post also reviewed scores of additional secret documents, most of which have not been made public.

1/5   ←   →

The Discord document dump is the latest in a colorful 21st-century tradition of secrets spilled online, from WikiLeaks' earliest uploads to Russian operatives' hack of the Democratic National Committee. At a time when swaths of the U.S. government are fixated on Chinese spycraft, it serves as a reminder that information leaks in the internet age can come from just about anywhere — a risk the U.S. government has generally accepted as a price of free speech, said Anupam Chander, a law professor at Georgetown University and an expert on technology regulations.

"The internet was never designed with national security at its heart," Chander said. "It's inherently vulnerable."

The hypothetical threats posed by TikTok's Chinese ownership aren't about leaked classified documents. They include fears that China's government might demand or covertly gain access to data on the app's American users, or persuade the company to secretly manipulate its algorithms in ways that promote or suppress certain ideas. In particular, the ban of TikTok from government devices is meant to guard against the possibility that Chinese Communist Party members or officials could gain access to the personal data of U.S. officials.

Advertisement

There's no hard evidence that any of those things have happened. Both the Chinese government and TikTok insist they never will, and TikTok has taken unusual steps to limit the exposure of Americans' data, such as not tracking their precise location using GPS, as countless other mobile apps routinely do. And the Pentagon has official guidance for troops on how to use TikTok safely.

Still, the theoretical possibility has sparked bipartisan furor in Washington. Not content with the government devices ban, some congressional Republicans and Democrats, and the Biden administration, are scrambling for a legal basis on which to ban it all altogether. One approach would give the secretary of commerce special powers to crack down not just on TikTok, but also on whole categories of apps whose parent companies are based in countries designated as "foreign adversaries."

The fears are understandable. China is known to spy. Barriers between Chinese companies and the Chinese government are flimsy. And President Xi Jinping has put the screws to tech firms in the past.

Advertisement

Yet if the goal is to plug the holes in the U.S. information sphere, banning TikTok and other foreign apps might be like a Band-Aid on a colander.

**The Discord Leaks**

←   →






Twitter censored pro-Trump views before Jan. 6

Advertisement

TOP STORIES

Technology
Big Tech news and how to take control of your data and devices

Review | Google Pixel Fold review: Competent, not captivating

What's your type? Try these tests to pick the perfect font for you.

Meta's new AI lets people make chatbots. They're using it for sex.

↻ Try a different topic

Sign in or create a free account to save your preferences.

Leak suspect indicted on new counts of mishandling classified material

The biggest revelations from The Post's document leaks investigation

Discord member documents leak chat group

Advertisement

Some 3 million Americans hold government security clearances, and thanks to the internet, any one of them can connect with, send information to, or get hacked by pretty much anyone else, anywhere in the world, at any time. Edward Snowden, who revealed National Security Agency surveillance programs, and Reality Winner, who leaked an intelligence report about Russian election interference, intentionally publicized classified information for political and moral reasons. A staffer for Hillary Clinton's 2016 presidential campaign clicked a link in a phishing email that gave Russian hackers access to campaign chairman John Podesta's login credentials. U.S. forces abroad have inadvertently exposed the location of secret facilities through their use of fitness apps.

Now Jack Teixeira, a 21-year-old member of the Massachusetts Air National Guard, is accused of uploading tranches of classified documents to a private chat group on the social app Discord, mostly just because he could. Reporting indicates that one member of his private chat then uploaded some of the documents to a much larger Discord group, and they gradually spread from there — ultimately making their way onto Twitter and into public view.

Advertisement

Over the years, the largest social networks have attempted, with mixed results, to constrain the spread of certain types of information deemed harmful, from covid-19 conspiracy theories to deepfake videos to hacked private information, especially in public-facing feeds. But keeping a given class of material off the internet entirely has proved nearly impossible; if Facebook and Twitter won't host Alex Jones or a mass shooting video, some other site surely will. Even child pornography flourishes in the internet's darker alleys, despite being illegal and aggressively policed.

Chander acknowledges it's possible that China could obtain compromising information on U.S. officials via secret back doors in an app like TikTok. It's just that there are so many other ways to obtain compromising information on the internet that the focus on TikTok can feel like a distraction — especially given that the type of information TikTok gathers is "not your typical blackmail material, or your typical espionage material," Chander said.

"The general tenor of the conversation at the national level has focused our attention on TikTok as if the American people are supposed to galvanize to protect ourselves" by deleting a Chinese-owned short-video app, he said. "Why aren't we being taught how to protect ourselves from ransomware? Why isn't there a national campaign to prevent phishing efforts? The Russian [Internet Research Agency] showed they did not have to own Facebook to own Facebook." Such initiatives, Chander believes, would do far more to secure Americans' information than a TikTok ban.

Advertisement

The Washington Post reached out to more than a dozen lawmakers active in discussions about national security and technology for comment. Several expressed concerns about the leak, but most did not respond to requests for comment, and none addressed what, if anything,

**MOST READ**

1  Opinion | He has flown 23 million miles. Here are his travel secrets.

2  Supreme Court rejects theory that would have meant radical changes to election rules 

3  Melted, pounded, extruded: Why many ultra-processed foods are unhealthy

4  Advice | The plant protein that could push meat off your plate

5  Wildfire smoke puts Chicago among cities with worst air quality in the world

Advertisement

Meanwhile, Montana on Friday became the first state to pass a law banning TikTok.

**CORRECTION**

An earlier version of this story misidentified John Podesta's position at the time that Russian hackers obtained his login credentials. He was chairman of the Hillary Clinton presidential campaign. This version has been corrected.

*Cristiano Lima contributed to this report.*

### The Discord Leaks

In exclusive interviews with a member of the Discord group where U.S. intelligence documents were shared, The Washington Post learned details of the alleged leaker, "OG." The Post also obtained a number of previously unreported documents from a trove of images of classified files posted on a private server on the chat app Discord.

**How the leak happened:** The Washington Post reported that the individual who leaked the information shared documents with a small circle of online friends on the Discord chat platform. This is a timeline of how the documents leaked.

**The suspected document leaker:** Jack Teixeira, a young member of the Massachusetts Air National Guard, was indicted on six charges in the investigation into leaks of hundreds of pages of classified military intelligence. The Post reported

Show more ⌄

💬 576 Comments        ↗ Share

 By Will Oremus

Will Oremus writes about the ideas, products and power struggles shaping the digital world for The Washington Post. Before joining The Post in 2021, he spent eight years as Slate's senior technology writer and two years as a senior writer for OneZero at Medium. 🐦 Twitter

+ Follow

---

**MORE FROM THE POST**

### Liz Cheney on what's wrong with politics: 'We're electing idiots'
Today at 12:41 p.m. EDT

### Opinion | Moves to expunge Trump impeachments would be laughable if not so dangerous
June 26, 2023

### Opinion | A new, sensible plan for fall covid boosters is taking shape
Today at 6:45 a.m. EDT

### Advice | Carolyn Hax: Fiancé says money concerns are 'meaningless small talk'
Today at 12:00 a.m. EDT

### Man carves love note into Colosseum in latest case of tourist misbehavior
Today at 8:02 a.m. EDT



 NEWSLETTER  AS NEWS BREAKS
**Tech News Alerts**
Breaking news email alerts on technology and the tech industry.

Sign up 

---

**PAID PROMOTED STORIES**                Recommended by Outbrain ▷



# EXHIBIT 19

EXPERTS   EVENTS   RESEARCH PROGRAMS   RESEARCH & COMMENTARY   NEWSLETTERS   FOR MEDIA   ABOUT US   DONATE

BROOKINGS   U.S. Economy   Russia   Technology & Information   Climate Change   Race in Public Policy   Topics   Regions

COMMENTARY

# TikTok bans won't guarantee consumer safety

Darrell M. West, Mishaela Robison
February 16, 2023



7 min read

Print

Recent weeks have seen bans on the video platform TikTok from a variety of entities. President Joe Biden recently signed legislation that includes a provision banning the application from phones and computers issued by federal agencies. In addition, a dozen states such as Alabama, Maryland, New Hampshire, Texas, and Virginia have implemented similar prohibitions on devices used by their employees. Similarly, numerous universities such as Auburn, University of Georgia, Boise State, University of Iowa, University of Oklahoma, and the University of Texas have banned the app on university-issued phones and from campus Wi-Fi networks. And bans such as these are far from a new concept for American institutions.

While there is an array of possible explanations for these prohibitions—for instance, critics warn the app's algorithms amplify misinformation and disinformation, distort societal discourse, and compromise confidential information—the most cited rationale is national security. The reason behind these concerns is as follows. The app is run by ByteDance, a Chinese-owned company, which has led to widespread fears about national security risks, the sharing of confidential information with foreign officials, and the protection of personal privacy.

information with foreign officials, and the protection of personal privacy.

Further, Chinese companies certainly warrant detailed scrutiny given the Chinese government's move toward tight control of its own population and surveillance of people in other countries. But Americans should keep in mind that TikTok's connection with China is far from an anomaly in the market; many US firms either manufacture in China or rely upon components developed in China.

## How we got here

TikTok has previously attempted to address security concerns through various approaches, such as moving data from American users to servers housed in the United States. But these moves did little to allay concerns, especially when evidence came to light that U.S. user data has been shared with the firm's Chinese employees and the app's developers have employed keylogging tools. Last year, for example, a researcher argued that TikTok's in-app browser included tracking capabilities, which could allow them to know what a user types within that app, such as passwords or credit card information.

Now the firm is proposing a more comprehensive approach known as Project Texas, in which all data from U.S.-based users would be stored in domestic servers that are owned by the American software company Oracle. This data would not be accessible by TikTok or ByteDance employees who are located outside of the country, and TikTok would create a new U.S. data security team to handle privacy protection.

That proposal is the result of discussion with the Committee on Foreign Investment in the United States (CFIUS) and would allow this team of experts to routinely audit the data system. Still, these proposed changes are far from what lawmakers and cybersecurity experts desire.



TechTank
Improving Technology Policy

Read more from TechTank

Follow the authors

@DarrWest

@mishaelarobison

More On
Technology & Information

More On
Technology & Information

SUB-TOPICS
Privacy, Social Media

PROGRAM
Governance Studies

REGION
China

CENTER
Center for Technology Innovation



Get the latest from Center for Technology Innovation

Email Address

Security practices such as these have sought to mitigate concerns. Yet, still many open border and market advocates worry these actions will limit American options in terms of competition with foreign firms. There clearly are credible concerns, including from the FBI, regarding national security, and those in support of the application's security handling like the detailed analysis by researchers at Georgia Tech, which concluded that the evidence of national security risks from TikTok is weak and there needs to be more detailed documentation of nefarious behavior to justify these bans. In addition, security critics need to define exactly what they mean by national security concerns.

## Are TikTok's data practices different from other companies?

Several experts already have argued that TikTok bans won't make Americans safer. One reason is that much of the information collected by TikTok is like that compiled by many companies that host consumer-facing products. The app undoubtedly has information on which videos users have watched, comments they have made about those items, and their geolocation while watching the videos, as well as both users' and their friends' contact information, but that is true for nearly all digital platforms and e-commerce sites around the world.

It also is the case that digital firms compile data on users, and many buy and sell consumer data via third-party vehicles. It has been estimated that leading U.S. data brokers have up to 1,500 pieces of information on the typical American, and that both domestic and foreign entities can purchase detailed profiles on nearly anyone with an online presence. Even with aggregated data, it is possible to identify specific individuals through a relatively small number of attributes, with some research estimating that "99.98% of Americans" could be re-anonymized from relatively small datasets. Still, what sets TikTok apart are the amount and type of trackers they use. Per a 2022 study utilizing Apple's "Record App Activity" feature, TikTok utilizes over twice the average amount of potential trackers for social media platforms. Almost all these trackers were maintained by third parties, making it harder to know what TikTok is doing with the information they collect.

If concerns about TikTok are around the compromising of personal information with government authorities, either in China or elsewhere, there are many firms both within the U.S. and abroad that have been accused of the same. For example, a former Twitter employee has been convicted of acting as a foreign agent for Saudi Arabia and providing confidential information from that platform about dissidents to foreign officials. Geolocation data are routinely bought around the world by data brokers and repackaged for sale to advertisers, governments, and businesses around the world.

Regarding concerns that Chinese companies operating within the U.S. are beholden to Chinese laws, the same can be said of American companies that operate in China. Some observers have expressed worries about Tesla vehicles being made in China for some of the same reasons, and what the company may have to do to maintain good relations with Chinese officials. Furthermore, if the criterion for bans based on national security is access to users' confidential information, there is a long list of American and foreign companies that face security challenges via their Chinese operations. As examples, many digital products sold domestically are made in China. And a wide variety of smart appliances, pharmaceuticals, personal protective equipment, computer chips, and other products are assembled there.

## TikTok's standing among social media

Regardless of the rationale for U.S. bans, it is undeniable that TikTok has a large user following. The app has around 1.9 billion monthly global users, with 100 million monthly users in the United States alone. The app is particularly popular with teenagers and young adults who love its easily user-generated content and off-beat videos. In addition to impacting this large user base, a ban on TikTok can equally impact people in a variety of professions, including influencers, social media managers, and tech workers who rely on their brand for product development and marketing.

Because of this, the app's enormous popularity has proved challenging for American social media firms that seek to compete with it. A host of domestic companies have sought to develop alternative services but have not reached the same audience or user engagement as TikTok. Corporate executives have long had concerns with TikTok. Yet, if corporate competition rather than national security is the problem, part of the solution may be for these firms to cultivate and foster innovation that effectively competes with TikTok in the marketplace, especially around consumer engagement.

In the end, if policymakers are serious about addressing Chinese security risks, they should limit the ability of commercial data brokers to sell information to adversarial foreign entities (or their intermediaries), in general. Even if TikTok did not exist, China could purchase confidential information on U.S. consumers from other companies and use that material for nefarious purposes, creating similar national security challenges. The U.S. needs stronger overall platform governance and data privacy regulation to mitigate problems not just from TikTok but from social media platforms overall.

---

RELATED CONTENT



TECHNOLOGY & INFORMATION

**What the debate over TikTok means for the future of social media**

Mishaela Robison, Jack Karsten

October 12, 2020



PRIVACY

**Examining the intersection of data privacy and civil rights**

# EXHIBIT 20

### OFFICE OF THE GOVERNOR
#### STATE OF MONTANA

GREG GIANFORTE
GOVERNOR



KRISTEN JURAS
LT. GOVERNOR

**TO:**    Kevin Gilbertson, Chief Information Officer
          Executive agency directors

**FROM:**  Governor Greg Gianforte

**CC:**     Attorney General Austin Knudsen
           Secretary of State Christi Jacobsen
           State Auditor Troy Downing
           Superintendent of Public Instruction Elsie Arntzen

**DATE:**  December 16, 2022

**RE:**     Prohibiting the Use of TikTok on State IT Infrastructure

Government's chief responsibility is keeping its citizens safe and secure. Recently, the director of the Federal Bureau of Investigation raised "national security concerns" about TikTok operations, warning the app is controlled by "a government that doesn't share our values, and that has a mission that's very much at odds with what's in the best interests of the United States."

TikTok, a video-sharing app owned by a Chinese company called ByteDance Ltd., harvests expansive amounts of data from its users' devices, much of which is unrelated to the app's purported objective of video sharing, and offers this information to the Chinese Communist Party.

Use of TikTok on state devices poses a significant risk to the security of our state and Montanans' sensitive data. Given these grave security concerns, effective immediately, no executive agency, board, commission, or other executive branch entity, official, or employee of the State of Montana shall download or access TikTok on government-issued devices or while connected to the state network. Additionally, any third party firms conducting business for or on behalf of the State of Montana shall not use TikTok.

This TikTok ban applies to all state-issued cell phones, laptops, tablets, desktop computers, and other devices which connect to the internet, and I direct you to take all necessary steps to block TikTok from being accessed. If TikTok is currently downloaded on any device described above, it must be immediately removed. If exceptions to enable law enforcement and essential government uses of the app are necessary, they must be reported to the Office of the Governor by agency leadership.

Together, we will defend the State of Montana and its people against threats to our security and way of life.

# EXHIBIT 21



AN ACT ESTABLISHING THE CONSUMER DATA PRIVACY ACT; PROVIDING DEFINITIONS;

ESTABLISHING APPLICABILITY; PROVIDING FOR CONSUMER RIGHTS TO PERSONAL DATA;

ESTABLISHING REQUIREMENTS AND LIMITATIONS FOR A CONTROLLER OF PERSONAL DATA;

ESTABLISHING REQUIREMENTS AND LIMITATIONS FOR A PROCESSOR OF PERSONAL DATA;

PROVIDING FOR DATA PROTECTION ASSESSMENTS; PROVIDING EXEMPTIONS AND COMPLIANCE

REQUIREMENTS; PROVIDING FOR ENFORCEMENT; AND PROVIDING A DELAYED EFFECTIVE DATE

AND A TERMINATION DATE.


BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:


**Section 1.   Short title.** [Sections 1 through 12] may be cited as the "Consumer Data Privacy Act".


**Section 2.   Definitions.** As used in [sections 1 through 12], unless the context clearly indicates

otherwise, the following definitions apply:

(1)      "Affiliate" means a legal entity that shares common branding with another legal entity or

controls, is controlled by, or is under common control with another legal entity.

(2)      "Authenticate" means to use reasonable methods to determine that a request to exercise any

of the rights afforded under [section 5(1)(a) through (1)(e)] is being made by, or on behalf of, the consumer who

is entitled to exercise these consumer rights with respect to the personal data at issue.

(3)      (a) "Biometric data" means data generated by automatic measurements of an individual's

biological characteristics, such as a fingerprint, a voiceprint, eye retinas, irises, or other unique biological

patterns or characteristics that are used to identify a specific individual.

(b)      The term does not include:

(i)      a digital or physical photograph;



(ii)     an audio or video recording; or

(iii)     any data generated from a digital or physical photograph or an audio or video recording, unless that data is generated to identify a specific individual.

(4)     "Child" means an individual under 13 years of age.

(5)     (a) "Consent" means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to allow the processing of personal data relating to the consumer. The term may include a written statement, a statement by electronic means, or any other unambiguous affirmative action.

(b)     The term does not include:

(i)     acceptance of a general or broad term of use or similar document that contains descriptions of personal data processing along with other unrelated information;

(ii)     hovering over, muting, pausing, or closing a given piece of content; or

(iii)     an agreement obtained using dark patterns.

(6)     (a) "Consumer" means an individual who is a resident of this state.

(b)     The term does not include an individual acting in a commercial or employment context or as an employee, owner, director, officer, or contractor of a company, partnership, sole proprietorship, nonprofit, or government agency whose communications or transactions with the controller occur solely within the context of that individual's role with the company, partnership, sole proprietorship, nonprofit, or government agency.

(7)     "Control" or "controlled" means:

(a)     ownership of or the power to vote more than 50% of the outstanding shares of any class of voting security of a company;

(b)     control in any manner over the election of a majority of the directors or of individuals exercising similar functions; or

(c)     the power to exercise controlling influence over the management of a company.

(8)     "Controller" means an individual who or legal entity that, alone or jointly with others, determines the purpose and means of processing personal data.

(9)     "Dark pattern" means a user interface designed or manipulated with the effect of substantially subverting or impairing user autonomy, decision-making, or choice.



(10)     "Decisions that produce legal or similarly significant effects concerning the consumer" means decisions made by the controller that result in the provision or denial by the controller of financial or lending services, housing, insurance, education enrollment or opportunity, criminal justice, employment opportunities, health care services, or access to necessities such as food and water.

(11)     "Deidentified data" means data that cannot be used to reasonably infer information about or otherwise be linked to an identified or identifiable individual or a device linked to the individual if the controller that possesses the data:

(a)     takes reasonable measures to ensure that the data cannot be associated with an individual;

(b)     publicly commits to process the data in a deidentified fashion only and to not attempt to reidentify the data; and

(c)     contractually obligates any recipients of the data to satisfy the criteria set forth in subsections (11)(a) and (11)(b).

(12)     "Identified or identifiable individual" means an individual who can be readily identified, directly or indirectly.

(13)     "Institution of higher education" means any individual who or school, board, association, limited liability company, or corporation that is licensed or accredited to offer one or more programs of higher learning leading to one or more degrees.

(14)     "Nonprofit organization" means any organization that is exempt from taxation under section 501(c)(3), 501(c)(4), 501(c)(6) or 501(c)(12) of the Internal Revenue Code of 1986 or any subsequent corresponding internal revenue code of the United States as amended from time to time.

(15)     (a) "Personal data" means any information that is linked or reasonably linkable to an identified or identifiable individual.

(b)     The term does not include deidentified data or publicly available information.

(16)     (a) "Precise geolocation data" means information derived from technology, including but not limited to global positioning system level latitude and longitude coordinates or other mechanisms, that directly identifies the specific location of an individual with precision and accuracy within a radius of 1,750 feet.

(b)     The term does not include the content of communications, or any data generated by or connected to advanced utility metering infrastructure systems or equipment for use by a utility.



*Authorized Print Version* – SB 384

**ENROLLED BILL**

(17)     "Process" or "processing" means any operation or set of operations performed, whether by manual or automated means, on personal data or on sets of personal data, such as the collection, use, storage, disclosure, analysis, deletion, or modification of personal data.

(18)     "Processor" means an individual who or legal entity that processes personal data on behalf of a controller.

(19)     "Profiling" means any form of automated processing performed on personal data to evaluate, analyze, or predict personal aspects related to an identified or identifiable individual's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.

(20)     "Protected health information" has the same meaning as provided in the privacy regulations of the federal Health Insurance Portability and Accountability Act of 1996.

(21)     "Pseudonymous data" means personal data that cannot be attributed to a specific individual without the use of additional information, provided the additional information is kept separately and is subject to appropriate technical and organizational measures to ensure that the personal data is not attributed to an identified or identifiable individual.

(22)     "Publicly available information" means information that:

(a)     is lawfully made available through federal, state, or municipal government records or widely distributed media; or

(b)     a controller has a reasonable basis to believe a consumer has lawfully made available to the public.

(23)     (a) "Sale of personal data" means the exchange of personal data for monetary or other valuable consideration by the controller to a third party.

(b)     The term does not include:

(i)     the disclosure of personal data to a processor that processes the personal data on behalf of the controller;

(ii)     the disclosure of personal data to a third party for the purposes of providing a product or service requested by the consumer;

(iii)     the disclosure or transfer of personal data to an affiliate of the controller;

(iv)     the disclosure of personal data in which the consumer directs the controller to disclose the



*Authorized Print Version* – SB 384

**ENROLLED BILL**

personal data or intentionally uses the controller to interact with a third party;

(v)        the disclosure of personal data that the consumer:

(A)        intentionally made available to the public via a channel of mass media; and

(B)        did not restrict to a specific audience; or

(vi)        the disclosure or transfer of personal data to a third party as an asset that is part of a merger,

acquisition, bankruptcy, or other transaction, or a proposed merger, acquisition, bankruptcy, or other

transaction in which the third party assumes control of all or part of the controller's assets.

(24)        "Sensitive data" means personal data that includes:

(a)        data revealing racial or ethnic origin, religious beliefs, a mental or physical health condition or

diagnosis, information about a person's sex life, sexual orientation, or citizenship or immigration status;

(b)        the processing of genetic or biometric data for the purpose of uniquely identifying an individual;

(c)        personal data collected from a known child; or

(d)        precise geolocation data.

(25)        (a) "Targeted advertising" means displaying advertisements to a consumer in which the

advertisement is selected based on personal data obtained or inferred from that consumer's activities over time

and across nonaffiliated internet websites or online applications to predict the consumer's preferences or

interests.

(b)        The term does not include:

(i)        advertisements based on activities within a controller's own internet websites or online

applications;

(ii)        advertisements based on the context of a consumer's current search query or visit to an

internet website or online application;

(iii)        advertisements directed to a consumer in response to the consumer's request for information

or feedback; or

(iv)        processing personal data solely to measure or report advertising frequency, performance, or

reach.

(26)        "Third party" means an individual or legal entity, such as a public authority, agency, or body,

other than the consumer, controller, or processor or an affiliate of the controller or processor.



(27)      "Trade secret" has the same meaning as provided in 30-14-402.


Section 3.   **Applicability.** The provisions of [sections 1 through 12] apply to persons that conduct business in this state or persons that produce products or services that are targeted to residents of this state and:

(1)      control or process the personal data of not less than 50,000 consumers, excluding personal data controlled or processed solely for the purpose of completing a payment transaction; or

(2)      control or process the personal data of not less than 25,000 consumers and derive more than 25% of gross revenue from the sale of personal data.


Section 4.   **Exemptions.** (1) [Sections 1 through 12] do not apply to any:

(a)      body, authority, board, bureau, commission, district, or agency of this state or any political subdivision of this state;

(b)      nonprofit organization;

(c)      institution of higher education;

(d)      national securities association that is registered under 15 U.S.C. 78o-3 of the federal Securities Exchange Act of 1934, as amended;

(e)       financial institution or an affiliate of a financial institution governed by, or personal data collected, processed, sold, or disclosed in accordance with, Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801, et seq.; or

(f)      covered entity or business associate as defined in the privacy regulations of the federal Health Insurance Portability and Accountability Act of 1996, 45 CFR 160.103.

(2)      Information and data exempt from [sections 1 through 12] include:

(a)      protected health information under the privacy regulations of the federal Health Insurance Portability and Accountability Act of 1996;

(b)      patient-identifying information for the purposes of 42 U.S.C. 290dd-2;

(c)      identifiable private information for the purposes of the federal policy for the protection of human subjects of 1991, 45 CFR, part 46;



(d)        identifiable private information that is otherwise information collected as part of human subjects research pursuant to the good clinical practice guidelines issued by the international council for harmonisation of technical requirements for pharmaceuticals for human use;

(e)        the protection of human subjects under 21 CFR, parts 6, 50, and 56, or personal data used or shared in research as defined in the federal Health Insurance Portability and Accountability Act of 1996, 45 CFR 164.501, that is conducted in accordance with the standards set forth in this subsection (2)(e), or other research conducted in accordance with applicable law;

(f)        information and documents created for the purposes of the Health Care Quality Improvement Act of 1986, 42 U.S.C. 11101, et seq.;

(g)        patient safety work products for the purposes of the Patient Safety and Quality Improvement Act of 2005, 42 U.S.C. 299b-21, et seq., as amended;

(h)        information derived from any of the health care-related information listed in this subsection (2) that is:

(i)        deidentified in accordance with the requirements for deidentification pursuant to the privacy regulations of the federal Health Insurance Portability and Accountability Act of 1996; or

(ii)        included in a limited data set as described in 45 CFR 164.514(e), to the extent that the information is used, disclosed, and maintained in a manner specified in 45 CFR 164.514(e).

(i)        information originating from and intermingled to be indistinguishable with or information treated in the same manner as information exempt under this subsection (2) that is maintained by a covered entity or business associate as defined in the privacy regulations of the federal Health Insurance Portability and Accountability Act of 1996, 45 CFR 160.103, or a program or qualified service organization, as specified in 42 U.S.C. 290dd-2, as amended;

(j)        information used for public health activities and purposes as authorized by the federal Health Insurance Portability and Accountability Act of 1996, community health activities, and population health activities;

(k)        the collection, maintenance, disclosure, sale, communication, or use of any personal information bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living by a consumer reporting agency, furnisher, or user that



provides information for use in a consumer report and by a user of a consumer report, but only to the extent that the activity is regulated by and authorized under the Fair Credit Reporting Act, 15 U.S.C. 1681, as amended;

(l)       personal data collected, processed, sold, or disclosed in compliance with the Driver's Privacy Protection Act of 1994, 18 U.S.C. 2721, et seq., as amended;

(m)      personal data regulated by the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. 1232g, et seq., as amended;

(n)       personal data collected, processed, sold, or disclosed in compliance with the Farm Credit Act of 1993, 12 U.S.C. 2001, et seq., as amended;

(o)       data processed or maintained:

(i)       by an individual applying to, employed by, or acting as an agent or independent contractor of a controller, processor, or third party to the extent that the data is collected and used within the context of that role;

(ii)       as the emergency contact information of an individual under [sections 1 through 12] and used for emergency contact purposes; or

(iii)       that is necessary to retain to administer benefits for another individual relating to the individual who is the subject of the information under subsection (2)(a) and is used for the purposes of administering the benefits; and

(p)       personal data collected, processed, sold, or disclosed in relation to price, route, or service, as these terms are used in the Airline Deregulation Act of 1978, 49 U.S.C. 40101, et seq., as amended, by an air carrier subject to the Airline Deregulation Act of 1978, to the extent [sections 1 through 12] are preempted by the Airline Deregulation Act of 1978, 49 U.S.C. 41713, as amended.

(3)       Controllers and processors that comply with the verifiable parental consent requirements of the Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6501, et seq., shall be considered compliant with any obligation to obtain parental consent pursuant to [sections 1 through 12].


**Section 5.   Consumer personal data -- opt-out -- compliance -- appeals.** (1) A consumer must have the right to:



(a)        confirm whether a controller is processing the consumer's personal data and access the consumer's personal data, unless such confirmation or access would require the controller to reveal a trade secret;

(b)        correct inaccuracies in the consumer's personal data, considering the nature of the personal data and the purposes of the processing of the consumer's personal data;

(c)        delete personal data about the consumer;

(d)        obtain a copy of the consumer's personal data previously provided by the consumer to the controller in a portable and, to the extent technically feasible, readily usable format that allows the consumer to transmit the personal data to another controller without hindrance when the processing is carried out by automated means, provided the controller is not required to reveal any trade secret; and

(e)        opt out of the processing of the consumer's personal data for the purposes of:

(i)        targeted advertising;

(ii)        the sale of the consumer's personal data, except as provided in [section 7(2)]; or

(iii)        profiling in furtherance of solely automated decisions that produce legal or similarly significant effects concerning the consumer.

(2)        A consumer may exercise rights under this section by a secure and reliable means established by the controller and described to the consumer in the controller's privacy notice.

(3)        (a) A consumer may designate an authorized agent in accordance with [section 6] to exercise the rights of the consumer to opt out of the processing of the consumer's personal data under subsection (1)(e) on behalf of the consumer.

(b)        A parent or legal guardian of a known child may exercise the consumer rights on the known child's behalf regarding the processing of personal data.

(c)        A guardian or conservator of a consumer subject to a guardianship, conservatorship, or other protective arrangement, may exercise the rights on the consumer's behalf regarding the processing of personal data.

(4)        Except as otherwise provided in [sections 1 through 12], a controller shall comply with a request by a consumer to exercise the consumer rights authorized pursuant to this section as follows:

(a)        A controller shall respond to the consumer without undue delay, but not later than 45 days after



receipt of the request. The controller may extend the response period by 45 additional days when reasonably necessary, considering the complexity and number of the consumer's requests, provided the controller informs the consumer of the extension within the initial 45-day response period and the reason for the extension.

(b)      If a controller declines to act regarding the consumer's request, the controller shall inform the consumer without undue delay, but not later than 45 days after receipt of the request, of the justification for declining to act and provide instructions for how to appeal the decision.

(c)      Information provided in response to a consumer request must be provided by a controller, free of charge, once for each consumer during any 12-month period. If requests from a consumer are manifestly unfounded, excessive, technically infeasible, or repetitive, the controller may charge the consumer a reasonable fee to cover the administrative costs of complying with the request or decline to act on the request. The controller bears the burden of demonstrating the manifestly unfounded, excessive, technically infeasible, or repetitive nature of the request.

(d)      If a controller is unable to authenticate a request to exercise any of the rights afforded under subsections (1)(a) through (1)(d) of this section using commercially reasonable efforts, the controller may not be required to comply with a request to initiate an action pursuant to this section and shall provide notice to the consumer that the controller is unable to authenticate the request to exercise the right or rights until the consumer provides additional information reasonably necessary to authenticate the consumer and the consumer's request to exercise the consumer's rights. A controller may not be required to authenticate an opt-out request, but a controller may deny an opt-out request if the controller has a good faith, reasonable, and documented belief that the request is fraudulent. If a controller denies an opt-out request because the controller believes the request is fraudulent, the controller shall send notice to the person who made the request disclosing that the controller believes the request is fraudulent and that the controller may not comply with the request.

(e)      A controller that has obtained personal data about a consumer from a source other than the consumer must be deemed in compliance with the consumer's request to delete the consumer's data pursuant to subsection (1)(c) by:

(i)      retaining a record of the deletion request and the minimum data necessary for the purpose of ensuring the consumer's personal data remains deleted from the controller's records and not using the retained



data for any other purpose pursuant to the provisions of [sections 1 through 12]; or

(ii) opting the consumer out of the processing of the consumer's personal data for any purpose

except for those exempted pursuant to the provisions of [sections 1 through 12].

(5) A controller shall establish a process for a consumer to appeal the controller's refusal to act on

a request within a reasonable period after the consumer's receipt of the decision. The appeal process must be

conspicuously available and like the process for submitting requests to initiate action pursuant to this section.

Not later than 60 days after receipt of an appeal, a controller shall inform the consumer in writing of any action

taken or not taken in response to the appeal, including a written explanation of the reasons for the decisions. If

the appeal is denied, the controller shall also provide the consumer with an online mechanism, if available, or

other method through which the consumer may contact the attorney general to submit a complaint.

