UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SAMANTHA ALARIO, et al., | |
| *Plaintiffs*, | CV 23-56-M-DWM |
| and | CV 23-61-M-DWM |
| TIKTOK INC. | |
| *Consolidated Plaintiff*, | |
| v. | |
| AUSTIN KNUDSEN, *in his official capacity as Attorney General of Montana.* | |
| *Defendant*. | |

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND THE MEDIA LAW RESOURCE
CENTER IN SUPPORT OF PLAINTIFFS' AND CONSOLIDATED
PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICI CURIAE ............................................................. 1

SOURCE OF AUTHORITY TO FILE ..................................................... 3

DISCLOSURE STATEMENT .................................................................. 3

SUMMARY OF ARGUMENT ................................................................. 4

ARGUMENT ........................................................................................... 5

I.    TikTok delivers crucial public benefits to journalists gathering and
      publishing the news. ..................................................................... 5

      A.    TikTok is an important tool for gathering certain forms of news. .......... 5

      B.    TikTok is an important avenue for disseminating the news to an
            audience less likely to be found on other platforms. ............................... 7

II.   Statutes that single out individual communications platforms or foreclose an
      entire forum for gathering news pose an acute threat to press freedom. .......... 9

      A.    Laws that single out particular channels of communication must be
            narrowly tailored to a compelling interest. .............................................. 9

      B.    Total bans on a particular forum or means of gathering the news will
            rarely—if ever—survive First Amendment scrutiny ............................ 12

CONCLUSION ...................................................................................... 14

CERTIFICATE OF COMPLIANCE ................................................... 16

CERTIFICATE OF SERVICE .............................................................. 17

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ............................................................................13

*Ark. Writers' Project, Inc. v. Ragland*,
    481 U.S. 221 (1987)............................................................................10

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994).........................................................................*passim*

*Kleindeinst v. Mandel*,
    408 U.S. 753 (1972)............................................................................12

*Koala v. Khosla*,
    931 F.3d 887 (9th Cir. 2019) ............................................................................10

*Lamont v. Postmaster Gen.*,
    381 U.S. 301 (1965)............................................................................11

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983).........................................................................4, 10, 15

*Project Veritas v. Schmidt*,
    72 F.4th 1043 (9th Cir. 2023) ..................................................................4, 13, 14

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) ..................................................................12

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)............................................................................10

*U.S. WeChat Users Alliance v. Trump*,
    488 F. Supp. 3d 912 (N.D. Cal. 2020) ................................................................12

*United Bhd. of Carpenters & Joiners of Am. Loc. 586 v. NLRB*,
    540 F.3d 957 (9th Cir. 2008) ............................................................................13

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)............................................................................13

**Statutes**

An Act Banning TikTok in Montana, SB 419 (2023) ....................................*passim*

**Other Authorities**

@TikTok, TikTok (Mar. 21, 2023),
    https://perma.cc/D48Z-JCCD ..............................................................................5

Alyssa Choiniere, *TikTok's Immersive Platform Builds Personal Connections
    Between Journalists and Followers*, Editor & Publisher (Mar. 1, 2023),
    https://perma.cc/3RVR-SWZE ...........................................................................7

Amanda Silberling, *NyQuil Chicken Isn't Actually a TikTok Trend*, TechCrunch
    (Sept. 21, 2022),
    https://perma.cc/2YE7-MGDJ ...........................................................................11

Amarah Ennis, *Advice for Using TikTok to Drive News Engagement*, Int'l Ctr. for
    Journalists (Apr. 10, 2023),
    https://perma.cc/7BS7-LK35 .............................................................................7

Andy Meek, *The Washington Post, A 143-Year-Old Newspaper, Just Hit 1M
    TikTok Followers*, Forbes (Aug. 28, 2021),
    https://perma.cc/3LBG-JHQB ............................................................................9

David Pierce, *I Tried Replacing Google with TikTok, and It Worked Better than I
    Thought*, Verge (Sept. 21, 2022),
    https://perma.cc/JT9E-QVPD .............................................................................8

