1   JoAnn Jett Corson
    Registered Diplomate Reporter
2   Certified Realtime Reporter
    P. O. Box 8006
3   Missoula, Montana 59807-8006
    406/829-7123 office
4   joann_corson@mtd.uscourts.gov

5   United States Court Reporter

6

7

8                **IN THE UNITED STATES DISTRICT COURT**
                    **FOR THE DISTRICT OF MONTANA**
9                        **MISSOULA DIVISION**

10  SAMANTHA ALARIO et al.,          )
                       Plaintiffs,)
11       and                         )
                                     )  Consolidated Case Nos.
12  TIKTOK INC.,                     )  CV 23-56-M-DWM
             Consolidated Plaintiff,)  CV 23-61-M-DWM
13       v.                          )
                                     )  **TRANSCRIPT OF HEARING**
14  AUSTIN KNUDSEN, in his official  )  **ON MOTIONS FOR**
    capacity as Attorney General of  )  **PRELIMINARY INJUNCTION**
15  the State of Montana,            )
                       Defendant.)
16  _____)

17

18              **BEFORE THE HONORABLE DONALD W. MOLLOY**
                 **UNITED STATES DISTRICT COURT JUDGE**
                    **FOR THE DISTRICT OF MONTANA**
19

20           Russell Smith United States Courthouse
                      201 East Broadway
21              Missoula, Montana 59802
                 Thursday, October 12, 2023
22                08:58:53 to 10:11:19

23

24

              Proceedings recorded by machine shorthand
25     Transcript produced by computer-assisted transcription

```
 1                           APPEARANCES

 2   For the Plaintiffs:          MS. AMBIKA KUMAR
                                  Attorney at Law
 3                                DAVIS WRIGHT TREMAINE LLP
                                  920 Fifth Avenue
 4                                Seattle, Washington 98104

 5                                MS. NATASHA PRINZING JONES
                                  Attorney at Law
 6                                BOONE KARLBERG PC
                                  P.O. Box 9199
 7                                Missoula, Montana 59807

 8   For the Consolidated         MR. ALEXANDER A. BERENGAUT
     Plaintiff:                   Attorney at Law
 9                                COVINGTON & BURLING LLP
                                  850 Tenth Street NW
10                                Washington, D.C. 20001

11                                MR. ROB CAMERON
                                  Attorney at Law
12                                JACKSON, MURDO & GRANT PC
                                  203 North Ewing
13                                Helena, Montana 59601

14   For the Defendant:           MR. CHRISTIAN B. CORRIGAN
                                  Solicitor General
15                                MR. PETER M. TORSTENSEN, JR.
                                  Assistant Solicitor General
16                                OFFICE OF MONTANA ATTORNEY GENERAL
                                  P.O. Box 201401
17                                Helena, Montana 59620

18
                                CONTENTS
19
```

Proceedings .......................................... 3
Argument by Ms. Kumar ................................. 5
Argument by Mr. Berengaut ............................ 13
Argument by Mr. Corrigan ............................. 22
Rebuttal Argument by Ms. Kumar ....................... 48
Rebuttal Argument by Mr. Berengaut ................... 49
Reporter's Certificate ............................... 53

PROCEEDINGS

1

2       (Open court.)

3               THE COURT:  Good morning.  Please be seated.

4               Well, good morning, everybody.  And, those of you

5       from out of state, welcome to beautiful Missoula.

6               So before we get started in this case, in September

7       of this year, the Judicial Conference of the United States

8       altered the standards of whether or not streaming can be

9       allowed in the Federal District Court.  And the conference

10      indicated that the presiding judge presiding over any civil

11      nontrial proceeding can authorize live remote public audio

12      access to any portion of the proceedings in which a witness is

13      not testifying, and that's the Judicial Policy Section 420(b).

14      And as I indicated, that went into effect in September of this

15      past year.

16              There have been a number of requests by outside

17      entities for streaming, audio streaming, of the arguments in

18      this case, and I have indicated to the clerk's office that, as

19      the presiding judge, I have no objection so long as there is

20      an understanding that if a witness is called, then the IT

21      people have been instructed to follow my direction, which is

22      to terminate any audio streaming as long as there is a witness

23      that is engaged in active testimony in the case.

24              And I have no idea what the parties' intentions are,

25      but in the event that there is a witness, then the audio

1    stream will be terminated, and then, at the conclusion of

2    whatever witness, if there is a witness, once it's back to the

3    oral argument of the attorneys, then that would be -- the

4    streaming would be allowed again.

5             I think, for the benefit of those who happen to be

6    listening to the streaming, if you would, and also for the

7    benefit of the court reporter, indicate your name when you are

8    making whatever argument you are, and I'll try and address you

9    myself by your first name so that there is a record.

10            So is there any question about that from counsel

11   about what the policy is and the live streaming?

12       (No response.)

13            THE COURT:  I don't see anybody volunteering to ask

14   the Court questions, so would you please call the first matter

15   on the calendar?

16            THE CLERK:  This is the time set for a hearing on

17   motions for preliminary injunction in Consolidated Cases

18   CV 23-56-M-DWM and CV 23-61-M-DWM, *Alario et al. v. Knudsen*.

19            THE COURT:  Well, each party has 30 minutes, and I

20   believe, Ms. Kumar, you are up first.  And if you intend to

21   reserve any of your time, you need to tell me.  I'll give you

22   a heads-up, but if you keep talking, you're using your time.

23            So do you want to save any time for rebuttal?

24            MS. KUMAR:  Yes, Your Honor.  Mr. Berengaut and I

25   have agreed, first, in the first instance, to split the time

4

1   that we have together, so 15 minutes for each of us.  Each of

2   us will reserve three minutes of our time for reply.

3          THE COURT:  All right.  So you're gonna argue for

4   12 minutes.

5          MS. KUMAR:  Yes, Your Honor.

6          THE COURT:  All right.  You're up.

7          MS. KUMAR:  Good morning, Your Honor.

8          Ambika Kumar for the creator plaintiffs.

9          I will handle the First Amendment arguments,

10  although Mr. Berengaut may weigh in on the First Amendment on

11  behalf of the company.  Mr. Berengaut will handle the

12  preemption arguments.

13         The parties intend to rest on the papers for the

14  Commerce Clause unless the Court has questions.

15         Turning to the First Amendment issue, Montana's ban

16  of TikTok shutters a forum for communication on which

17  plaintiffs undisputedly rely to express themselves and, in

18  some cases, to make a living.  It is overbroad and fails

19  strict or even intermediate scrutiny under the First

20  Amendment.

21         As a threshold matter, Your Honor raised the

22  question of the Montana Constitution in an order.  We believe

23  SB 419 violates the Montana Constitution, but unfortunately a

24  Federal Court cannot offer them relief if -- the plaintiffs

25  relief unless the State waives its sovereign immunity, so

1   we're focused here on the First Amendment argument.

2          I'll talk about the two doctrines under which we've

3   made our claims, overbreadth and scrutiny, starting with

4   overbreadth.

5          The law prohibits TikTok from operating altogether.

6   Banning a forum for communication is a regulation of speech

7   subject to the First Amendment.  And under the First

8   Amendment, a law is overbroad if a substantial number of its

9   applications are unconstitutional, judged in relation to the

10  statute's plainly legitimate sweep.  So the Court has to look

11  at what, if any, is a legitimate sweep of the law, and are

12  there a substantial number of applications that are

13  unconstitutional?

14         Starting with the sweep, the law has little, if any,

15  legitimate sweep.  The State has posited two interests in the

16  law.  The first is to protect national security, and the

17  second is to prohibit, quote-unquote, dangerous content.

18         Starting with the interest in foreign affairs, in

19  national security, the State has no interest in national

20  security.  And even if it did, they have cited no evidence of

21  their interest here.  They cite a handful of newspaper

22  articles largely summarizing allegations made by former

23  employees.

24         In contrast, TikTok has provided declarations

25  attesting that the State's speculation that TikTok is stealing

1  user data against their will and sharing it with China is

2  false.