**Section 6.   Authorized agent.** (1) A consumer may designate another person to serve as the

consumer's authorized agent and act on the consumer's behalf to opt out of the processing of the consumer's

personal data for one or more of the purposes specified in [section 5(1)(e)]. The consumer may designate an

authorized agent by way of a technology, including but not limited to an internet link or a browser setting,

browser extension, or global device setting indicating a customer's intent to opt out of such processing.

(2) A controller shall comply with an opt-out request received from an authorized agent if the

controller is able to verify, with commercially reasonable effort, the identity of the consumer and the authorized

agent's authority to act on the consumer's behalf.

(3) Opt-out methods must:

(a) provide a clear and conspicuous link on the controller's internet website to an internet web

page that enables a consumer, or an agent of the consumer, to opt out of the targeted advertising or sale of the

consumer's personal data; and

(b) by no later than January 1, 2025, allow a consumer to opt out of any processing of the

consumer's personal data for the purposes of targeted advertising, or any sale of such personal data through

an opt-out preference signal sent with the consumer's consent, to the controller by a platform, technology, or

mechanism that:

(i) may not unfairly disadvantage another controller;



(ii)         may not make use of a default setting, but require the consumer to make an affirmative, freely given and unambiguous choice to opt out of any processing of a customer's personal data pursuant to [sections 1 through 12];

(iii)        must be consumer-friendly and easy to use by the average consumer;

(iv)        must be consistent with any federal or state law or regulation; and

(v)         must allow the controller to accurately determine whether the consumer is a resident of the state and whether the consumer has made a legitimate request to opt out of any sale of a consumer's personal data or targeted advertising.

(4)        (a) If a consumer's decision to opt out of any processing of the consumer's personal data for the purposes of targeted advertising, or any sale of personal data, through an opt-out preference signal sent in accordance with the provisions of subsection (3) conflicts with the consumer's existing controller-specific privacy setting or voluntary participation in a controller's bona fide loyalty, rewards, premium features, discounts, or club card program, the controller shall comply with the consumer's opt-out preference signal but may notify the consumer of the conflict and provide the choice to confirm controller-specific privacy settings or participation in such a program.

(b)        If a controller responds to consumer opt-out requests received in accordance with subsection (3) by informing the consumer of a charge for the use of any product or service, the controller shall present the terms of any financial incentive offered pursuant to subsection (3) for the retention, use, sale, or sharing of the consumer's personal data.

**Section 7.   Data processing by controller -- limitations.** (1) A controller shall:

(a)        limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purposes for which the personal data is processed, as disclosed to the consumer;

(b)        establish, implement, and maintain reasonable administrative, technical, and physical data security practices to protect the confidentiality, integrity, and accessibility of personal data appropriate to the volume and nature of the personal data at issue; and

(c)        provide an effective mechanism for a consumer to revoke the consumer's consent under this section that is at least as easy as the mechanism by which the consumer provided the consumer's consent and,



on revocation of the consent, cease to process the personal data as soon as practicable, but not later than 45

days after the receipt of the request.

(2)      A controller may not:

(a)      except as otherwise provided in [sections 1 through 12], process personal data for purposes

that are not reasonably necessary to or compatible with the disclosed purposes for which the personal data is

processed as disclosed to the consumer unless the controller obtains the consumer's consent;

(b)      process sensitive data concerning a consumer without obtaining the consumer's consent or, in

the case of the processing of sensitive data concerning a known child, without processing the sensitive data in

accordance with the Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6501, et seq.;

(c)      process personal data in violation of the laws of this state and federal laws that prohibit

unlawful discrimination against consumers;

(d)      process the personal data of a consumer for the purposes of targeted advertising or sell the

consumer's personal data without the consumer's consent under circumstances in which a controller has actual

knowledge that the consumer is at least 13 years of age but younger than 16 years of age; or

(e)      discriminate against a consumer for exercising any of the consumer rights contained in

[sections 1 through 12], including denying goods or services, charging different prices or rates for goods or

services, or providing a different level of quality of goods or services to the consumer.

(3)      Nothing in subsection (1) or (2) may be construed to require a controller to provide a product or

service that requires the personal data of a consumer that the controller does not collect or maintain or prohibit

a controller from offering a different price, rate, level, quality, or selection of goods or services to a consumer,

including offering goods or services for no fee, if the consumer has exercised their right to opt out pursuant to

[sections 1 through 12] or the offering is in connection with a consumer's voluntary participation in a bona fide

loyalty, rewards, premium features, discounts, or club card program.

(4)      If a controller sells personal data to third parties or processes personal data for targeted

advertising, the controller shall clearly and conspicuously disclose the processing, as well as the way a

consumer may exercise the right to opt out of the processing.

(5)      A controller shall provide consumers with a reasonably accessible, clear, and meaningful

privacy notice that includes:



Authorized Print Version – SB 384

**ENROLLED BILL**

(a)        the categories of personal data processed by the controller;

(b)        the purpose for processing personal data;

(c)        the categories of personal data that the controller shares with third parties, if any;

(d)        the categories of third parties, if any, with which the controller shares personal data; and

(e)        an active e-mail address or other mechanism that the consumer may use to contact the controller; and

(f)        how consumers may exercise their consumer rights, including how a consumer may appeal a controller's decision regarding the consumer's request.

(6)        (a) A controller shall establish and describe in a privacy notice one or more secure and reliable means for consumers to submit a request to exercise their consumer rights pursuant to [sections 1 through 12] considering the ways in which consumers normally interact with the controller, the need for secure and reliable communication of consumer requests, and the ability of the controller to verify the identity of the consumer making the request.

(b)        A controller may not require a consumer to create a new account to exercise consumer rights but may require a consumer to use an existing account.

Section 8.    Data processor -- allowances -- limitations. (1) A processor shall adhere to the instructions of a controller and shall assist the controller in meeting the controller's obligations under [sections 1 through 12] to include:

(a)        considering the nature of processing and the information available to the processor by appropriate technical and organizational measures as much as reasonably practicable to fulfill the controller's obligation to respond to consumer rights requests;

(b)        considering the nature of processing and the information available to the processor by assisting the controller in meeting the controller's obligations in relation to the security of processing the personal data and in relation to the notification of a breach of security, as provided for in 30-14-1704, of the system of the processor to meet the controller's obligations; and

(c)        providing necessary information to enable the controller to conduct and document data protection assessments.



(2)     A contract between a controller and a processor must govern the processor's data processing procedures with respect to processing performed on behalf of the controller. The contract must be binding and clearly set forth instructions for processing data, the nature and purpose of processing, the type of data subject to processing, the duration of processing, and the rights and obligations of both parties. The contract must also require that the processor:

(a)     ensure that each person processing personal data is subject to a duty of confidentiality with respect to the personal data;

(b)     at the controller's direction, delete or return all personal data to the controller as requested at the end of the provision of services, unless retention of the personal data is required by law;

(c)     on the reasonable request of the controller, make available to the controller all information in the processor's possession necessary to demonstrate the processor's compliance with the obligations in [sections 1 through 12];

(d)     engage any subcontractor pursuant to a written contract that requires the subcontractor to meet the obligations of the processor with respect to the personal data; and

(e)     allow and cooperate with reasonable assessments by the controller or the controller's designated assessor, or the processor may arrange for a qualified and independent assessor to assess the processor's policies and technical and organizational measures in support of the obligations under [sections 1 through 12] using an appropriate and accepted control standard or framework and assessment procedure for the assessments. The processor shall provide a report of the assessment to the controller on request.

(3)     Nothing in this section may be construed to relieve a controller or processor from the liabilities imposed on the controller or processor by virtue of the controller's or processor's role in the processing relationship, as described in [sections 1 through 12].

(4)     Determining whether a person is acting as a controller or processor with respect to a specific processing of data is a fact-based determination that depends on the following context in which personal data is to be processed:

(a)     A person who is not limited in the processing of personal data pursuant to a controller's instructions or who fails to adhere to a controller's instructions is a controller and not a processor with respect to a specific processing of data.



(b)      A processor that continues to adhere to a controller's instructions with respect to a specific processing of personal data remains a processor.

(c)      If a processor begins, alone or jointly with others, determining the purposes and means of the processing of personal data, the processor is a controller with respect to the processing and may be subject to an enforcement action under [section 12].

Section 9.   Data protection assessment. (1) A controller shall conduct and document a data protection assessment for each of the controller's processing activities that presents a heightened risk of harm to a consumer. For the purposes of this section, processing that presents a heightened risk of harm to a consumer includes:

(a)      the processing of personal data for the purposes of targeted advertising;

(b)      the sale of personal data;

(c)      the processing of personal data for the purposes of profiling in which the profiling presents a reasonably foreseeable risk of:

(i)      unfair or deceptive treatment of or unlawful disparate impact on consumers;

(ii)      financial, physical, or reputational injury to consumers;

(iii)      a physical or other form of intrusion on the solitude or seclusion or the private affairs or concerns of consumers in which the intrusion would be offensive to a reasonable person; or

(iv)      other substantial injury to consumers; and

(d)      the processing of sensitive data.

(2)      (a) Data protection assessments conducted pursuant to subsection (1) must identify and weigh the benefits that may flow, directly and indirectly, from the processing to the controller, the consumer, other stakeholders, and the public against the potential risks to the rights of the consumer associated with the processing as mitigated by safeguards that may be employed by the controller to reduce these risks.

(b)      The controller shall factor into any data protection assessment the use of deidentified data and the reasonable expectations of consumers, as well as the context of the processing and the relationship between the controller and the consumer whose personal data will be processed.

(3)      (a) The attorney general may require that a controller disclose any data protection assessment



that is relevant to an investigation conducted by the attorney general, and the controller shall make the data

protection assessment available to the attorney general.

(b)        The attorney general may evaluate the data protection assessment for compliance with the

responsibilities set forth in [sections 1 through 12].

(c)        Data protection assessments are confidential and are exempt from disclosure under the

Freedom of Information Act, 5 U.S.C. 552.

(d)        To the extent any information contained in a data protection assessment disclosed to the

attorney general includes information subject to attorney-client privilege or work product protection, the

disclosure may not constitute a waiver of the privilege or protection.

(4)        A single data protection assessment may address a comparable set of processing operations

that include similar activities.

(5)        If a controller conducts a data protection assessment for the purpose of complying with another

applicable law or regulation, the data protection assessment must be considered to satisfy the requirements

established in this section if the data protection assessment is reasonably similar in scope and effect to the data

protection assessment that would otherwise be conducted pursuant to this section.

(6)        Data protection assessment requirements must apply to processing activities created or

generated after January 1, 2025, and are not retroactive.


**Section 10.    Deidentified data.** (1) Any controller in possession of deidentified data shall:

(a)        take reasonable measures to ensure that the deidentified data cannot be associated with an

individual;

(b)        publicly commit to maintaining and using deidentified data without attempting to reidentify the

deidentified data; and

(c)        contractually obligate any recipients of the deidentified data to comply with all provisions of

[sections 1 through 12].

(2)        Nothing in [sections 1 through 12] may be construed to:

(a)        require a controller or processor to reidentify deidentified data or pseudonymous data; or

(b)        maintain data in identifiable form or collect, obtain, retain, or access any data or technology to



be capable of associating an authenticated consumer request with personal data.

(3)     Nothing in [sections 1 through 12] may be construed to require a controller or processor to comply with an authenticated consumer rights request if the controller:

(a)     is not reasonably capable of associating the request with the personal data or it would be unreasonably burdensome for the controller to associate the request with the personal data;

(b)     does not use the personal data to recognize or respond to the specific consumer who is the subject of the personal data or associate the personal data with other personal data about the same specific consumer; and

(c)     does not sell the personal data to any third party or otherwise voluntarily disclose the personal data to any third party other than a processor, except as otherwise permitted in this section.

(4)     The rights afforded under [section 5(1)(a) through (1)(d)] may not apply to pseudonymous data in cases in which the controller is able to demonstrate that any information necessary to identify the consumer is kept separately and is subject to effective technical and organizational controls that prevent the controller from accessing the information.

(5)     A controller that discloses pseudonymous data or deidentified data shall exercise reasonable oversight to monitor compliance with any contractual commitments to which the pseudonymous data or deidentified data is subject and shall take appropriate steps to address any breaches of those contractual commitments.

**Section 11.   Compliance by controller or processor.** (1) Nothing in [sections 1 through 12] may be construed to restrict a controller's or processor's ability to:

(a)     comply with federal, state, or municipal ordinances or regulations;

(b)     comply with a civil, criminal, or regulatory inquiry, investigation, subpoena, or summons by federal, state, municipal, or other government authorities;

(c)     cooperate with law enforcement agencies concerning conduct or activity that the controller or processor reasonably and in good faith believes may violate federal, state, or municipal ordinances or regulations;

(d)     investigate, establish, exercise, prepare for, or defend legal claims;



(e)     provide a product or service specifically requested by a consumer;

(f)     perform under a contract to which a consumer is a party, including fulfilling the terms of a written warranty;

(g)     take steps at the request of a consumer prior to entering a contract;

(h)     take immediate steps to protect an interest that is essential for the life or physical safety of the consumer or another individual and when the processing cannot be manifestly based on another legal basis;

(i)     prevent, detect, protect against, or respond to security incidents, identity theft, fraud, harassment, malicious or deceptive activities, or any illegal activity, preserve the integrity or security of systems, or investigate, report, or prosecute those responsible for any of these actions;

(j)     engage in public or peer-reviewed scientific or statistical research in the public interest that adheres to all other applicable ethics and privacy laws and is approved, monitored, and governed by an institutional review board that determines or similar independent oversight entities that determine:

(A)     whether the deletion of the information is likely to provide substantial benefits that do not exclusively accrue to the controller;

(B)     the expected benefits of the research outweigh the privacy risks; and

(C)     whether the controller has implemented reasonable safeguards to mitigate privacy risks associated with research, including any risks associated with reidentification;

(k)     assist another controller, processor, or third party with any of the obligations under [sections 1 through 12]; or

(l)     process personal data for reasons of public interest in public health, community health, or population health, but solely to the extent that the processing is:

(A)     subject to suitable and specific measures to safeguard the rights of the consumer whose personal data is being processed; and

(B)     under the responsibility of a professional subject to confidentiality obligations under federal, state, or local law.

(2)     The obligations imposed on controllers or processors under [sections 1 through 12] may not restrict a controller's or processor's ability to collect, use, or retain personal data for internal use to:

(a)     conduct internal research to develop, improve, or repair products, services, or technology;



(b)      effectuate a product recall;

(c)      identify and repair technical errors that impair existing or intended functionality; or

(d)      perform internal operations that are reasonably aligned with the expectations of the consumer or reasonably anticipated based on the consumer's existing relationship with the controller or are otherwise compatible with processing data in furtherance of the provision of a product or service specifically requested by a consumer or the performance of a contract to which the consumer is a party.

(3)      The obligations imposed on controllers or processors under [sections 1 through 12] may not apply when compliance by the controller or processor with [sections 1 through 12] would violate an evidentiary privilege under the laws of this state. Nothing in [sections 1 through 12] may be construed to prevent a controller or processor from providing personal data concerning a consumer to a person covered by an evidentiary privilege under the laws of this state as part of a privileged communication.

(4)      A controller or processor that discloses personal data to a processor or third-party controller in accordance with [sections 1 through 12] may not be considered to have violated [sections 1 through 12] if the processor or third-party controller that receives and processes the personal data violates [sections 1 through 12] provided, at the time the disclosing controller or processor disclosed the personal data, the disclosing controller or processor did not have actual knowledge that the receiving processor or third-party controller would violate [sections 1 through 12]. A receiving processor or third-party controller receiving personal data from a disclosing controller or processor in compliance with [sections 1 through 12] is likewise not in violation of [sections 1 through 12] for the transgressions of the disclosing controller or processor from which the receiving processor or third-party controller receives the personal data.

(5)      Nothing in [sections 1 through 12] may be construed to:

(a)      impose any obligation on a controller or processor that adversely affects the rights or freedoms of any person, including but not limited to the rights of any person:

(i)      to freedom of speech or freedom of the press guaranteed in the first amendment to the United States constitution; or

(ii)      under Rule 504 of the Montana Rules of Evidence; or

(b)      apply to a person's processing of personal data during the person's personal or household activities.



(6)      Personal data processed by a controller pursuant to this section may be processed to the extent that the processing is:

(a)      reasonably necessary and proportionate to the purposes listed in this section; and

(b)      adequate, relevant, and limited to what is necessary in relation to the specific purposes listed in this section. The controller or processor must, when applicable, consider the nature and purpose of the collection, use, or retention of the personal data collected, used, or retained pursuant to subsection (2). The personal data must be subject to reasonable administrative, technical, and physical measures to protect the confidentiality, integrity, and accessibility of the personal data and to reduce reasonably foreseeable risks of harm to consumers relating to the collection, use, or retention of personal data.