Delaney Dryfoos & Katelynn Weisbrod, *TikTok Just Became a Go-To Source for
    Real-Time Videos of Hurricane Ian*, Inside Climate News (Oct. 1, 2022),
    https://perma.cc/VH55-EQKH..............................................................................6

Drew Harwell, *How TikTok Ate the Internet*, Wash. Post (Oct. 14, 2022),
    https://perma.cc/RY2S-T3GZ.........................................................................5, 8

H.R. Rep. No. 100-40, pt. 3 (1987) .......................................................................12

*How to Be Successful on TikTok with Washington Post's "TikTok Guy" Dave
    Jorgenson*, FOX 5 DC (Mar. 16, 2022),
    *available at* https://perma.cc/NQV2-UBKY .......................................................9

Kalley Huang, *For Gen Z, TikTok Is the New Search Engine*, N.Y. Times (Sept. 16, 2022),
https://perma.cc/442V-KAK4 ................................................................8

Katerina Eva Matsa, *More Americans Are Getting News on TikTok, Bucking the Trend on Other Social Media Sites*, Pew Rsch. Ctr. (Oct. 21, 2022),
https://perma.cc/5LFH-D9L6 ...............................................................8

Katie Mather, *No, There Is Not a Deadly TikTok 'Boat Jumping Challenge.' Why Do Fake TikTok Trends Spread?*, In the Know (July 13, 2023),
https://perma.cc/B2RL-N5SU ...............................................................11

Kyle Chayka, *Watching the World's "First TikTok War"*, New Yorker (Mar. 3, 2022),
https://perma.cc/XQ6K-A878 ................................................................6

Maisy Farren, *How Gen Z Are Using TikTok to Document Their Messy Recovery from Mental Health Issues*, Vice (Mar. 13, 2020),
https://perma.cc/63L8-LPZS .................................................................6

*The State of Media & Entertainment*, Morning Consult (2023),
https://perma.cc/L8LW-VW9W .............................................................6

Nic Newman, *How Publishers Are Learning to Create and Distribute News on TikTok*, Reuters Inst. at Oxford Univ. (Dec. 8, 2022),
https://perma.cc/S38P-WL83 ................................................................8

Taylor Lorenz, *How Twitter Lost Its Place as the Global Town Square*, Wash. Post (July 7, 2023),
https://perma.cc/5D5C-J9PP .................................................................8

Taylor Lorenz, *That Dangerous TikTok Trend on the Today Show? It Was Fake.*, Wash. Post (July 13, 2023),
https://perma.cc/LAW2-F5ZN ...............................................................11

Taylor Lorenz, *The Political Pundits of TikTok*, N.Y. Times (Feb. 27, 2020),
https://perma.cc/K74W-YLAJ ...............................................................6

Tom Jones, *Opinion: What Will Newsrooms Do if TikTok Is Banned?*, Poynter (Mar. 30, 2023),
https://perma.cc/TEZ9-GZ8T ................................................................9

Vivien Götz, *Using TikTok for Investigative Journalism*, Mobile Journalism
   Manual,
   https://perma.cc/VJV3-83GH ............................................................................5

## INTEREST OF AMICI CURIAE

The Reporters Committee for Freedom of the Press ("Reporters Committee") is an unincorporated nonprofit association founded by journalists and media lawyers in 1970.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Media Law Resource Center ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues.  These include news and analysis of legal, legislative, and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings.  The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues.  It counts as members over 125 media companies, including newspaper, magazine, and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field.  The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

As organizations that defend and exercise the right to gather the news, proposed amici have a strong interest in ensuring journalists in Montana can do so freely—including through the use of modern tools of their trade, like TikTok.

## SOURCE OF AUTHORITY TO FILE

On July 26, pursuant to Local Rule 7.5(b), amici dispatched via third-party commercial carrier an unopposed motion for leave to file their brief.  *See* ECF No. 28.  On August 1, this Court granted that motion.  *See* ECF No. 30.

## DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press has no parent corporation and issues no stock.

The Media Law Resource Center has no parent corporation and issues no stock.