3          With respect to the interest of, quote-unquote,

4  dangerous content, the State may regulate only unprotected

5  content.  The Supreme Court has held time and again that the

6  State may not prohibit constitutionally protected speech

7  merely because the State believes that speech will harm

8  people.  The Supreme Court has also identified a discrete set

9  of categories of unprotected speech and cautioned that the

10  states cannot expand them on their own.

11          THE COURT:  Well, tell me something.  Are you taking

12  the position that the State of Montana, under the

13  Constitution, cannot regulate any aspect of the internet?

14          MS. KUMAR:  That, that's the Commerce Clause

15  argument, and I don't think the --

16          THE COURT:  Well, tell me.  I mean, if the State

17  says, hypothetically, TikTok is asking for information that

18  the users consent to and they give that voluntarily to TikTok,

19  is it your position that TikTok cannot be regulated in any

20  way?  Because I think if you look at this morning's news,

21  didn't the State of New York and the attorney general there

22  yesterday introduce some regulation of the internet concerning

23  safety for children and that sort of thing?

24          MS. KUMAR:  So to answer your question, our position

25  is not that the State can never regulate anything on the

1    internet.  Our position is that the State has gone completely

2    overboard.  It's not even close as to whether they've

3    regulated too much, and that's underscored by the alternatives

4    that they had that they appear not to have even considered,

5    much less excluded.

6           So there are at least three alternatives that we can

7    think of.  One is Montana has a consumer privacy statute that

8    was enacted largely at the same time that the ban was enacted.

9    The State could enforce that statute.

10          Second, the State could offer heightened protections

11   for journalists, government officials, and anyone that is,

12   quote, adverse to the Chinese Communist Party's interest,

13   which appears to be their interest on the face of the statute.

14   And, indeed, the State has already banned TikTok on government

15   devices which is a step in that direction.

16          Third, the State could enact a law prohibiting the

17   transfer of data to specified third parties.  Instead of doing

18   that, the State banned the entire forum, and that is plainly

19   overbroad.  It is unconstitutional under the *Jews for Jesus*

20   case in which the municipality of Los Angeles enacted a ban of

21   First Amendment activities in the central area terminal of

22   Los Angeles International Airport.  And the Court said -- the

23   Supreme Court said that is completely overbroad because it

24   bars speech that even has no risk of being disruptive, which

25   was the State's asserted interest.  And the Court held that

1    there was no conceivable government interest that could

2    justify such a prohibition.  And the same is true here.  There

3    is no interest that could justify TikTok's complete ban in the

4    State of Montana.

5            THE COURT:  So when they enact legislation, I think

6    your earlier argument, if I can take you back to that, is that

7    there were two principal reasons:  national security, because

8    of arguments about the People's Republic of China and/or the

9    Chinese military, and then the dangerous content.

10           Is there some prohibition for a legislature enacting

11   legislation that may not have any factual basis but it's just

12   an opinion of the law enforcement people or some other

13   entity -- I mean, they actually have to have facts to make

14   legislation -- or are they free to do whatever they want so

15   long as it's made within the confines of the Constitution?

16           MS. KUMAR:  They have to have facts.  And I would

17   point the Court towards *Brown v. Entertainment Merchants*

18   *Association* in which the State of California tried to regulate

19   violent video games.  And the State actually provided studies

20   purporting to show the harm caused by violent video games, but

21   the Court rejected that and said that's just conjecture.  It's

22   just speculation, correlation, not causation.

23           We don't even have a study or an expert declaration

24   or anything from the State that even, after the fact, tries to

25   articulate the facts that would be necessary to serve -- to

1    show compelling interest.  Indeed, the State asked for

2    discovery in this matter on an expedited basis, which was

3    provided to them.  They haven't cited any of that evidence.

4    They haven't said that the production was incomplete or said

5    that they need more.  They've rested on this handful of

6    newspaper articles for their national security interest.

7         With respect to the dangerous content, they don't

8    even, they don't -- they appear to have abandoned that

9    interest in their opposition to the preliminary injunction

10   motion, perhaps because, in looking at the case law, it is so

11   clear that the State cannot regulate protected speech in this

12   manner.

13        So, yes, the State has to have some evidence of its

14   interest, and it has provided none here, nor has it rebutted

15   the evidence that has been provided by TikTok.

16        Turning to the level of scrutiny, assuming the Court

17   does not rule on overbreadth grounds, it should strike down

18   the ban under the applicable level of scrutiny.

19        Plaintiffs contend that strict scrutiny applies for

20   several reasons.  First, because the law effectuates a prior

21   restraint by stopping speech from happening in the first

22   place.  Second, because it singles out a single entity,

23   TikTok, for disfavor.  And, third, because on its face, it

24   regulates on the basis of content by specifying the kinds of

25   content that it is concerned about in the preamble to the

1    statute.  But it doesn't matter whether you apply strict or

2    intermediate scrutiny.  Both tests result in the same

3    conclusion.

4           To start with, there is, again, no legitimate

5    government interest here for the reasons -- same reasons I

6    described earlier.  Second, there is no relationship between

7    the means used and the goals served.  Even under intermediate

8    scrutiny, the means chosen to solve a government interest must

9    not burden substantially more speech than is necessary to

10   further the government's legitimate interest.

11          Again, the State has alternatives.  We have

12   identified alternatives that -- the State doesn't even try to

13   explain why it hasn't looked at them or used them.

14          And the infirmity in the law is underscored by its

15   underinclusion.  TikTok's expert has testified that there are

16   many ways for foreign governments to obtain U.S. user data

17   and, not only that, that the user data that they could obtain

18   from TikTok is not particularly meaningful.

19          And the State admits, on the dangerous content

20   interest, that minors can -- they say, "We're only regulating

21   one platform."  Well, that just underscores that minors can go

22   to any other platform anywhere else on the internet and

23   encounter the same content.  So this underinclusiveness

24   reinforces the absence of tailoring.

25          THE COURT:  Well, why can't the people who use

1    TikTok for commercial purposes do the same thing, just go to a

2    different platform and use that?

3            MS. KUMAR:  So the creators have good reason for

4    preferring TikTok, attesting that they cannot reach the

5    audiences or consume the content they want on other platforms.

6    TikTok is unique.  Unlike other platforms, it doesn't have

7    profile pages or doesn't focus on friends and family.  Doesn't

8    have a place for posting photos or written, written material.

9    It is a video-sharing app, and TikTok's rep and the creators

10   have all attested that the app's organic reach, the reach to

11   an audience that doesn't require payment, is unparalleled.

12           The creators have specifically said that they cannot

13   simply pick up and move to a different platform.  Ms. DiRocco

14   attested that she makes 10 to 30 percent of her income on

15   TikTok and has found no success -- not found success on other

16   platforms.  She also has a community to which she would lose

17   access.  She is a veteran.  She uses TikTok to network with

18   other veterans about suicide prevention and the like.  She has

19   tried to find similar communities and an audience on other

20   platforms and has failed.

21           The other declarants have made similar statements,

22   making clear that it's not simply a matter of getting off this

23   platform and getting on another platform.

24           THE COURT:  You're at 11 minutes and 42 seconds, so

25   if you're gonna reserve three minutes, you're getting close.

1          MS. KUMAR:  Okay.  Well, then I will reserve the

2    rest of my time.

3          THE COURT:  All right.

4          Mr. -- "Berengaut"?  Is that correct?

5          MR. BERENGAUT:  That's correct, Your Honor.

6          THE COURT:  Did I pronounce your name correctly?

7          MR. BERENGAUT:  You did, Your Honor.  Thank you.

8          Thank you, Your Honor.

9          Without repeating Ms. Kumar's First Amendment

10   argument, I want to briefly touch on the question you posed

11   about whether the users of TikTok could go to another platform

12   in the event that SB 419 enters into effect.  And the reason I

13   want to return to that point is because it raises the fact

14   that the company here has articulated two distinct First

15   Amendment interests that are implicated by the ban.

16          The first is the company's own speech on the TikTok

17   platform, and the second is the independent and equally

18   protectable right to exercise editorial judgment with respect

19   to the content that is allowed and not allowed on the

20   platform, and that's a right recognized in the *Hurley* line of

21   cases.