(7)      If a controller processes personal data pursuant to an exemption in this section, the controller bears the burden of demonstrating that the processing qualifies for the exemption and complies with the requirements in subsection (6).

(8)      Processing personal data for the purposes expressly identified in this section may not solely make a legal entity a controller with respect to the processing.

**Section 12.   Enforcement.** (1) The attorney general has exclusive authority to enforce violations pursuant to [sections 1 through 11].

(2)      (a) The attorney general shall, prior to initiating any action for a violation of any provision of [sections 1 through 11], issue a notice of violation to the controller.

(b)      If the controller fails to correct the violation within 60 days of receipt of the notice of violation, the attorney general may bring an action pursuant to this section.

(c)      If within the 60-day period the controller corrects the noticed violation and provides the attorney general an express written statement that the alleged violations have been corrected and that no such further violations will occur, no action must be initiated against the controller.

(3)      Nothing in [sections 1 through 11] may be construed as providing the basis for or be subject to a private right of action for violations of [sections 1 through 11] or any other law.

**Section 13.   Codification instruction.** [Sections 1 through 12] are intended to be codified as an



integral part of Title 30, chapter 14, and the provisions of Title 30, chapter 14, apply to [sections 1 through 12].


**Section 14.    Effective date.** [This act] is effective October 1, 2024.


**Section 15.    Termination**. [Section 12(2)] terminates April 1, 2026.

- END -



*Authorized Print Version* – SB 384

**ENROLLED BILL**

I hereby certify that the within bill,

SB 384, originated in the Senate.

_____

Secretary of the Senate

_____

President of the Senate

Signed this _____day

of_____, 2023.

_____

Speaker of the House

Signed this _____day

of_____, 2023.

SENATE BILL NO. 384

INTRODUCED BY D. ZOLNIKOV, K. REGIER, E. BOLDMAN, S. MORIGEAU, K. BOGNER, K. SULLIVAN, K. ZOLNIKOV, D. EMRICH

AN ACT ESTABLISHING THE CONSUMER DATA PRIVACY ACT; PROVIDING DEFINITIONS; ESTABLISHING APPLICABILITY; PROVIDING FOR CONSUMER RIGHTS TO PERSONAL DATA; ESTABLISHING REQUIREMENTS AND LIMITATIONS FOR A CONTROLLER OF PERSONAL DATA; ESTABLISHING REQUIREMENTS AND LIMITATIONS FOR A PROCESSOR OF PERSONAL DATA; PROVIDING FOR DATA PROTECTION ASSESSMENTS; PROVIDING EXEMPTIONS AND COMPLIANCE REQUIREMENTS; PROVIDING FOR ENFORCEMENT; AND PROVIDING A DELAYED EFFECTIVE DATE AND A TERMINATION DATE.

# EXHIBIT 22



June 30, 2022

The Honorable Marsha Blackburn
United States Senate
357 Dirksen Senate Office Building
Washington, DC 20510

The Honorable Roger Wicker
United States Senate
555 Dirksen Senate Office Building
Washington, DC 20510

The Honorable John Thune
United States Senate
511 Dirksen Senate Office Building
Washington, DC 20510

The Honorable Roy Blunt
United States Senate
260 Russell Senate Office Building
Washington, DC 20510

The Honorable Ted Cruz
United States Senate
127A Russell Senate Office Building
Washington, DC 20510

The Honorable Jerry Moran
United States Senate
521 Dirksen Senate Office Building
Washington, DC 20510

The Honorable Shelley Moore Capito
United States Senate
172 Russell Senate Office Building
Washington, DC 20510

The Honorable Cynthia Lummis
United States Senate
124 Russell Senate Office Building
Washington, DC 20510

The Honorable Steve Daines
United States Senate
320 Hart Senate Office Building
Washington, DC 20510

Dear Senators Blackburn, Wicker, Thune, Blunt, Cruz, Moran, Capito, Lummis, and Daines,

Thank you for your letter dated June 27, 2022. We appreciate the opportunity to address the concerns you set forth. Many of your questions appear to stem from a recent BuzzFeed article, which contains allegations and insinuations that are incorrect and are not supported by facts. We appreciate the opportunity to set the record straight by answering your questions.

Before doing so, we would like to contextualize what many of the people quoted in the article were talking about and what the company has been broadly working to achieve. For well over a year, we've been pursuing a multi-pronged initiative called "Project Texas" to strengthen the company's data security program. Security experts can confirm that these initiatives are often painstaking and complex, even with expert assistance from world-class companies like Oracle and Booz Allen. Some people working on these projects do not have visibility into the full picture, working on a task

TikTok Inc.
5800 Bristol Pkwy, Suite 100
Culver City, CA 90230



without realizing that it's a single step in a much bigger project or a test to validate an assumption.

That's critical context for the recordings leaked to Buzzfeed, and one thing their reporting got right: the meetings "*were in service of Project Texas's aim to halt this data access.*"

The broad goal for Project Texas is to help build trust with users and key stakeholders by improving our systems and controls, but it is also to make substantive progress toward compliance with a final agreement with the U.S. Government that will fully safeguard user data and U.S. national security interests. We have not spoken publicly about these plans out of respect for the confidentiality of the engagement with the U.S. Government, but circumstances now require that we share some of that information publicly to clear up the errors and misconceptions in the article and some ongoing concerns related to other aspects of our business.

While we are disappointed that leaks have put us in this position, we are pleased to share the substantial progress on our objectives. As we recently reported, we now store 100% of U.S. user data by default in the Oracle cloud environment, and we are working with Oracle on new, advanced data security controls that we hope to finalize in the near future. That work puts us closer to the day when we will be able to pivot toward a novel and industry-leading system for protecting the data of our users in the United States, with robust, independent oversight to ensure compliance.

We are taking additional measures beyond data security, which we will briefly touch on in our responses below.

We have been clear dating back to an early 2020 blog post that we are working on a broad set of objectives: "*Similar to industry peers, we will continue to drive our goal of limiting the number of employees who have access to user data and the scenarios where data access is enabled. Although we already have controls in place to protect user data, we will continue to focus on adding new technologies and programs focused on global data residency, data movement, and data storage access protections worldwide*." (https://newsroom.tiktok.com/en-us/our-approach-to-security). There is a distinction between data storage and data access, but they are both—together— important components of our efforts to earn trust and improve security for TikTok; our solution will now ensure both the storage of all U.S. user data in the United States and all data sharing outside of the protected enclave in the United States will be pursuant to protocols and terms approved by the U.S. Government.

In light of the context above, we are confident that when you review our responses, you will see that TikTok has not, at any point, misled Congress about our data and security controls and practices. We understand, respect, and appreciate the incredibly important work of your Committee and Congress, and we have always approached our engagements with Members and staff, both in public and in private, with candor and



integrity. We stand by the statements Michael Beckerman made before Congress and are grateful for his leadership.

As we continue our productive conversations with the Administration and continue to explore commercial partnerships with companies like Oracle, we look forward to keeping you and the full Committee apprised of our work to further ensure the security of U.S. user data.

Please see below for TikTok's responses to your questions.

1. **Is it true that TikTok employees located in China currently have, or had in the past, access to U.S. user data? This could include programmers, product developers, data teams, as well as trust and safety and content moderation professionals.**
   a. **If yes, please explain in detail which employees have or had such access and for what purposes.**
   b. **If the employees had this access in the past but no longer do, please identify the applicable date ranges.**

Employees outside the U.S., including China-based employees, can have access to TikTok U.S. user data subject to a series of robust cybersecurity controls and authorization approval protocols overseen by our U.S.-based security team. In addition, TikTok has an internal data classification system and approval process in place that assigns levels of access based on the data's classification and requires approvals for access to U.S. user data. The level of approval required is based on the sensitivity of the data according to the classification system.

The solution that TikTok is implementing pursuant to Project Texas has focused on evaluating and revising TikTok's internal policies and operational controls in relation to U.S. user data access, to take steps to strengthen data security around U.S. user data and, ultimately, to make the organizational, process, and technical changes to help ensure compliance and enhance protection of U.S. user data defined as "protected" through engagement with CFIUS. As we are in the process of undergoing CFIUS national security review, we have kept CFIUS informed of these efforts. This protected user data will be stored in Oracle Cloud Infrastructure with access limited only to authorized personnel, pursuant to protocols being developed with the U.S. Government.

2. **TikTok's privacy policy says you share data you collect with your parent companies and affiliates and that you transmit user information to servers and data centers overseas.**
   a. **Have any ByteDance employees—located in China or elsewhere— had access to U.S. User data, either currently or in the past?**

Please see our response to question 1.

3



**b. What are the locations of the servers and data centers overseas where TikTok transmits U.S. user data?**

TikTok has long stored U.S. user data in data centers in the U.S. and Singapore, as well as in cloud-based services offered by AWS, the Google Cloud Platform, and Azure. Our Virginia data center includes physical and logical safety controls such as gated entry points, firewalls, and intrusion detection technologies. It is also important to maintain backup data storage locations to guard against catastrophic scenarios where user data could be lost, and our data center in Singapore serves as the backup data storage location for our U.S. user data.

100% of U.S. user traffic is now being routed to Oracle Cloud Infrastructure. We are still using our U.S. and Singapore data centers for backup, but as we continue our work to deliver on U.S. data governance, we expect to delete U.S. users' protected data from our own systems and fully pivot to Oracle cloud servers located in the U.S.

**3. Do any ByteDance employees have a role in shaping TikTok's algorithm?**

Subject to the controls described in our response to question 1, ByteDance engineers around the world may assist in developing those algorithms, however our solution with Oracle will ensure that training of the TikTok algorithm only occurs in the Oracle Cloud Infrastructure and will also ensure appropriate third-party security vetting and validation of the algorithm. For more information about how TikTok's algorithm recommends content, please see our Newsroom post: https://newsroom.tiktok.com/en-us/how-tiktok-recommends-videos-for-you.

**4. Do any Douyin employees have any access to American user data or a role in shaping TikTok's algorithm?**

ByteDance developed the algorithms for both Douyin and TikTok, and therefore some of the same underlying basic technology building blocks are utilized by both products, but TikTok's business logic, algorithm, integration, and deployment of systems is specific to the TikTok application and separate from Douyin.

Under Project Texas and as a result of our work with the U.S. Government, going forward our solution with Oracle will ensure the TikTok application and platform, including the algorithm, is deployed through the Oracle Cloud Infrastructure in the United States with third-party security vetting and validation of the software for the application and platform, including the TikTok algorithm.



5. **In the past, TikTok has said that it has never—nor would it ever—provide user data to the Chinese government, even if asked. Yet your privacy policy says you can disclose data collected to respond to government inquiries.**
   a. **Has TikTok ever disclosed any U.S. user data to respond to government inquiries from the Chinese Communist Party?**
   b. **If the Chinese Communist Party asked you for U.S. user data, what is to stop you from providing it? Can the CCP compel you to provide this data, regardless of response? Can they access it, regardless of response?**
   c. **Has ByteDance ever responded to CCP inquiries on TikTok's behalf?**
   d. **Has TikTok ever shared U.S. user data with ByteDance for the purpose of responding to a CCP inquiry?**

We have not been asked for such data from the CCP. We have not provided U.S. user data to the CCP, nor would we if asked.

More information about government requests for user data that we receive across the world is available in our Information Request Reports, available at https://www.tiktok.com/transparency/en-us/information-requests-2021-1/.

6. **Do TikTok employees in the U.S. use software developed by ByteDance, such as Lark?**

Yes.

7. **Does ByteDance have any role—either in the past or in the present—in hiring TikTok employees in the U.S.?**

As would be expected of any global company with subsidiaries, ByteDance plays a role in the hiring of key personnel at TikTok. However, as we have described before, TikTok is led by its own global CEO, Shou Zi Chew, a Singaporean based in Singapore.

8. **Does TikTok own or lease its own office space in the U.S., and does ByteDance have any ownership or lease stake in those facilities?**

TikTok leases office space in cities across the U.S., including Los Angeles, Austin, Chicago, New York, Detroit, Seattle, DC, and Nashville.  These leases are through U.S. entities, TikTok Inc. (a California corporation) and ByteDance Inc. (a Delaware corporation).

9. **Does the Chinese government have an ownership stake or seat on the Board of Directors, or provide personnel in any other leadership position, of the Beijing ByteDance Technology Company?**



      **a. What role does this seat play in impacting decisions made at ByteDance or TikTok?**

      **b. Does this position afford an opportunity for the board member to determine whether and how TikTok or ByteDance will respond to CCP inquiries?**

      **c. Does this position afford an opportunity for the board member to view TikTok user data?**

      **d. Would you be informed, as a matter of policy, if a board member did view the data? If the board member did share the data, in any capacity, with the CCP?**

As multiple corporate entities share the "ByteDance" name, several China-based ByteDance entities were renamed earlier this year to keep the names of businesses and entities more consistent. Beijing Bytedance Technology Co. Ltd is now called Beijing Douyin Information Service Limited. We will refer to it here using its new name for avoidance of confusion.

ByteDance Ltd., the ultimate parent entity that is incorporated in the Cayman Islands, has a global board, including Bill Ford of General Atlantic, Arthur Dantchik of Susquehanna International Group, Philippe Laffont of Coatue, Neil Shen of Sequoia, and the company's CEO Rubo Liang. The majority of ByteDance's investors are global institutional funds such as Coatue, General Atlantic, KKR, Sequoia, Softbank, and Susquehanna International Group.

Beijing Douyin Information Service Limited is a separately held subsidiary of ByteDance Ltd. Beijing Douyin Information Service Limited does not have any direct or indirect ownership interest in or control over any TikTok entity. Further, employees of Beijing Douyin Information Service Limited are restricted from U.S. user database access. The Chinese state-owned enterprise's acquisition of 1% of Beijing Douyin Information Service Limited was necessary for the purpose of obtaining a news license in China for several China-based content applications, such as Douyin and Toutiao.

The Chinese government does not directly or indirectly have the right to appoint board members or otherwise have specific rights with respect to any ByteDance entity within the chain of ownership or control over the TikTok entity.

      **10. How will TikTok's new cloud service arrangement be structured, and how will the company determine which data is "protected" such that it is not shared with employees or others in China?**

TikTok recently published a Newsroom post outlining our U.S. data governance practices and announcing a commercial relationship with Oracle in support of these practices (https://newsroom.tiktok.com/en-us/delivering-on-our-us-data-governance).



As described in question 1, U.S. user data at issue is being defined as "protected" through engagement with CFIUS, and will be stored in the Oracle Cloud Infrastructure with access limited only to certain personnel in USDS. Under the contemplated arrangement, access to U.S. user data by anyone outside of USDS will be limited by, and subject to, robust data access protocols, with further monitoring and oversight mechanisms by Oracle to validate compliance.

In order to facilitate a global platform, non U.S.-based employees, including China-based employees, will have access to a narrow set of non-sensitive TikTok U.S. user data, such as public videos and comments available to anyone anywhere in the world, to ensure global interoperability so our U.S. users, creators, brands, and merchants are afforded the same rich and safe TikTok experience as global users.

### 11. Why is TikTok not planning to ensure that all U.S. user data is blocked from view of employees or others in China?

As described in our response to question 10, access to U.S. user data by anyone outside of our new USDS team will be limited by, and subject to, robust data access protocol that will be developed in close collaboration with Oracle and CFIUS.

We're proud to be able to serve a global community of more than a billion people who use TikTok to creatively express themselves and be entertained, and we're dedicated to giving them a platform that builds opportunity and fosters connections worldwide. We also work hard to safeguard our community, both in how we address potentially harmful content and how we protect against unauthorized access to user data.

Consistent with the operation of this global platform, and as described in our response to question 10, certain China-based employees will have access to a narrow, non-sensitive set of TikTok U.S. user data, such as the public videos and comments available to anyone, to ensure global interoperability so our U.S. users, creators, brands, and merchants are afforded the same rich and safe TikTok experience as global users. But this access will be very limited, it will not include private TikTok U.S. user information, and it will only occur pursuant to protocols being developed with the U.S. Government.

*****



We thank you for your questions and appreciate the opportunity to provide additional details and clarification.  We know we are among the most scrutinized platforms from a security standpoint, and we aim to remove any doubt about the security of U.S. user data. We're dedicated to earning and maintaining the trust of our community and of policymakers, and will continue to work every day to protect our platform and provide a safe, welcoming, and enjoyable experience for our community.