3

## SUMMARY OF ARGUMENT

For working journalists today, TikTok is a vital tool.  The app has emerged as a key part of the digital public square, hosting conversations on matters of significant public importance, and it enables members of the press to gather information sometimes shared nowhere else.  TikTok has likewise given reporters a new means to share content themselves, providing them with new audiences and opening up new forms of engagement that other platforms do not provide.  But SB 419, An Act Banning TikTok in Montana (hereinafter, "the Act" or "the TikTok ban"), imposes an all-out ban on that "unique" channel of communication, *Project Veritas v. Schmidt*, 72 F.4th 1043, 1066 (9th Cir. 2023), leaving open no adequate alternative means for local journalists to realize the distinctive newsgathering benefits that TikTok offers.

The Act violates the First Amendment.  The Constitution requires the closest scrutiny of statutes that "single out" individual media or communications companies, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983), as well as laws that cut off access to an entire platform for gathering or publishing news or information, *see City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994).  The TikTok ban does both—and its sweep is very far from narrowly tailored to any legitimate interest of the State of Montana.  Amici therefore urge that the preliminary injunction be granted.

4

## ARGUMENT

I. **TikTok delivers crucial public benefits to journalists gathering and publishing the news.**

Since its rise in popularity, TikTok has become a valuable tool for journalists gathering and disseminating the news.  Reporters use the app to develop stories, to communicate with sources, and to identify leads—and the platform is likewise used by millions of Americans as a source of news.  *See* Katerina Eva Matsa, *More Americans Are Getting News on TikTok, Bucking the Trend on Other Social Media Sites*, Pew Research (Oct. 21, 2022), https://perma.cc/MD6H-9QCD.

A.   TikTok is an important tool for gathering certain forms of news.

TikTok has been called a "a treasure trove for journalists," providing access to a raft of "content that can't be found elsewhere."  Vivien Götz, *Using TikTok for Investigative Journalism*, Mobile Journalism Manual, https://perma.cc/VJV3-83GH.  That much is true not only thanks to the sheer number of users of the popular service, but also because TikTok's format and audience make it an especially rich source of news unlikely to appear elsewhere.

For one, TikTok's emphasis on short-form video makes it a valuable source of firsthand recordings of breaking news events.  The app is "increasingly being used," for instance, "to share real-time videos of extreme weather events," and broadcasters in turn "are already incorporating TikTok videos into their coverage" when camera crews cannot safely reach the scene of a natural disaster themselves.

Delaney Dryfoos & Katelynn Weisbrod, *TikTok Just Became a Go-To Source for Real-Time Videos of Hurricane Ian*, Inside Climate News (Oct. 1, 2022), https://perma.cc/VH55-EQKH.  TikTok videos likewise supplied "some of the earliest and most direct glimpses of the Russian invasion" of Ukraine, enriching the global public's understanding of the war.  Kyle Chayka, *Watching the World's "First TikTok War"*, New Yorker (Mar. 3, 2022), https://perma.cc/XQ6K-A878.

TikTok's content is further distinguished by the audience that creates and shares it.  TikTok's user base skews younger than those of other social networks, making it "one of the apps with the greatest difference between daily usage among Gen Z adults and adults overall."  *The State of Media & Entertainment*, Morning Consult at 15 (2023), https://perma.cc/L8LW-VW9W.  As a result, the app provides reporters a unique window into the views and lives of younger Americans—from their political organizing, *see* Taylor Lorenz, *The Political Pundits of TikTok*, N.Y. Times (Feb. 27, 2020), https://perma.cc/K74W-YLAJ, to their psychological wellbeing, *see* Maisy Farren, *How Gen Z Are Using TikTok to Document Their Messy Recovery from Mental Health Issues*, Vice (Mar. 13, 2020), https://perma.cc/63L8-LPZS.  Without access to a platform where millions of young people are expressing themselves, members of the press would be handicapped in their effort to understand the stories of that share of the public.