22          The reason I return to that point, Your Honor, is

23   because even at the intermediate level of scrutiny where the

24   question is whether there are ample alternative channels of

25   communication, if the right at issue is the right to exercise

1    editorial judgment with respect to the composition of this

2    platform, that is per se a right that can't be exercised on

3    any other platform because it's TikTok's right to do that on

4    its own platform.

5            And even if we looked at TikTok's right to engage in

6    speech on its own platform, in the *City of Ladue* case, the

7    Court recognized that displaying a sign from one's own

8    residence carries a message that's quite distinct from placing

9    that sign somewhere else.  So, in other words, there is no

10   alternative for TikTok to engage in speech on its own platform

11   because its ability to do so, on its own platform, carries a

12   specific and additional significance.

13           Turning to preemption, Your Honor, the ban is

14   preempted both as a matter of the foreign affairs field

15   preemption doctrine and as a matter of conflict preemption.

16           Turning first to the foreign affairs preemption

17   argument, the parties agree that the *Movsesian* case sets out

18   the governing standard here, which has two elements.  The

19   first element is whether the state law concerns an area of

20   traditional state responsibility.  The State casts this as a

21   traditional exercise of the consumer protection power, but you

22   do not need to look further than the first line of the

23   statute's preamble to see that the real purpose of the statute

24   is to make a foreign affairs statement.

25           The first line of the statute says, "Whereas, the

1    People's Republic of China is an adversary of the United

2    States and Montana and has an interest in gathering

3    information about Montanans, Montana companies, and the

4    intellectual property of users to engage in corporate and

5    international espionage."  It is clear from this language that

6    the real purpose of the statute is to declare a foreign policy

7    for the State of Montana.

8            The second element of the *Movsesian* standard asks

9    whether the state law intrudes on the foreign affairs powers.

10   Here, just as in *Movsesian*, the statute expresses a distinct

11   political point of view on a specific matter of foreign

12   policy.  Put differently, it establishes a foreign policy for

13   Montana.

14           And, again, this is clear from this very first line

15   of the preamble where the statement is made that the People's

16   Republic of China is an adversary of the United States and

17   Montana, stated separately, again, with an interest in

18   international espionage against Montana.

19           And, Your Honor, it's particularly significant that

20   the language of this law articulates the United States and

21   Montana distinctly, both as adversaries of the People's

22   Republic of China.  And the reason that is significant is

23   because in the Ninth Circuit *Von Saher* case, the Court said,

24   considering there a California statute, California cannot have

25   a distinct juristic personality from that of the United States

1  when it comes to matters of foreign policy -- or foreign

2  affairs, excuse me.

3          And that's exactly what we have here, the United

4  States and Montana cast as distinct juristic personalities

5  with respect to a question of foreign affairs.

6          THE COURT:  Well, what about the sequence of events

7  here?  I'm sure you followed it:

8          You have all the news articles that are referenced

9  by the State that are at the end, basically, of 2022;

10         Then on January 19 of 2023, Senate Bill 419 is

11  introduced;

12         On February 1, there is a Chinese balloon that's

13  flying over Montana, apparently collecting data or whatever;

14         And then the bill is signed into law I think on

15  May 14, or around there, of 2023.

16         So, I mean, is there some argument the State can

17  make that we have proof that the Chinese are collecting

18  information in Montana because there's a balloon flying over

19  that obviously was collecting some data for some reason?

20         MR. BERENGAUT:  Your Honor, the State certainly

21  hasn't made an argument based on the balloon, but from our

22  perspective, that timeline simply reinforces -- and there were

23  statements made, to the effect that the balloon was a partial

24  justification for the law, which are cited in the papers.

25         But that sequence of events simply serves to

1    reinforce that this is really about making a foreign affairs

2    statement.  If there was concern on the part of the

3    legislature about the Chinese balloon, an act of purported

4    international espionage, state-to-state espionage, and the

5    Montana Legislature took it upon itself to address that

6    concern through the ban of TikTok, that just brings us right

7    into the middle of the concerns that the Ninth Circuit was

8    talking about in *Movsesian*.

9            One more point briefly on field preemption, which is

10   that the concern about intrusion into the foreign affairs

11   power is not limited simply to the preamble of the law but

12   also reflected in its operative text.  And in particular,

13   that's seen in Section 4 of the law, the contingent voidness

14   provision, which states that the ban "is void if tiktok is

15   acquired by or sold to a company that is not incorporated in

16   any other country designated as a foreign adversary [citation

17   omitted] at the time tiktok is sold or acquired."

18           Now this also brings us into some of the conflict

19   preemption questions, but it further serves to reinforce that

20   this law is really about managing what is perceived as a

21   foreign affairs challenge.

22           Turning to conflict preemption, the ban conflicts

23   with two different federal statutory schemes, the first being

24   IEEPA and the second being the CFIUS statute.

25           Addressing IEEPA first, when Congress enacted that

1    statute, it struck a considered balance.  It authorized the

2    President to regulate foreign transactions in connection with

3    national security but specifically withheld the power to

4    regulate personal communications and informational materials

5    because of concerns about restricting speech.

6            In the 2020 TikTok litigation, the courts upheld

7    that balance by finding that it would violate IEEPA to ban

8    TikTok on a nationwide basis.

9            With SB 419, the State has overridden that balance

10   by banning TikTok irrespective of the presence of personal

11   communications and informational materials on the platform.

12   And the Supreme Court decision in *Arizona v. United States* is

13   really on all fours with this particular conflict preemption

14   concern.

15           In that case, the federal immigration law

16   specifically withheld the imposition of criminal liability in

17   certain immigration circumstances, and Arizona law layered

18   that liability on top of the federal scheme.

19           Both statutes, the state and federal, were

20   purportedly in service of the same goal, of addressing

21   immigration, but the Court found that the Arizona law upset

22   the balance that Congress struck and was accordingly

23   preempted, and the same is true here with respect to IEEPA.

24           And then very briefly on CFIUS, Your Honor, the

25   conflict here is a little different but no less clear.  The

1    CFIUS statute empowers the President to mandate divestitures

2    of foreign acquisitions that, in his judgment, threaten

3    national security.

4          But the statute also puts other tools in the

5    President's tool kit.  One of those tools is the ability to

6    negotiate a mitigation agreement with the companies involved

7    in order to address the government's concerns, and those

8    mitigation negotiations are ongoing right now between TikTok

9    and CFIUS.

10          SB 419 would take that tool out of the federal

11    government's tool kit by imposing a ban and, through the

12    Section 4 provision, mandating divestiture irrespective of the

13    outcome of those federal negotiations.

14          This literally preempts CFIUS's review by

15    eliminating a scenario of a mitigation agreement that would

16    permit the company to operate under the terms of that

17    agreement in all 50 states.  I mean, why would any company

18    enter into negotiations with CFIUS at the federal level if any

19    state could override the outcome of that negotiation by

20    imposing its own national security judgment about divestiture

21    at the state level?

22          Thank you, Your Honor.  I'll reserve the balance of

23    my time.

24          THE COURT:  Well, let me ask you an off-the-wall

25    question.

1          MR. BERENGAUT:  Yes, Your Honor.

2          THE COURT:  So as you understand this law, does it

3    apply throughout the State of Montana, every geographic area,

4    or, I think the language is, "territorial jurisdiction of

5    Montana"?

6          MR. BERENGAUT:  Yes, Your Honor.

7          THE COURT:  Okay.  So does the law apply -- there

8    are seven Indian reservations, and the State of Montana has

9    criminal jurisdiction over only one, Public Law 280, the

10   Salish and Kootenai.  The territorial jurisdiction is defined

11   as "all places subject to the criminal jurisdiction of

12   Montana," which the State does not have criminal jurisdiction

13   at six of the seven indigenous reservations.