Sincerely,


Shou Zi Chew
CEO, TikTok


cc:
The Honorable Maria Cantwell
The Honorable Richard Blumenthal

# EXHIBIT 23

TikTok

Home    🔍 Search

How TikTok is supporting our community through COVID-19 ⊙                                    ✕

**Getting started** ⌄

**Using TikTok** ⌄

**Account and privacy settings** ⌄

**Safety** ⌃

  Report a problem

  Report a comment

  Report a direct message

  Report a hashtag

  Report an impersonation account

  Report a LIVE comment

  Report a LIVE video

  Report a sound

  Report a suggested search

  Report a Series

  Report a TikTok Sticker

  Report a video

  Report someone

  Report another issue

  Share feedback

  **Account and user safety**

    Account safety

    User safety

  Community Guidelines

  Content violations and bans

  Audience controls

  For Parents and Guardians

  Avoid fraudulent message attacks on TikTok

  Inactive Account Policy

  Minimum age appeals for TikTok LIVE

  Underage appeals on TikTok

  Intellectual property

  Copyright

  Trademark and counterfeiting

  Youth Portal

  Connect to third-party apps

  TikTok Developer Tools and related terms

  TikTok Research API

  Law Enforcement Data Request Guidelines

  Reporting security vulnerabilities

**Log in and troubleshooting** ⌄

**TikTok LIVE, Gifts, and wallet** ⌄

**Monetize on TikTok** ⌄

# User safety

### Jump to a section

What is Restricted Mode?  •  How to turn Restricted Mode on or off  •  What are video keyword filters?  •  What is Family Pairing?  •  How to set up Family Pairing  •  How to manage Family Pairing controls  •  Safety resources

At TikTok, we care about your safety while using the app. That's why we provide a number of safety tools and resources that allow you to control privacy preferences and access content that's most relevant or appropriate for you or your family.

### What is Restricted Mode?

Restricted Mode on TikTok limits exposure to content that may not be suitable for everyone. We're always working on improving this feature, so if you find a video in Restricted Mode that you think should be restricted, you can report it.

### How to turn Restricted Mode on or off

To turn Restricted Mode on or off:
1. In the TikTok app, tap **Profile** at the bottom.
2. Tap the **Menu** button at the top.
3. Tap **Settings and privacy**.
4. Tap **Content preferences**, then tap **Restricted Mode**.
5. Follow the steps in the app to set or enter a passcode to turn Restricted Mode on or off.
Note: This feature is available only on the TikTok app and not available on mobile and desktop browsers.

### What are video keyword filters?

Video keyword filters on TikTok allow you to tailor the content in your For You and Following feeds.
Note: Certain keywords can't be filtered.

To add video keyword filters:
1. In the TikTok app, tap **Profile** at the bottom.
2. Tap the **Menu** button at the top.
3. Tap **Settings and privacy**.
4. Tap **Content Preferences**, then tap **Filter video keywords**.
5. Tap **Add keywords** and enter a word or hashtag you'd like to filter.
6. Select the feeds you'd like to filter from.
7. Tap **Save** to confirm.
Note: You can add up to 100 keywords.

To filter hashtags directly from a video in the For You or Following feed:
1. In the TikTok app, press and hold on the video, or tap the **Share** button on the side, and tap **Not interested**.
2. Tap **Details** to display a list of hashtags found on the video.
3. Select the hashtags you'd like to filter.
4. Tap **Submit** to confirm.
Note: This option is not available on ads.

To delete or edit filtered keywords:
1. In the TikTok app, tap **Profile** at the bottom.
2. Tap the **Menu** button at the top.
3. Tap **Settings and privacy**.
4. Tap **Content Preferences**, then tap **Filter video keywords**.
5. Tap the **Delete** button next to any keywords you'd like to remove.
6. Tap **Delete** to confirm.

### What is Family Pairing?

Family Pairing on TikTok allows parents and teens to customize their safety settings based on individual needs. A parent can link their TikTok account to their teen's and set parental controls including:

**Daily screen time**
• Decide how long your teen can spend on TikTok each day. For teens between the ages 13 to 17, this setting is turned on by default to 1 hour.
• Set your teen's screen time limit directly from your own account.
• Set one screen time limit to apply to all your teen's devices.

- Set a passcode that you can choose to enter after your teen reaches their time to allow them to turn [...]

**Screen time dashboard**
- Get a summary of your teen's time spent on TikTok including:
  - The cumulative time spent each day for the last 4 weeks
  - The number of times your teen opened the app each day for the last 4 weeks

Note: This feature is currently not available everywhere.

Learn more about screen time on TikTok.

**Mute push notifications**
- Decide when to mute your teen's push notifications. This setting is turned on by default:
  - For teens between the ages of 13 to 15 years, the scheduled time is set to 9:00 PM to 8:00 AM by default
  - For teens between the ages of 16 to 17 years, the scheduled time is set to 10:00 PM to 8:00 AM by default
- Schedule additional time directly from your own account. Keep in mind, the default scheduled time overrides any custom time that falls within the default time.

Learn more about how to mute push notifications on TikTok.

**Restricted Mode**
- Restrict your teen's exposure to content that may not be appropriate or suitable for them.

**Search**
- Decide whether your teen can search for videos, hashtags, or LIVE videos on TikTok.

**Discoverability**
- Decide whether your teen's account is private or public. With a private account, your teen can approve who can follow them and view their content.

**Suggest account to others**
- Decide whether your teen's account can be recommended to others. Learn more about suggested accounts on TikTok.

**Direct Messages**
- Restrict who can send messages to your teen, or turn off direct messaging completely.
Keep in mind:
- Direct messaging on TikTok is available only to registered account holders aged 16 and older.
- Direct messaging is automatically turned off for registered accounts between the ages of 13 and 15.
Learn more about direct messages on TikTok.

**Liked videos**
- Decide who can view your teen's liked videos.

**Comments**
- Decide who can comment on your teen's videos.

Note: TikTok's Family Pairing parental controls are available only on the TikTok mobile app and not on mobile and desktop browsers. If your teen accesses TikTok from a browser as well as the mobile app, you may want to use the parental controls available on the mobile and desktop browser, in addition to TikTok's mobile app parental controls.

To set up screen time limits and restrict your teen's TikTok usage on browsers, visit:
- Google's family center for Android and Chrome.
- Apple's parental controls for iPhones, iPads, Macs, and Safari.


**How to set up Family Pairing**

To link parent and teen accounts:
1. In the TikTok app, tap Profile at the bottom.
2. Tap the Menu button at the top.
3. Tap Settings and privacy, then tap Family Pairing.
4. Tap Parent or Teen.
5. Follow the steps in the app to link accounts.


**How to manage Family Pairing controls**

To manage or view Family Pairing controls:
1. In the TikTok app, tap Profile at the bottom.
2. Tap the Menu button at the top.
3. Tap Settings and privacy, then tap Family Pairing.
4. Select the account you want to manage.
5. Update the controls, as needed.


**Safety resources**

At TikTok, we want to ensure you have the safety resources you need to safeguard your online experience. The following resources are available if you or someone you know needs support.

**Safety Center**
Visit our Safety Center to learn more about safety resources and tools on TikTok. You can also find information on your account status and records of any reports you've submitted, and share feedback in the app version of Safety Center.

To visit our Safety Center in the TikTok app:
1. Tap Profile at the bottom of the screen.
2. Tap the Menu button at the top.
3. Tap Settings and privacy, then tap Support.
4. Tap Safety Center.



Global resources

Family Online Safety Institute

- Internet Watch Foundation
- WePROTECT Global Alliance
- National Center for Missing & Exploited Children

**Local resources**

For a list of local organizations, visit our Safety Center and select your country or region.

**Additional resources**

You can find additional resources in our Safety Center for the following issues:

- Preventing child sexual abuse on TikTok
- Sexual Assault Resources
- Eating disorders
- Bullying prevention
- COVID-19
- Suicide and self-harm
- Digital well-being
- Parent and caregivers guide

---

Was this helpful?   👍 Yes   👎 No

**Helpful links**

Creating an account
Setting up your profile
Creating a TikTok video

---

♪ TikTok

**Company**
About TikTok
Newsroom
Contact
Careers
ByteDance

**Programs**
TikTok for Good
TikTok for Developers
Effect House
Advertise on TikTok
TikTok Rewards
TikTok Browse
TikTok Embeds

**Resources**
Help Center
Safety Center
Creator Portal
Community Guidelines
Transparency
Accessibility

**Legal**
Terms of Service

English ▼

© 2023 TikTok

# EXHIBIT 24

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| TIKTOK INC., | ) |
| | ) |
| and | ) |
| | ) |
| BYTEDANCE LTD., | ) |
| | ) |
| *Petitioners*, | ) |
| | ) |
| v. | ) |
| | ) |
| THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES, | ) |
| | ) |
| STEVEN T. MNUCHIN, in his official capacity as Secretary of the Treasury and Chairperson of the Committee on Foreign Investment in the United States, | ) |
| | ) |
| DONALD J. TRUMP, in his official capacity as President of the United States, | ) |
| | ) |
| and | ) |
| | ) |
| WILLIAM P. BARR, in his official capacity as United States Attorney General, | ) |
| | ) |
| *Respondents*. | ) |

No. _____20-1444_____

## PETITION FOR REVIEW

Pursuant to Section 721 of the Defense Production Act (50 U.S.C.

§ 4565(e)(2)) and Rule 15(a) of the Federal Rules of Appellate Procedure,

TikTok Inc. and ByteDance Ltd. hereby petition this Court for review of the Presidential Order Regarding the Acquisition of Musical.ly by ByteDance Ltd., 85 Fed. Reg. 51,297 (Aug. 14, 2020) (the "Divestment Order"), and the related action of the Committee on Foreign Investment in the United States ("CFIUS"), including its determination to reject mitigation, truncate its review and investigation, and refer the matter to the President (collectively, the "CFIUS Action").[1]  This Court has original and exclusive jurisdiction to hear Petitioners' challenges.   50 U.S.C. § 4565(e)(2); *see also Ralls Corp. v. CFIUS*, 758 F.3d 296, 311 (D.C. Cir. 2014); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

The Divestment Order and the CFIUS Action seek to compel the wholesale divestment of TikTok, a multi-billion-dollar business built on technology developed by Petitioner ByteDance Ltd. ("ByteDance"), based on the government's purported national security review of a three-year-old transaction that involved a *different business*.  This attempted taking

---

[1] A copy of the Divestment Order and CFIUS's July 30, 2020 letter to Petitioners memorializing the CFIUS Action are attached to this Petition.

2

exceeds the authority granted to Respondents under Section 721, which authorizes CFIUS to review and the President to, at most, prohibit a specified "covered transaction" to address risks to national security created by that transaction. Here, that covered transaction was ByteDance's acquisition of the U.S. business of another Chinese-headquartered company, Musical.ly—a transaction that did *not* include the core technology or other aspects of the TikTok business that have made it successful and yet which the Divestment Order now seeks to compel ByteDance to divest.

The Divestment Order and CFIUS Action are also unlawful in other respects. They violated the Due Process Clause because they prematurely terminated the review to which Petitioners were entitled and denied them a meaningful hearing. The CFIUS Action violated the Administrative Procedure Act because the agency failed to adequately explain its decision and did not take account of the alternative mitigation proposals submitted by Petitioners. Finally, the forced divestment of Petitioners' business without fair compensation would constitute an unlawful taking under the Fifth Amendment.

3

To facilitate this Court's consideration of this Petition for Review, Petitioners summarize the pertinent factual background and the legal claims they intend to raise.[2]

## Background and Nature of Proceedings

**A.    CFIUS's Authority Over Certain "Covered Transactions"**

1.    CFIUS is an interagency committee authorized under Section 721 to "review" and "investigat[e]" a "covered transaction" to determine its effects on national security.[3]  50 U.S.C. § 4565(b)(1)(A)–(B).  Congress defined a "covered transaction" to include "[a]ny merger, acquisition, or

---

[2] Because Congress established the original and exclusive jurisdiction of this Court over CFIUS petitions for review recently, in 2018, Pub. L. No. 115-232, sec. 1715(2), 132 Stat. 1636, 2191, (50 U.S.C. § 4565(e)(2)), Petitioners are filing a Petition for Review that is more detailed than may be required by Federal Rule of Appellate Procedure 15(a) to provide background on the statutory and regulatory scheme and factual allegations.  *See Am. Paper Inst. v. ICC*, 607 F.2d 1011, 1012 (D.C. Cir. 1979) (per curiam).  Petitioners reserve their rights to raise additional facts and arguments in the briefing on the merits.  *See, e.g.*, *CropLife Am. v. EPA*, No. 02-1057, 2002 WL 1461788, at *1 (D.C. Cir. July 8, 2002) (per curiam).

[3] Section 721 was enacted in 1988, Pub. L. 100-418, and amended several times, most notably in the Foreign Investment and National Security Act of 2007, Pub. L. 110-49, and the Foreign Investment Risk Review Modernization Act of 2018, Pub. L. 115-232.

4

takeover … by or with any foreign person that could result in foreign control of any United States business." *Id.* § 4565(a)(4)(B)(i).

2. Entities can voluntarily submit such transactions for review, *id.* § 4565(b)(1)(A), and CFIUS can request that parties submit transactions for review, 31 C.F.R. § 800.501(b). CFIUS's review process begins once it accepts a notice of a transaction filed by an entity, *id.* §§ 800.501, 800.503(a), and must be completed within 45 days, 50 U.S.C. § 4565(b)(1)(F); 31 C.F.R. § 800.503(b). The statute provides that CFIUS "shall" conduct an investigation if, *inter alia*, the initial review "results in a determination that – the transaction threatens to impair the national security" and the risk has not been mitigated, to be completed within 45 days from the date the investigation is commenced. 50 U.S.C. § 4565(b)(2)(A), (B)(i)(I), (C)(i); 31 C.F.R. §§ 800.505(a), 800.508(a). CFIUS may, during the review or investigation, "complete the action of the Committee with respect to the transaction" and "refer the transaction to the President for action." 50 U.S.C. § 4565(*l*)(2).

3. Before action by CFIUS is completed or action by the President is taken, CFIUS may "negotiate, enter into or impose, and enforce any agreement or condition with any party to a completed covered

5

transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction." *Id.* § 4565(*l*)(3)(A)(i). Such actions "shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction, which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id.* § 4565(*l*)(4)(A).

4. Congress authorized the President "to suspend or prohibit any covered transaction" if the President finds that (i) there is credible evidence that the foreign person acquiring the interest in the U.S. business as a result of the covered transaction might take action that threatens to impair the national security and (ii) provisions of law other than Section 721 and the International Emergency Economic Powers Act do not provide adequate and appropriate authority to protect the national security of the United States in the matter before the President. *Id.* § 4565(d)(1), (4); 31 C.F.R. § 800.101.

**B.    ByteDance's Business**

5. ByteDance Ltd. ("ByteDance") is an innovative technology company founded as a start-up in 2012 by Chinese entrepreneur Yiming

6

Zhang.  The company launched its first flagship app, Toutiao, the same year.  Toutiao is a news and content aggregating app, developed for the Chinese market, that uses a proprietary "recommendation engine" developed entirely in China by ByteDance's team of elite engineers with advanced training and expertise—and based upon cutting-edge machine learning and artificial intelligence technology—to create a personalized content feed for each user.

6.    Based in large part on the innovation and commercial appeal of ByteDance's recommendation engine, Toutiao was a huge success.  Toutiao's recommendation engine has influenced the core technology developed for several of ByteDance's other apps.  Building on the experience with Toutiao and its recommendation engine, in September 2016, ByteDance launched in China a short entertainment video app called Douyin, and ByteDance created another recommendation engine for Douyin that recommends videos to Douyin users.  Like Toutiao, Douyin was highly successful in China.

7.    On May 12, 2017, ByteDance launched TikTok globally in over 150 countries, including the United States.  ByteDance developed TikTok to be a short entertainment video app that serves a user base

outside of China.  When it launched TikTok, ByteDance leveraged its experience with Toutiao and Douyin, and it developed another recommendation engine that customizes each user's content feed based on how the user interacts with the content they watch.  TikTok is operated separately from Douyin (and other ByteDance apps), and at no time has TikTok been available in mainland China.

## C.    ByteDance's Acquisition of Musical.ly

8.    Another app already in the marketplace at the time of TikTok's launch was Musical.ly, a music video app launched in 2014 and developed by musical.ly (a Cayman parent company, together with its subsidiaries, referred to herein as the "Musical.ly company").  The Musical.ly company was founded by two Chinese entrepreneurs, headquartered in Shanghai, managed from China, and majority owned and controlled by Chinese shareholders.

9.    On November 23, 2017, ByteDance acquired the Musical.ly company, which also had a small U.S. presence.  Out of nearly 300 Musical.ly company employees worldwide, 20 were based in the United States, and they were not responsible for core operations, such as software and product development.    The Musical.ly app had

8

approximately 9.9 million U.S. registered monthly active users whose data was stored in Japan. After completing the transaction, ByteDance integrated some of the Musical.ly company's U.S. assets—namely, the Musical.ly app's U.S. user base, some music licensing agreements and other copyright agreements—into its TikTok business.