6

But even setting aside the distinctive content that the app hosts, TikTok allows journalists to engage with their readers in distinctively valuable ways— building trust and cultivating potential sources among an audience that may have limited faith in traditional news.  *See* Alyssa Choiniere, *TikTok's Immersive Platform Builds Personal Connections Between Journalists and Followers*, Editor & Publisher (Mar. 1, 2023), https://perma.cc/3RVR-SWZE.  Features like "dueting," where users can create new videos that play next to existing ones, or "stiching," where users can display the first few seconds of an existing video and then respond, help create a uniquely responsive dialogue between news creators and their audiences.  Amarah Ennis, *Advice for Using TikTok to Drive News Engagement*, Int'l Ctr. for Journalists (Apr. 10, 2023), https://perma.cc/7BS7-LK35.  Those functions make journalists more accessible to other users—enabling viewers to offer tips, to correct errors, and to push the story forward.  *See id.*

B.    TikTok is an important avenue for disseminating the news to an audience less likely to be found on other platforms.

TikTok also offers the press the opportunity to reach "an audience that could not be reached nearly as well by other means."  *City of Ladue*, 512 U.S. at 57.  Over a quarter of adult Americans under thirty regularly get their news from TikTok, a number that has steadily increased over the past several years.  *See* Matsa, *supra*.  It has become the default news source for some, especially—for many of the same reasons already discussed above—for those seeking real-time

updates about fast-developing stories or looking for information about politics.
*See* Taylor Lorenz, *How Twitter Lost Its Place as the Global Town Square*, Wash.
Post (July 7, 2023), https://perma.cc/5D5C-J9PP.

Young people have also begun to turn to TikTok as a search engine, often
choosing it over the Google search bar when looking for information about the
world, including news.  *See* Kalley Huang, *For Gen Z, TikTok Is the New Search
Engine*, N.Y. Times (Sept. 16, 2022), https://perma.cc/442V-KAK4; Harwell,
*supra*; David Pierce, *I Tried Replacing Google with TikTok, and It Worked Better
than I Thought*, Verge (Sept. 21, 2022), https://perma.cc/JT9E-QVPD.  Adapting
to that new reality, roughly half of publishers have started regularly posting news
content on the app to reach that growing audience.  *See* Nic Newman, *How
Publishers Are Learning to Create and Distribute News on TikTok*, Reuters Inst. at
Oxford Univ. (Dec. 8, 2022), https://perma.cc/S38P-WL83.

For instance, The Washington Post has attracted a large following on
TikTok by making videos where the paper's TikTok czar Dave Jorgenson acts out
a piece of a traditional news story.  Andy Meek, *The Washington Post, A 143-
Year-Old Newspaper, Just Hit 1M TikTok Followers*, Forbes (Aug. 28, 2021),
https://perma.cc/3LBG-JHQB; *How to Be Successful on TikTok with Washington
Post's "TikTok Guy" Dave Jorgenson*, FOX 5 DC (Mar. 16, 2022), *available at*
https://perma.cc/NQV2-UBKY.  Katie Drummond, Vice Media's senior vice

president, likewise told one news outlet that "TikTok has become an incredibly valuable place for VICE journalists to disseminate vital news, information, and entertainment content to our audiences around the world."  Tom Jones, *Opinion: What Will Newsrooms Do if TikTok Is Banned?*, Poynter (Mar. 30, 2023), https://perma.cc/TEZ9-GZ8T.  And if TikTok were banned, Drummond said, "that content would undeniably reach fewer people."  *Id.*

## II.   Statutes that single out individual communications platforms or foreclose an entire forum for gathering news pose an acute threat to press freedom.

Montana's TikTok ban eliminates the unique benefits the app offers to journalists working to gather and disseminate the news.  That severe restriction invites the highest degree of constitutional skepticism and cannot withstand it.