14         So nobody cited Article I, Section 8, Clause 3, in

15   its entirety, but I'll tell you what it says.  Everybody cited

16   "[t]o regulate commerce with foreign nations, and among the

17   several states," and nobody cited the final clause, "and with

18   the Indian tribes."

19         So is there a conflict with the power of the federal

20   government in the instance where they have sole power,

21   criminal jurisdiction, over six of the reservations?  Does

22   this law apply to the reservations?

23         MR. BERENGAUT:  Your Honor, we believe it would not

24   apply to the reservations, and the respect in which this point

25   came up in our papers is regarding the challenge of applying

1    the law within precise geographic boundaries based on the

2    approximate IP address information that is available to the

3    company to determine where a user is located.  And that would

4    inflict an unfair detriment on the territories of the tribes

5    that are within the State of Montana because, by the terms of

6    the law, it wouldn't be competent to regulate there, but,

7    nevertheless, people who would lawfully be permitted to access

8    TikTok in those areas might nevertheless have an undue burden

9    inflicted on them because of the challenges in determining

10   whether they are actually in a territory that is appropriately

11   regulated by SB 419, the territorial jurisdiction of Montana,

12   as you say, or on the territory of a Native American tribe.

13         THE COURT:  Well, if an indigenous person is on the

14   Crow Indian Reservation using TikTok, does TikTok get nailed

15   for $10,000 when the individual is not subject to the law, if

16   my hypothetical is true?

17         MR. BERENGAUT:  Our understanding is that the law

18   would not reach there.  I would welcome the State's view on

19   that since they would be the one in position to enforce the

20   law.

21         Our concern, Your Honor, is that even if that person

22   on -- the indigenous person in that territory is lawfully

23   permitted by SB 419 to access TikTok, the challenges of

24   determining whether they are, in fact, on that territory or

25   not might mean that they would unfairly be deprived of their

1  lawful ability to access the app because of the broad-brush

2  terms of the law and its extremely punitive sanctions which

3  would require any company trying to implement the law to err

4  on the side of caution in order to benefit from the

5  affirmative defense in Section 1, subparagraph (3), that "the

6  violating entity could not have reasonably known that the

7  violation occurred within the territorial jurisdiction of

8  Montana."

9          THE COURT:  All right.  Thank you.  And sorry for

10  the off-the-wall question.

11          MR. BERENGAUT:  Thank you, Your Honor.

12          THE COURT:  Mr. Corrigan.

13          Good morning.

14          MR. CORRIGAN:  Good morning, Your Honor.

15          May it please the Court.  Christian Corrigan,

16  solicitor general, on behalf of the defendant, Austin Knudsen.

17          The Court should deny plaintiffs' request for a

18  preliminary injunction.  The Montana Legislature responded to

19  serious widespread concerns about data privacy in enacting

20  SB 419 which prevents TikTok from operating in Montana until

21  it ceases ties with China or other foreign adversaries.

22          Now TikTok disputes the concerns addressed by the

23  Montana Legislature and has characterized the mountain of

24  publicly available evidence about its data practices and

25  relationship to the CCP as unconfirmed allegations and

1  unfounded speculation.  Yet on the other hand, TikTok claims

2  federal law preempts SB 419 because it's negotiating with the

3  federal government over national security concerns.

4       But the Montana Legislature's concerns are shared by

5  33 states and the U.S. Congress which have all banned TikTok

6  on government devices, not to mention the U.S. Department of

7  Justice, the Trump and Biden Administrations, congressional

8  leadership from across the political spectrum, other foreign

9  governments, former employees of the company, and security

10  experts which have all sounded the alarm.

11       THE COURT:  Well, is Senate Bill 419 narrowly

12  construed, and is it narrowly tailored to meet the concern

13  apparently that the legislature had?

14       MR. CORRIGAN:  I think it is, Your Honor.  To the

15  extent the Court views it through a narrow tailoring analysis,

16  it cures the exact source of evil that it sought to remedy

17  under *City of LA v. Taxpayers for Vincent*.  There simply is no

18  other way to guarantee Montanans safety from the use of TikTok

19  other than a flat ban until it ceases its ties with China.

20  And I --

21       THE COURT:  But everybody on TikTok gives them

22  voluntarily the information that the State is concerned about,

23  don't they?  I mean, you can't get on TikTok without giving

24  them certain private information, just like any other

25  platform, Google, whatever it is.

1          MR. CORRIGAN:  I think what differentiates TikTok

2     from any other social media platform and why sort of a general

3     social media law wouldn't work here and would not serve the

4     State's interest and would achieve its goal less effectively

5     is because TikTok is the only application that has a

6     connection to a hostile foreign power.  It's the only one

7     where there is evidence that there's a god credential or a

8     backdoor accessible from China.  There's no evidence, and the

9     company hasn't put forth any evidence, that Facebook, Meta,

10     Snapchat, any of the other competitor companies have that type

11     of capability.

12          THE COURT:  But haven't they put forward some

13     significant sworn affidavits under perjury that they do not do

14     the very things you just said the State was concerned about?

15     They don't give the information to the Chinese military.  They

16     do not give the information to the Chinese government.  TikTok

17     does not operate in China, nor does their parent corporation.

18     So how do you get it both ways?

19          I mean, it goes back to my question of Ms. Kumar.  I

20     mean, what factual basis, not opinion, but what factual basis

21     is required before the State can enact legislation that

22     regulates either on a hypothetical or on known facts?

23          MR. CORRIGAN:  Sure, Your Honor.

24          So I think that the State doesn't -- the State is

25     allowed and the Montana Legislature responded to widely

1   publicly available evidence.  The State doesn't need to form a

2   blue ribbon commission to show that fire is dangerous or water

3   is wet.  The widespread reporting and concerns that were

4   raised were enough for the State to rely on in enacting

5   SB 419.

6           Now in regards to Your Honor's question about their

7   experts, you know, one thing I would say is that is the actual

8   purpose of scrutinizing expert testimony, because you have

9   their experts saying, "Well, I've seen TikTok's policies.

10  This is what they've given to me."

11          But we have a record that the company will say one

12  thing publicly and then do something else.  For example, the

13  *New York Times* article that we cite on page 5, Footnote 10,

14  discussing internal documents from its internal messaging

15  software Lark, notes that internal communications and reports

16  from Lark, which is a tool used by all ByteDance's

17  subsidiaries, including its 7,000 U.S. employees, appear to

18  contradict the statements made by TikTok's CEO to Congress.

19  So we have statements from the company on one end and then

20  news reports and whistleblowers coming out and saying, "No,

21  this isn't what's happening" on the other end.

22          And that's why I think that if, if the State -- or

23  if the plaintiffs are going to rely on these declarations,

24  they need to be scrutinized.  They need to see if what's being

25  sent to their experts and what their experts are commenting on

1   actually lines up with the facts in this case.

2       THE COURT:  Well, there was expedited discovery in

3   the case.  Did you find anything that you thought would really

4   negate what their experts are saying?

5       MR. CORRIGAN:  So, Your Honor, as you know, we, we

6   obtained some very expedited and limited discovery in the

7   hopes that they might be able to clear up some of the factual

8   questions, but unfortunately it was -- we did not.  It was a

9   very limited time frame.  There wasn't time to meet and confer

10  and then come to this Court ahead of -- just several weeks

11  ahead of when our response was due.

12      There were questions about the ownership structure

13  of TikTok, about their beneficial owners, and unfortunately we

14  didn't receive anything that was helpful.  And, notably, they

15  didn't, they didn't, they didn't cite any of their responses

16  to us as proof to defeat application of the law or defeat the

17  purpose of the law.

18      So I think that while discovery certainly will be

19  helpful if we get into -- the Court gets into a narrow

20  tailoring analysis or if the Court looks at some of the more

21  nuanced questions, but the discovery wasn't productive,

22  Your Honor.

23      THE COURT:  Okay.  So if you wouldn't mind, go back

24  to the original two points that Ms. Kumar made:  that this

25  law, and it appears from the statute itself, is based on

1    national security concerns; and then there is a question about

2    dangerous conduct.