10.  At the time of the acquisition, ByteDance examined the Musical.ly app's source code and determined that Musical.ly's platform—the mobile software application, server and data storage infrastructure, and its algorithm powering recommendations for user content—was technically and commercially inferior to TikTok. ByteDance had significantly better engineering infrastructure than Musical.ly, with a more experienced engineering team that was ten times larger. The ByteDance development and engineering teams determined that, although Musical.ly's app was superficially similar to TikTok, the technology developed by ByteDance, and particularly TikTok's recommendation engine, was much more sophisticated.

11.  As a result, starting in February 2018, ByteDance abandoned the Musical.ly code base and technology, including Musical.ly's recommendation engine, operation system, user growth, and marketing

9

tools.  ByteDance kept, for a time, the Musical.ly name, but over the course of 2018, it phased out Musical.ly's back-end operations and technology and combined its user base with the users of the app that ByteDance had started, namely, TikTok.  In August 2018, ByteDance stopped offering the Musical.ly app.

12.    In short, the TikTok technology platform—which is among the most important drivers of its astounding growth and popularity—was not acquired by ByteDance from the Musical.ly company but instead developed by ByteDance before the Musical.ly acquisition had even occurred.

13.  In addition to utilizing TikTok's superior technology, including its recommendation engine, ByteDance significantly increased brand and content promotional spending compared to that of the Musical.ly company.  ByteDance expanded promotions and marketing activities in the United States to include out-of-home advertising, television commercials, and key opinion leader marketing as well as campaigns related to specific events and holidays.  Whereas the Musical.ly company had spent only about $300,000 on advertising in the United States in 2017 before it was acquired by ByteDance in November

of that year, Petitioners spent more than $300 million on U.S. advertising for TikTok in 2019, the first full year after the Musical.ly app was abandoned.

14.    ByteDance also supported TikTok by dramatically expanding its U.S.-based business.  Whereas prior to the acquisition the Musical.ly company had just 20 U.S. employees, Petitioners hired hundreds of U.S. employees led by a U.S.-based leadership team deeply committed to protecting U.S. user data privacy and security, and to promoting U.S.-led content moderation and localized community guidelines.

15.    The improved technological infrastructure and ByteDance's superior commercial strategy bore fruit and significantly increased TikTok's U.S. user base independently of what ByteDance acquired as part of the Musical.ly company.  Although the Musical.ly app had 9.9 million monthly active U.S. users at the time of the transaction in November 2017, today there are 98 million monthly active U.S. users on the TikTok platform, making TikTok the fastest growing app in the country during that period.

11

### D. The CFIUS Proceeding

16. The parties did not submit the Musical.ly transaction to CFIUS for review in 2017 because ByteDance was a Chinese-headquartered company and Musical.ly was also a Chinese-headquartered company; the Musical.ly company had only a small U.S. presence; and the product was a short form music video app that did not appear to raise any U.S. national security concerns. Nevertheless, on October 15, 2019, CFIUS sent ByteDance a set of questions regarding its acquisition of Musical.ly. After several months of responding to CFIUS's questions and making presentations to CFIUS, on May 27, 2020, at CFIUS's request, ByteDance submitted a formal notice to CFIUS regarding its acquisition of the U.S. business of Musical.ly.

17. On June 15, 2020, CFIUS informed ByteDance by letter that on June 16, 2020, it would initiate its formal review of a covered transaction—ByteDance's acquisition of the "U.S. Business of Musical.ly"—triggering a 45-day statutory-review period. 50 U.S.C. § 4565(b)(1)(F); 31 C.F.R. § 800.503(b). Over the next several weeks, ByteDance submitted extensive responses to hundreds of questions posed by CFIUS.

12

18.    Around July 7, 2020, however—only three weeks into the 45-day review process—the government abruptly cut short that process and threatened to force the divestiture of TikTok.  In the preceding weeks, news media had reported that TikTok users claimed to have used TikTok to coordinate mass ticket reservations for the President's June 20, 2020 campaign rally in Tulsa, depressing attendance and causing an embarrassment for the campaign.  Shortly thereafter, on July 6, 2020, Secretary of State Mike Pompeo said that the United States was considering banning TikTok.  Within days of Secretary Pompeo's statement, Treasury Department officials informed ByteDance that it would need to propose a divestiture of TikTok to resolve the matter.

19.    Even though the Treasury Department's demand lacked any legal foundation, ByteDance submitted a term sheet on July 15 that proposed a national security mitigation solution in an effort to address its concerns.  ByteDance submitted another such proposal on July 29, and on July 30, the day before the 45-day statutory review period ended, submitted with Microsoft Corporation a letter of intent regarding a potential transaction involving TikTok.

13

20.    As noted above, if CFIUS identifies a national security concern with the covered transaction during the initial 45-day statutory review period, the statute and regulation contemplate that CFIUS "shall" conduct an investigation that may last for an additional 45 days, 50 U.S.C. § 4565(b)(2)(A), (B)(i)(I), (C)(i); 31 C.F.R. § 800.505(a), 800.508(a), which period gives CFIUS the opportunity to investigate the facts thoroughly and, if CFIUS has concerns about the transaction, engage in detailed consultations regarding potential mitigation of its concerns with the entities involved in the transaction.  After its investigation, if CFIUS rejects mitigation, CFIUS sends a letter to the entity, as required by this Court's decision in *Ralls*, 758 F.3d at 319 (addressing the predecessor statutory CFIUS scheme), detailing the unclassified basis of its findings and affording the entity the opportunity to respond before determining whether to issue a report to the President.

21.    In this case, CFIUS dramatically departed from this statutory and regulatory scheme and well-established agency practice.  Instead of the deliberative process required by Section 721, Treasury officials summarily conveyed to Petitioners CFIUS's intent to force a divestment even though the Committee's staff was continuing to gather facts to

14

inform its statutorily required risk-based analysis.  CFIUS itself never responded to Petitioners' proposed mitigation solutions and never explained why these mitigation solutions were inadequate, nor did it offer any counter-proposals for mitigation.

22.    On July 30, 2020, at the end of the 45-day review period, CFIUS notified Petitioners by letter that CFIUS was "undertaking an investigation of the transaction," commencing the 45-day statutory investigation period.  Just a few hours later, however, CFIUS informed ByteDance in a separate letter that it had rejected ByteDance's mitigation proposals and had not identified adequate mitigation measures, without any explanation of the basis for that determination. The letter stated summarily that ByteDance's two mitigation proposals "do not adequately address" the Committee's concerns.  The letter also stated that CFIUS "anticipate[d]" that it would "refer the matter to the President for decision."  CFIUS then—the very next day—referred the matter to the President without affording ByteDance a meaningful opportunity to respond to CFIUS's determination to reject mitigation and instead refer the matter to the President.  This summary determination rejecting mitigation, truncating CFIUS's review and investigation, and

15

referring the matter to the President (collectively, the "CFIUS Action") "complete[d]" CFIUS's action with respect to the transaction, 50 U.S.C. § 4565(*l*)(2).

23.   On August 7, 2020, ByteDance responded to the July 30 CFIUS letter, demonstrating that many of the factual findings in the letter were inaccurate or outdated and reiterating its request for prompt and meaningful engagement with CFIUS.  To date, ByteDance has not received a substantive response to its August 7 letter.

## E.   The Divestment Order

24.   On August 14, 2020, the President issued the Divestment Order.  The Order asserted, again without explanation, that ByteDance, through its acquisition of Musical.ly, "might take action that threatens to impair the national security of the United States."  The Divestment Order prohibited ByteDance's acquisition of the Musical.ly company and directed ByteDance to "divest all interests and rights in (i) any tangible or intangible property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States … [and] (ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States."  The Divestment

16

Order states that it takes effect on November 12, 2020, unless CFIUS grants a 30-day extension.

25.    Before the issuance of the Divestment Order, President Trump stated that he might be willing to approve a mitigation proposal involving a transaction with a U.S. acquirer *in lieu* of a ban, so long as the government would receive a "substantial portion" of any price paid by the acquirer.

26.    While Petitioners believed the Divestment Order to be unlawful, they continued to explore mitigation alternatives with the government to try to achieve a resolution that would obviate the need for litigation.  To that end, on September 13, Petitioners proposed a multi-layered approach to security of the TikTok app and its U.S. user data to fully address any national security concerns.

27.    On September 19, 2020, the President informed reporters that he had given his "blessing" to and "approved … in concept" that September 13 mitigation proposal.[4]  The President also indicated that the

---

[4] Rachel Lerman, "Trump says he has given his 'blessing' to TikTok deal but that final terms are still being negotiated," *Washington Post* (Sep. 19, 2020).

(Page 17 of Total)

agreement involved "about a $5 billion contribution toward education," but did not specify the source of the investment or the purpose for which it would be used.[5]  During a campaign rally that evening, the President announced what he alleged to be a new term of the proposed TikTok agreement.  Specifically, he stated that the U.S. government had a "deal worked out," in which the parties to the deal would "pay $5 billion into a fund for education" so that "we can educate people as to the real history of our country."[6]  Petitioners had not agreed to contribute to such a fund.

28.  On November 6, 2020, ByteDance submitted a fourth mitigation proposal, which contemplated addressing the purported national security concerns through a restructuring of TikTok U.S. by creating a new entity, wholly owned by Oracle, Walmart and existing U.S. investors in ByteDance, that would be responsible for handling TikTok's U.S. user data and content moderation.  To allow time to negotiate the final terms of a mitigation solution, ByteDance requested that CFIUS extend by 30 days the deadline for complying with the

---

[5] *Id.*

[6] Demetri Sevastopulo & James Fontanella-Khan, "Doubts surround 'education fund' at heart of US TikTok deal," *Financial Times* (Sept. 20, 2020).

18

Divestment Order, which the Order itself authorized. As of this filing, no extension has been granted.

29.    From the time the Divestment Order was issued, Petitioners have been engaged in discussions with CFIUS in an effort to reach a mitigation solution that would avoid litigation. Petitioners had hoped it would not be necessary to seek judicial intervention, but given that the Divestment Order mandates divestment by November 12, Petitioners have no choice but to file this Petition to preserve their rights. Petitioners remain committed to reaching a negotiated mitigation solution with CFIUS satisfying its national security concerns, and they intend to file a motion to stay enforcement of the Divestment Order only if discussions reach an impasse and the government indicates an intent to take action to enforce the Order.

## Grounds On Which Relief Is Sought

Petitioners seek review of the CFIUS Action and Divestment Order on grounds that include, without limitation, the following.

### Ground 1: *Ultra Vires* Action

30.    The CFIUS Action and the Divestment Order exceed the scope of the government's authority under Section 721 of the Defense

19

Production Act and are *ultra vires*, because they (i) seek to compel divestment of assets that were not part of, and (ii) seek to address purported national security risks that do not arise out of, the "covered transaction." *See* 50 U.S.C. § 4565(d)(1) (limiting Presidential action to covered transactions and risks threatened from such transactions); *id.* § 4565(b)(1), (2) (limiting CFIUS "national security reviews and investigations" to covered transactions).

31.    The CFIUS Action and Divestment Order are *ultra vires* because they seek to compel the divestment of assets that were not part of the covered transaction. Congress in Section 721 authorized CFIUS to review and investigate only a "*covered transaction* to determine the effects of the transaction" on national security. 50 U.S.C. § 4565(b)(1)(A)(i), *see also id.* § 4565(b)(2) (authorizing "investigation of the effects of a *covered transaction* on the national security"). During its "review or investigation of a *covered transaction*," CFIUS may "complete the action of the Committee with respect to the transaction and refer *the transaction*" to the President for action or impose conditions on "the *covered transaction* in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction."

20

*Id.* § 4565(*l*)(2), (3)(A)(i).  The President, in turn, has authority to, at most, "suspend or prohibit any *covered transaction* that threatens to impair the national security of the United States."  *Id.* § 4565(d)(1).

32.    The plain text of Section 721 thus limits the authority of CFIUS and the President to the covered transaction: CFIUS may refer only a "covered transaction" to the President, and the President may suspend or prohibit only a "covered transaction."

33.    Yet the CFIUS Action and Divestment Order ignore that limitation.

a. The CFIUS Action—the determination that national security risk arising from the transaction could not be mitigated and the referral to the President—exceeded this statutory authority because it was directed at the TikTok U.S. business in its entirety, even though the "covered transaction" under review was ByteDance's acquisition of the U.S. business of the Musical.ly company.

b. The Divestment Order exceeded statutory authority because it mandated that ByteDance divest the entire U.S. TikTok business and all data and assets associated with it, and thus

21

was not limited to the U.S. business of the Musical.ly company that was the covered transaction.

c. The Musical.ly brand has been completely phased out of Petitioners' TikTok U.S. business for more than two years, and only 3.2 million of TikTok's 98 million monthly active U.S. users had a Musical.ly app account at the time of the transaction. The TikTok U.S. business—its technology, its value, its employees, locations, contracts, and the overwhelming majority of its users and their data—is a product of ByteDance that was not derived from the U.S. business of Musical.ly, and thus was not part of the "covered transaction," and the President accordingly did not have the authority to order its divestment.

d. The CFIUS Action and the Divestment Order ignored these facts, all of which Petitioners provided to CFIUS during its months-long gathering of information. The CFIUS Action targeted TikTok and its "approximately 133 million users" even though neither TikTok nor the vast majority of its users were acquired by ByteDance as part of the Musical.ly

22

company transaction. The Divestment Order similarly purports to require ByteDance to divest "any tangible and intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States" and "any data obtained or derived from TikTok application or Musical.ly application users in the United States"—in other words, assets that had nothing to do with ByteDance's acquisition of Musical.ly or the U.S. business of Musical.ly or its U.S. assets and, in critical aspects, encompassed assets that are not and never have been in the United States.

e. Neither the CFIUS Action nor the Divestment Order even attempt to justify a divestment of the scope and character demanded. Instead, they merely assert that "ByteDance merged its TikTok application with Musical.ly's social media application and created a single integrated social media application." While Musical.ly's 9.9 million monthly active users migrated to TikTok, and the U.S. Musical.ly entities were renamed to reflect that the Musical.ly app and brand

23

had been abandoned, the CFIUS Action and Divestment Order do not explain how this could subject the entire TikTok U.S. business to divestment under CFIUS authority, including the technology used to support and the data derived from that business—which indisputably was not part of the covered transaction.

34.  The CFIUS Action and Divestment Order are *ultra vires* for the additional reason that they seek to address purported national security risks that do not arise out of the "covered transaction." Section 721 limits CFIUS's authority to the review and investigation of "the *effects of a covered transaction* on the national security of the United States." 50 U.S.C. § 4565(b)(1)(A)(i), (2)(A) (emphasis added). Before completion of CFIUS's review or investigation, it may "mitigate any risk to the national security of the United States that arises *as a result* of the covered transaction." *Id.* § 4565(*l*)(3)(A)(i) (emphasis added). And CFIUS may make a referral to the President based only on "a risk-based analysis … of the effects on the national security of the United States *of the covered transaction*." *Id.* § 4565(*l*)(4)(A) (emphasis added).

24

35.    CFIUS's regulations, in turn, provide that such a "risk based analysis shall include credible evidence demonstrating the risk and an assessment of the threat, vulnerabilities, and consequences to national security *related to the transaction*."    31 C.F.R. § 800.102 (emphasis added).  The President may act only "to suspend or prohibit any *covered transaction that threatens to impair* the national security of the United States."    50 U.S.C. § 4565(d)(1) (emphasis added).    To mandate divestment, the President must find that the foreign acquirer "*as a result of the covered transaction* might take action that threatens to impair the national security." *Id.* § 4565(d)(4)(A) (emphasis added).

36.    The statute thereby limits CFIUS's and the President's authority to address national security risks arising as a result of the covered transaction.   The statute does not authorize CFIUS or the President to address preexisting national security risks or other national security risks that do not result from the covered transaction.  Yet in this respect as well the CFIUS Action and Divestment Order exceed the limits of the statute.

     a. The CFIUS Action and the Divestment Order exceed Section 721's grant of authority because the purported risks they

25

address do not arise "as a result of" the acquisition, which was an acquisition of one China-headquartered company (Musical.ly) by another China-headquartered company (ByteDance). Rather, the risks cited by the government are associated with concerns relating to Chinese ownership of apps *generally*. Any threat posed by Chinese ownership of the Musical.ly app was present prior to the covered transaction, and is not a risk that arose as a result of the covered transaction. It is necessarily the case that whatever national security risks posed by the Musical.ly app and its Chinese ownership at the time of the acquisition were not enlarged or changed by the acquisition of the Musical.ly company by another China-headquartered company, ByteDance.

b. CFIUS did not explain how the covered transaction—the acquisition of one China-headquartered company of another—results in an incremental national security risk. Nor does the Divestment Order, which is even more sparse and merely parrots the statutory language, declaring that ByteDance, through the transaction, "might take action that

threatens to impair the national security of the United States."

c.  Because the CFIUS Action and Divestment Order are predicated on perceived threats that are not a result of the covered transaction, they are unlawful. *Cf.* Dep't of Defense Instr. No. 2000.25, DoD Procedures for Reviewing and Monitoring Transactions Filed with the Committee on Foreign Investment in the United States (CFIUS) at 32 ("If the only risk that exists after the transaction is the same risk that existed before the transaction, then that risk is not considered an appropriate rationale for CFIUS-based mitigation.").