### A.   Laws that single out particular channels of communication must be narrowly tailored to a compelling interest.

The Supreme Court has long required close First Amendment scrutiny of regulations that, like SB 419, single out a particular channel of communication. And for good reason:  That kind of stark "differential treatment . . . suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional."  *Minneapolis Star*, 460 U.S. at 585.  But even absent "invidious intent," and even in the context of otherwise content-neutral economic regulation, the Constitution guards against the risk selective regulation poses to press freedom by requiring that the government "offer a compelling

justification" for any statute that, "on its face, treats the press differently." *Koala*

*v. Khosla*, 931 F.3d 887, 897 (9th Cir. 2019) (citation and internal quotation marks

omitted).  So too here.  Like other laws that "target[] individual publications," the

TikTok ban triggers strict scrutiny.  *Minneapolis Star*, 460 U.S. at 592–93; *see also*

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227–28 (1987).

The TikTok ban cannot survive strict scrutiny because Montana's decision

to single out the platform bears no relationship to any "special characteristic" of

TikTok in particular.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 660–61

(1994) (citation and internal quotation marks omitted).  The Act relies, for

instance, on the suggestion that "TikTok fails to remove, and may even promote,

dangerous content that directs minors to engage in dangerous activities," citing a

long list of social media trends and challenges.  An Act Banning TikTok in

Montana, SB 419 (2023).  But many of the examples that Montana offered did not

originate on TikTok, are freely available on other social media sites, and may not

represent bona fide trends at all.  *See, e.g.*, Amanda Silberling, *NyQuil Chicken*

*Isn't Actually a TikTok Trend*, TechCrunch (Sept. 21, 2022),

https://perma.cc/2YE7-MGDJ; Katie Mather, *No, There Is Not a Deadly TikTok*

*'Boat Jumping Challenge.' Why Do Fake TikTok Trends Spread?*, In the Know

(July 13, 2023), https://perma.cc/B2RL-N5SU; Taylor Lorenz, *That Dangerous*

*TikTok Trend on the Today Show? It Was Fake.*, Wash. Post (July 13, 2023),

https://perma.cc/LAW2-F5ZN.  If anything, the recurring role of the press in debunking hoax challenges on social media highlights the valuable role that access to TikTok plays in journalism about the lives of youth.

Neither can Montana's reliance on TikTok's ownership by "ByteDance, a Chinese corporation," justify the ban under a First Amendment analysis.  An Act Banning TikTok in Montana, SB 419 (2023).  For one, the public has a First Amendment right to receive news and views from abroad—even from what the State sees as "adversar[ies] of the United States," *id.*—as the Supreme Court made clear more than fifty years ago, *see Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965).  Congress has made the same judgment, in the context of the International Emergency Economic Powers Act (IEEPA), that "no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment."  *Cernuda v. Heavey*, 720 F. Supp. 1544, 1548 (S.D. Fla. 1989) (quoting H.R. Rep. No. 100–40, pt. 3, at 113 (1987)).[1]  Montana has no legitimate interest in attempting to "pick and choose which ideas it will let into the country."  *Kleindeinst v. Mandel*, 408 U.S. 753, 780 (1972) (Marshall, J., dissenting); *cf. TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 109 (D.D.C. 2020)

---

[1]     Amici take no position on whether the Act is preempted by IEEPA or otherwise interferes with Congress's power to regulate commerce and foreign affairs.  *See* Pls.' Memorandum of Law in Support of Mot. for Preliminary Injunction at 20–27 (ECF No. 22).

(rejecting defense of an effort to restrict access to TikTok that would likewise have empowered the government to "shut[] down the *New York Times*" to "stop[] the flow of news").

Finally, whatever concern Montana might have for the privacy of its residents and officials, "there are obvious alternatives to a complete ban" that would not—as the Act does—"burden substantially more speech than is necessary." *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 927 (N.D. Cal. 2020) (citation and internal quotation marks omitted) (concluding as much with respect to asserted interest in "reduc[ing] WeChat's collection of data from U.S. users"). A flat ban is the antithesis of narrow tailoring; it cannot survive the scrutiny the Constitution requires when the government opts to single out a communications platform for unique burdens.

> B.     Total bans on a particular forum or means of gathering the news will rarely—if ever—survive First Amendment scrutiny.