3            One, is national security concern the principal

4    reason the law was enacted?  And, two, have you abandoned any

5    argument about dangerous conduct?

6            MR. CORRIGAN:  Sure, Your Honor.

7            First, I would say that national security is not the

8    principal focus.  It's data privacy.  Now that might happen to

9    overlap with national security concerns or nat- -- but there's

10   also no case law specifically saying that a state can't have

11   national security concerns.

12           For example, a state might have a statute against

13   terrorism, punishing terror- -- crimes of terrorism, and a

14   federal law or a federal concern about terrorism might have an

15   international/national security element to it, but there are

16   domestic reasons why a state law could prevent acts of

17   terrorism.  And, here, the State is concerned about data

18   privacy and its relation to a hostile foreign power.

19           Now as Your Honor's -- as to Your Honor's question

20   about whether this is, I think, whether it's content-based or

21   conduct-based based on the type of content that's on TikTok,

22   there is nothing in the law aimed at TikTok's actual content.

23   There is nothing in there regulating the law -- or regulating

24   TikTok because of the content that is actually on, on the, on

25   the app.

1          There are, of course, widespread concerns about the

2    types of things that are seen on TikTok, and a number of

3    states are investigating TikTok under traditional consumer

4    protection laws.  But to the extent there were any references

5    in the hearing or in the bill to the actual content on TikTok,

6    what I think that gets to is the lack of concern for consumer

7    protection; that the legislature is able to look at an app

8    like TikTok and say, "Well, on the front end, they show such a

9    lack of concern for consumer protection and the types of

10   challenges and content that's put on there, why should we

11   trust them on the back end to not share data with a hostile

12   foreign power that owns a stake in the company?"

13         So I, I would like to get back to point out that

14   something that wasn't brought up is that why this, this bill

15   regulates TikTok's conduct and not its actual content.  And

16   *Arcara* makes clear that a sanction imposed pursuant to a

17   generally applicable law doesn't trigger First Amendment

18   scrutiny even where the sanction results in a burden on

19   expression.  The bookstore in *Arcara* was being used for

20   illicit purposes, and the closing of the bookstore targeted

21   the illicit activity surrounding it, not the selling of the

22   books.

23         So, here, TikTok's app is the physical premises of

24   the bookstore that just happened to be selling books.

25   Likewise, TikTok is being targeted for its data practices and

1    risk to consumers, not its speech.

2           And another great analogy would be the maker of a

3    cell phone can't prevent the State from banning that cell

4    phone model if it causes cancer or explodes on its user or is

5    designed as intentionally vulnerable to criminals just because

6    nearly everything that happens on a cell phone is protected

7    speech.

8           THE COURT:  Well, I think that's not a very good

9    analogy, but that's your argument.

10          And your argument just confuses me about that you

11   need to protect consumers from having their data stolen, I

12   think is the words that are used.  Everybody on TikTok

13   voluntarily gives their personal data.  So if they want to

14   give that information to whatever the platform is, how is it

15   that you can protect them?  That's sort of a paternalistic

16   argument; that, you know, "These people don't know what

17   they're doing.  They're exposing themselves to the Chinese

18   military so we need to, say, ban TikTok to keep citizens from

19   exercising certain individual liberties or rights that they

20   may have."

21          MR. CORRIGAN:  Well, Your Honor, I think that one of

22   the key differences between TikTok and other apps is that --

23   and the consent given to TikTok is that TikTok claims that it

24   is not associated with a hostile foreign power.  Virginia's

25   amicus brief cited Arizona and Indiana consumer protection

1    actions based on deception regarding data privacy and its ties

2    to the CCP.  Just two days ago, the State of Utah filed a

3    similar action with claims against the company for deception

4    based on its ties to China and the CCP.

5            And so to the extent a consumer is willing to give

6    up their data to, to a company, that's one thing, but when the

7    company is being deceitful about its connection to the CCP --

8    it would be similar about if a sports gambling website was

9    operating out of the Cayman Islands and posed a risk to

10   consumers because they would have their credit card numbers

11   stolen.  The State would still have the ability to say, "No,

12   this website or this entity cannot operate in the State of

13   Montana, even if sports gambling is legal elsewhere, because

14   we think that's too much of a risk."  Even if the consumer

15   willingly gives its -- gives his or her data up to that

16   entity, the State is allowed to say, "This product is too

17   dangerous for use in Montana."

18           Your Honor, I would like to address the point about

19   the -- under the First Amendment about time, place, and manner

20   of restrictions and about the availability of an alternative

21   forum.

22           Plaintiff cited the *Jews for Jesus* case, but I

23   differentiate that by saying, well, that was targeted

24   specifically at First Amendment speech and banned specifically

25   all speech in one forum.  But I think the more proper analogy

1    would be if an entire airport was shut down or if an entire

2    public park was shut down not to stop the speech there but

3    because the City or the State couldn't guarantee anyone's

4    safety and said no activity would occur there.

5          As to the unique nature of TikTok's platform, I

6    point the Court to *Lone Star Video v. City of LA*, which said,

7    "Although mobile billboards are a unique mode of

8    communication, nothing . . . suggests that [plaintiffs']

9    overall 'ability to communicate effectively is threatened.'"

10   They were "free to disseminate their messages through myriad

11   other channels, such as stationary billboards, bus benches,

12   flyers, newspapers, or handbills."

13         And that's also the same as *Frisby v. Schultz* where

14   the Court found ample alternatives remained because protesters

15   weren't, weren't barred from neighborhoods and could still go

16   door to door; they simply couldn't picket in front of

17   residences.

18         I'd also point out that SB 419 doesn't ban an entire

19   medium.  *Packingham v. North Carolina*, the Supreme Court

20   described the internet as a medium, not just one app.  *Turner

21   Broadcasting v. FCC* calls cable news in general a medium.  We

22   don't stop the sharing of all online videos.  It's just one

23   channel of communication, just banning one particular unsafe

24   product --

25         THE COURT:  So let me ask you this question.

31

1          If it turns out that the Chinese Communist Party had

2     an interest in the *Missoulian*, could the State ban the

3     *Missoulian*?

4          MR. CORRIGAN:  No, Your Honor, unless similar

5     circumstances existed, and I think that that's a really --

6     that as *Arcara* says, plaintiffs can't use First Amendment

7     protection as a cloak to avoid the State's consumer power.

8     For example, the *New York Times* offers a media app.  It can't

9     offer illegal sports gambling simply because it's also

10    offering First Amendment protected activity.  So the State

11    wouldn't be able to enact this type of ban unless very

12    specific, nearly identical factual circumstances existed, and

13    that's not the case here, Your Honor.

14         And I think what differentiates TikTok from, say, a

15    news publication or any type of other media outlet is the

16    two-way interaction between the app; where someone is

17    physically just downloading the app on their phone, creates

18    this apparatus that has access to the user's data and poses a

19    real security threat, versus, say, even if a foreign adversary

20    were to open a publication here in Missoula and publish

21    propaganda.

22         I'd also -- on that note, I point to the prior

23    restraint case law and point out that SB 419, of course,

24    doesn't eliminate an entire medium and leaves open alternative

25    avenues.  The users are free to put out their content in any

1    other forum, and they've admitted they have access to other

2    platforms; they just don't like them as much.

3            THE COURT:  Yeah, but isn't there a distinction

4    between having 200,000 followers on TikTok and having 1,500 on

5    some other platform?

6            MR. CORRIGAN:  Well, there might be, Your Honor, but

7    I'd point the Court to a case that they cited, the *U.S. WeChat*

8    *Users v. Trump* case from the Northern District of California.

9    The plaintiffs there established that there were no viable

10   substitute platforms for the Chinese-speaking and

11   Chinese-American community, and the Court said it was the only

12   means of communication for many, not less communication, not

13   less sales.  Only.

14           And I think if you go back to *Lone Star Video v.*

15   *City of LA*, we're looking at the overall ability to

16   communicate.  And the fact that there are many alternative

17   forums for plaintiffs to use, including other social media

18   apps, shows that while they may not be using their preferred

19   method, there are alternative methods available.