## Ground 2:  Violation of Due Process

37.  CFIUS's rejection of mitigation, truncation of its review and investigation, and referral of the matter to the President, and the manner in which the Divestment Order was issued, violated Petitioners' Fifth Amendment due process rights.

38.  In a CFIUS proceeding involving divestiture, "due process requires, at the least, that an affected party be informed of the official

(Page 27 of Total)

action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 307–14, 319.  Petitioners here have protected interests in their assets subject to divestment, such that they are entitled to due process under the Fifth Amendment.  *Id.* at 315–16.

39.  Petitioners were not afforded a meaningful opportunity to review or respond to the facts upon which the CFIUS Action and Divestment Order purported to be based.  Although Petitioners were permitted to provide information *to* CFIUS, they were *not* "given access to the unclassified evidence on which the official actor relied" or "afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 319.

40.  The July 30 letter announcing the CFIUS action was cursory, conclusory, and unsubstantiated.  The letter failed to address key points necessary for ByteDance to understand CFIUS's concerns and have a meaningful opportunity to respond to them.  And CFIUS addressed its supposed concerns—the most important issue in a CFIUS review—in a single, conclusory sentence.  Beyond this one conclusory sentence, CFIUS's findings in the July 30 letter either were so broad as to apply to every company active in China; were based on inaccurate or outdated

28

news reports; or were unsupported or, in some cases, directly contradicted by the record before CFIUS.  While Treasury officials expressed their intent to conclude that the agency had concerns, CFIUS itself never informed ByteDance of its concerns prior to announcing the CFIUS action on July 30 and did not provide any explanation for its determination that the purported national security risks could not be adequately mitigated other than through complete divestiture. Moreover, CFIUS's determination concluding CFIUS's action was issued only a few hours before the referral to the President, precluding ByteDance from a meaningful opportunity to respond.

## Ground 3:  Violation of the Administrative Procedure Act

41.   The CFIUS Action was arbitrary, capricious, and unlawful. *See* 5 U.S.C. § 706(2).

42.   To survive APA scrutiny, "the agency must examine the relevant data and articulate a satisfactory explanation for its action [that is] based on a consideration of the relevant factors …."  *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."

29

*Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  Moreover, an agency must "consider significant alternatives to the course it ultimately chooses."  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).

43.    The  CFIUS  Action  relied  almost  exclusively  on uncorroborated third-party reports and ignored significant evidence presented by Petitioners that refuted CFIUS's stated concerns.  In particular, the CFIUS Action failed to consider or explain why the steps that ByteDance was willing to undertake to mitigate CFIUS's purported national security concerns were inadequate.  Petitioners submitted two detailed proposed term sheets on July 15 and July 29, 2020.  CFIUS's July 30 letter announcing its action—sent the day after the second term sheet was submitted—stated summarily that CFIUS "considered the feasibility" of the proposals and that the mitigation proposals "do not adequately address" the government's concerns.

44.    The July 30 letter articulates no national security concerns that could not have been resolved by either proposal.  To the contrary, the only justification for CFIUS's conclusion was that "as ByteDance *currently* operates, company leadership and personnel in China remain

30

significantly involved in both the day-to-day operations and broader strategic direction of TikTok, reducing the likelihood that any U.S.-based personnel could successfully detect, disclose, and defeat actions to impair U.S. national security." The explanation is a non sequitur: ByteDance's mitigation proposals contemplated significant alterations to the current operation of TikTok in the United States, which the government's public statements have indicated could be adequate.

45. In short, CFIUS chose the harshest measure available under the statute—a referral to the President for divestiture—without considering alternatives, trying to craft a narrower solution, or providing a cogent explanation of why divestiture was justified over such alternatives. That failure renders CFIUS's action arbitrary and capricious. Where, as here, interested parties propose an alternative that "was neither frivolous nor out of bounds," it is reversible error for an agency to fail to consider that alternative. *Chamber of Commerce v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005).

31

## Ground 4:  Unconstitutional Taking

46.    The Presidential Order constitutes an unlawful taking without just compensation, in violation of the Fifth Amendment's Taking Clause.

47.    The Order effectively leaves ByteDance no choice but to either (i) forfeit all of its assets in and data derived from the TikTok U.S. business to the government or a government-approved entity, on whatever conditions the government decides to impose, or, (ii) if such an agreement cannot be reached, abandon the TikTok U.S. business.

48.    This forced divestiture mandated by the government, which would permanently deprive ByteDance of its property without compensation, is a classic taking.  The government has taken virtually *all* of the "sticks" in the "bundle" of property rights ByteDance possesses in its TikTok U.S. platform, leaving it with no more than the twig of potentially being allowed to make a rushed, compelled sale, under shifting and unrealistic conditions, and subject to governmental approval.  *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987). This "mandate to relinquish specific, identifiable property" thus "effects a per se taking."  *Horne v. Dep't of Agric.*, 576 U.S. 350, 364–65 (2015).

32

49.   Prospective relief is warranted where, as here, just compensation would not be available if the unlawful order is enforced. *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 521–22 (1998) (plurality op.) (collecting cases involving "the lack of a compensatory remedy" in which the Court has "granted equitable relief for Takings Clause violations" and concluding that "declaratory judgment and injunction sought by petitioner constitute an appropriate remedy under the circumstances"); *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978) (providing declaratory relief on a takings claim because challenged action could produce "potentially uncompensable damages").

50.   This taking cannot be defended as a bona fide exercise of regulatory authority.  The factors in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–24 (1978), support the conclusion that the Divestment Order is an unconstitutional taking.  The economic impact of the divestment is severe, it profoundly interferes with ByteDance's reasonable investment-backed expectations, and it does not actually further the purported purpose of protecting national security.

33

## **Requested Relief**

Petitioners request that this Court hold unlawful, vacate, enjoin, and set aside the Divestment Order and the CFIUS Action, and grant any further relief that may be appropriate.

DATED: November 10, 2020       Respectfully submitted,

                                    */s/ Beth S. Brinkmann*

| | |
|---|---|
| John E. Hall | Beth S. Brinkmann (No. 477771) |
| Anders Linderot | Alexander A. Berengaut |
| COVINGTON & BURLING LLP | Thomas R. Brugato |
| The New York Times Building | COVINGTON & BURLING LLP |
| 620 Eighth Avenue | One CityCenter |
| New York, New York 10018 | 850 Tenth Street, NW |
| Telephone: +1 (212) 841-1000 | Washington, DC 20001 |
| Facsimile: + 1 (212) 841-1010 | Telephone: +1 (202) 662-6000 |
| Email: jhall@cov.com | Facsimile: + 1 (202) 778-6000 |
|      alinderot@cov.com | Email: bbrinkmann@cov.com |
| |      aberengaut@cov.com |
| |      tbrugato@cov.com |

*Attorneys for Petitioners*

34

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| TIKTOK INC., <br><br> and <br><br> BYTEDANCE LTD., <br><br> *Petitioners*, <br><br> v. <br><br> THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES, <br><br> STEVEN T. MNUCHIN, in his official capacity as Secretary of the Treasury and Chairperson of the Committee on Foreign Investment in the United States, <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> and <br><br> WILLIAM P. BARR, in his official capacity as United States Attorney General, <br><br> *Respondents.* | No. _____ |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure

and Circuit Rule 26.1, Petitioners state as follows:

ByteDance Ltd. ("ByteDance") is a private company incorporated in the Cayman Islands.  ByteDance owns several content platforms that enable people around the world to connect with, consume, and create entertainment content, including TikTok.  TikTok is an inclusive platform for short-form mobile videos with over two billion global downloads and 98 million monthly active users in the United States.

TikTok Inc. is an indirect wholly owned subsidiary of ByteDance. All of the outstanding shares of capital stock of TikTok Inc. are held by TikTok LLC, a Delaware limited liability company, which in turn is wholly owned by TikTok Ltd., a Cayman entity, which in turn is wholly owned by ByteDance.

DATED: November 10, 2020

John E. Hall
Anders Linderot
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: +1 (212) 841-1000
Facsimile: + 1 (212) 841-1010
Email:  jhall@cov.com
        alinderot@cov.com

Respectfully submitted,

*/s/ Beth S. Brinkmann*

Beth S. Brinkmann (No. 477771)
Alexander A. Berengaut
Thomas R. Brugato
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: +1 (202) 662-6000
Facsimile: + 1 (202) 778-6000
Email:  bbrinkmann@cov.com
        aberengaut@cov.com
        tbrugato@cov.com

*Attorneys for Petitioners*

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th Day of November, I caused copies of the foregoing Petition for Review and Corporate Disclosure Statement to be served upon the parties listed below by first class mail, postage prepaid, to:

Committee on Foreign Investment in the United States
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Steven T. Mnuchin
Secretary of the Treasury of the United States
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Ave. NW
Washington, DC 20500

William P. Barr
United States Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530

/s/ Beth S. Brinkmann
Beth S. Brinkmann

# Exhibit A

# Presidential Documents

### Order of August 14, 2020

### Regarding the Acquisition of Musical.ly by ByteDance Ltd.

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 721 of the Defense Production Act of 1950, as amended (section 721), 50 U.S.C. 4565, it is hereby ordered as follows:

**Section 1**. *Findings*. (a) There is credible evidence that leads me to believe that ByteDance Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("ByteDance"), through acquiring all interests in musical.ly, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Musical.ly"), might take action that threatens to impair the national security of the United States. As a result of the acquisition, ByteDance merged its TikTok application with Musical.ly's social media application and created a single integrated social media application; and

(b) Provisions of law, other than section 721 and the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), do not, in my judgment, provide adequate and appropriate authority for me to protect the national security in this matter.

**Sec. 2**. *Actions Ordered and Authorized*. On the basis of the findings set forth in section 1 of this order, considering the factors described in subsection (f) of section 721, as appropriate, and pursuant to my authority under applicable law, including section 721, I hereby order that:

(a) The transaction resulting in the acquisition by ByteDance of Musical.ly, to the extent that Musical.ly or any of its assets is used in furtherance or support of, or relating to, Musical.ly's activities in interstate commerce in the United States ("Musical.ly in the United States"), is hereby prohibited, and ownership by ByteDance of any interest in Musical.ly in the United States, whether effected directly or indirectly through ByteDance, or through ByteDance's subsidiaries, affiliates, or Chinese shareholders, is also prohibited.

(b) In order to effectuate this order, not later than 90 days after the date of this order, unless such date is extended for a period not to exceed 30 days, on such written conditions as the Committee on Foreign Investment in the United States (CFIUS) may impose, ByteDance, its subsidiaries, affiliates, and Chinese shareholders, shall divest all interests and rights in:

(i) any tangible or intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States, as determined by the Committee; and

(ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States. Immediately upon divestment, ByteDance shall certify in writing to CFIUS that all steps necessary to fully and permanently effectuate the actions required under sections 2(a) and 2(b) have been completed.

(c) Immediately upon divestment, ByteDance shall certify in writing to CFIUS that it has destroyed all data that it is required to divest pursuant to section 2(b)(ii), as well as all copies of such data wherever located, and CFIUS is authorized to require auditing of ByteDance on terms it deems appropriate in order to ensure that such destruction of data is complete.

(d) ByteDance shall not complete a sale or transfer under section 2(b) to any third party:

Case 3:23-cv-00056-DWM Document 18-6 Filed 07/05/23 Page 204 of 216
USCA Case #20-1419 Document #1876778 Filed 07/10/2020 Page 6 of 4

**51298** **Federal Register** / Vol. 85, No. 161 / Wednesday, August 19, 2020 / Presidential Documents

(i) until ByteDance notifies CFIUS in writing of the intended recipient or buyer; and

(ii) unless 10 business days have passed from the notification in section 2(d)(i) and CFIUS has not issued an objection to ByteDance. Among the factors CFIUS may consider in reviewing the proposed sale or transfer are whether the buyer or transferee: is a U.S. citizen or is owned by U.S. citizens; has or has had a direct or indirect contractual, financial, familial, employment, or other close and continuous relationship with ByteDance, or its officers, employees, or shareholders; and can demonstrate a willingness and ability to support compliance with this order. In addition, CFIUS may consider whether the proposed sale or transfer would threaten to impair the national security of the United States or undermine the purpose of this order, and whether the sale effectuates, to CFIUS's satisfaction and in its discretion, a complete divestment of all tangible or intangible assets or property, wherever located, used to enable or support the operation of the TikTok application in the United States.

(e) From the date of this order until ByteDance provides a certification of divestment to CFIUS pursuant to section 2(b), ByteDance and TikTok Inc., a Delaware corporation, shall certify to CFIUS on a weekly basis that they are in compliance with this order and include a description of efforts to divest the interests and rights described in section 2(b) and a timeline for projected completion of remaining actions.

(f) Any transaction or other device entered into or employed for the purpose of, or with the effect of, evading or circumventing this order is prohibited.

(g) Without limitation on the exercise of authority by any agency under other provisions of law, and until such time as the divestment is completed and verified to the satisfaction of CFIUS, CFIUS is authorized to implement measures it deems necessary and appropriate to verify compliance with this order and to ensure that the operations of the TikTok application are carried out in such a manner as to ensure protection of the national security interests of the United States. Such measures may include the following: on reasonable notice to ByteDance and TikTok Inc., employees of the United States Government, as designated by CFIUS, shall be permitted access, for purposes of verifying compliance with this order, to all premises and facilities of ByteDance and TikTok Inc., and any of their respective subsidiaries, operated in furtherance of the TikTok application located in the United States:

(i) to inspect and copy any books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of ByteDance or TikTok Inc., or any of their respective subsidiaries, that concern any matter relating to this order;

(ii) to inspect or audit any information systems, networks, hardware, software, data, communications, or property in the possession or under the control of ByteDance or TikTok Inc., or any of their respective subsidiaries; and

(iii) to interview officers, employees, or agents of ByteDance or TikTok Inc., or any of their respective subsidiaries, concerning any matter relating to this order. CFIUS shall conclude its verification procedures within 90 days after the certification of divestment is provided to CFIUS pursuant to subsection (b) of this section.

(h) If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby. If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements.

(i) The Attorney General is authorized to take any steps necessary to enforce this order.

**Sec. 3**. *Reservation.* I hereby reserve my authority to issue further orders with respect to ByteDance, Musical.ly, Musical.ly in the United States, and TikTok Inc. as shall in my judgment be necessary to protect the national security.

**Sec. 4**. *Publication and Transmittal.* (a) This order shall be published in the *Federal Register.*

(b) I hereby direct the Secretary of the Treasury to transmit a copy of this order to the appropriate parties named in section 1 of this order.

THE WHITE HOUSE,
*August 14, 2020.*

[FR Doc. 2020–18360
Filed 8–18–20; 11:15 am]
Billing code 3295–F0–P

# Exhibit B



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

JUL **3 0** 2020

Page 2 of 7

Filed: 11/10/2020   Document #1870778   USCA Case #20-1444

David N. Fagan
Covington & Burling LLP
850 10th Street, NW
Washington, DC 20001

Michael E. Leiter
Skadden, Arps, Slate, Meagher, and Flom LLP
1440 New York Avenue, NW
Washington, DC 20005

Re: <u>Case 20-100: ByteDance Ltd. (Cayman Islands; UBO: China)/U.S. Business of Musical.ly</u>

Dear Messrs. Fagan and Leiter:

I am writing on behalf of the Committee on Foreign Investment in the United States (CFIUS or the "Committee") regarding CFIUS Case 20-100, involving the November 23, 2017, merger of a wholly owned subsidiary of ByteDance Ltd. ("ByteDance"), an exempted company with limited liability incorporated in the Cayman Islands and headquartered in Beijing, China, with and into musical.ly ("Musical.ly"), an exempted company with limited liability incorporated in the Cayman Islands (the "Transaction").

The purpose of this letter is to provide notice that CFIUS has identified national security risks arising from the Transaction and that it has not identified mitigation measures that would address those risks. As a result of the Transaction, ByteDance merged the Musical.ly application ("app") with the TikTok app and created a single integrated social media app. Today that integrated social media app—which retained the name TikTok—has amassed approximately 133 million registered users in the United States and collects extensive amounts of user data and content, behavioral data, and device and network data. To the extent that they can be summarized at an unclassified level, the national security risks arising as a result of the Transaction include furthering the Chinese government's ability to: (1) access and exploit TikTok user data on millions of Americans; and (2) promote a pro-Chinese Communist Party (CCP) agenda in the United States through TikTok.