Montana's TikTok ban poses a further threat to press freedom because it forecloses gathering and publishing the news on an entire platform. *See City of Ladue*, 512 U.S. at 55. Such flat bans are very nearly *per se* unconstitutional, *see id.* (collecting cases), even when content neutral, because they necessarily fail to "leave open ample alternative channels for communication," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation and internal quotation marks omitted); *see also United Bhd. of Carpenters & Joiners of Am. Loc. 586 v. NLRB*, 540 F.3d

12

957, 969 (9th Cir. 2008) (A regulation that shuts off a mode of "public expression across the landscape of a particular community or setting fails to leave open ample alternatives."); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1064 (9th Cir. 2010) (noting that such total bans are "almost *never*" consistent with the First Amendment). The same is true here, where Montana has left open no means for local journalists to realize TikTok's benefits in gathering and disseminating news.

It is no answer to say that Montana reporters will be able to use other social media platforms (with different features, different content, and different audiences), because the Ninth Circuit has made clear that the ample-alternative-channels analysis precludes defining a mode of expression with such "a high level of generality." *Project Veritas*, 72 F.4th at 1066. The First Amendment asks whether the government has denied journalists the benefits of a "unique" means of gathering the news—in *Project Veritas*, "real-time, unannounced audiovisual recordings"—rather than whether the press can still "engag[e] in investigative journalism of some sort" despite the ban. *Id*.

In that analysis, just as "neither sculpture nor architecture is a substitute for painting," neither Instagram nor Twitter is a substitute for TikTok. *Id.* As discussed above, journalists' direct engagement with users on TikTok "carries a message quite distinct from placing the same [message] elsewhere," helping to personalize the connection between reporters and their audiences—"an important

13

component of many attempts to persuade." *City of Ladue*, 512 U.S. at 56.  The app is doubly distinctive because of its audience, which "could not be reached nearly as well by other means." *Id.* at 57.  And as already canvassed in detail, user-generated content on TikTok supplies the press with information about events of obvious public concern that may be available nowhere else.  Journalists cannot merely shift to another social network to capture those benefits; their features and their audiences are not fungible.  Montana has banned a unique channel for gathering and disseminating the news.  *See Project Veritas*, 72 F.4th at 1066.

For all of the reasons discussed above, the First Amendment condemns that result several times over.  In a dangerous precedent, the ban "single[s] out" an individual communications company for adverse treatment, *Minneapolis Star*, 460 U.S. at 591, and it imposes a flat bar on a vital means of gathering and publishing the news, *see City of Ladue*, 512 U.S. at 55.  Those burdens are untethered from any legitimate interest of the State of Montana.  This Court should enjoin the Act.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant the preliminary injunction.

Dated: August 4, 2023                          Respectfully submitted,

                                               /s/ Peter Michael Meloy
                                               Peter Michael Meloy
                                               MELOY LAW FIRM

14

P.O. Box 1241
Helena, Montana 59624-1241
Telephone: (406) 442-8670
mike@meloylawfirm.com
*Counsel for Amicus Curiae*

Bruce D. Brown
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of Local Rules 7.1(d)(2)(A) and 7.5 and this Court's August 1 order granting leave to file because, excluding the parts of the document exempted by Local Rule 7.1(d)(2)(E), according to the word count feature of the word processing program used to prepare this brief, this document contains 2,878 words.

2.  This document complies with the formatting requirements of Local Rule 1.5.  The text of the brief is 14-point Times New Roman font with double-spacing and one-inch margins, with a page size of 8½ x 11 inches.

Dated: August 4, 2023                    Respectfully submitted,

                                         /s/ Peter Michael Meloy
                                         Peter Michael Meloy
                                         MELOY LAW FIRM
                                         P.O. Box 1241
                                         Helena, Montana 59624-1241
                                         Telephone: (406) 442-8670
                                         mike@meloylawfirm.com
                                         *Counsel for Amicus Curiae*

16

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, pursuant to Local Rule 7.5(c), the within document was served via this Court's CM/ECF system.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

Dated: August 4, 2023                    Respectfully submitted,

/s/ Peter Michael Meloy
Peter Michael Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, Montana 59624-1241
Telephone: (406) 442-8670
mike@meloylawfirm.com
*Counsel for Amicus Curiae*

17