20           And the plaintiffs cite in their reply -- they cite

21   the *Conrad* case, saying that the availability of an

22   alternative forum doesn't justify a prior restraint.  But,

23   first, as I've -- we've argued in our briefing, this isn't a

24   prior restraint.

25           And *Conrad* is a great example.  It demonstrates why

1    their theory is flawed.  In *Conrad*, it was a prior restraint

2    because the theater turned down a specific production because

3    of nudity and lewdness in the production.  That's why it

4    became a prior restraint.  The proper analogy is if the

5    theater in *Conrad* had said, "We can't guarantee anyone's

6    safety in this theater.  We have to shut this down so no one

7    is allowed to."

8         And then, finally, I point the Court to *One World*

9    *One Family v. City of Honolulu*.  That was the flat ban on

10   selling merchandise in city streets with no discretion, and

11   that differentiated from a permit regime even though selling

12   T-shirts was plainly First Amendment activity.  It was a valid

13   time, place, and manner restriction, not a prior restraint.

14   They banned all commerce from taking place in those areas, and

15   that just happened to include speech.

16        If Your Honor has no more First Amendment questions,

17   or would like to come back to it, I would like to try to

18   address the preemption argument with my remaining time.

19        THE COURT:  Would you address the issue which I

20   asked about earlier and you sort of answered, but the narrow

21   tailoring?  It seems to me there are a number of things the

22   legislature might have or could have done.  For instance:

23        Instead of banning TikTok, regulate what data they

24   could obtain;

25        Create some sort of criminal statute that if they

34

1   obtained illegally or against the will of the user, they could

2   get prosecuted criminally;

3          Create a civil remedy if any user or anybody using

4   the platform had their data, as the State characterized it,

5   stolen, then they could have a remedy against TikTok itself;

6          Or even recently the attorney general in Montana has

7   been on TV with public address matters that apparently have

8   been effective regarding the safety of sexual exploitation of

9   women and kids.  Why not have the attorney general get on and

10  make a public service announcement that, "We think that TikTok

11  is affiliated with the Chinese Communist Party or the Chinese

12  military.  Please do not use it.  If you do use it, understand

13  you may be compromising your personal data or information"?

14         Seems like there's a lot of things that could have

15  been done short of an outright ban.

16         MR. CORRIGAN:  So first, Your Honor, under -- if

17  we're under intermed-, intermediate scrutiny, the State only

18  has to show that it's narrowly tailored to promote a

19  substantial government interest.  That would be achieved less

20  effectively absent this regulation.

21         To the extent Your Honor is concerned about strict

22  scrutiny and about there being less restrictive means, I'll --

23         THE REPORTER:  Mr. Corrigan, slow down.

24         MR. CORRIGAN:  I apologize.

25         THE REPORTER:  Slow down.

1          MR. CORRIGAN:  To the extent Your Honor is concerned

2     about narrow tailoring, promoting a substantial government

3     interest -- or narrowly tailoring.  I'll start there under

4     strict scrutiny.  I think the main reason is because of

5     TikTok's ability to dodge general consumer protection

6     investigations.

7          As we cite on page 17, Footnote 14, of our brief,

8     45 state attorneys general have demanded that TikTok produce

9     materials subpoenaed for consumer protection investigations.

10    They wrote that, including Montana, TikTok has repeatedly

11    failed to respond adequately and appropriately to reasonable

12    requests for information.

13         Just a few weeks ago, Tennessee filed a motion to

14    compel in District Court regarding spoliation of material

15    relating to the Lark platform.  As I mentioned, that's related

16    to the May 2023 *New York Times* article on page 5, Footnote 10,

17    of our brief about the Lark platform where Beijing-based

18    employees -- a TikTok employee was concerned that

19    Beijing-based employees were owners of Lark groups that

20    contained secret data of U.S. users.

21         And so I think that TikTok provides a unique threat

22    for state consumer protection law and for consumers.  And so I

23    think under intermediate scrutiny in particular, allowing

24    TikTok to operate and then saying, "Well, they may be subject

25    to consumer protection investigations or lawsuits from

1   consumers," would be much less effective for the State because

2   there would be, there would be a difficulty in finding types

3   of -- and ascertaining and holding them accountable for

4   violations for sharing data with China, et cetera.

5         THE COURT:  Well --

6         MR. CORRIGAN:  And I think that's why it satisfies.

7         THE COURT:  But of any of the 45 states you

8   referenced, did any of them ban TikTok?

9         MR. CORRIGAN:  They, they have not yet, Your Honor.

10  You know, Montana has certainly been at the forefront of this,

11  and Montana took the lead here.  But there are -- of course,

12  there's legislation, obviously, pending at the federal level

13  on this, and, and, you know, Montana was first and is the

14  first sort of test case on this.

15        I don't how much time I have left, Your Honor, but I

16  would like to address the preemption argument.

17        THE COURT:  You've got ten minutes.

18        MR. CORRIGAN:  Wonderful.  Thank you.

19        The State's regulation of TikTok doesn't improperly

20  infringe on the federal government's foreign affairs power,

21  nor does it conflict with federal policy.  Regarding field

22  preemption, it's not enough for plaintiffs to say that because

23  SB 419 involves China, Montana lacks the power to protect its

24  consumers.

25        And plaintiffs' counsel said that Montana is saying

1    that the fed- -- that China is a foreign adversary.  Well, the

2    foreign government has said China is a foreign adversary in

3    15 C.F.R. 7.4, so Montana is simply reiterating what the

4    federal government has said.

5          And no case law cited by the plaintiffs forecloses

6    SB 419.  And, in fact, the two cases most relied on for field

7    preemption, *Movsesian* and *Von Saher*, easily support upholding

8    SB 419 for field preemption purposes.

9          *Movsesian* says that a plaintiff can only invoke

10   foreign affairs field preemption if they show, first, the

11   State has no serious claim to be addressing a traditional

12   state responsibility; and, two, it must intrude on the federal

13   government's foreign affairs power.

14         For the first prong, SB 419 isn't aimed at creating

15   a worldwide forum for suing China or TikTok or regulating

16   outside the state's borders like in *Von Saher* or *Movsesian*;

17   and, second, it doesn't intrude on the federal government's

18   foreign affairs power.  It doesn't establish Montana's own

19   foreign policy; it fits within the federal government's

20   foreign policy.  This is one company, and it's not about

21   regulating outside the state's borders.  It simply says this

22   company cannot operate as long as it has these foreign ties.

23         It doesn't subject foreign companies to lawsuits in

24   Montana like *Movsesian* or establish a remedy for wartime

25   injuries like *Von Saher* or adjudicate Holocaust-era insurance

1    claims from Europe 50 years ago like in *Garamendi*.

2           *Movsesian*, *Von Saher*, and *Zschernig v. Miller* all

3    look at whether the application of the statute would force the

4    State to make value judgments or determinations about events

5    or rulings in foreign jurisdictions of genocide victims or

6    reparation efforts.

7           As far as conflict preemption goes, the plaintiffs

8    haven't met the high threshold necessary to show SB 419

9    conflicts with the President's power under IEEPA or

10   Section 721 of the Defense Production Act.  Plaintiffs have

11   not and cannot point to a direct conflict.  The best they can

12   do is assert, assert obstacle preemption, which is very

13   similar to field preemption, and this involves determining

14   whether a state law stands as an obstacle to the execution and

15   objections -- objectives of Congress.

16          But the best plaintiffs can do is point to two laws,

17   one of which they claim they're not subject to, and the other

18   gives the President authority to shift economic activity

19   towards national defense priorities.  That's hardly the type

20   of regulatory scheme or statute the Supreme Court found to be

21   an obstacle in *Crosby* or the Eleventh Circuit did in *Odebrecht*

22   or the Supreme Court in *Garamendi* where there was presidential

23   agreement on how to handle Holocaust-era insurance claims.