In conducting its analysis of whether a transaction poses national security risks, CFIUS assesses whether a foreign person has the intent and capability to take action to impair the national security of the United States (the "threat") and whether the nature of the U.S. business presents susceptibility to impairment of U.S. national security (the "vulnerability"). National security risk is a function of the interaction between threat and vulnerability, and the potential consequences of that interaction for U.S. national security.

(Page 44 of Total)

Page 3 of 7

Filed: 11/10/2020    Document #1870778

USCA Case #20-1444

In reaching its determination CFIUS relied upon both classified and unclassified information. The sources of unclassified information include: (1) material provided by ByteDance in response to approximately 50 questions from CFIUS before ByteDance submitted its May 27, 2020, joint notice (the "Notice"); (2) material provided by ByteDance during two meetings with CFIUS representatives on November 12, 2019, and March 27, 2020; (3) material provided by ByteDance in the Notice; (4) material provided by ByteDance in response to approximately 120 questions from CFIUS after ByteDance submitted its Notice;[1] and (5) phone calls held between ByteDance and representatives of the Committee.  CFIUS also considered unclassified information obtained from press reports cited throughout this letter.

### CFIUS Assesses that ByteDance Poses a Threat to U.S. National Security

In assessing whether ByteDance has the intent and capability to take action to impair U.S. national security, CFIUS considered the following unclassified information:

- China's National Security Law imposes broad obligations on citizens and corporations to assist and cooperate with the Chinese government in protecting national security including providing data, information, and technological support to security agencies, law enforcement agencies, and the military.[2]  China's Cybersecurity Law similarly requires Chinese companies to store data within China, cooperate with crime and security investigators, and allow full access to data to Chinese authorities upon request.[3]

- In 2017, one of ByteDance's primary Chinese affiliates, Beijing ByteDance Technology Co., Ltd., established a Communist Party Committee in its governance structure led by the company's vice president Fuping Zhang.  According to press reports, the Committee holds regular meetings attended by current and aspiring CCP members, CCP officials, and senior ByteDance leadership including founder and CEO Yiming Zhang.  The meetings cover "doing a proper job of spreading positive energy" (reportedly a propaganda euphemism), "enhancing industry self-discipline," and "building a digital silk road."[4]

- In October 2018, Yiming Zhang was listed in the All-China Federation of Industry and Commerce's "100 outstanding private entrepreneurs at the 40th anniversary of reform and opening up."  China's United Front Work Department was reportedly heavily involved in the selection of the list, which seeks business leaders who "resolutely uphold the Party's leadership, unswervingly go along the path of socialism with Chinese characteristics, and champion the reform and opening-up policies."[5]

---

[1] The material ByteDance provided in response to all questions is hereinafter referred to as "the Responses."
[2] "China Enacts New National Security Law," Covington & Burling LLP Web site, July 2, 2015 (accessed July 29, 2020, www.cov.com/~/media/files/corporate/publications/2015/06/china_passes_new_national_security_law.pdf).
[3] Jack Wagner, "China's Cybersecurity Law: What you need to know," *The Diplomat*, June 1, 2017 (accessed July 17, 2017, www.thediplomat.com/2017/06/chinas-cybersecurity-law-what-you-need-to-know).
[4] David Bandurski, "Tech Firms Tilt Toward the Party," *China Media Project*, May 2, 2018 (accessed July 17, 2020, www.chinamediaproject.org/2018/05/02/tech-firms-tilt-toward-the-party); Yaqiu Wang, "Targeting TikTok's privacy policy alone misses a larger issue: Chinese state control," *Quartz*, January 24, 2020 (accessed July 17, 2020, www.qz.com/1788836/targeting-tiktoks-privacy-alone-misses-a-much-larger-point).
[5] Danielle Cave, et. al., "Mapping China's Tech Giants: ByteDance," *Australian Security Policy Institute*, November 28, 2019 (accessed July 17, 2020, www.chinatechmap.aspi.org.au/#/company/bytedance).

(Page 45 of Total)

Page 4 of 7      Filed: 11/10/2020      Document #1870778      USCA Case #20-1444

- In April 2018, China's State Administration of Radio and Television publicly chastised ByteDance for hosting vulgar and insensitive content on two of its social media apps, Neihan Duanzi and Toutiao, and temporarily ordered their removal from app stores in China.  In response, ByteDance discontinued Neihan Duanzi altogether and Yiming Zhang issued a public apology for failing to acknowledge that "technology must be led by the socialist core value system."  Zhang further pledged to "deepen cooperation with authoritative media" and "elevate distribution of authoritative media content."  ByteDance announced plans to educate its employees about socialist core values and committed to hiring 4,000 additional employees to monitor and censor content, also calling upon Chinese government representatives to supervise ByteDance's platforms.[6]

- ByteDance collaborates with public security bureaus across China, including in Xinjiang, where the Chinese government has detained an estimated 1.5 million religious and ethnic Uighur minorities.  For example, ByteDance assisted the Beijing Radio and Television Bureau's "Xinjiang Aid" initiative to "propagate and showcase Hotan's new image" via propaganda on Douyin—the Chinese version of TikTok—following two years of mass detentions and the destruction of mosques, cemeteries, and traditional sites in Hotan.[7]

- ByteDance plays an active role in disseminating CCP propaganda throughout China, according to press reports.[8]  More than 500 Chinese government entities at various levels have accounts on Douyin that they use to promote nationalist and socialist content as well as support the country's social credit system.[9]

- In September 2019, *The Guardian* reported on leaked TikTok content moderation documents that show ByteDance censored references to certain political leaders and specific groups, events, and issues under bans on "demonization or distortion of local or other countries' history," "foreign leaders and sensitive figures," and "highly controversial topics," including Tiananmen Square, Falun Gong, independence movements in Tibet and Taiwan, and religious content in certain countries.  The reports also describe how certain content was made invisible to other users without being overtly removed from TikTok.[10]

[6] David Bandurski, "Tech Shame in the 'New Era,'" *China Media Project,* April 11, 2018 (accessed July 16, 2020, www.chinamediaproject.org/2018/04/11/tech-shame-in-the-new-era); "Open Apology from CEO of Toutiao Following the Ban of Neihan Duanzi," *Medium,* April 16, 2020 (accessed July 28, 2020, www.medium.com/@pandaily/open-apology-from-ceo-of-toutiao-following-the-ban-of-neihan-duanzi-6381000939d0).
[7] Danielle Cave, et. al., "Mapping China's Tech Giants: ByteDance," *Australian Security Policy Institute,* November 28, 2019 (accessed July 17, 2020, www.chinatechmap.aspi.org.au/#/company/bytedance).
[8] *Ibid.*; Rose Perper, "Report claims TikTok parent company ByteDance is working with China's Communist Party to spread propaganda on Xinjiang," *Business Insider,* November 29, 2019 (accessed July 28, 2020, www.businessinsider.com/tiktok-parent-company-bytedance-spreads-chinese-propaganda-report-2019-11).
[9] Meng Jing, "Government Agencies Jump on Short-Video Bandwagon to Ensure Chinese Youth Still Hears 'Official Voice,'" *South China Morning Post,* June 15, 2018 (accessed July 16, 2020, www.scmp.com/tech/china-tech/article/2150837/government-agencies-jump-short-video-bandwagon-ensure-chinese-youth); Louise Matsakis, "How the West Got China's Social Credit System Wrong," *Wired,* July 29, 2019 (accessed July 28, 2020, www.wired.com/story/china-social-credit-score-system).
[10] Alex Hern, "Revealed: How TikTok Censors Videos that Do Not Please Beijing," *The Guardian,* September 25, 2019 (accessed July 16, 2020, www.theguardian.com/technology/2019/sep/25/revealed-how-tiktok-censors-videos-that-do-not-please-beijing).

(Page 46 of Total)

Page 5 of 7      Filed: 11/10/2020      Document #1870778      USCA Case #20-1444

- According to a November 2019 report citing six former U.S.-based ByteDance employees, "moderators based in Beijing had the final call on whether flagged videos were approved [on TikTok]" and their "attempts to persuade Chinese teams not to block or penalize certain videos were routinely ignored, out of caution about the Chinese government's restrictions and previous penalties on other ByteDance apps."[11]

- TikTok spokespeople have repeatedly claimed, "[w]e have never provided user data to the Chinese government, nor would we do so if asked."[12] However, ByteDance acknowledged in the Responses that Chinese laws require companies incorporated in China to provide user data to which they have access.

***TikTok Has Vulnerabilities that the Chinese Government Can Exploit to Impair U.S. National Security***

In assessing the extent to which the nature of TikTok and the assets that support it present susceptibility to the impairment of U.S. national security, CFIUS considered the following unclassified information:

- According to the Notice and Responses, TikTok collects extensive amounts of user data and content,[13] behavioral data based on users' interaction with the app,[14] and device and network data associated with users' mobile devices on which the app is installed.[15]

- In the Responses, ByteDance described TikTok's algorithm as a "more sophisticated, personalized model for every user to predict their interest in a more precise and tailored fashion." According to industry press, "The AI-powered apps at ByteDance go to an extreme not common yet in the West."[16]

---

[11] Drew Harwell and Tony Romm, "Inside TikTok: A culture clash where U.S. views about censorship often were overridden by the Chinese bosses," *The Washington Post,* November 5, 2019 (accessed July 17, 2020, www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overriden-by-chinese-bosses).

[12] Makena Kelly, "The U.S. government is considering a TikTok ban, says secretary of state," *The Verge,* July 7, 2020 (accessed July 20, 2020, www.theverge.com/2020/7/7/21316062/tiktok-band-app-mike-pompeo-government-china-bytedance-communist-party).

[13] Username, password, email address, phone number, name, nickname, birthday/age, profile thumbnail, biographical information, device contacts list, and third-party account information (*e.g.,* Facebook, Twitter, Google, Instagram, PayPal), videos, music, pictures, articles, hashtags, captions, comments, direct messages, and other material uploaded by users (including private or unpublished content users store on the app). TikTok collects further categories of data about users who become influencers pursuant to contracts with ByteDance, including nationality, ID photograph, home address, family relations, passport number, and driver's license number. However, only a limited number of TikTok users are influencers.

[14] Likes given, likes received, not interested, video playtime, share, follows, followers, block list, favorites, downloads, log-in history, browsing history, search history, keystroke patterns and rhythms, and purchase history.

[15] Internet Protocol address, cookie data, device identifiers, mobile carriers, network settings, time zone settings, app and file names and types, source of user, Android ID, Apple ID For Advertisers, Google Advertising ID, device model and characteristics (*e.g.,* screen resolution), operating system, list of installed apps, systems language and region, and geolocation-related data (including Global Positioning System data).

[16] Rebecca Fannin, "The Strategy Behind TikTok's Global Rise," *Harvard Business Review,* September 13, 2019 (accessed July 18,2020, www.hbr.org/2019/09/the-strategy-behind-tiktoks-global-rise).

(Page 47 of Total)

- The current version of TikTok's privacy policy provided in the Notice states that "[w]e may disclose your information to respond to subpoenas, court orders, legal process, law enforcement requests, or government inquiries . . . ." The current version of the privacy policy further states that "[w]e may share your information with a parent, subsidiary, or other affiliate of our corporate group."

- ByteDance stores TikTok user data on servers hosted by Alibaba, a large Chinese Internet company. Press reports have revealed how large Chinese Internet companies including Alibaba actively support the Chinese government's intelligence, surveillance, and censorship efforts. They "openly act as the government's eyes and ears in cyberspace" and designate spaces in their offices for coordinating with representatives of the Chinese government.[17]

- ByteDance has 2,409 employees in China supporting TikTok with access to data for up to 133 million U.S. TikTok user accounts, according to the Responses. ByteDance is unable to account for how many queries of U.S. TikTok user accounts China-based personnel make, but on a global basis ByteDance employees query databases containing such data 4,200 times per day on average. U.S. and China-based ByteDance employees manage these internal databases and applications for operating TikTok, which do not have the capability to restrict permissions to access data based upon an employee's physical location in China, according to the Responses.

- ByteDance regularly provides software updates for TikTok written by engineers based in China, and the company stated in the Responses that "China-based personnel will continue to have a critical role in delivering the software, on both the front-end applications and the backend, to power the TikTok app user experience." ByteDance confirmed in the Responses that app stores have in the past flagged issues with the updates ByteDance has provided before making such updates available for users to download.

- In the beginning of 2020, Apple "fixed a serious problem in iOS where apps could secretly access the clipboard on users' devices inquiries . . . one of the apps caught snooping by security researchers was China's TikTok."[18] When asked about the app's access to users' device clipboards, a TikTok spokesperson first cited an "outdated Google advertising software development kit" that was since replaced. When asked again several months later after the Apple update showed continued clipboard access by TikTok the spokesperson claimed the access was "triggered by a feature designed to identify repetitive, spammy behavior" and was being remedied through a software update, according to the Responses.

---

[17] Liza Lin and Josh Chin, "China's Tech Giants Have a Second Job: Helping Beijing Spy on Its People," *The Wall Street Journal*, November 30, 2017 (accessed July 17, 2020, www.wsj.com/articleschinas-tech-giants-have-a-second-job-helping-the-government-see-everything-15120556284).

[18] Zak Doffman, "Warning: Apple Suddenly Catches TikTok Secretly Spying on Millions of iPhone Users," *Forbes*, June 26, 2020 (accessed July 22, 2020, www.forbes.com/sites/zakdoffman/2020/06/26/warning-apple-suddenly-catches-tiktok-secretly-spying-on-millions-of-iphone-users).

Page 7 of 7

Filed: 11/10/2020

Document #1870778

USCA Case #20-1444

In assessing the consequences, CFIUS considered the potential effects on national security that could reasonably result from the exploitation of the vulnerabilities by the identified threat actors, and concluded that such effects could impair the national security of the United States.

Based upon the Committee's national security expertise and judgement, CFIUS has considered the feasibility of mitigation measures to address the national security concerns posed by the Transaction, including the proposals ByteDance submitted to the Committee on July 15, 2020, and July 29, 2020.  The Committee considered that as ByteDance currently operates, company leadership and personnel in China remain significantly involved in both the day-to-day operations and broader strategic direction of TikTok, reducing the likelihood that any U.S.-based personnel could successfully detect, disclose, and defeat actions to impair U.S. national security.

CFIUS also considered press reports that indicate that ByteDance has not fully complied with its binding obligations to the U.S. Government in another context.[19]  In light of these considerations, CFIUS has concluded that the proposals do not adequately address the identified national security concerns.  For a mitigation measure to feasible it must be effective, monitorable, and enforceable over a sustained period of time.

CFIUS has not identified any mitigation measures that could be negotiated or imposed to address all sources of national security risk arising from the Transaction.  Accordingly, the Committee anticipates that it will refer the matter to the President for decision.  CFIUS considers referrals to the President when it has not identified a reasonable way to mitigate the national security risk.

ByteDance may promptly provide CFIUS with additional relevant information for its consideration.

Sincerely,

Thomas P. Feddo
Assistant Secretary
Investment Security

---

[19] Explainer: How the U.S. Seeks to Protect Children's Privacy Online," *The New York Time,* July 8, 2020 (accessed July 18, 2020, www.nytimes.com/reuters/2020/07/08/technology/08reuters-tiktok-privacy-children-explainer).

(Page 49 of Total)

# EXHIBIT 25

Case 9:23-cv-00056-DWM   Document 18-6   Filed 07/05/23   Page 214 of 216

[ORAL ARGUMENT NOT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TikTok Inc., *et al.*,

        Petitioners,

  v.

Committee on Foreign Investment in
  the United States, et al.,

        Respondents.

No. 20-1444

## STATUS REPORT

On February 19, 2021, this Court placed this petition for review in abeyance, directing that status reports be filed at 60-day intervals. The government has filed status reports on April 21, 2021, June 21, 2021, August 23, 2021, October 19, 2021, December 20, 2021, February 18, 2022, April 19, 2022, June 21, 2022, August 22, 2022, October 21, 2022, December 20, 2022, and now respectfully submits this status report.

The parties continue to be involved in ongoing negotiations to determine whether this case may be resolved by mutual agreement, and staff-level officials at each of the Committee member agencies continue to

review the agency action in question to determine the appropriate course going forward.

Abeyance continues to be appropriate, and we therefore respectfully request that respondents be permitted to file another status report within 60 days after the filing of this report, by April 24, 2023.

Respectfully submitted,

SHARON SWINGLE

s/ *Casen B. Ross*

CASEN B. ROSS
  *Attorneys, Appellate Staff*
  Civil Division, Room 7270
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  202.514.1923

February 2023

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2023, I electronically filed the foregoing document with the Clerk of the Court by using the appellate CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Casen B. Ross*
CASEN B. ROSS