24          First, under IEEPA, TikTok is a product, not an

25   informational material covered by Section 1702(b).  But

1   regardless of whether it is or it isn't, plaintiffs are really

2   making a field preemption argument when they say, on pages 16

3   to 17 of their brief, that Congress has already spoken that

4   national security concerns don't trump First Amendment rights.

5   And we know this because they cite *Von Saher*, which is itself

6   a field preemption case.

7         Now as far as the Defense Production Act goes, it's

8   again at best sort of an implied field preemption or an

9   implied obstacle preemption argument and, more likely, another

10  field preemption.  The plaintiffs say that CFIUS may consider

11  whether foreign governments may access U.S. citizen data, and

12  that's the same concern as SB 419, but that's just one factor

13  Congress added in 2018 to what CFIUS could take into

14  consideration.  And it's also important that the plaintiffs

15  never actually addressed the purpose of the Defense Production

16  Act, which isn't to protect data privacy; it's about defense

17  preparedness, the domestic supply chain, and national

18  emergencies.

19        Now contrast those statutes with *Crosby* and

20  *Odebrecht*.  The sanctions at issue there interfere directly

21  with the primary purpose of the federal regime they affected.

22        In *Crosby*, it was plainly obvious because there was

23  a congressional act regarding sanctions on Burma, and

24  Massachusetts passed sanctions on Burma.

25        *Odebrecht* involved, in the Eleventh Circuit,

1   involved a plethora of laws and regulations about Cuba.  And,

2   again, here, plaintiffs have cited two laws:  one which they

3   claim they're not subject to; and, two, the other is about

4   emergency authority to control domestic industries.

5          But there are a variety of other differences with

6   *Crosby* and *Odebrecht*.  *Crosby* and *Odebrecht* both relied on the

7   fact that the United States received diplomatic objections to

8   the laws.

9          In *Crosby*, the United States government participated

10  as amici and said the act frustrated its goals.  And that came

11  after a more full record and testimony from State Department

12  officials that the Massachusetts sanctions got in the way of

13  carrying out congressional objectives.

14         But, most importantly, in both cases, the sole

15  object of the regulation was the foreign government.  The Cuba

16  amendment in *Odebrecht* had no value for Florida citizens

17  outside the goal of pressuring the regime in Cuba.

18         And the same goes for *Crosby*.  The Massachusetts act

19  kept its citizens from doing business with Burma, but there

20  was no tangible benefit to the State other than punishing

21  Burma.

22         But, here, the State has set this as a consumer

23  protection that tangibly benefits Montana consumers by keeping

24  their data from being shared with a hostile foreign power.

25         THE COURT:  Isn't that totally inconsistent with the

1    arguments of the attorney general in the various hearings and

2    his public statements, that the sole purpose is to basically,

3    my words, bring China to some sort of recognition?  And it

4    says, "Whereas, the People's Republic of China is an adversary

5    of the United States and Montana and has an interest in

6    gathering information . . . and the intellectual property."

7    It seems like everything that the attorney general argued at

8    hearings and in public statements is directed to, "We're gonna

9    teach China a lesson," not, "We're gonna protect people."

10            MR. CORRIGAN:  Well, it's pushing back on intrusions

11   into Montanans' data privacy, and I think the Supreme Court

12   has cautioned about cherry-picking statements from individual

13   legislators or even sponsors of the bill.

14            And I'd point out that the attorney general is not a

15   member of the Montana Legislature.  The attorney general --

16            THE COURT:  I know, but he wrote the bill.

17            MR. CORRIGAN:  He was involved with the bill, but at

18   the end of the day --

19            THE COURT:  He said he wrote the bill.

20            MR. CORRIGAN:  He was involved with writing the

21   bill, but the elected representatives of Montana are the ones

22   who voted on the legislation.  The attorney general -- and,

23   and that, that comes to an issue with legislative history,

24   where looking too much into individual statements would give

25   the ability of individual legislators to perhaps poison the

1   bill or perhaps give a purpose to the bill that isn't actually

2   reflected in its operative functions.

3            And I think to the extent there's overlap with

4   pushing back on China or doing things to push back on -- or

5   that overlap with foreign policy, those are, those are

6   secondary.  The first concern is data privacy.

7            THE COURT:  Okay.

8            Well, I wonder if you could tell me:  What is the

9   limiting principle to what you are arguing?  So Wyoming has

10  one set of laws about internet platforms.  Idaho has a

11  different one.  North Dakota has a different one.  New York

12  has a different one.  Texas has a different one.  What is the

13  limiting principle?

14           MR. CORRIGAN:  Sure.

15           So I think national operators routinely have to

16  conform their businesses to in-state operations, and the

17  internet doesn't entirely exempt every national e-commerce or

18  every national operator from state regulation simply because

19  it's operating in a state.

20           I think, first of all, it's important to show that

21  there is no federal regulation in this area.  There is no --

22  you know, Virginia's amicus brief discusses that states have

23  various data privacy laws for social media platforms and

24  elsewhere, and so there is no conflicting federal -- set of

25  federal regulations here.  States routinely enact data privacy

1    laws.   And to some extent, the logical conclusion of the

2    plaintiffs' argument is that it would invalidate application

3    of all state consumer protection or data privacy laws to

4    TikTok.

5             And so I think the limiting principle, if Your Honor

6    is getting into the domestic Commerce Clause area, ultimately

7    it comes down to whether there's some type of undue burden or

8    to the extent the extraterritorial effects doctrine is

9    applicable.

10            I think here in this case, it's very clear from

11   their declaration, from the expert that they've designated,

12   that this technology does exist, and every sports gambling app

13   uses it.   They simply claim that they don't want to do it or

14   that it's going to be too burdensome.

15            And I think that that's particularly interesting,

16   Your Honor, given that, again, this technology is very

17   widespread.   It's similar to the SPGG- -- *SPGGC v. Blumenthal*

18   case from the Second Circuit about the regulation of gift

19   cards over the internet where the Court found that there was a

20   near perfect way to determine whether the application was

21   operating in the state, and that's why there wasn't an undue

22   burden on interstate commerce.

23            And so ultimately I think if, if the -- the main

24   limiting principle would probably be, if the Court, if the

25   Court goes there, whether there's an undue burden or not, but

1    it involves a variety of factors that I don't think are

2    present here.

3              THE COURT:  Okay.  Well, you're at your 30 minutes.

4              But would you mind asking the off-the-wall -- or

5    answering the off-the-wall question about the jurisdiction?

6    The implication for the application of this particular law is

7    "the territorial jurisdiction of Montana," which means "all

8    places subject to the criminal jurisdiction of Montana."  And

9    I think you probably agree:  Montana doesn't have criminal

10   jurisdiction on six of the indigenous reservations.

11             MR. CORRIGAN:  I agree, Your Honor, and I think, the

12   State's position, we'd agree with the plaintiffs' position

13   that it would not apply on those reservations, because that

14   would be outside the territorial jurisdiction of the State.

15             THE COURT:  So how does that impact the enforcement

16   of the ban?

17             MR. CORRIGAN:  Well, I think it would be similar to

18   designating whether -- ascertaining whether someone is in

19   Idaho, Utah, Montana.  And as the plaintiffs acknowledge,

20   there is an affirmative defense to enforcement of the law if

21   the violator could not reasonably have known that someone

22   would access it from inside the State of Montana.

23             So to the extent the company may institute some type

24   of geotracking measure and if someone is right on the state

25   line and using it, if the company does a reasonable job to

1   make sure that it's not being operated in Montana, they would

2   have an affirmative defense to enforcement.

3          THE COURT:  So is it a criminal statute?

4          MR. CORRIGAN:  It is not, Your Honor.  It is a

5   civil, it is a civil enforcement, consumer protection statute.

6          THE COURT:  And what's the affirmative defense?  "We

7   didn't do it"?

8          MR. CORRIGAN:  The affirmative defense is that --

9   that I just mentioned is that if they could not have

10   reasonably anticipated that the violation would have taken

11   place in the State of Montana, the statute can't be enforced

12   against them.  It's, it's almost a mens rea provision.

13          THE COURT:  And so that's enforced by the attorney

14   general's office, not by the county attorney?

15          MR. CORRIGAN:  It's enforced by the Office of

16   Consumer Protection under the Office of the Attorney General.

17          THE COURT:  So if you wouldn't mind, I think I

18   understood what you said, but Montana is the only forum in the

19   entire United States or its territories that has banned

20   TikTok.

21          MR. CORRIGAN:  That's correct, Your Honor.  For a

22   flat ban, that's correct.

23          THE COURT:  Does that seem a little strange to you?

24   Everybody else is marching and -- it's kind of like the mother

25   that was watching the parade, and everybody -- there's one of

1   the bands that goes by, and one guy is out of step and it's

2   her son.  And she said, "Look at that.  The whole band is out

3   of step except for my son."

4           MR. CORRIGAN:  Well, Your Honor, I think that states

5   are the laboratories of democracy, and states take, states

6   take new types of measures all the time.  I think California

7   just banned a whole bunch of products, including Skittles,

8   going forward and is the first state to necessarily do that.

9   And so just because one state is the first to do something

10  doesn't mean it's necessarily out of step.

11          I also think that the evidence for TikTok has gotten

12  worse over the last six months.  It's certainly been a concern

13  for, for a number of years, but Montana's Legislature

14  responded very quickly to what it saw are growing concerns and

15  took the first step.  And that other states haven't followed

16  isn't necessarily an indictment of the Montana Legislature or

17  Montana having the foresight, and it's very possible they

18  could do so in the future.  They might be waiting for the

19  outcome of this litigation, Your Honor.  It's possible.

20          THE COURT:  All right.  Thank you.

21          MR. CORRIGAN:  Thank you, Your Honor.

22          THE COURT:  So, Ms. Kumar, you have about three

23  minutes.  And you can lower that.

24          MS. KUMAR:  (Lowering podium.)

25          THE COURT:  Yeah.  Okay.

1          MS. KUMAR:  Just a few points, Your Honor.

2          The State fails to explain how the law is narrowly

3   tailored, nor is it.  It doesn't address the purported evil,

4   as Mr. Corrigan just suggested.  The danger, at least as to

5   the national -- remember, there's two interests.  The national

6   security interest, the danger is not the operation of the

7   platform; it's the sharing -- alleged sharing of data.  With

8   respect to dangerous content, again, the evil is not the

9   operation of the platform; it is ostensibly the publication of

10  what content that the State deems dangerous, even if the State

11  had an interest in that.

12         And, remember, the interest must be real, must be

13  substantiated by evidence.  As Your Honor knows from the *Free

14  Speech Coalition* case, the government cannot just assume harm

15  without showing the harm to justify it in the area of speech

16  regulation.

17         So the government instead, instead of discussing

18  tailoring in any detail, pivots to *Arcara*, claiming that

19  *Arcara* means that this isn't a regulation of speech.  *Arcara*

20  concerned a statute of general application where the Court

21  held that the First Amendment is not implicated because

22  application of a public health law to premises that happened

23  to be a bookstore -- the First Amendment isn't implicated in a

24  situation like this.

25         Here, we have a law that has targeted a single

48

1   platform -- it's not a generally applicable law -- and it is

2   targeted at what that platform does with data, which is an

3   integral part of the speech process under the *Sorrell* case

4   from the U.S. Supreme Court.   This is more like *Sorrell* than

5   it is like *Arcara*.   It is more like the *Project Veritas* case

6   where the Court held that unannounced recording was protected

7   speech.   And it's more like *Minneapolis Star* where the Court,

8   the Supreme Court, held that a tax on the press is still a

9   tax, is still a regulation of speech.

10          The *Jews for Jesus* case is directly on point.   It is

11  not distinguishable merely because the government expressly

12  said it was banning First Amendment activities.   There is no

13  material distinction here.   There is no dispute that TikTok

14  engages in First Amendment protected speech or that its users

15  do as well.

16          Just like the State may not ban speech in an

17  airport, it cannot close a forum for speech that the U.S.

18  Supreme Court itself has held is integral to the fabric of our

19  modern society and culture.

20          We ask that the Court enjoin the law on the basis of

21  the First Amendment.

22          THE COURT:   Thank you.

23          Mr. Berengaut, you have, I think, just about three

24  minutes.   Actually you've got four minutes.

25          MR. BERENGAUT:   Thank you, Your Honor.

1          Three very brief points, Your Honor.

2          The first is in response to my friend's comment that

3     the attorney general's first concern was data privacy with

4     respect to the enactment of this law and not a purported

5     concern about China as a national security threat.

6          This is a quote from the attorney general's

7     testimony before the House of Representatives in connection

8     with the ban.  It's in the record at Document 13-2 at page 5.

9     "This is a business that is controlled by an existential

10    threat an [*sic*] enemy of the United States, and that's China's

11    own words.  China considers America it's [*sic*] largest enemy

12    by their own military doctrines and publications.  They see a

13    war with the United States as inevitable, and they're using

14    TikTok as an initial salvo in that war."

15          Again, Your Honor, further indication that the

16    central concern in the enactment of this law was the

17    declaration of a foreign policy with respect to China.

18          Point 2.  Regarding *Arcara*, in addition to the

19    reasons that Ms. Kumar explained that case is distinguishable,

20    there is one other reason which ties to the company's First

21    Amendment interest in its exercise of editorial discretion.

22    In that case, the Court noted that the severity of the burden

23    on speech was mitigated by the fact that the bookstore could

24    set up shop at another location in the same town.  Here,

25    TikTok cannot move down the street and set up shop elsewhere

1    in Montana.   It is being banned from the entire state.

2               And, third, Your Honor, very briefly, on the point

3    about discovery, the State has asserted that there was, there

4    was no time to meet and confer and that's the reason they

5    haven't, haven't responded to the discovery or addressed the

6    discovery or cited the discovery in their papers.

7               The discovery in this case was served on July 21.

8    The State had ample time to raise any purported deficiencies.

9    It did not.   It did not seek any meet and confer.   It did not

10   seek an opportunity to take depositions of any of the

11   affidavits that were submitted in connection with TikTok's

12   motion for a preliminary injunction.

13              Not only did it not seek further discovery, address

14   the discovery it received, it did not even address the

15   declarations that were submitted together with TikTok's motion

16   for preliminary injunction in its opposition but, instead,

17   rested primarily on the purely legal arguments that you have,

18   you have heard, you have heard today.

19              Thank you, Your Honor.

20              THE COURT:  All right.   Thank you.

21              Well, the case just argued will be submitted.

22              I would compliment counsel, both, on the briefing in

23   the case.

24              And Mr. Corrigan in particular, I think the State's

25   brief is much better than I have seen in the past.  Apparently

1    somebody got rid of the poison pen over there, and your

2    briefing is very helpful.

3                And the briefing of the other -- the plaintiffs is

4    certainly helpful.

5                And I will get a resolution of this on a preliminary

6    matter, not on any permanent matter, but on a preliminary

7    matter as quickly as I can.

8                So thank you for the argument, and we will be in

9    recess.

10       (Proceedings were concluded at 10:11:19.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2              I, JoAnn Jett Corson, a Registered Diplomate

3      Reporter and Certified Realtime Reporter, certify that the

4      foregoing transcript is a true and correct record of the

5      proceedings given at the time and place hereinbefore

6      mentioned; that the proceedings were reported by me in machine

7      shorthand and thereafter reduced to typewriting using

8      computer-assisted transcription; that after being reduced to

9      typewriting, a certified copy of this transcript will be filed

10     electronically with the Court.

11             I further certify that I am not attorney for, nor

12     employed by, nor related to any of the parties or attorneys to

13     this action, nor financially interested in this action.

14             IN WITNESS WHEREOF, I have set my hand at Missoula,

15     Montana this 27th day of October, 2023.

16

17                              /s/ JoAnn Jett Corson
                              _____
18                              JoAnn Jett Corson
                              United States Court Reporter
19

20

21

22

23

24

25